# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | |
|---|---|
| LEONARDO GARCIA VENEGAS, | |
| *Plaintiff,* | |
| v. | Case No. 1:25-cv-397-JB-C |
| TOM HOMAN, WHITE HOUSE BORDER CZAR, IN HIS OFFICIAL CAPACITY, ET AL., | Oral argument requested |
| *Defendants.* | |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 3

   I.   Immigration officers raid Leo's worksites and baselessly detain him—twice ......... 3

   II.   DHS policies authorized the searches and seizures Leo experienced .................... 6

   III.   DHS policies are actively harming construction workers in this District ............. 12

LEGAL STANDARD ......................................................................................... 16

ARGUMENT ...................................................................................................... 17

   I.   Leo will likely win his Fourth Amendment and regulatory claims ...................... 17

      A.   The Warrantless Entry Policy is likely unlawful .......................................... 18

      B.   The Preemptive Detention Policy is likely unlawful .................................... 21

      C.   The Continued Detention Policy is likely unlawful ..................................... 24

   II.   Absent a preliminary injunction, Leo and the putative classes will suffer irreparable harm ................................................................................................ 27

   III.   The remaining preliminary injunction elements are satisfied ............................. 28

CONCLUSION ................................................................................................... 30

CERTIFICATE OF SERVICE ............................................................................ 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. DHS,*
594 U.S. 758 (2021) ........................................................................... 29

*Alabama v. Sec'y of Educ.,*
No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) ................... 29

*Alcocer v. Mills,*
800 F. App'x 860 (11th Cir. 2020) ....................................................... 25

*Aracely R. v. Nielsen,*
319 F. Supp. 3d 110 (D.D.C. 2018) ...................................................... 16

*Arizona v. United States,*
567 U.S. 387 (2012) ........................................................................... 26

*Asinor v. District of Columbia,*
111 F.4th 1249 (D.C. Cir. 2024).......................................................... 25

*Au Yi Lau v. INS,*
445 F.2d 217 (D.C. Cir. 1971)............................................................. 26

*Bennett v. Spear,*
520 U.S. 154 (1997) ........................................................................... 16

*Brewster v. Beck,*
859 F.3d 1194 (9th Cir. 2017) ............................................................ 24

*Brown v. Texas,*
443 U.S. 44 (1979) ....................................................................... 21, 22

*Cannon v. Macon County,*
1 F.3d 1558 (11th Cir. 1993),
*modified on other grounds,* 15 F.3d 1022 (11th Cir. 1994) ...................... 24

*Career Colls. & Schs. of Tex. v. Dep't of Educ.,*
98 F.4th 220 (5th Cir. 2024),
*cert. granted in part,* 145 S. Ct. 1039 (2025) ................................... 16, 30

*Davis v. Mississippi,*
394 U.S. 721 (1969) ........................................................................... 22

*Democratic Exec. Comm. of Fla. v. Lee,*
    915 F.3d 1312 (11th Cir. 2019) ................................................................. 29

*Diamond Alt. Energy LLC v. Env't Prot. Agency,*
    145 S. Ct. 2121 (2025) ............................................................................... 20

*Fla. Immigrant Coal. v. Uthmeier,*
    778 F. Supp. 3d 1315 (S.D. Fla. 2025) ..................................................... 27

*Florida v. Jardines,*
    569 U.S. 1 (2013) ........................................................................................ 19

*Florida v. Royer,*
    460 U.S. 491 (1983) .................................................................................... 24

*Garcia-Mir v. Meese,*
    781 F.2d 1450 (11th Cir. 1986) ............................................................ 27, 29

*Georgia v. POTUS,*
    46 F.4th 1283 (11th Cir. 2022) .................................................................. 29

*Gissendaner v. Comm'r, Ga. Dep't of Corr.,*
    779 F.3d 1275 (11th Cir. 2015) ................................................................. 16

*Gonzalez v. FedEx Ground Package Sys., Inc.,*
    No. 12-CV-80125, 2013 WL 12080223 (S.D. Fla. Aug. 1, 2013) ............ 26

*INS v. Delgado,*
    466 U.S. 210 (1984) ............................................................................. 21, 22

*Kansas v. Glover,*
    589 U.S. 376 (2020) ............................................................................. 22, 23

*Kidd v. Mayorkas,*
    734 F. Supp. 3d 967 (C.D. Cal. 2024) .................................................. 18, 28

*Lebron v. Wilkins,*
    820 F. Supp. 2d 1273 (M.D. Fla. 2011) .................................................... 29

*Lyall v. City of Los Angeles,*
    807 F.3d 1178 (9th Cir. 2015) ................................................................... 19

*Mancusi v. DeForte,*
    392 U.S. 364 (1968) ............................................................................. 19, 20

*Manuel v. City of Joliet,*
    580 U.S. 357 (2017) .................................................................................... 24

*Marshall v. Barlow's, Inc.*,
  436 U.S. 307 (1978) ........................................................................ 18

*Maryland v. Garrison*,
  480 U.S. 79 (1987) .......................................................................... 24

*Morales v. Chadbourne*,
  793 F.3d 208 (1st Cir. 2015) ......................................................... 26

*Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jackson*,
  896 F.2d 1283 (11th Cir. 1990) .................................................... 27

*Noem v. Vasquez Perdomo*,
  No. 25A169, 2025 WL 2585637 (U.S. Sept. 8, 2025) ................... 23, 24, 25

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ...................................................... 29

*Owens v. State*,
  565 So. 2d 1283 (Ala. Crim. App. 1990) ..................................... 19

*Peterman v. Coleman*,
  764 F.2d 1416 (11th Cir. 1985) .................................................... 18

*Rakas v. Illinois*,
  439 U.S. 128 (1978) ........................................................................ 19

*Reyes v. Maschmeier*,
  446 F.3d 1199 (11th Cir. 2006) .................................................... 19

*Scott v. Roberts*,
  612 F.3d 1279 (11th Cir. 2010) .................................................... 29

*Swint v. City of Wadley*,
  51 F.3d 988 (11th Cir. 1995) ........................................................ 22, 23

*Truax v. Raich*,
  239 U.S. 33 (1915) .......................................................................... 20

*United Farm Workers v. Noem*,
  785 F. Supp. 3d 672 (E.D. Cal. 2025) ......................................... 27, 28

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) .................................................... 26

*United States v. Alarcon-Gonzalez*,
  73 F.3d 289 (10th Cir. 1996) ........................................................ 22, 23

iv

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) ............................................................ 21, 22, 23, 25

*United States v. De La Cruz,*
    703 F.3d 1193 (10th Cir. 2013) ................................................. 23

*United States v. Place,*
    462 U.S. 696 (1983) ........................................................................ 24

*Ybarra v. Illinois,*
    444 U.S. 85 (1979) ........................................................................ 22

**Codes and Statutes**

5 U.S.C. § 706(2)(A), (B), (D) .............................................. 20, 24, 27

8 U.S.C. § 274a.2 .......................................................................... 21

8 U.S.C. § 1324a .......................................................................... 21

Ala. Code §13A-7-1(3) ................................................................ 19

Ala. Code § 13A-7-4 .................................................................... 19

Ala. Code §13A-7-4(a) ................................................................ 19

Ala. Code § 31-13-3(10) .............................................................. 15

Ala. Code § 31-13-29(c)(1) ................................................. 5, 15, 16

Ala. Code § 31-13-29(g) ...................................................... 5, 15, 16

Ala. Code § 31-13-3(11) ........................................................... 5, 26

**Rules and Regulations**

6 C.F.R. § 37.3 ................................................................................ 5

6 C.F.R. § 37.71 ............................................................... 11, 12, 26

8 C.F.R. § 210.5 ............................................................................ 15

8 C.F.R. § 287.8(b)(1)–(2) ..................................................... 21, 24

8 C.F.R. § 287.8(b)(2) ....................................................... 2, 17, 18

8 C.F.R. § 287.8(c)(2) ............................................................ 2, 18

8 C.F.R. § 287.8(c)(2)(i) ........................................................................................ 26

8 C.F.R. § 287.8(c)(2)(i)–(ii) ............................................................................ 26, 27

8 C.F.R. § 287.8(f)(1)–(2) .................................................................................... 18

8 C.F.R. § 287.8(f)(2) ............................................................................ 2, 17, 18, 20

20 C.F.R. § 422.104(a)(1)–(3) .............................................................................. 15

Administrative Procedure Act Section 705 ..................................................... 16, 30

Administrative Procedure Act Section 706 ............................................................ 16

**Other Authorities**

Exec. Order No. 14159 § 2, 90 Fed. Reg. 8443 (Jan. 29, 2025) ............................... 6

Exec. Order No. 14159 § 6(c), 90 Fed. Reg. 8443 (Jan. 29, 2025) .......................... 6

ALEA, *STAR ID Document List*,
    https://tinyurl.com/4t99ra2v........................................................................ 26

ALEA, *STAR ID Frequently Asked Questions*,
    https://tinyurl.com/mw3avyzu ...................................................................... 26

**INTRODUCTION**

American citizens have a right to work on private property free from the looming threat that armed federal officers will burst onto the site, without a warrant, and detain them just for doing their jobs. But the federal government has adopted a set of policies under which immigration officers are repeatedly violating this core American right. This case is not about whether the government's policies are wise or effective ways to catch illegal immigrants. This case, instead, makes a more fundamental point: The government can't treat innocent American citizens (and other lawful residents) like criminals just for going to work. The Fourth Amendment, and federal regulations that restrict immigration officers' search-and-seizure powers, demand better.

And Plaintiff Leonardo Garcia Venegas deserves better. Leo is an American citizen who works in the construction industry in southern Alabama. Leo has worked hard for years to help build many of the new homes required to support the region's fast-growing population. Then came the raids. In early 2025, federal immigration officers started raiding private construction sites across the region. In May, Leo was working on a fenced-in private site posted with a No Trespassing sign when officers stormed in unannounced, detained him and all other Latino workers, dismissed his REAL ID as fake, and kept him handcuffed for nearly an hour. Just three weeks later, officers walked right into a home in which Leo was working, ordered him out, told him his REAL ID could be fake, and marched him out of the development before they finally acknowledged that Leo is a citizen.

Neither raid was an outlier. They were the direct result of three Department of Homeland Security policies that grant immigration officers broad power to (1) raid the

non-public areas of private construction sites without consent or a warrant, (2) preemptively detain workers on those sites without reasonable suspicion that they are undocumented, and (3) continue detaining those workers even after they have produced evidence of citizenship or lawful presence. Defendants—federal agencies, officials, and immigration officers—are enforcing these policies against construction workers on private sites across this District. Regardless of whether these policies are effective at catching illegal immigrants, they catch innocent citizens and legal residents in the dragnet.

Leo seeks a preliminary injunction to protect himself and those similarly situated from the imminent threat posed by the challenged policies. *See* Pl.'s Mot. Class Cert. (ECF No. 31) (defining putative classes). Each preliminary injunction factor favors relief. *First*, Leo will likely prevail on the merits of his claims.[1] The Warrantless Entry Policy is likely unlawful because the Fourth Amendment and 8 C.F.R. § 287.8(f)(2) forbid officers from searching the non-public areas of construction sites without a warrant. The Preemptive Detention Policy is likely unlawful because the Fourth Amendment and 8 C.F.R. § 287.8(b)(2) forbid officers from conducting dragnet, suspicionless seizures of people on those sites. And the Continued Detention Policy is likely unlawful because the Fourth Amendment and 8 C.F.R. § 287.8(c)(2) forbid officers from detaining workers who've shown presumptive proof of citizenship or lawful presence, like a REAL ID.

*Second*, the challenged policies pose an imminent threat to Leo's and the putative classes' liberty and privacy rights. Without preliminary relief, they will suffer irreparable

---

[1] While Leo is likely to prevail on all his claims, Leo limits this motion for preliminary relief to the constitutional and regulatory claims in Counts I, II, and IV.

harm. Leo has already experienced these illegal raids twice since May. And he's not alone. The challenged policies threaten the rights of the putative class members—the thousands of other citizens and lawful residents who work in construction across this District. Without this Court's intervention, countless innocent people risk being seized in lawless construction site raids. Only a preliminary injunction can prevent further harm.

*Finally*, equity favors relief. The government has no interest in enforcing policies that violate the Fourth Amendment and its own regulations. And the public will suffer if those policies continue during the pendency of this case. Although the government has an interest in enforcing immigration laws, that interest cannot trump the fundamental rights of citizens like Leo or the thousands of putative class members. They must be free to earn an honest living without armed officers storming onto their work site, rounding them up, and dismissing their papers as fake. Surely Defendants—with their vast power and resources—can enforce immigration laws without trampling everybody else's rights. Officers can have voluntary conversations, conduct brief stops based on reasonable suspicion in a place they have a lawful right to be, or get valid warrants. But they cannot disregard property rights, treat whole groups of workers as inherently suspect, and refuse to accept proof that their suspicions are wrong. A preliminary injunction is necessary.

STATEMENT OF FACTS

**I.    Immigration officers raid Leo's worksites and baselessly detain him—twice.**

Leo is a U.S. citizen of Mexican descent who was born in Lehigh Acres, Florida, and lives in Robertsdale, Alabama. Ex. A (Leo Decl.) ¶¶ 1–3. Since graduating high school in 2019, Leo has been building homes in new subdivisions throughout Baldwin County,

3

typically on sites owned by D.R. Horton and Lennar—two major builders in this District. *Id.* ¶¶ 3–6. He regularly works on a five-man concrete crew, while at least six other crews come and go to handle everything from framing to painting to landscaping. *Id.* ¶ 14.

On May 21, Leo arrived at a Lennar site in Foley, where he was scheduled to lay the foundations for four homes in a new development. *Id.* ¶¶ 20–21. The sites were each posted with a No Trespassing sign and surrounded by knee-high black fences. *Id.* ¶ 22. Around 8:00 a.m., as Leo was walking back to his site, he saw five armed men—three of whom were masked—hurdling the fence and running past the No Trespassing sign. *Id.* ¶ 26. The officers also ran past the four non-Latino workers and went straight for Leo's crew, all of whom were Latino. *Id.* ¶¶ 23–24, 27. Three of Leo's crewmembers ran, and some officers chased them, but Leo and his brother stayed put. *Id.* ¶¶ 28–29. When two of the officers approached Leo's brother (who was undocumented), he asked why they were on the site and if they had a warrant. *Id.* ¶ 30. Without responding or asking any questions, the officers grabbed Leo's brother and forced him to the ground. *Id.* ¶ 31.

At the sight of officers tackling his brother, Leo remained calm. *Id.* ¶ 32. He took out his phone, started recording, and inched closer. *Id.* Leo got about 25 feet from his brother before a masked officer stepped into Leo's way. *Id.* ¶¶ 33–34. When Leo widened his path to keep his camera trained on his brother, the officer declared, "You're making this more complicated than you want to." *Id.* ¶¶ 36–37. Then, without asking Leo any questions, the officer grabbed Leo by the arm and started forcing him to the ground. *Id.* ¶ 38. Leo yelled, "Don't touch me! I'm a citizen!" and "I'll show you my papers!" *Id.* ¶¶ 38, 40. The non-Latino workers watching on yelled, "That's illegal!" "You're not supposed to

be doing that!" "He's a citizen!" "He's not even doing nothing wrong—what the fuck?" *Id.* ¶ 41. Leo repeated, "I'm a citizen! Stop! I'll show you my papers now!" *Id.* ¶ 42. But a second officer, ignoring all the protests about Leo's citizenship, ran over and tackled Leo as an officer yelled, "Get on the fucking ground!" *Id.* ¶ 43. A third officer rushed right past the site's No Trespassing sign and helped hold Leo down. *Id.* ¶¶ 44, 46.

One officer reached into Leo's pocket and pulled out his Alabama driver's license— a STAR ID that complies with the REAL ID Act. *Id.* ¶¶ 48–50. By law, Leo's ID is presumptive evidence of his citizenship or lawful presence. Ala. Code §§ 31-13-3(11), 31-13-29(c)(1), (g); 6 C.F.R. § 37.3. Rather than accept that Leo is a citizen, however, the officers told him his REAL ID was fake, handcuffed him, removed him from his worksite, and brought him to their unmarked car, where they held him for over an hour. Leo Decl. ¶¶ 51–56. Leo continued to tell the officers that he's a citizen and pleaded with them to check his Social Security Number. *Id.* ¶ 53. Eventually, an officer relented, confirmed his citizenship, and released him. *Id.* ¶ 54. Leo was never charged with a crime. *Id.* ¶ 57.

Leo had to take nearly two weeks off work to recover from the raid. *Id.* ¶¶ 59–60. Then, almost as soon as he returned, it happened again. *Id.* ¶ 61. On June 12, Leo was working alone inside a home in a D.R. Horton development in Fairhope while the rest of his crew worked at a different development. *Id.* ¶¶ 61–64, 68. The house had its walls, a roof, windows, and doors, but no garage door or siding. *Id.* ¶¶ 66–67. Although there were other crews in the development, the closest was eight houses away. *Id.* ¶ 70. Leo was working in a back bedroom when a federal officer walked in the house and ordered Leo outside. *Id.* ¶¶ 71–78. Leo said he was a citizen, but the officer insisted. *Id.* ¶ 79. Leo saw

5

another officer standing about five feet behind him, just outside the room's open window. *Id.* ¶ 80. With no choice but to obey, Leo followed the officer outside. *Id.* ¶¶ 81–83.

Outside, the first officer told Leo they were there to check his immigration status. *Id.* ¶ 84. Leo reiterated that he was a citizen. *Id*. ¶ 85. He showed the officers his REAL ID. *Id.* Like the last time, though, the officers said Leo's REAL ID could be fake and ordered him to go with them so that they could check his status. *Id.* ¶ 86. The officers marched Leo—one officer in front and one behind—about two blocks away, to their unmarked car at the edge of the development. *Id.* ¶¶ 88–91. They lined up Leo with other Latino workers whom they'd detained at other sites in the development. *Id.* ¶¶ 91–92. This time, it took about 20–30 minutes for officers to acknowledge Leo's citizenship and release him—along with two other workers Leo knew had lawful status (and at least one of whom was a citizen). *Id.* ¶¶ 94–96. Leo was never charged with a crime. *Id.* ¶ 97.

## II.  DHS policies authorized the searches and seizures Leo experienced.

The federal immigration officers involved in the May 21 and June 12 raids did not have consent or a warrant to enter Leo's construction sites. *Id.* ¶ 98. They did not have any reason to suspect Leo was violating the law. *Id.* ¶ 99. Nor did they have any basis to continue detaining Leo after seeing his REAL ID. *Id.* ¶ 100. Yet the officers did all of these things to Leo *twice* because DHS granted immigration officers sweeping (and unlawful) powers to implement the Administration's immigration goals.

On inauguration day, the President set a policy "to achieve the total and efficient enforcement of [immigration] laws" and ordered DHS to establish task forces nationwide and "use all available law enforcement tools" to achieve his goal. Executive Order 14159

§§ 2, 6(c). DHS Secretary Noem, in turn, ordered DHS to prioritize mass deportations and deputized officers from other federal agencies to join the "whole-of-government approach to immigration enforcement." Ex. B (Windham Decl.) ¶¶ 4–5.[2] The Administration "set a goal of a minimum of 3,000 arrests for ICE per day" and "is going to keep pushing to get that number up higher[.]" *Id.* ¶ 3.

To that end, senior immigration officials have asserted that the Administration has unlimited power to enforce immigration laws. *See id.* ¶¶ 13–14 (White House Border Czar asserting "there's no limitation" on the President's immigration power, and White House Deputy Chief of Staff for Policy and Homeland Security Advisor asserting government's "duty" to "ensur[e] the full and unrestricted enforcement of federal immigration law"). Indeed, senior officials have directed officers to "do what [they] need to do," to "push the envelope," to turn the "creative knob up to 11," and that "[i]f it involves handcuffs on wrists, it's probably worth pursuing." *Id.* ¶ 15.

DHS has adopted several policies to implement these directives. The three targeting Alabama's construction industry are enforced by the "Gulf of America Homeland Security Task Force," which enlists officers from seven subagencies within DHS and DOJ (*e.g.*, ICE, CBP, FBI, ATF). *Id.* ¶ 16. Those policies include: (1) a Warrantless Entry Policy; (2) a Preemptive Detention Policy; and (3) a Continued Detention Policy. Although Leo's claims focus on construction-site raids in Alabama, the policies' existence is confirmed by senior officials' statements and immigration officers' conduct nationwide.

---

[2] Mr. Windham's declaration compiles information from publicly available sources, all of which are linked in the declaration with the date on which the source was accessed.

***Warrantless Entry Policy.*** DHS has authorized immigration officers to search all construction sites without consent or a warrant—even private areas that are posted with No Trespassing signs, enclosed with fences, or enclosed with structures.

As background, DHS has ordered "massively expand[ed]" "worksite enforcement operations." Windham Decl. ¶ 6. Their worksite raids in Alabama target the construction industry. *See id.* ¶ 10. The regional Special Agent in Charge at HSI explained that the Gulf of America Task Force is targeting construction sites in Alabama because that's where they believe undocumented immigrants likely work. *Id.* On February 13, local news reported that construction site raids were hitting new residential developments in Baldwin County. *Id.* ¶ 7. Then, over the summer, they "stepped up raids on construction sites." *Id.* ¶ 10. A June 12 report confirmed that "for months" the Gulf of America Task Force had "raided multiple construction sites across the bay." *Id.* ¶ 8. Leo knows of 15 raids just from working in the industry. Leo Decl. ¶ 20. By September, that number was up to least 21 raids "on one site or across several" sites in Baldin and Mobile counties. Windham Decl. ¶ 9.

In carrying out these raids, DHS instructs officers to take an overly broad view of what property is open to the public. An ICE training document says that officers may enter "open areas" without a warrant even if "the area may be fenced, and even if 'no trespassing' signs have been posted." *Id.* ¶ 17. It even encourages officers to "conclude that an open garage affords the primary means of entry to a home" and enter unless "a resident clearly indicates he does not want the officer to do so." *Id*. For certain types of businesses—even *residential* properties when construction workers are present—officers freely enter private areas where the public isn't granted access. *See id.* ¶¶ 20–21, 35 (examples of warrantless

entries of non-public areas of a car wash, an auto-repair shop, and a gated business lot). Just last week, an immigration officer in Chicago jumped a fence at an *occupied* home when he saw construction workers on a ladder. *Id.* ¶ 35.

The Gulf of America Task Force has applied this same broad view of "open areas" to the entire Alabama construction industry. Immigration officers routinely enter private construction sites without consent, without knocking or announcing their presence, and without warrants—even though these sites are typically posted with No Trespassing signs and enclosed with fencing or structures. *See* Leo Decl. ¶ 98; Ex. C (Estrada Decl.) ¶¶ 8–9, 13. These warrantless raids have followed the same pattern across sites owned by the region's largest homebuilders—D.R. Horton, Lennar, and DSLD Homes. Leo Decl. ¶¶ 20–21, 26, 62–63, 74; Estrada Decl. ¶¶ 12–13.

***Preemptive Detention Policy***. DHS also authorizes immigration officers, once they enter a worksite, to immediately—and without asking questions—detain everybody who fits the agency's general demographic profile for undocumented workers in that industry.

This policy replaces targeted investigations into individuals with mass detentions based on demographic profiles. As Chief Border Patrol Agent Gregory Bovino explained, officers simply go to "a particular place or location" where they think they'll find "illegal alienage" and detain individuals based on "how they look." Windham Decl. ¶ 18 (Bovino contrasting a detainee's looks with those of a white reporter). Because DHS no longer requires officers to identify specific suspects before raids, DHS even ditched the form that officers previously used to identify its intended targets. *Id.* ¶ 19.

Construction sites are one place DHS thinks it will find undocumented workers in Alabama. And Latinos are one group DHS targets in that industry. So, even though there are at least 33,150 lawful Latino construction workers in Alabama, Windham Decl. ¶ 11, and even though over 84% of construction workers nationwide are documented, *id.* ¶ 32, immigration officers presume that *all* Latino construction workers are *undocumented*. Leo Decl. ¶¶ 27, 47 (officers ignored white and black workers and seized Latino workers); Estrada Decl. ¶ 14 (same); Windham Decl. ¶ 22 (construction site superintendent near Mobile, Alabama, "said Hispanic workers who are in the U.S. legally are scared of being detained by ICE, 'because of their skin color. They are scared because they look the part'").

Immigration officers often have no idea who is on the construction sites they raid. Leo Decl. ¶ 99. Yet DHS policy allows them to preemptively detain all workers who fit the DHS profile without any prior knowledge of their identity, without asking any questions, and without observing any suspicious conduct by the individual workers they seize. *Id.*; *see also, e.g.*, Windham Decl. ¶ 33 (officers arrested construction worker in D.C., about whom they had no prior knowledge and whom they did not question, despite his valid Temporary Protected Status), ¶ 34 (officers arrested construction business owner in D.C., about whom they had no prior knowledge and whom they did not question, despite his Employment Authorization, Social Security Number, and open asylum application).

Armed with this policy, officers invade construction sites and round up all Latino workers, often placing them in handcuffs or zip-ties immediately. Leo Decl. ¶¶ 26–44, 62–90 (sites in this District); Estrada Decl. ¶¶ 17, 25 (site in this District); *see also* Ex. D (Doe Decl.) ¶¶ 9, 11 (same for landscaping site near Alabama border); Windham Decl. ¶ 23

10

(citing reports of recent business raid during which children and citizens were zip-tied). Non-Latino workers are left alone. Leo Decl. ¶ 27; Estrada Decl. ¶ 14; Doe Decl. ¶ 11. These are not *Terry* stops—they are not brief and there is no inquiry. Leo was held for about 90 minutes across two stops at which officers did not ask questions about Leo's status and nothing he said could have set him free. Leo Decl. ¶¶ 56, 96. Other citizens and lawful residents have been detained for hours or days. Doe Decl. ¶ 18; *see also* Windham Decl. ¶ 30 (citing report of two dozen citizens "held for more than a day").

One explanation for why these raids do not function like *Terry* stops is that DHS believes it can *arrest* people based on the "reasonable suspicion" it thinks attaches to someone's ethnicity and occupation. As Chief Agent Bovino recently explained: "We need reasonable suspicion to make an immigration arrest. You notice I did not say probable cause, nor did I say I need a warrant." Windham Decl. ¶ 24. Assistant DHS Secretary Tricia McLaughlin gave a similar comment in response to this lawsuit: "DHS law enforcement uses 'reasonable suspicion' to make arrests." *Id.* ¶ 25.

***Continued Detention Policy.*** Finally, whether an initial detention is lawful or not, DHS authorizes the continued detention of all people who fit DHS's profile even after a detainee produces credible evidence of citizenship or lawful presence, like a REAL ID.

Indeed, DHS has ordered officers to "err on the side of action, not caution," because "[t]his administration would rather have you arrest the U.S. citizen and sort it out later." *Id.* ¶ 26. In practice, that means refusing to accept *all* government-issued IDs—including the REAL IDs that DHS certifies are issued only to people with lawful status, 6 C.F.R.

11

§ 37.71. Senior officials claim it's because some states issue driver's licenses without proof of lawful presence, Windham Decl. ¶ 26, but those licenses are *not* REAL IDs.

There are plenty of recent examples. In Chicago, a Latina U.S. citizen and service worker was detained for an hour because immigration officers "questioned the validity of her passport and told her she 'doesn't look like' her family name, Greeley." *Id.* ¶ 27. In Los Angeles, a citizen with a REAL ID was held for 20 minutes because he couldn't remember the name of his birth hospital. *Id.* ¶ 28. In Idaho, officers raided a business, collected every Latino's papers, put them in a bag, and tied the bag around their necks before lining them up for further investigation. *Id.* ¶ 23. In D.C., a Latino construction worker with Temporary Protected Status told officers that he had his papers and they replied, "No you don't. You are illegal. Shut up, bitch! You're illegal!" *Id.* ¶ 33. And just this month in Escambia County, Florida, officers raided a private worksite and refused to accept a Latina landscaper's U.S. Employment Authorization Card, Social Security Card, and Florida REAL ID because "the Biden Administration made a lot of mistakes." Doe Decl. ¶ 16.

Immigration officers in Alabama treat REAL IDs with similar disregard. Leo has had five officers, during two separate raids that were three weeks and 20 miles apart, tell him that they could not trust that his REAL ID was real. Leo Decl. ¶¶ 51, 86.

### III.  DHS policies are actively harming construction workers in this District.

The challenged policies are sweeping up innocent U.S. citizens and lawful residents. Leo Decl. ¶ 95 (three lawful workers); Estrada Decl. ¶¶ 20–26, 29 (four lawful workers); Doe Decl. ¶ 19 (two lawful workers). The lucky ones are handcuffed for about 10 minutes.

Estrada Decl. ¶ 26. Others are handcuffed for an hour. Leo Decl. ¶ 52. Others spend hours in handcuffs or end up in jail. Ex. E (Alvirde-Ruiz Decl.) ¶¶ 17–20; Doe Decl. ¶ 18.

As one local business owner reported, the raids have "scared even some workers with valid legal status from coming to work." Windham Decl. ¶ 9. That fear is warranted, he said, because "on several occasions" he's seen "ICE detaining and arresting workers who obtained either a work permit or were seeking legal status as part of their employment." *Id.* Another local business owner agreed: Because construction workers "have been picked up even though they had documentation," even citizens and lawful residents are working with "their head[s] on a swivel because they're so concerned any minute that they may get raided." *Id.* ¶ 10. Consistent with this fear, many construction workers and business owners in this District are unwilling to publicly tell their stories out of fear of retaliation. Leo Decl. ¶ 102; Windham Decl. ¶ 20. Even so, two other Alabama construction workers have sworn that they have had similar experiences to Leo.

**Jorge Estrada** is a U.S. citizen of Latino descent who was born in Galveston, Texas, and now lives in Baldwin County. Estrada Decl. ¶¶ 1–2. Jorge has worked in the Alabama construction industry for a decade. *Id.* ¶ 2. On July 23, he was installing the roof on a house in a new residential development owned by DSLD Homes in Spanish Fort. *Id.* ¶¶ 3–5. The site was posted with a No Trespassing sign and partially enclosed with knee-high black fencing. *Id.* ¶ 8. There were at least 20 other construction workers on the site that day, all visibly Latino. *Id.* ¶ 10.

As Jorge was working on the roof, he saw trucks, a motorcycle, a helicopter, and drones nearing the site, moving past a crew of non-Latino workers. *Id.* ¶¶ 12–14. About

13

15–20 immigration officers (several of them masked) stormed the site—jumping the fencing and running past the No Trespassing sign—and entered the house. *Id.* ¶¶ 13, 15. The officers immediately began physically detaining people, tackling several to the ground, and handcuffing them without identifying themselves or asking questions. *Id.* ¶ 17. As far as Jorge could tell, the officers appeared to have a strategy of "arrest first, ask questions later." *Id*. The officers ordered Jorge and other workers to come down from the roof. *Id.* ¶¶ 18–19. Jorge told them he was a citizen, but they ordered him down anyway. *Id.* ¶ 19.

When Jorge climbed down, the officers quickly handcuffed him without identifying themselves or asking questions. *Id.* ¶ 20. He repeated that he was a citizen and said he had his REAL ID. *Id.* ¶ 21. The officers reached into his pocket, took out his ID, and scanned it with a mobile device. *Id.* ¶ 23. Rather than promptly release Jorge, the officers continued to question him about who he was, where he was born, and when he got his ID. *Id.* ¶ 24. The officers uncuffed Jorge after about 10 minutes. *Id.* ¶ 26.

At that point, Jorge asked the officers if they had a warrant and asked several more to identify themselves. None responded. *Id.* ¶¶ 27, 32. Jorge's wife then arrived. *Id.* ¶ 30. One officer in an FBI vest told his wife that the officers receive a bonus for every undocumented worker they catch, and offered her a $200 cut of that bonus if she said which workers were undocumented. *Id.* ¶ 31. Jorge is aware of at least three other workers on the site that day who had legal authorization to work in the U.S. and yet were handcuffed anyway. *Id.* ¶ 29. Jorge was never charged with a crime. *Id.* ¶ 34.

**Gehovani Alvirde-Ruiz** is a Mexican national who holds a Green Card, has lived and worked in the U.S. for well over a decade, and lives and works in Jefferson County,

Alabama. Alvirde-Ruiz Decl. ¶¶ 1–2. On February 1, he arrived home from his construction job to three federal immigration officers parked at his house. *Id.* ¶ 3. Before he could exit his car, an officer opened his driver's side door and, while holding his gun, ordered, "Show me your hands!" *Id.* ¶ 4. The first officer asked, "Who are you?" as he and another officer pulled Gehovani out of the vehicle. *Id.* ¶ 5. Gehovani said, "I have papers." *Id.* ¶ 6. An officer replied, "Show me! Where were you born?" *Id.* ¶ 7.

Gehovani handed them his Green Card, Social Security Card, and Alabama driver's license, all of which are issued only to lawful residents.[3] *Id.* ¶¶ 9, 11. Rather than promptly release him, the officers noted his license was not a STAR ID and said, "We got one" and that they were going to deport him. *Id.* ¶¶ 11–12. The officers told Gehovani that his Green Card and Social Security Card were fake and said, "You are in the United States without permission." *Id.* ¶ 15. They drove Gehovani to a detention facility, where an officer said Gehovani had the best fake papers he had ever seen. *Id.* ¶¶ 18–19. It took three more hours before the officers conceded Gehovani's papers were valid and released him. *Id.* ¶ 20.

*    *    *

DHS's policies are hurting countless U.S. citizens and lawful residents nationwide. Windham Decl. ¶ 30 (citing report collecting examples of citizen arrests). Locally, Alabama construction workers "have been picked up even though they had documentation." *Id.* ¶ 10; Leo Decl. ¶¶ 51, 86 (REAL ID); Estrada Decl. ¶¶ 20–26 (REAL ID); Alvirde-Ruiz Decl.

---

[3] Ala. Code §§ 31-13-3(10), 31-13-29(c)(1), (g) (Alabama license); 8 C.F.R. § 210.5 (Green Card); 20 C.F.R. § 422.104(a)(1)–(3) (Social Security Card).

¶¶ 6–20 (Green Card, Social Security Card, Alabama driver's license); *see also* Doe Decl.

¶¶ 11–14 (Employment Authorization, Social Security Card, REAL ID).

Whether reduced to writing or not, these policies are being enforced by federal agents across a range of agencies that DHS Secretary Noem has deputized as immigration officers. Because these policies "mark the consummation of the agency's decisionmaking process" and "legal consequences[] flow" from their enforcement, they constitute final agency action subject to this Court's review. *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 138–39 (D.D.C. 2018) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

## LEGAL STANDARD

A preliminary injunction is appropriate where a plaintiff shows (1) a substantial likelihood of success on the merits of any claim, (2) an injunction is necessary to prevent irreparable harm, (3) the threatened injury outweighs the harm the injunction could cause the defendants, and (4) the preliminary injunction is in the public interest. *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015). Similarly, Section 705 of the Administrative Procedure Act empowers a court to issue all relief necessary to "preserve status or rights" to "the extent necessary to prevent irreparable injury" during its review of agency action. "[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted in part*, 145 S. Ct. 1039 (2025).

16

**ARGUMENT**

Leo seeks a preliminary injunction and relief under the APA because he's already been seized during two separate warrantless raids, on two different construction sites 20 miles apart, merely for doing his job. Leo needs to keep working, but, in the words of an industry spokesperson, the raids "haven't . . . [been] slowing down." Windham Decl. ¶ 10. Leo, and the thousands of lawful construction workers in the putative classes who stand in his shoes, *see* Pl.'s Br. Supp. Class Cert. (ECF No. 31-1) at 9–13, face an imminent risk that their liberty and privacy rights will be violated every day the raids continue.

A preliminary injunction is a proper remedy for that threat for three basic reasons. *First*, Leo will likely prevail on the merits of Counts I, II, and IV because both the Fourth Amendment and DHS regulations forbid immigration officers from (1) searching the non-public areas of construction sites without consent or a warrant, (2) conducting dragnet, suspicionless seizures of Latino workers on those sites, and (3) continuing to detain workers who show presumptive evidence of U.S. citizenship or lawful presence. *Second*, each challenged policy will irreparably harm Leo and the putative class members until they are enjoined. *Third*, the government has no interest in, and the public only suffers from, the enforcement of policies that violate the Fourth Amendment and DHS regulations.

**I.    Leo will likely win his Fourth Amendment and regulatory claims.**

All three of the challenged policies are likely unlawful. The Warrantless Entry Policy likely violates the Fourth Amendment and 8 C.F.R. § 287.8(f)(2), both of which forbid immigration officers from searching non-public commercial property without consent or a warrant. The Preemptive Detention Policy likely violates the Fourth Amendment and 8

17

C.F.R. § 287.8(b)(2), both of which forbid immigration officers from rounding up workers on private property without reasonable suspicion that they are violating immigration or other laws. And the Continued Detention Policy likely violates the Fourth Amendment and 8 C.F.R. § 287.8(c)(2), both of which forbid immigration officers from continuing to detain suspected illegal immigrants after they have shown presumptive evidence of their U.S. citizenship or lawful presence.

### A. The Warrantless Entry Policy is likely unlawful.

The Fourth Amendment does not allow "federal agents to enter a place of business from which the public is restricted . . . to conduct their own warrantless search." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 315 (1978); *Peterman v. Coleman*, 764 F.2d 1416, 1420 (11th Cir. 1985). A DHS rule echoes this limitation. An immigration officer

> may not enter into the non-public areas of a business, [or] a residence including the curtilage of such residence . . . for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected.

8 C.F.R. § 287.8(f)(1)–(2). When officers' "systematic conduct" defies these limits, an injunction is appropriate. *See, e.g.*, *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 977–85 (C.D. Cal. 2024) (enjoining "ICE's systemwide policy and practice" of searching curtilage without a warrant under both the Fourth Amendment and 8 C.F.R. § 287.8(f)(2)).

Because the Warrantless Entry Policy allows warrantless entries, it's likely unlawful. Construction sites in this District are typically posted with No Trespassing signs, fenced in, or enclosed with structures. Leo Decl. ¶ 9; Estrada Decl. ¶ 8. Every reasonable person understands that posted or enclosed construction sites are not open to the public. For one,

18

it's a trespass under Alabama law. *See* Ala. Code §§ 13A-7-1(3), 13A-7-4(a); *cf. Owens v. State*, 565 So. 2d 1283, 1283–84 (Ala. Crim. App. 1990) (unlicensed entry on gravel pit was a trespass under § 13A-7-4)). And it's dangerous for everyone involved. Leo Decl. ¶ 11.

Private construction sites, in other words, are not like sidewalks and parking lots. *See Florida v. Jardines*, 569 U.S. 1, 8–10 (2013) (relying on social customs to define implied license to enter private property). And yet, that's how the Warrantless Entry Policy treats them. It allows immigration officers to enter private construction sites—property where no member of the public could freely go—without consent or a warrant.

Leo can challenge these entries for at least three reasons. *First*, one who "lawfully possesses or controls property" has a right to be free from unreasonable searches of the property "by virtue of [the] right to exclude." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978). Leo, while working on a job site, is a lawful possessor with the right to exclude intruders. Leo Decl. ¶¶ 8–12; Restatement (Second) of Torts § 422, cmt. c ("[p]ossession usually is surrendered fully in the case of construction" until "completion of the work"). Anyone with "sufficient possessory rights," including the right to exclude, has the right to challenge a warrantless entry—even if they're only working on a property for one day. *See Lyall v. City of Los Angeles*, 807 F.3d 1178, 1186 (9th Cir. 2015) (Bybee, J.) (holding that concert organizers could challenge the search of a warehouse they occupied for only one night based, in part, on their right to exclude unwanted visitors).

*Second*, under the Fourth Amendment, "employees have a protectable, reasonable expectation of privacy against workplace searches." *Reyes v. Maschmeier*, 446 F.3d 1199, 1203 (11th Cir. 2006) (citing *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968)). In *Mancusi*,

the seminal case on worksite privacy, the Court held that a union worker had the right to challenge the search of a shared office because he "could reasonably have expected that only [union affiliates] and their personal and business guests would enter." 392 U.S. at 369–70. The same principle applies when Leo is working on a construction site: He can reasonably expect that only his affiliates will enter. *See* Leo Decl. ¶¶ 8–12.

*Third*, Leo can invoke 8 C.F.R. § 287.8(f)(2)'s parallel protection because he has a professional interest at stake. Leo's work requires focus, autonomy, and coordination with coworkers. Leo Decl. ¶ 11. It's "common sense" that granting officers unfettered power to raid sites and round up workers will hurt Leo's ability to earn a living. *See Diamond Alt. Energy LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2135 (2025) (businesses were injured by law that "hurts their bottom line"); *see also Truax v. Raich*, 239 U.S. 33, 38–39 (1915) (workers have a "manifest interest in the freedom of the employer to exercise his judgment without illegal interference or compulsion"). The Warrantless Entry Policy has subjected Leo and the putative class members to disruptions, delays, and missed work. Leo Decl. ¶¶ 59, 102. And when they can work, "their head's on a swivel because they're so concerned any minute that they may get raided." Windham Decl. ¶ 10. Leo has an interest in working without his head on a swivel.

Because neither the Fourth Amendment nor 8 C.F.R. § 287.8(f)(2) allows these warrantless searches, Leo will likely show that the policy is unconstitutional, arbitrary and capricious, and fails to follow the requisite procedures. 5 U.S.C. § 706(2)(A), (B), (D).

20

**B.    The Preemptive Detention Policy is likely unlawful.**

The Fourth Amendment also forbids officers from detaining people to investigate their immigration status absent "observations [that] lead [them] reasonably to suspect that a *particular* [person] . . . [is] illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (emphasis added). Of course, officers who are lawfully present on a worksite can ask people about their immigration status. *See INS v. Delgado*, 466 U.S. 210, 216–17 & n.5 (1984). But when officers physically detain a worker, or make it so a reasonable person would not feel free to leave, the stop is unlawful "absent some reasonable suspicion of misconduct." *Id.* at 216–17 (citing *Brown v. Texas*, 443 U.S. 44, 52 (1979)). Again, a DHS regulation mirrors this settled rule: In order to "briefly detain" a person, an officer must have "reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(b)(1)–(2).

The Preemptive Detention Policy flouts these principles. It allows officers to enter private construction sites and preemptively detain *all* Latino workers without asking them any questions. *Supra* pp. 9–11. That's true even though there are over 33,150 Latinos legally working in Alabama's construction industry, and even though 84% of that industry nationally is documented. *Supra* p. 10. The policy does not even require officers to know who will be on a particular site. *Supra* pp. 10–11. Plus, the employers who staff these sites are bound by federal laws that forbid the hiring of undocumented workers. 8 U.S.C. §§ 274a.2, 1324a. And even when officers suspect a particular employer is failing to

comply with these mandatory requirements, they must have reason to suspect a particular worker is in the country illegally to justify a stop. *Delgado*, 466 U.S. at 216–17.

A mere "demographic profile," standing alone, does not generate "individualized" reasonable suspicion. *Kansas v. Glover*, 589 U.S. 376, 385 n.1 (2020) (reiterating holding of *Brignoni-Ponce*, 422 U.S. 873, that there's no legitimate basis to detain someone "when the only ground for suspicion was that the occupants appeared to be of Mexican ancestry" (cleaned up)); *Davis v. Mississippi*, 394 U.S. 721, 722 (1969) (rejecting dragnet collection of fingerprints in a general search for an otherwise unidentified "Negro youth"). Nor does someone's "mere propinquity" to a suspect justify a stop. *Ybarra v. Illinois*, 444 U.S. 85, 88–91 (1979). Even when officers have a good reason to suspect one person at a business of committing a crime, that doesn't let them detain everyone else there. *Id.*; *see also Brown*, 443 U.S. at 51–52 (a person's mere presence in a "neighborhood frequented by drug users" does not justify a seizure). Officers cannot detain "all employees, patrons, and owners present" and search them "randomly" just because they suspect *some* people at the business of a crime. *Swint v. City of Wadley*, 51 F.3d 988, 992–96 (11th Cir. 1995). They must have evidence that "all of the [people]" they detain have also committed a crime. *Id.*

The Tenth Circuit has applied this same principle to wholesale seizures of Latino construction workers. *United States v. Alarcon-Gonzalez*, 73 F.3d 289 (10th Cir. 1996). There, INS agents got a tip that some roofing companies employed illegal immigrants. *Id.* at 290–91. But the agents didn't limit their investigation to those companies. They saw a group of Latino roofers, apparently staffed by a different company, and seized them all. *Id.* The Tenth Circuit held that the reasonable suspicion did not extend to everybody who had

the same ethnicity and occupation: Even though "the INS agents [had] a reasonable basis for suspecting that some roofers might be illegal aliens . . . [that] did not give them a reasonable basis for suspecting that Alarcon–Gonzalez *in particular* might be one of them." *Id.* at 293 (emphasis added) (citing *Brignoni–Ponce,* 422 U.S. 873). Ethnicity plus occupation could not justify the stops because being a Latino and "[w]orking as a roofer is totally consistent with innocence." *Id*.

Likewise, merely sharing an employer with someone suspected of being in the country illegally is not enough. *See United States v. De La Cruz*, 703 F.3d 1193, 1199 (10th Cir. 2013) ("Even if the agents had reasonable suspicion to believe that Gill's Truck Wash employed illegal aliens—based on information and circumstances suggesting that both Guel-Rivera and Armando were unlawfully in the country and both worked at the truck wash—such a belief would not justify seizing De La Cruz."). Officers can't round up everyone on a worksite just because they suspect that *somebody* at that worksite is violating the law. Investigative stops require "individualized" or "particularized" suspicion—that means specific facts about specific people. *Glover*, 589 U.S. at 385 n.1.

The Preemptive Detention Policy authorizes the very sort of worksite roundups rejected in *Swint*, *Alarcon-Gonzalez*, and *De La Cruz*. The policy is not limited to an industry with an "extremely high" percentage of illegal workers. *Cf. Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637, at *1 (U.S. Sept. 8, 2025) (Kavanaugh, J., concurring). Again, about 84% of construction workers are documented, including 33,150 Latino workers in Alabama. Nor does it target day-laborers looking for daily, paperless work. *Cf. id.* Nor do officers even wait to hear if someone speaks Spanish, to the extent someone's preferred

language can be suspicion. *Cf. id.* Instead, the policy allows the preemptive detention of *any* Latino on *any* construction site without *any* particularized suspicion. That's precisely what the Fourth Amendment and 8 C.F.R. § 287.8(b)(1)–(2) forbid. Thus, Leo is likely to show that this policy is unconstitutional, arbitrary and capricious, and fails to follow the required process. 5 U.S.C. § 706(2)(A), (B), (D).

### C.    The Continued Detention Policy is likely unlawful.

Even when immigration officers have lawfully entered a site and lawfully detained workers, those seizures cannot extend beyond their justification. An investigative stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). The Fourth Amendment protects the "right to be free from continued detention after it was or should have been known that the detainee was entitled to release." *Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir. 1993), *modified on other grounds*, 15 F.3d 1022 (11th Cir. 1994). Officers must end a search or seizure "as soon as they … [a]re put on notice of the *risk* that they *might*" no longer have the legal justification they thought at the outset. *Maryland v. Garrison*, 480 U.S. 79, 87–88 (1987) (emphasis added); *see also Manuel v. City of Joliet*, 580 U.S. 357, 368 (2017) (applying the same rule to the continued seizure of a person).

A seizure becomes unlawful once a reasonable officer should know it has outlasted its justification. *United States v. Place*, 462 U.S. 696, 709 (1983) (seizure of luggage became unreasonable due to its duration and the officers' lack of diligence); *see also Brewster v. Beck*, 859 F.3d 1194, 1196–97 (9th Cir. 2017) (when justification for a seizure has lapsed, government must "cease the seizure or secure a new justification"); *accord*

*Asinor v. District of Columbia*, 111 F.4th 1249, 1255 (D.C. Cir. 2024). No less is required of immigration officers: If they "learn that the individual they stopped is a U.S. citizen or otherwise lawfully in the United States, they [must] *promptly* let the individual go." *Vasquez Perdomo*, 2025 WL 2585637, at *1 (Kavanaugh, J., concurring) (emphasis added).

The Eleventh Circuit applied this rule to immigration stops in *Alcocer v. Mills*, 800 F. App'x 860, 865 (11th Cir. 2020). An officer detained Judith Alcocer for driving with a suspended license and then continued to hold her on suspicion of being in the country illegally. *Id.* at 861–63. But the officer knew Alcocer had a Georgia driver's license and a Social Security Number—both of which a person can obtain only if they are a U.S. citizen or lawfully present. *Id.* at 866–87. These documents "should have negated suspicion of illegal presence." *Id.* at 866. Because the officer should have known the initial justification lapsed, the continued detention violated clearly established Fourth Amendment law: "The Supreme Court has long held that, beyond a *Terry* stop, the detention of a suspected alien 'must be based on consent or probable cause' that the person is, in fact, an [illegal] alien." *Id.* at 868 (quoting *Brignoni-Ponce*, 422 U.S. at 881–82). "To rule otherwise on this record," the Eleventh Circuit emphasized, "would raise real concerns about the continued unlawful detention of U.S. citizens based on legally inapplicable, groundless immigration hunches unsupported by even arguable probable cause." *Id.* at 867–68.

Yet again, a DHS regulation bolsters the Fourth Amendment principle here: Absent a warrant, an immigration officer may convert a brief investigatory stop into an "arrest . . . only when [the officer] has reason to believe [*i.e.*, probable cause] that the person to be

arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i)–(ii).[4]

The Continued Detention Policy authorizes the very type of seizures that *Alcocer* forbids—but at scale. Many of these seizures turn into arrests that exceed the officers' power under 8 C.F.R. § 287.8(c)(2)(i)–(ii). Under the policy, immigration officers can detain workers—initially seized on the premise that they are undocumented—even after workers show proof of citizenship or lawful presence. *Supra* pp 11–12. It happened to Leo twice. Both times, officers had his driver's license in hand within minutes. *Supra* pp. 5–6. Alabama issues licenses only to citizens or those who are lawfully present, Ala. Code § 31-13-29(c)(1), (g), specifically "to discourage illegal immigration within the state and maximize enforcement of federal immigration laws through cooperation with federal authorities." *United States v. Alabama*, 691 F.3d 1269, 1276 (11th Cir. 2012). Thus, Leo was "entitled to the presumption that he . . . [was] lawfully present." Ala. Code § 31-13-3(11). Leo's license also has a star in the corner, which he could obtain only with the documents DHS certifies are compliant with the federal REAL ID Act. 6 C.F.R. § 37.71.[5] Under that Act, a REAL ID "suffice[s] to establish lawful presence." *Arizona v. United States*, 567 U.S. 387, 449 n.1 (2012) (Alito, J., concurring in part).

---

[4] The phrase "reason to believe" in 8 C.F.R. § 287.8(c)(2)(i) means "probable cause." *Gonzalez v. FedEx Ground Package Sys., Inc.*, No. 12-CV-80125, 2013 WL 12080223, at *13 (S.D. Fla. Aug. 1, 2013) (citing, in part, *Au Yi Lau v. INS*, 445 F.2d 217, 222 (D.C. Cir. 1971)); *accord Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015).

[5] *See generally* ALEA, *STAR ID Document List*, https://tinyurl.com/4t99ra2v; ALEA, *STAR ID Frequently Asked Questions*, https://tinyurl.com/mw3avyzu.

Yet the Continued Detention Policy allows officers to ignore *individual* workers' presumptive proof of citizenship or lawful presence based on the *general assumption* that Latino construction workers are undocumented. Rather than promptly release workers who produce a REAL ID or similar documents, the policy allows officers to keep workers handcuffed (Leo's first raid), march them blocks away (Leo's second raid), interrogate them further (Jorge's raid), or throw them in jail (Gehovani). Because the policy allows officers to extend seizures after new evidence (including a DHS-certified REAL ID) dispels the purported basis for those seizures, the policy violates the Fourth Amendment and 8 C.F.R. § 287.8(c)(2)(i)–(ii) and is arbitrary and capricious. 5 U.S.C. § 706(2)(A), (B), (D).

## II. Absent a preliminary injunction, Leo and the putative classes will suffer irreparable harm.

The next factor is whether a preliminary injunction is needed to avoid irreparable harm. It is. Leo, and the thousands of putative class members who stand in his shoes, Pl.'s Br. Supp. Class Cert. (ECF No. 31-1) 9–13, will likely suffer irreparable harm so long as Defendants are allowed to enforce the DHS policies challenged in this case.

"There is, perhaps, no injury more substantial and less reparable than improper denial of the right to liberty." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1454 (11th Cir. 1986). And "invasions of privacy, because of their intangible nature," "[can]not be compensated for by monetary damages," and thus inflict irreparable harm. *Ne. Fla. Ch. of Ass'n of Gen. Contractors of Am. v. City of Jackson*, 896 F.2d 1283, 1285 (11th Cir. 1990). That's why courts, in this circuit and elsewhere, readily enjoin unlawful searches and seizures. *See, e.g., Fla. Immigrant Coal. v. Uthmeier*, 778 F. Supp. 3d 1315, 1321 (S.D. Fla. 2025) (temporarily enjoining unlawful immigration arrests); *United Farm Workers v. Noem*, 785

27

F. Supp. 3d 672, 743 (E.D. Cal. 2025) (preliminarily enjoining unlawful ICE detentions and arrests); *Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 977–85 (C.D. Cal. 2024) (enjoining ICE policy and practice of searching curtilage without a warrant).

Leo faces the same irreparable harm and is entitled to the same equitable relief. Simply by showing up for work, Leo risks more warrantless raids, being preemptively detained because he fits a DHS profile, and remaining detained even after he shows presumptive proof of his citizenship. Leo has already experienced these precise harms twice since May, through no fault of his own. And construction raids in this District show no signs of slowing down. Windham Decl. ¶ 10. As Leo's job brings him to new sites on a regular basis, and the Gulf of America Task Force continues to raid new developments, the risk of harm is concrete and ongoing. Short of quitting his job—something he can't afford to do—there is nothing Leo can do to avoid the imminent risk of further harm.

All other citizens and lawfully present construction workers in this District who fit the DHS profile face the same risk of harm. That's why Leo has filed a motion asking this Court to certify three putative classes and to enjoin the policies' enforcement on a class-wide basis to ensure that thousands of U.S. citizens and lawfully present workers do not have their liberty and privacy rights violated while the parties litigate the legality of the challenged policies. *See* Pl.'s Br. Supp. Class Cert. (ECF No. 31-1) 9–13, 19.

## III.  The remaining preliminary injunction elements are satisfied.

That leaves the final two preliminary injunction factors: whether Leo's threatened injury outweighs any that Defendants will suffer if enjoined, and whether the injunction would harm the public. These factors "merge" when the government is the defendant.

*Georgia v. POTUS*, 46 F.4th 1283, 1292 (11th Cir. 2022). Defendants here—all part of the federal government—have no interest in violating the Fourth Amendment or their own regulations, and if they were allowed to do so, the public would only suffer. *Lebron v. Wilkins*, 820 F. Supp. 2d 1273, 1292–93 (M.D. Fla. 2011) ("[P]reliminarily enjoining what appears likely to be deemed to be an unconstitutional intrusion on the Fourth Amendment rights . . . serves the public interest and outweighs whatever minimal harm a preliminary injunction might visit upon the State.").[6]

Leo does not dispute the government's "weighty interest" in its immigration laws. *See Garcia-Mir v. Meese*, 781 F.2d 1450, 1454 (11th Cir. 1986). But Leo is not an illegal immigrant. And neither are the thousands of putative class members: U.S. citizens and lawful residents who want to work on private property free from the looming threat of illegal searches and seizures. *See* Pl.'s Br. Supp. Class Cert. (ECF No. 31-1) 9–13. Weighty as immigration enforcement may be, "[t]he balance of equities tilts strongly" against the government when core rights are threatened. *Garcia-Mir*, 781 F.2d at 1455. Simply put, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Georgia*, 46 F.4th at 1303 (quoting *Ala. Ass'n of Realtors v. DHS*, 594 U.S. 758, 766 (2021)).

---

[6] *See, e.g.*, *Alabama v. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *7 (11th Cir. Aug. 22, 2024) ("the public has no interest in enforcing a regulation that likely violates the APA and raises First Amendment concerns"); *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) ("neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance"); *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) (noting the government "has no interest in enforcing an unconstitutional law"); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) ("the public interest is served when constitutional rights are protected").

\*    \*    \*

Because Leo will likely establish that the challenged policies violate the Fourth Amendment and DHS regulations, a preliminary injunction is needed. This Court should enjoin the Official Capacity Defendants, the Defendant Agencies, and the United States from enforcing the challenged policies against the putative classes defined in Leo's motion for class certification. *See* Pl.'s Mot. Class. Cert. (ECF No. 31). The injunction should forbid:

- Searching the non-public areas of construction sites within this District without the consent of a person with lawful authority to provide it or a judicial warrant based on probable cause. "Non-public areas" include areas of private property that are posted with a No Trespassing sign, substantially enclosed with fencing or a structure, or that are otherwise used, developed, or marked in a manner to put a reasonable person on notice that entry is not permitted.

- Preemptively detaining workers on construction sites within this District without particularized evidence that would lead a reasonably prudent officer to believe that each individual worker they detain is violating the law.

- Continuing to detain workers on construction sites within this District, on the premise that they may be an illegal immigrant, even after those workers show or the officer sees presumptive evidence of U.S. citizenship or lawful presence in the country. "Presumptive evidence" includes a REAL ID, U.S. Passport, U.S. Birth Certificate, Social Security Card, Green Card, Work Visa, U.S. Employment Authorization Card, or comparable government-issued document.

Alternatively, the Court can temporarily set aside the challenged policies during the pendency of the case. *See* 5 U.S.C. § 705; *Career Colls.*, 98 F.4th at 255.

## CONCLUSION

Leo respectfully requests that the Court grant his motion and either preliminarily enjoin or temporarily set aside the challenged policies.

Dated: October 27, 2025.                Respectfully submitted,

                                        _/s/ Jared McClain_
                                        Jared McClain (DC Bar No. 1720062)*
                                        Jaba Tsitsuashvili (DC Bar No. 1601246)*
                                        Joshua Windham (NC Bar No. 51071)*
                                        INSTITUTE FOR JUSTICE
                                        901 N. Glebe Road, Suite 900
                                        Arlington, VA 22203
                                        (703) 682-9320
                                        jmcclain@ij.org
                                        *Admitted Pro Hac Vice

                                        *Counsel for Plaintiff*

31

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served a copy of the foregoing PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION by U.S. First Class mail, postage prepaid, to the following:

1. Tom Homan, White House Border Czar, in his official capacity,
   c/o Pamela Bondi in her official capacity as Attorney General,
   950 Pennsylvania Avenue, NW
   Washington, DC 20530-0001

2. U.S Department of Homeland Security
   C/O Kristi Noem, Secretary
   Office of the General Counsel
   U.S. Department of Homeland Security
   2707 Martin Luther King Jr. Ave, SE
   Washington, DC 20528-0485

3. U.S. Department of Justice,
   c/o Pamela Bondi in her official capacity as Attorney General
   950 Pennsylvania Avenue, NW
   Washington, DC 20530-0001

4. Kristi Noem, in her official capacity as Secretary
   of U.S. Dept of Homeland Security
   Office of the General Counsel
   U.S. Department of Homeland Security
   2707 Martin Luther King Jr. Ave, SE
   Washington, DC 20528-0485

5. Pamela Bondi, in her official capacity as U.S. Attorney General
   950 Pennsylvania Avenue, NW
   Washington, DC 20530-0001

6. Steve Schrank, in his official capacity as Special Agent
   of HSI- Atlanta Field Office
   Office of the General Counsel
   U.S. Department of Homeland Security
   2707 Martin Luther King Jr. Ave, SE
   Washington, DC 20528-0485

32

7. Sarah Jones, in her official capacity as Special Agent in Charge
   of FBI's Mobile, Alabama Office
   Federal Bureau of Investigations - Mobile, Alabama Office
   200 North Royal Street
   Mobile, AL 36602

8. Brian Acuna, in his official capacity as Acting Director
   of ICE's New Orleans Field Office
   U.S. Immigration and Customs Enforcement
   Office of the Principal Legal Advisor
   500 12th St. SW, Mail Stop 5900
   Washington, DC 20536-5900

9. Adam M. Calderon, in his official capacity as Chief Patrol Officer
   for CBP's New Orleans Sector
   Office of Chief Counsel
   U.S. Customs and Border Protection
   1300 Pennsylvania Avenue, Suite 4.4-B
   Washington, D.C. 20229

10. Jamey Vanvliet, in his official capacity as Acting Special Agent
    in Charge of ATF's Nashville Field Office
    Bureau of Alcohol, Tobacco, Firearms and Explosives - Nashville ATF Office
    302 Innovation Drive, Suite 300
    Franklin, Tennessee 37067

11. Mark F. Sloke, in his official capacity
    as U.S. Marshal for the Southern District of Alabama
    US Marshal Service for Southern District of Alabama
    1155 St. Joseph Street, #201
    Mobile, AL 36602-3606

12. Five Unknown Federal Immigration Enforcement Officers, in their official capacities
    U.S. Immigration and Customs Enforcement
    Office of the Principal Legal Advisor
    500 12th St. SW, Mail Stop 5900
    Washington, DC 20536-5900

13. The United States of America,
    c/o Donald J. Trump, in his official capacity as President
    1600 Pennsylvania Ave NW
    Washington, DC 20500