# DECLARATION OF LEONARDO GARCIA VENEGAS

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

LEONARDO GARCIA VENEGAS,

      *Plaintiff,*

v.

      Case No. 1:25-cv-397-JB-C

TOM HOMAN, WHITE HOUSE BORDER CZAR,
IN HIS OFFICIAL CAPACITY, ET AL.,

      *Defendants.*

## DECLARATION OF LEONARDO GARCIA VENEGAS

I, Leonardo Garcia Venegas ("Leo"), do affirm and state as follows:

1.      I am a United States citizen of Mexican descent, a longtime Alabama resident, and a longtime construction worker in Baldwin County, Alabama.

2.      I was born in 1999 in Lehigh Acres, Florida. My parents are both Mexican nationals who were living in the country at the time of my birth but have since returned to Mexico.

3.      When I was 14 years old, I moved to Robertsdale, Alabama, where I attended and graduated Robertsdale High School in 2019. Robertsdale has been my home ever since.

4.      I have worked in the construction industry in Baldwin County for about eight years. I have mainly done bricklaying, masonry, and concrete finishing, although I am qualified to and do perform many other construction tasks. I regularly build homes on construction sites in new private developments in Baldwin County.

5.     Based on my experience working in the construction industry, I perceive the Daphne-Foley-Fairhope area to be a fast-growing area. Dozens of new developments with thousands of new homes are going up every year. I help build those new homes by working as a contractor for Southern Home Crafters, LLC, and have many colleagues at the company who, like me, are either U.S. citizens or lawfully present in the country.

6.     I typically help build homes in subdivisions owned by D.R. Horton and Lennar. Based on my years of experience and observations working in the construction industry, D.R. Horton, Lennar, and DSLD are some of the most prolific homebuilders in southern Alabama.

7.     On these construction sites, I actively work on private property that is not open to the public. My understanding based on my experience in the industry is that, when I am working on a privately owned construction site, neither the owners of these residential developments, my employer, nor any other subcontractor would want or allow intruders or unauthorized members of the public onto the construction sites.

8.     Indeed, based on my years of experience and observations working in the construction industry, my expectation is that only the owner, developer, their agents, employees, or contractors, or other authorized personnel or visitors will enter an active construction site.

9.     My expectation that intruders will not enter active construction sites is especially strong when those sites are marked with a "no trespassing" sign, enclosed with fencing (whether partially or fully), or enclosed with a structure (whether partially or fully)—as nearly every construction site I have ever worked on is.

10.    When I start working on a private construction site, myself and my crew typically take and maintain exclusive possession of that site (along with any other crews working on the site), which the owner does not regain until the job is done. During that time, my understanding and expectation is that only people who are affiliated with the construction project will enter the site.

11.    If people not affiliated with the construction project were to enter a site on which I am actively working without permission, I personally would suffer several harms, including distraction from my work, reduced work quality, increased risk of injury, and even firing and potential legal liability for any injuries that occur.

12.    My understanding and expectation is that I, my crew, and our supervisors have a right and duty to exclude anyone who enters a private construction site on which I am actively working without permission. This understanding and expectation derives from the nature of the work, safety risks I have been trained to avoid, my experience in the industry, and my communications with my crew and my supervisors.

13.    After I start a construction job, myself and my crew typically remain on site continuously until the job is done each day—especially in my current work, which deals with wet concrete.

14.    While working on a construction site, I typically work on a crew of five concrete specialists. And the developments and sites on which we work typically include at least seven other teams, each consisting of about five workers. (In other words, it is typical for at least 35 people, working in five-member crews, to collaboratively build

different parts of each home.) Those other teams do things like framing, plumbing, electric, drywall, roofing, siding, painting, and landscaping.

15.     Workers move between different subdivisions from day to day and week to week as their portion of the work is completed or while waiting for other teams to finish their work.

16.     Thus, I rarely work in a fixed location for more than a few days. My work brings me to different construction sites across Baldwin County, with different owners, staffed by different contractors.

17.     I am aware of at least 15 raids—not including the raids I experienced— of private construction sites in Baldwin County since January 2025.

18.     To my knowledge, those 15 raids—just like the raids I personally experienced—were done without a warrant or the owner's consent and without any reason to suspect the particular workers on those sites of violating any laws.

19.     In a span of just over three weeks across May and June 2025, I experienced two raids on private construction sites where I was working—one on a site owned by D.R. Horton and the other on a site owned by Lennar.

20.     Around 7:00 a.m. on the morning of May 21, I showed up to lay the concrete foundation of the first four homes in a new residential subdivision in Foley, Alabama.

21.     The subdivision was owned by Lennar.

22.     The site on which I was working—along with others in the development—was posted with a No Trespassing sign and surrounded by a knee-high, black perimeter fence.

23.     The concrete crew consisted of five workers, including me, all of whom were Latino.

24.     There was also a crew of non-Latino workers (two White, two Black) who were there to deliver concrete for the site.

25.     It began to rain, so I left the site to go get plastic to cover the freshly poured concrete.

26.     When I walked back onto the site around 8:00 a.m., I saw five armed men in camouflage—three of whom were masked—jumping over the short fence at the property line and running past the No Trespassing sign, toward my coworkers.

27.     The officers ran right past four white and black workers without detaining them and went straight for four Latino workers.

28.     Three members of my crew ran at the sight of armed men running toward them, and two officers gave chase.

29.     A fourth member of the crew, my brother, did not move; he stood on the freshly poured foundation for a home's garage on one of the site.

30.     Two officers approached my brother, and he asked them why they were on the property and whether they had a warrant.

31.    The officers, without answering my brother's questions or asking any of their own, grabbed my brother by the hand and shoulder and pulled him down to the ground.

32.    When I saw the officers physically assault my brother without a warning or explanation, I remained calm. I dropped the plastic I was carrying, took out my cell phone, and began to record as I walked slowly to get closer to my brother.

33.    As I reached the other side of the home's foundation, I began walking on the wire mesh where my colleagues had just begun to spread concrete.

34.    An armed and masked officer stepped into my path when I got about 25 feet away from where the other officers were restraining my brother on the ground.

35.    I asked the officer, "Immigration?" And he replied, "Yes, immigration."

36.    I diverted my path slightly and continued walking calmly in a perimeter around my brother's detention (still at a significant distance) so I could continue filming my brother's detention on my cell phone. I did not pick up my pace or make any suspicious movements.

37.    The officer followed me but didn't ask any questions; he simply warned, "You're making this more complicated than you want to."

38.    I continued walking, but the officer suddenly sped up and grabbed me by the arm, causing me to exclaim, "Don't touch me! I'm a citizen!"

39.    Without asking any questions or giving me any orders, the officer forced my arm behind my back and began to push me to the ground.

40.    I yelled out, "Help!" And I told the officer, "I'll show you my papers now."

6

41.    The non-Latino members of my crew (none of whom any officers ever approached) looked on and yelled, "That's illegal!" "You're not supposed to be doing that!" "He's a citizen!" "He's not even doing nothing wrong—what the fuck?"

42.    I continued to repeat, "I'm a citizen! Stop! I'll show you my papers now!"

43.    Then a second officer rushed over and helped tackle me, as one of the two officers shouted, "Get on the fucking ground!"

44.    A third officer rushed past the property's No Trespassing sign and grabbed me, helping to physically restrain my movement.

45.    My cellphone fell from my hand into the freshly poured, still wet cement.

46.    From the ground, I continued to yell, "I'm a citizen! I'm a citizen! I'm a citizen!"

47.    To the best of my knowledge, the three officers detained me based solely on their presumption that Latino construction workers are all undocumented.

48.    While the three officers held me on the ground, they handcuffed me, and one of the officers reached into my pocket to search for my identification.

49.    I had my active, valid driver's license, an Alabama STAR ID (compliant with the REAL ID Act of 2005) issued in 2023, in my pocket.

50.    To get the Star on my license, I had to (and in fact did) provide the government with documents to verify my identity, date of birth, and Social Security Number to prove my citizenship.

51.     The officers who detained me refused to accept my STAR ID as proof of my citizenship. The officers told me that my STAR ID was fake, handcuffed me, removed me from my jobsite, and led me to an unmarked car.

52.     The officers held me, handcuffed, near the back of their vehicle for over an hour. They kept ignoring my pleas that I was a citizen. The handcuffs were tight and painful, and I stood the entire time in the hot Alabama sun.

53.     While I stood there detained, I continued to tell the officers I was a citizen and pleaded with them to check my Social Security Number.

54.     One of the officers finally relented, made a phone call, and confirmed that my Social Security Number was valid.

55.     The officers removed my handcuffs and let me walk back to work.

56.     All told, my wrongful detention lasted over an hour.

57.     I was not charged with a crime because I had not done anything wrong.

58.     The officers never had any valid reason to believe I had done anything wrong; they had no individualized suspicion before detaining me and did not ask me any questions to test their generalized profile.

59.     I had to take nearly two weeks off from work to recover emotionally after my first detention, at a significant financial cost.

60.     I felt dreadful after my detention—not only because it happened once but because I knew it could happen again. I was afraid to return to work.

61.     Just about two weeks after I apprehensively went back to work, I was detained again on another private construction site when another immigration patrol saw me working and assumed, without reasonable suspicion, that I was undocumented.

62.     The second detention was on June 12, 2025, at a partially built development in Fairhope, Alabama.

63.     I was still working for Southern Home Crafters, LLC. This job, however, was in a new residential subdivision owned by D.R. Horton.

64.     I was working alone inside a partially constructed home.

65.     The property was surrounded by a black perimeter fence, behind which a contractor was storing pallets full of bricks for siding and other building materials.

66.     The structure of the home was also already complete.

67.     The home had its walls, roof, windows, and some doors (but no garage doors, siding, or yard).

68.     I was alone inside the house as I finished up my team's work while the rest of my crew moved on to another development.

69.     While I was working inside this house, I was in exclusive possession of the site and had the right to exclude any unauthorized intruders.

70.     There were other construction crews working down the road in the same development, though the closest was about eight houses away.

71.     Around 8:20 a.m., I was working alone in a back bedroom with my headphones in, listening to music.

72.    Suddenly, I got the sense that somebody else was in the room watching me from behind.

73.    I was not expecting anyone to be in the house because I was in a closed structure on private property. Nor was anyone but other construction workers authorized to be on the property—let alone inside the house.

74.    Yet two federal immigration officers had spotted me working through the bedroom window, thought I fit DHS's generalized profile of an undocumented worker, and approach the home. One officer entered through an unlocked garage door while the other stood outside.

75.    Feeling someone's presence from behind, I turned around and saw an officer standing in the doorway of the bedroom.

76.    The officer was armed and masked.

77.    I took out my headphones and asked, "Why are you here?"

78.    The officer responded in Spanish, ordering me to follow him outside.

79.    I told the officer I am a citizen, but the officer insisted I follow him outside of the house anyway.

80.    I turned back toward where I was working in the bedroom and saw another immigration officer standing about five feet behind me, just outside the room's open window.

81.    With one officer blocking the bedroom doorway and another standing at the window, I was surrounded.

82.    The officer inside the house again ordered me to follow him outside.

83.     Cornered and understanding that I had no choice but to obey, I followed the officer outside to the back patio.

84.     Outside, the first officer who approached me told me that they were there to check my immigration status.

85.     I reiterated that I was a citizen. I took out my REAL ID and gave it to the officer.

86.     But, once again, my REAL ID did not convince the officers that I am a citizen. They told me I had to go with them so that they could verify my immigration status because my REAL ID could be fake.

87.     Nothing about my ID suggested that it could be fake.

88.     The officers then led me to the edge of the subdivision, at least 12 lots away, where their car was parked.

89.     As the officers led me down the road, one armed officer walked in front of me while the other armed officer walked behind me to make sure that I could not leave.

90.     I understood that I was not free to leave.

91.     Once we reached the officers' unmarked vehicle, the officers placed me into a lineup with other workers they had detained and slowly checked my legal status.

92.     As I stood there, other officers arrived with workers they had detained from the other crews in the development.

93.     At least two of those detained workers also had lawful status, one of whom I had worked with years prior and know is a citizen.

94.    The officers eventually confirmed what I had told them all along: I am a U.S. citizen.

95.    The officers released me along with the two other workers with lawful status.

96.    My second detention lasted somewhere between 20 and 30 minutes.

97.    I was not charged with a crime because I had not done anything wrong.

98.    To my knowledge, the officers involved in the May 21 and the June 12 raids did not have consent or a warrant to enter the construction sites.

99.    To my knowledge, the officers involved in the May 21 and the June 12 raids did not have any valid basis before stopping me to suspect me of violating federal immigration laws or other laws. The officers at both raids did not even seem to know the identity of me or anyone else on the site prior to detaining us, and they did not ask me any questions about my immigration status before detaining me.

100.    To my knowledge, the officers involved in the May 21 and the June 12 raids did not have any valid basis, after seeing my REAL ID, to continue detaining me.

101.    Due to the raids, I have missed almost two weeks of work, lost income, have suffered and continue to suffer stress, anxiety, and emotional distress. I live in constant fear that I will be subjected to further detention just for showing up to work.

102.    The injury I have suffered is typical of construction workers throughout Alabama who fit the same demographic profile. Many construction workers are scared to work. And they are also scared to speak publicly about their experiences during the raids

because they worry they might lose their lawful status or that their friends or family might be targeted for retaliation.

103.    I reviewed a copy of this declaration that was translated into Spanish by Institute for Justice attorney Katrin Marquez, and I spoke with her and Institute for Justice attorney Jared McClain by telephone to confirm the declaration's accuracy.

Executed October 27, 2025.

Leonardo Garcia Venegas (Oct 27, 2025 11:47:02 CDT)

Leonardo Garcia Venegas

# EXECUTED SPANISH VERSION ATTACHED

EN LA CORTE DEL DISTRITO DE LOS ESTADOS UNIDOS
DEL DISTRITO DEL SUR DE ALABAMA
EN LA DIVISION DE MOBILE

| | |
|---|---|
| LEONARDO GARCIA VENEGAS, | |
| *Demandante,* | |
| v. | Case No. 1:25-cv-397-JB-C |
| TOM HOMAN, WHITE HOUSE BORDER CZAR, IN HIS OFFICIAL CAPACITY, ET AL., | |
| *Acusados.* | |

### DECLARACION DE LEONARDO GARCIA VENEGAS

Yo, Leonardo Garcia Venegas ("Leo"), declaro y afirmo lo siguiente:

1.      Soy ciudadano estadounidense de ascendencia mexicana, residente de Alabama desde hace mucho tiempo y trabajador de la construcción en el condado de Baldwin, Alabama desde hace mucho tiempo.

2.      Nací en 1999 en Lehigh Acres, Florida. Mis padres son de nacionalidad mexicana y vivían en el país cuando yo nací, pero ya han regresado a México.

3.      Cuando tenía 14 años, me mudé a Robertsdale, Alabama, donde asistí y me gradué de Robertsdale High School en 2018. Robertsdale ha sido mi hogar desde entonces.

4.      He trabajado en la industria de la construcción en el condado de Baldwin durante aproximadamente ocho años. Principalmente he realizado trabajos de albañilería, mampostería y acabado de concreto, aunque estoy calificado para realizar

1

muchas otras tareas de construcción. Suelo construir viviendas en sitios de construcción en nuevos desarrollos privados en el condado de Baldwin.

5.      Basándome en mi experiencia en la industria de la construcción, considero que la zona de Daphne-Foley-Fairhope es un área de crecimiento rápido. Cada año se construyen decenas de nuevos desarrollos con miles de viviendas nuevas. Ayudo a construir esas nuevas viviendas trabajando como contratista para Southern Home Crafters, LLC, y tengo muchos colegas en la empresa que, como yo, son ciudadanos estadounidenses o residen legalmente en el país.

6.      Normalmente ayudo a construir casas en subdivisiones propiedad de D.R. Horton y Lennar. Basándome en mis años de experiencia y observaciones en el sector de la construcción, D.R. Horton, Lennar y DSLD son algunos de los constructores de viviendas más prolíficos del sur de Alabama.

7.      En estas obras, trabajo en propiedades privadas no abiertas al público. Según mi experiencia en el sector, cuando trabajo en una obra privada, ni los propietarios de estos desarrollos residenciales, ni mi empleador, ni ningún otro subcontratista querrían ni permitirían la entrada de intrusos o personas no autorizadas a las obras.

8.      De hecho, en base a mis años de experiencia y observaciones trabajando en la industria de la construcción, mi expectativa es que solo el propietario, el desarrollador, sus agentes, empleados o contratistas u otro personal autorizado o visitantes ingresen a un sitio de construcción activo.

2

9.      Mi expectativa de que los intrusos no ingresen a los sitios de construcción activos es especialmente fuerte cuando esos sitios están marcados con un cartel de "no trespassing," rodeados por una cerca (ya sea parcial o total) o rodeados por una estructura (ya sea parcial o total), como lo es casi cada sitio de construcción en el que he trabajado.

10.     Cuando empiezo a trabajar en una obra privada, mi equipo y yo solemos tomar posesión exclusiva de la misma (junto con cualquier otro equipo que trabaje en ella), la cual el propietario no recupera hasta que la obra esté terminada. Durante ese tiempo, entiendo y espero que solo las personas afiliadas al proyecto de construcción accedan a la obra.

11.     Si personas ajenas al proyecto de construcción ingresaran sin permiso a una obra en la que estoy trabajando, sufriría varios daños, como distracciones, menor calidad del trabajo, mayor riesgo de lesiones e incluso despido y posible responsabilidad legal por cualquier lesión que se produzca.

12.     Entiendo y espero que yo, mi equipo y nuestros supervisores tengamos el derecho y el deber de excluir a cualquier persona que entre sin permiso a una obra privada en la que trabaje activamente. Esta comprensión y expectativa se derivan de la naturaleza del trabajo, los riesgos de seguridad que he recibido capacitación para evitar, mi experiencia en el sector y mi comunicación con mi equipo y mis supervisores.

13.     Después de comenzar un trabajo de construcción, mi equipo y yo normalmente permanecemos en el lugar continuamente hasta que el trabajo está

terminado cada día, especialmente en mi trabajo actual, que trata con hormigón húmedo.

14.     Cuando trabajo en una obra, suelo formar parte de un equipo de cinco especialistas en hormigón. Y los desarrollos y sitios en los que trabajamos generalmente incluyen al menos otros siete equipos, cada uno de ellos formado por unos cinco trabajadores. (En otras palabras, lo habitual es que al menos 35 personas, trabajando en equipos de cinco miembros, construyan conjuntamente diferentes partes de cada casa). Esos otros equipos hacen cosas como enmarcar, plomería, electricidad, paneles de yeso, techados, revestimientos, pintura y paisajismo.

15.     Los trabajadores se trasladan entre diferentes subdivisiones día a día y semana a semana a medida que se completa su parte del trabajo o mientras esperan que otros equipos terminen el suyo.

16.     Por lo tanto, rara vez trabajo en un lugar fijo más de unos días. Mi trabajo me lleva a diferentes obras en el condado de Baldwin, con diferentes propietarios y con diferentes contratistas.

17.     Tengo conocimiento de al menos 15 redadas (sin incluir las que experimenté) en sitios de construcción privados en el condado de Baldwin desde enero de 2025.

18.     Que yo sepa, esas 15 redadas —al igual que las que experimenté personalmente— se llevaron a cabo sin orden judicial ni consentimiento del propietario y sin ninguna razón para sospechar que los trabajadores de esos sitios estuvieran violando alguna ley.

19.     En un lapso de poco más de tres semanas entre mayo y junio de 2025, experimenté dos redadas en sitios de construcción privados donde trabajaba: uno en un sitio propiedad de D.R. Horton y el otro en un sitio propiedad de Lennar.

20.     Alrededor de las 7:00 a. m. de la mañana del 21 de mayo, me presenté para colocar los cimientos de concreto de las primeras cuatro casas en una nueva subdivisión residencial en Foley, Alabama.

21.     La subdivisión era propiedad de Lennar.

22.     El sitio en el que estaba trabajando, junto con otros en el desarrollo, tenía un cartel de "No Trespassing" y estaba rodeado por una cerca perimetral negra hasta la altura de las rodillas.

23.     El equipo de hormigón estaba compuesto por cinco trabajadores, incluyéndome a mí, todos ellos latinos.

24.     También había un equipo de trabajadores no latinos (dos blancos y dos negros) que estaban allí para entregar hormigón para el sitio.

25.     Empezó a llover, así que salí del sitio para ir a buscar plástico para cubrir el hormigón recién vertido.

26.     Cuando regresé al sitio alrededor de las 8:00 a. m., vi a cinco hombres armados y camuflados —tres de ellos enmascarados— saltando la cerca corta del límite de la propiedad y corriendo, pasando el letrero de "No Trespassing", hacia mis compañeros de trabajo.

27.     Los oficiales pasaron corriendo a los cuatro trabajadores blancos y negros sin detenerlos y fueron directamente hacia cuatro trabajadores latinos.

5

28.    Tres miembros de mi equipo corrieron al ver a hombres armados corriendo hacia ellos, y dos oficiales los persiguieron.

29.    Un cuarto miembro del equipo, mi hermano, no se movió; permaneció de pie sobre los cimientos recién construidos para el garaje de una casa en uno de los sitios.

30.    Dos oficiales se acercaron a mi hermano y él les preguntó por qué estaban en la propiedad y si tenían una orden judicial.

31.    Los oficiales, sin responder las preguntas de mi hermano ni preguntar  las suyas propias, agarraron a mi hermano de la mano y el hombro y lo tiraron al suelo.

32.    Cuando vi a los agentes agredir físicamente a mi hermano sin previo aviso ni explicación, mantuve la calma. Solté el plástico que llevaba, saqué mi celular y comencé a grabar mientras caminaba lentamente para acercarme a mi hermano.

33.    Cuando llegué al otro lado de los cimientos de la casa, comencé a caminar sobre la malla de alambre donde mis colegas acababan de comenzar a esparcir el hormigón.

34.    Un oficial armado y enmascarado se interpuso en mi camino cuando me encontraba a unos 25 pies de distancia de donde los otros oficiales estaban sujetando a mi hermano en el suelo.

35.    Le pregunté al oficial: "Immigration?" Y él respondió: "Yes, immigration."

36.    Desvié un poco mi camino y continué caminando tranquilamente en un perímetro alrededor de la detención de mi hermano (aún a una distancia significativa) para poder seguir filmando la detención de mi hermano con mi teléfono celular. No aceleré el paso ni hice ningún movimiento sospechoso.

37. El oficial me siguió, pero no hizo preguntas; simplemente me advirtió: "You're making this more complicated than you want to."

38. Seguí caminando, pero el agente aceleró de repente y me agarró del brazo, lo que me hizo exclamar: "Don't touch me! I'm a citizen!"

39. Sin hacerme preguntas ni darme órdenes, el oficial me metió el brazo detrás de la espalda y empezó a empujarme al suelo.

40. Grité: "Help!" Y le dije al oficial: "I'll show you my papers now."

41. Los miembros no latinos del equipo (a ninguno de los cuales ningún oficial se acercó jamás) miraron y gritaron: "That's illegal!" "You're not supposed to be doing that!" "He's a citizen!" "He's not even doing nothing wrong—what the fuck?"

42. Seguí repitiendo: "I'm a citizen! Stop! I'll show you my papers now!"

43. Después, un segundo oficial corrió y ayudó a detenerme, mientras uno de los dos oficiales gritaba: "Get on the fucking ground!"

44. Un tercer oficial pasó corriendo al cartel de "No Trespassing" de la propiedad y me agarró, ayudando a restringir mi movimiento físicamente.

45. Mi teléfono celular se cayó de mi mano al cemento recién vertido y aún húmedo.

46. Desde el suelo, seguí gritando, "I'm a citizen! I'm a citizen! I'm a citizen!"

47. Hasta donde yo sé, los tres oficiales me detuvieron basándose únicamente en su presunción de que todos los trabajadores de la construcción latinos son indocumentados.

48.    Mientras los tres oficiales me mantenían en el suelo, me esposaron y uno de ellos metió la mano en mi bolsillo para buscar mi identificación.

49.    Tenía en mi bolsillo mi licencia de conducir activa y válida, un STAR ID de Alabama (compatible con la Ley REAL ID de 2005) emitida en 2023.

50.    Para obtener la estrella en mi licencia, tuve que (y de hecho lo hice) proporcionar al gobierno documentos para verificar mi identidad, fecha de nacimiento y número de Seguro Social para demostrar mi ciudadanía.

51.    Los agentes que me detuvieron se negaron a aceptar mi STAR ID como prueba de ciudadanía. Me dijeron que era falsa, me esposaron, me sacaron de mi lugar de trabajo y me llevaron a un coche sin distintivos.

52.    Los agentes me mantuvieron esposado cerca de la parte trasera de su vehículo durante más de una hora. Ignoraron mis súplicas de que era ciudadano. Las esposas estaban apretadas y me dolían, y estuve todo el tiempo bajo el ardiente sol de Alabama.

53.    Mientras estuve allí detenido, continué diciéndoles a los oficiales que era ciudadano y les supliqué que verificaran mi número de Seguro Social.

54.    Uno de los oficiales finalmente cedió, hizo una llamada telefónica y confirmó que mi número de Seguro Social era válido.

55.    Los oficiales me quitaron las esposas y me dejaron volver al trabajo.

56.    En total, mi detención injusta duró más de una hora.

57.    No presentaron cargos penales contra mí porque yo no había hecho nada malo.

58.    Los oficiales nunca tuvieron ninguna razón válida para creer que yo había hecho algo malo; no tenían ninguna sospecha individualizada antes de detenerme y no me hicieron ninguna pregunta para probar su perfil generalizado.

59.    Tuve que tomarme casi dos semanas libres del trabajo para recuperarme emocionalmente después de mi primera detención, lo que me costó mucho dinero.

60.    Me sentí fatal después de mi detención, no solo porque había ocurrido una vez, sino porque sabía que podía volver a ocurrir. Tenía miedo de volver al trabajo.

61.    Apenas dos semanas después de haber regresado aprensivamente al trabajo, me detuvieron nuevamente en otro sitio de construcción privado cuando otra patrulla de inmigración me vio trabajando y asumió, sin sospecha razonable, que era indocumentado.

62.    La segunda detención tuvo lugar el 12 de junio de 2025, en un desarrollo parcialmente construido en Fairhope, Alabama.

63.    Seguía trabajando para Southern Home Crafters, LLC. Este trabajo, sin embargo, fue en una nueva subdivisión residencial propiedad de D.R. Horton.

64.    Estaba trabajando solo dentro de una casa parcialmente construida.

65.    La propiedad estaba rodeada por una cerca perimetral negra, detrás de la cual un contratista almacenaba paletas llenas de ladrillos para revestimiento y otros materiales de construcción.

66.    La estructura de la casa también ya estaba completa.

67.    La casa tenía sus paredes, techo, ventanas y algunas puertas (pero no tenía puertas de garaje, revestimiento ni patio).

68.    Estaba solo dentro de la casa mientras terminaba el trabajo de mi equipo mientras el resto de mi equipo se trasladaba a otro desarrollo.

69.    Mientras trabajaba dentro de esta casa, estaba en posesión exclusiva del sitio y tenía el derecho de excluir a cualquier intruso no autorizado.

70.    Habían otros equipos de construcción trabajando en la misma calle, en el mismo desarrollo, aunque el más cercano estaba a unas ocho casas de distancia.

71.    Alrededor de las 8:20 a.m., estaba trabajando solo en un dormitorio trasero con mis auriculares puestos, escuchando música.

72.    De repente, tuve la sensación de que alguien más estaba en la habitación observándome desde atrás.

73.    No esperaba que hubiera nadie en la casa, ya que me encontraba en una estructura cerrada en una propiedad privada. Además, solo otros trabajadores de la construcción estaban autorizados a estar en la propiedad, y mucho menos dentro de la casa.

74.    Sin embargo, dos agentes federales de inmigración me vieron trabajando desde la ventana del dormitorio, creyeron que encajaba en el perfil general del DHS de trabajador indocumentado y se acercaron a la casa. Un oficial entró por una puerta de garaje que no estaba cerrada con llave mientras el otro se quedó afuera.

75.    Sintiendo la presencia de alguien detrás de mí, me giré y vi a un oficial parado en la puerta del dormitorio.

76.    El oficial estaba armado y enmascarado.

77.    Me saqué los auriculares y pregunté: "Why are you here?"

10

78.    El oficial respondió en español, ordenándome que lo siguiera afuera

79.    Le dije al oficial que era ciudadano, pero el oficial insistió en que lo siguiera fuera de la casa de todos modos.

80.    Me giré hacia donde estaba trabajando en el dormitorio y vi a otro oficial de inmigración parado aproximadamente a cinco pies detrás de mí, justo afuera de la ventana abierta de la habitación.

81.    Con un oficial bloqueando la puerta del dormitorio y otro parado en la ventana, estaba rodeado.

82.    El oficial dentro de la casa de nuevo me ordenó seguirlo afuera.

83.    Acorralado y comprendiendo que no tenía más opción que obedecer, seguí al oficial hasta el patio trasero.

84.    Afuera, el primer oficial que se me acercó me dijo que estaban allí para verificar mi estatus migratorio.

85.    Reiteré que era ciudadano. Saqué mi REAL ID y se lo di al oficial.

86.    Pero, una vez más, mi REAL ID no convenció a los oficiales de que soy ciudadano. Me dijeron que tenía que acompañarlos para que verificaran mi estatus migratorio, ya que mi REAL ID podría ser falso.

87.    No había nada en mi identificación que sugiriera que pudiera ser falsa.

88.    Los oficiales luego me llevaron al borde de la subdivisión, al menos a 12 lotes de distancia, donde estaba estacionado su auto.

89.    Mientras los oficiales me llevaban por la calle, un oficial armado caminaba delante de mí mientras que el otro oficial armado caminaba detrás de mí para asegurarse de que no pudiera irme.

90.    Comprendí que no era libre de irme.

91.    Una vez que llegamos al vehículo sin identificación de los oficiales, los oficiales me colocaron en una fila con otros trabajadores que habían detenido y verificaron lentamente mi estatus legal.

92.    Mientras estaba allí, llegaron otros oficiales con trabajadores que habían detenido de los otros equipos del desarrollo.

93.    Al menos dos de esos trabajadores detenidos también tenían estatus legal; había trabajado con uno de ellos años antes y sé que es ciudadano.

94.    Los oficiales finalmente confirmaron lo que les había dicho desde el principio: soy ciudadano estadounidense.

95.    Los oficiales me liberaron junto con los otros dos trabajadores con estatus legal.

96.    Mi segunda detención duró entre 20 y 30 minutos.

97.    No presentaron cargos penales contra mí porque yo no había hecho nada malo.

98.    Que yo sepa, los oficiales involucrados en las redadas del 21 de mayo y del 12 de junio no tenían consentimiento ni orden judicial para ingresar a las obras de construcción.

99.    Que yo sepa, los agentes que participaron en las redadas del 21 de mayo y
del 12 de junio no tenían ninguna base válida, antes de detenerme, para sospechar que
había violado las leyes federales de inmigración u otras leyes. Los agentes de ambas
redadas ni siquiera parecían conocer mi identidad ni la de ninguna otra persona en el
lugar antes de detenernos, y no me hicieron ninguna pregunta sobre mi estatus
migratorio antes de detenerme.

100.    Que yo sepa, los oficiales involucrados en las redadas del 21 de mayo y del
12 de junio no tenían ninguna base válida, después de ver mi REAL ID, para continuar
deteniéndome.

101.    Debido a las redadas, he perdido casi dos semanas de trabajo, he perdido
ingresos y he sufrido y sigo sufriendo estrés, ansiedad y angustia emocional. Vivo con el
temor constante de ser sometido a más detenciones solo por ir a trabajar.

102.    La lesión que sufrí es típica de los trabajadores de la construcción de
Alabama que encajan en el mismo perfil demográfico. Muchos tienen miedo de trabajar.
Y también temen hablar públicamente sobre sus experiencias durante las redadas porque
les preocupa perder su estatus legal o que sus amigos o familiares sean objeto de
represalias.

103.    Revisé una copia de esta declaración que fue traducida al español por la
abogada del Instituto de Justicia, Katrin Márquez, y hablé con ella y con el abogado del
Instituto de Justicia, Jared McClain, por teléfono para confirmar la exactitud de la
declaración.

13

Ejecutado este 27 de Octubre del 2025.

_____
Leonardo Garcia Venegas