# DECLARATION OF JOSHUA WINDHAM

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

| | |
|---|---|
| LEONARDO GARCIA VENEGAS,<br><br>     *Plaintiff,*<br><br>v.<br><br>TOM HOMAN, WHITE HOUSE BORDER CZAR,<br>IN HIS OFFICIAL CAPACITY, ET AL.,<br><br>     *Defendants.* | Case No. 1:25-cv-397-JB-C |

**DECLARATION OF JOSHUA WINDHAM**

I, Joshua Windham, do affirm and state as follows:

1. I am a United States citizen, a Virginia resident, over 18 years old, and competent to make this declaration, which I make voluntarily based on my personal knowledge.

2. I am an attorney at the Institute for Justice, which represents the Plaintiff Leonardo Garcia Venegas in this case.

3. On October 23, 2025, I accessed the following webpage and watched the video on that page: *Stephen Miller reveals Trump admin's 'daily goal' for illegal migrant arrests*, Fox News, https://www.youtube.com/watch?v=MJNXsOqFSZs (May 29, 2025) (Stephen Miller stating, in part, that the President has "set a goal of a minimum of 3,000 arrests for ICE per day" and "is going to keep pushing to get that number up higher each and every single day").

4.      On October 23, 2025, I accessed the following webpage and read the text on that page: *Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials*, DHS (Jan. 23, 2025), https://archive.is/t0208 (agency stating, in part, that an Acting DHS Secretary "directive gives Department of Justice (DOJ) law enforcement officials in the U.S. Marshals, Drug Enforcement Administration (DEA), the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Federal Bureau of Prisons authority to investigate and apprehend illegal aliens" and that "Mobilizing these law enforcement officials will help fulfill President Trump's promise to the American people to carry out mass deportations").

5.      On October 23, 2025, I accessed the following webpage and read the text on that page: *100 days of record-breaking immigration enforcement in the US interior*, ICE (Apr. 29, 2025), https://archive.is/yPPfk (agency stating, in part, that the Administration has taken "a whole-of-government approach to immigration enforcement").

6.      On October 23, 2025, I accessed the following webpage and read the text on that page: *Trump will target US employers in next phase of immigration crackdown, Homan says*, Semafor (June 12, 2025), https://archive.is/tnjTb (Tom Homan stating, in part, that "[w]orksite enforcement operations are going to massively expand").

7.      On October 23, 2025, I accessed the following webpage and read the text and watched the video on that page: *FBI conducts illegal immigrant raids in D.R. Horton developments*, Fox10 (Feb. 13, 2025), https://www.fox10tv.com/2025/02/14/fbi-conducts-illegal-immigrant-raids-dr-horton-developments/ (report stating, in part, that "the FBI, Homeland Security, and Baldwin County Sheriff's Office mov[ed] in fast this

week, hitting multiple neighborhoods in Daphne and Spanish Fort," including construction sites in the Jubilee Farms and Stonebridge neighborhoods owned by builder D.R. Horton).

8.    On October 23, 2025, I accessed the following webpage and read the text and watched the video on that page: *Homeland Security investigator talks about Baldwin County raids*, Fox10 (June 12, 2025), https://www.fox10tv.com/2025/06/12/homeland-security-investigator-discusses-illegal-immigration-raids-baldwin-county/ (report stating, in part, that "FBI, HSI, and other federal agencies have raided multiple construction sites across the bay" and that raids had been happening "[f]or months," and quoting Steve Schrank, Special Agent in Charge for HSI, stating: "Some of th[e] [recent construction raids] goes along with where individuals could find employment and where they could settle down, and as we've seen significantly in Alabama, there's a tremendous potential in utilization of illegal alien workforces in development and construction, and with that growth, has brought in a significant illegal immigrant population to work those construction jobs and develop all of the housing that has been fueling some of the growth.").

9.    On October 23, 2025, I accessed the following webpage and read the text on that page: *Construction delayed as raids focus on coastal counties*, Lagniappe, https://archive.is/mpqoZ (Sept. 17, 2025) (report stating, in part, that "[a]ccording to statewide law enforcement data provided to Lagniappe, nearly half of the official [construction site] raids, which can be on one site or across several, in Alabama have occurred in Baldwin and Mobile counties, accounting for 21 raids. Lagniappe cross-

checked publicly reported raids against the provided data to ensure accuracy," and that because of those raids "[a] business owner in Baldwin County who asked to remain anonymous out of fear that ICE will target his job sites told Lagniappe the raids have significantly slowed down projects all across the county," that he "ha[s] seen or know of ICE detaining and arresting workers who obtained either a work permit or were seeking legal status as part of their employment," and that these raids "have removed a large portion of the area's skilled labor and scared even some workers with valid legal status from coming to work").

10.    On October 23, 2025, I accessed the following webpage and read the text on that page: *Alabama construction industry may face devastating worker shortage under Trump immigration crackdown*, AL.com (Sept. 21, 2025), https://archive.is/GjQPO (report stating, in part, that "[f]ederal authorities carrying out the administration's call for mass deportations have stepped up raids on construction sites this summer," that "Harrison, who owns a construction company in Tuscaloosa . . . . said news stories about worksite raids by Immigration and Customs Enforcement and the Trump administration's goals of mass deportation cause anxiety in the workplace even for workers with legal status. 'These guys on the job sites right now, their head's on a swivel because they're so concerned any minute that they may get raided,' Harrison said. 'They've heard that some of these people throughout the process have been picked up even though they had documentation. There's hysteria in that community. . . . There's enough news covered out there of raids that still keeps this in the forefront of this population's mind as well as ours,' Harrison said. 'I haven't seen it slowing down.'").

11. On October 23, 2025, I accessed the following webpage and read the text on that page and the following results of a query for the current number of construction employees in Alabama: *All Employees: Construction in Alabama*, Federal Reserve Bank of St. Louis (Aug. 2025), https://archive.is/mLFrq (query image below).

## ☆ All Employees: Construction in Alabama (ALCONS)

| *Observations* ⌄ | *Units:* | *Frequency:* |
|---|---|---|
| Aug 2025: **110.5** | Thousands of Persons, | Monthly |
| Updated: Sep 20, 2025 4:07 AM CDT | Seasonally Adjusted | |
| Next Release Date: Oct 21, 2025 | | |

The webpage states that it collected data from the U.S. Bureau of Labor Statistics, which states that its industry statistics derives from information that businesses provide to state agencies regarding their "wage and salary workers." *Occupational Employment and Wage Statistics*, U.S. BLS, https://archive.is/QxSqs. Relatedly, on October 20, 2025, I accessed the following webpage and read the text on that page and the following figure regarding the percentage of Hispanic workers in the United States construction industry: *Spotlight on Statistics*, U.S. BLS, https://archive.is/ZW6sB (figure image below).



Taking these two figures together—that there are documented 110,500 construction workers in Alabama, about 30% of whom are Hispanic—there are approximately 33,150 documented Hispanic construction workers in Alabama.

12.    On October 23, 2025, I accessed the following webpage and read the text on that page and the following figure regarding the fastest growing metropolitan areas in the country: *Press Release: Growth in Metro Areas Outpaced Nation*, U.S. Census Bureau (March 13, 2025), https://archive.is/wOf4I (figure image below).

## Top 10 U.S. Metro Areas by Percent Growth: July 1, 2023, to July 1, 2024

| Rank | Metro Area | April 1, 2020 (Estimates Base) | July 1, 2023 | July 1, 2024 | Percent Growth |
|---|---|---|---|---|---|
| 1 | Ocala, FL | 375,902 | 412,338 | 428,905 | 4.0% |
| 2 | Panama City-Panama City Beach, FL | 200,521 | 217,967 | 226,221 | 3.8% |
| 3 | Myrtle Beach-Conway-North Myrtle Beach, SC | 351,038 | 398,374 | 413,391 | 3.8% |
| 4 | Lakeland-Winter Haven, FL | 725,036 | 824,172 | 852,878 | 3.5% |
| 5 | Provo-Orem-Lehi, UT | 671,181 | 738,375 | 760,531 | 3.0% |
| 6 | Daphne-Fairhope-Foley, AL | 231,767 | 254,107 | 261,608 | 3.0% |
| 7 | Port St. Lucie, FL | 487,654 | 540,427 | 556,336 | 2.9% |
| 8 | Midland, TX | 175,587 | 183,557 | 188,766 | 2.8% |
| 9 | Odessa, TX | 165,182 | 165,450 | 170,022 | 2.8% |
| 10 | Spartanburg, SC | 355,237 | 385,441 | 395,934 | 2.7% |

Source: U.S. Census Bureau, Vintage 2024 Population Estimates.

13.     On October 23, 2025, I accessed the following webpage and watched the video and read the text on that page: *User Clip: No limit on Trump's authority*, CSPAN (Aug. 13, 2025), https://www.c-span.org/clip/white-house-event/user-clip-no-limit-on-trumps-authority/5169866 (Tom Homan stating, in part, that "President Trump doesn't have a limitation on his authority to make this country safe again. There is no limitation on that.").

14.     On October 23, 2025, I accessed the following webpage and read the text on that page: https://archive.is/fOZx9 (Oct. 5, 2025, 10:01pm) (Stephen Miller stating, in part, "it is the absolute moral and constitutional duty of the federal government to . . . ensur[e] the full and unrestricted enforcement of federal immigration law").

15.    On October 23, 2025, I accessed the following webpage and read the text on that page: *US immigration officers ordered to arrest more people even without warrants*, The Guardian (June 4, 2025), https://archive.is/2DBWr (report stating, in part, that "[s]enior US immigration officials over the weekend instructed rank-and-file officers to 'turn the creative knob up to 11' when it comes to enforcement," and that officers should ""do what [they] need to do,'" and "'push the envelope,'" and "'[i]f it involves handcuffs on wrists, it's probably worth pursuing'").

16.    On October 23, 2025, I accessed the following webpage and read the text on that page: *ICE, Homeland Security Task Force, partners investigate cockfighting operation, illegal immigration and other crimes*, ICE (June 16, 2025), https://archive.is/THhnM (agency stating, in part, that the "Gulf of America Homeland Security Task Force . . . . is comprised of U.S. Immigration and Customs Enforcement Homeland Security Investigations, FBI, IRS, Bureau of Alcohol Tobacco Firearms and Explosives, and supported by the United States Marshals Service, Customs and Border Protection, ICE's Enforcement and Removal Operations and the United States Attorney's Office").

17.    Attached as **Exhibit 1** is a true and correct copy of Doc. 489-4, from *Kidd v. Mayorkas*, 2:20-cv-03512-ODW-J, that I downloaded using PACER on October 4, 2025. The exhibit contains an Immigration and Customs Enforcement document that states officers "may enter . . . open areas" without consent or a warrant—even when "the area may be fenced, and even if 'no trespassing' signs have been posted"—and that officers may "conclude that an open garage affords the primary means of entry to a home" and

walk in unless "a resident clearly indicates he does not want the officer to do so." Ex. A at USA 0045536.

18.     On October 24, 2025, I accessed the following webpage and read the text on that page: *Transcript: Gregory Bovino says arrestees in Downtown Chicago chosen based partly on 'how they look'*, Chicago Sun Times (Sept. 30, 2025), https://archive.is/2yeYJ (Gregory Bovino stating, in part, that immigration officers go to places where they think they will find "illegal alienage" and can tell that a person is an illegal immigrant based on factors including "the particular characteristics of an individual, how they look. How do they look compared to, say, you? What's your name again? [Reporter, who is white, responds that his name is Chip.] Chip? Hey, Chip, you or other folks. How do they appear in relation to what you or other people look like?").

19.     On October 24, 2024, I accessed the following webpage and read the text on that page: *Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests*, NBC News (Sept. 9, 2025), https://archive.is/cdHqK (report stating, in part, that "For more than 15 years, before they conducted any operation to arrest an immigrant in the United States, officers with Immigration and Customs Enforcement's Enforcement and Removal Operations division have been required to fill out a form with details about their target—name, appearance, known addresses and employment, immigration history, any criminal history and more—and give it to a supervisor for approval. This year, in a sign of how the agency has moved from targeted enforcement to broad street sweeps under the Trump administration, that policy has been ended, six current and former officials and agents of ICE and the Department of

9

Homeland Security told NBC News. 'It's hard to fill out a worksheet that just says, "Meet in the Home Depot parking lot,"' one of the former ICE officials said.").

20.     On October 24, 2025, I accessed the following webpage and read the text on that page: *ICE is arresting migrants in worksite raids. Employers are largely escaping charges*, Washington Post (June 30, 2025), https://archive.is/iesKz (report stating, in part, that "two business owners whose companies were raided said armed DHS agents had entered areas restricted from the public. In February, ICE agents arrived at an auto repair shop outside Philadelphia. They entered a private back office and arrested the entire staff of three workers, said the owner, who spoke on the condition that he and his business not be named because he fears retaliation from the government," and that "[o]n June 22, Customs and Border Protection agents in masks, sunglasses, and bulletproof vests pulled up in unmarked cars at Bubble Bath Hand Car Wash in Torrance, California, chasing workers into a car wash tunnel marked with 'employees & clients only' signs. . . . The car wash owner, Emmanuel Karim Nicola-Cruz, said his requests to see a warrant were repeatedly denied. Security video of the incident obtained by The Post shows an agent pushing him into the tunnel. 'They weren't answering any of my questions,' Nicola-Cruz said. 'I feel like my rights were 100 percent violated. I feel absolutely, absolutely betrayed. We have American flags all over the property. We're an American business.'").

21.     On October 24, 2025, I accessed the following webpage and watched the video on that page: *Pregnant US citizen detained in Hawthorne during immigration operation*, NBCLA (June 10, 2025), https://www.youtube.com/watch?v=RzZdiL7Q1fQ (video depicting pregnant woman, in part, working in fenced and gated business lot and

10

telling immigration officers "this is private property" and "I literally work [here]," and that the officers needed to leave, before the officers handcuffed her).

22.    On October 24, 2025, I accessed the following webpage and read the text on that page: *This construction project was on time and on budget. Then came ICE*, Reuters (July 28, 2025), https://archive.is/pp4xl (stating, in part, that "Reuters interviewed 14 people in construction—CEOs, trade association officials and site supervisors—who said the [construction] raids are causing project delays and cost overruns and exacerbating existent shortages of skilled labor," including "Robby Anderson, a construction site superintendent [near Mobile, Alabama]," who "said Hispanic workers who are in the U.S. legally are scared of being detained by ICE, 'because of their skin color. They are scared because they look the part,'" and  "Jim Tobin, the CEO of the National Association of Home Builders, which has 140,000 members," who said "[t]he threats and the reporting of raids have caused workers to not show up at job sites, just whole crews for fear of a raid").

23.    On October 24, 2025, I accessed the following webpages and read the text and watched the videos on those pages, which summarize and include witness accounts of federal immigration officers raiding a business in Idaho on October 19, 2025, zip-tying hundreds of people, including children and U.S. citizens, and placing detainees' papers in plastic bags around their necks and lining them up for further investigation:

- https://www.newsweek.com/children-zip-tied-during-ice-raid-on-family-event-in-idaho-10912697
- https://www.facebook.com/story.php?story_fbid=4257847977825301&id=100008004210898&mibextid=wwXIfr&rdid=FA53cFvZPpFr3ij1#

- https://www.tiktok.com/@mocframing/video/7563178344456506654?_r=1
  &_t=ZP-90lPWUi2gvv

- https://www.tiktok.com/@bobanda16/video/7563259968233819422?_r=1&
  _t=ZP-90kaY2UBeJT

- https://www.tiktok.com/@jesusandhishorsebuddy/video/7563169249766821
  150?_r=1&_t=ZP-90lPdl8b1p9

- https://x.com/LongTimeHistory/status/1980437269052883005

- https://x.com/LongTimeHistory/status/1980714805687419210

24.     On October 24, 2025, I accessed the following webpage and read the text

on that page: *Border Patrol official denies racial profiling factors in immigration arrests,*

*says officers do consider whether people appear "panicked" or "scared,"* CNN (Oct. 8, 2025),

https://archive.is/0Zuof (Gregory Bovino stating, in part, "We need reasonable suspicion

to make an immigration arrest . . . . You notice I did not say probable cause, nor did I say

I need a warrant. We need reasonable suspicion of illegal alienage that's well-grounded

within the United States immigration law.").

25.     On October 24, 2025, I accessed the following webpage and read the text

on that page: *US citizen sues after twice being detained by immigration agents*, The

Guardian (Oct. 2, 2025), https://archive.is/4LCeP (Tricia McLaughlin stating, in part,

that "DHS law enforcement uses 'reasonable suspicion' to make arrests").

26.     On October 24, 2025, I accessed the following webpage and read the text

on that page: *How Do You Prove Your Citizenship? ICE won't say*, The Atlantic (Sept. 15,

2025), https://archive.is/mdlJQ (reporter summarizing anonymous ICE official stating,

in part, that "ICE officers have long been trained to avoid lawsuits by quickly releasing

U.S. citizens or other legal residents in their custody. But with the Trump administration

12

demanding more and more arrests and deportations, ICE officers have now been told to err on the side of action, not caution. 'This administration would rather have you arrest the U.S. citizen and sort it out later,' the official told me," and that when "I asked several career ICE officials why street-level status checks don't immediately end when someone presents a government ID such as a driver's license[,] [s]everal [officials] noted that 19 states and the District of Columbia issue driver's licenses to applicants who do not have to show proof of legal residency").

27.    On October 24, 2025, I accessed the following webpage and read the text on that page: *US Citizen Says ICE Detained Her, Said Her Passport 'Isn't Real,'* Newsweek, https://archive.is/mutJ8 (Oct. 14, 2025) (summarizing U.S. citizen and Latina service worker stating, in part, that after she left work federal "agents restrained her, placing her hands behind her back and securing them with zip ties, before questioning her for about an hour," that "she routinely carries a copy of her passport in case of encounters with federal authorities," and that "the agents questioned the validity of her passport and told her she 'doesn't look like' her family name, Greeley").

28.    Attached as **Exhibit 2** is a true and correct copy of a portion of the Excerpt of Record from *Vasquez Perdomo v. Noem*, No. 25-4312. In the exhibit, a U.S. citizen born and raised in Los Angeles, who is of Latino ethnicity, testifies that he was stopped by a federal immigration officer on a private tow yard and that, when he stated he was a citizen, the officer asked, "What hospital were you born in?," and when he replied that he did not know (multiple times), the officer "forcefully pushed me up against the metal gated fence, put my hands behind my back, and twisted my arm."

13

29.      On October 24, 2025, I accessed the following webpage and read the text on that page: *Lawsuit accuses ICE of illegally arresting Latino immigrants in D.C.*, Washington Post (Sept. 25, 2025), https://archive.is/JdDFm (report stating, in part, that a Salvadoran man who has "had temporary protected status since 2001" was walking to his truck when he "was seized by unidentified federal agents, who arrested him without a warrant and without asking for his name or identification," and that when he told the officers he had his papers, they responded, "No you don't, you are illegal. Shut up, bitch! You're illegal," and that he was "held overnight at an ICE processing facility" until "an ICE supervisor realized he had temporary protected status").

30.      On October 24, 2025, I accessed the following webpage and read the text on that page: *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days*, ProPublica (Oct. 16, 2025), https://archive.is/QCtWr (reporter stating, in part, that "[w]e compiled and reviewed every case we could find of agents holding citizens against their will, whether during immigration raids or protests. While the tally is almost certainly incomplete, we found more than 170 such incidents during the first nine months of President Donald Trump's second administration," that "[a]bout two dozen Americans have said they were held for more than a day without being able to phone lawyers or loved ones," and that in one of the citizen arrests she reviewed, officers "knocked over and then tackled a 79-year-old car wash owner, pressing their knees into his neck and back. His lawyer said he was held for 12 hours and wasn't given medical attention despite having broken ribs in the incident and having recently had heart surgery").

31.     I am a senior attorney at the Institute for Justice. I am currently one of three attorneys staffed to the above-captioned case, along with Jared McClain and Jaba Tsitsuashvili. Should additional resources be required to effectively litigate this case—whether additional attorneys or otherwise—the Institute for Justice stands ready and willing to supply those resources. In short, lack of resources will not be a barrier to our ability to effectively litigate this case.

32.     On October 24, 2025, in an effort to calculate the approximate percentage of undocumented construction workers in the United States, I took four steps. First, I identified the total number of documented construction workers in the country as of 2019 using the St. Louis Federal Reserve query system, which pulls from U.S. Bureau of Labor Statistics data (https://fred.stlouisfed.org/series/USCONS): 7,526,000. Second, I identified the total number of undocumented construction workers in the country in 2019 as reported in a Migration Policy Institute analysis of U.S. Census Bureau data (https://www.reuters.com/world/us/this-construction-project-was-time-budget-then-came-ice-2025-07-28/): 1,403,000. Third, I added those two figures—the documented and undocumented worker figures—to yield the total number of construction workers in the country in 2019: 8,929,000. Fourth, I divided 1,403,000 (number of undocumented workers) by 8,929,000 (total number of workers) to produce a final percentage for 2019: 15.7% undocumented. Thus, public data show that, as of 2019, about 15.7% of construction workers in the United States were undocumented—and thus, about 84.3% were documented.

15

33.     Attached as **Exhibit 3** is a true and correct copy of Doc. 17-2, from *Molina v. U.S. Department of Homeland Security*, 1:25-cv-03417-BAH, that I downloaded using PACER on October 24, 2025. In the exhibit, a construction worker who lives in D.C. and who has had Temporary Protected Status since 2001 testifies that he was arrested on his way to work by federal immigration officers who did not ask him any questions and did not appear to have any prior knowledge about him, and that when he told the officers he had his papers, they replied "No you don't. You're illegal," and to "Shut up bitch! You're illegal."

34.     Attached as **Exhibit 4** is a true and correct copy of Doc. 17-23, from *Molina v. U.S. Department of Homeland Security*, 1:25-cv-03417-BAH, that I downloaded using PACER on October 24, 2025. In the exhibit, the owner of a construction company that regularly works in D.C. who has work authorization, a valid driver's license, a Social Security Number, and a pending asylum application testifies that he was stopped in his car after pulling out of a Lowes parking lot and arrested by federal immigration officers who asked him no questions about his status and did not appear to have any prior knowledge about him, and that when he offered to show his documentation, the officers immediately handcuffed him and told him that his papers did not matter and were not valid to them.

35.     On October 26, 2025, I accessed the following webpage and watched the video on that page: *'Jarring, frightening attack': Chicago homeowner describes immigration raid at his home*, MSNBC (Oct. 25, 2025), https://www.msnbc.com/the-weekend-primetime/watch/-jarring-frightening-attack-chicago-homeowner-describes-immigration-

16

raid-at-his-home-250638405897 (video footage depicting a federal immigration officer entering a fenced-in residential lot with a locked gate, without a warrant, by jumping a fence after he saw construction workers on a ladder, even though the house on that lot was occupied, in order to detain the construction workers).

36.    The signed Spanish version of the Declaration of Jorge Estrada (ECF No. 30-4), was produced using the following steps: First, I had lengthy phone call with Mr. Estrada, my co-counsel Jaba Tsitsuashvili, and my colleague Katrin Marquez, an attorney at the Institute for Justice who is fluent in Spanish. Based on the facts Mr. Estrada stated on that call, I drafted an English version of Mr. Estrada's declaration. Then, we had that English version translated into an initial Spanish draft by Marcela Langlois, a Licensed Court Interpreter. Next, we had Ms. Marquez review the Spanish draft and identify any typos or phrasings that did not reflect the facts Mr. Estrada relayed on our call. Finally, I sent Mr. Estrada the final Spanish translated version and, on October 23, he signed that version. Mr. Estrada signed only the final Spanish version of the draft because that was the form in which he was most comfortable reviewing and signing the document. Based on my conversations with Mr. Marquez, the English version included with ECF No. 30-4 contains the same substantive factual content as Spanish version signed by Mr. Estrada.

37.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed October 24, 2025.

_____

Joshua Windham

ICE TRAINING DOCUMENT

# Exhibit B-1

# EXHIBIT 9

Exhibit 9
Page 00137



U.S. Immigration and
Customs Enforcement

# ICE ACADEMY

# Team Tactics

Exhibit 9

Page 00138

USA 0046363

Case 3:20-cv-07679-WHA Document 48-10 Filed 11/20/21 Page 22 of 82 Page ID #28027

# Field Operations Teams (FOT)

There is no I in team

<u>Work together</u> and <u>**communicate**</u>

Why?

To SAFELY and EFFECTIVELY
carry out the mission

Exhibit 9
Page 00139

2

**ICE ACADEMY**

USA 0046364

Case 3:20-cv-07721-SI Document 58-4 Filed 11/18/20 Page 23 of 82 Page ID #225673

# Goal of the Lesson

- **Condition:** Given field situations requiring an officer to serve an administrative warrant

- **Behavior:** the ICE officer will identify and demonstrate skills that safely and effectively utilize team tactics

- **Criterion:** according to ERO policies and procedures.

Exhibit 9

Page 00140

3

**ICE ACADEMY**

USA 0046365

Case 1:20-cv-09012-DLC Document 46 Filed 10/19/21 Page 24 of 82 Page ID #:136929

# Enabling Performance Objectives

EPO # 1:    Conduct a variety of knock and
            talk techniques with consent and
            with a withdrawal of consent

EPO# 2:     Make an arrest

EPO #3:     Serve an administrative warrant in
            a  business or commercial setting

EPO #4:     Prepare and execute an emergency action
            plan and down and disable officer (DDO)
            recovery

Exhibit 9
Page 00141        4

**ICE ACADEMY**

USA 0046366

Case 1:20-cv-06010-DLC-IPR Document 489-10 Filed 11/Page 25 Page 6 of Page ID Page ID #:98530

# Radio Review

Radio Communications

- PRO – Primary Radio Officer
- Call sign
- Contact C-100 re: start time
- Request or decline safety checks
- Advise C-100 of estimated time at the scene
- Notify C-100 re: clearing location
- LESC for immigration and criminal checks while on scene

Exhibit 9
Page 00142

5

ICE ACADEMY

USA 0046367

# FIS Review

Officer safety/common sense dictates you run checks (before/during/after) on individuals you suspect to be present or that you come in contact with.

Intelligence gathered impacts team's pre-op briefing: number of officers, pre-op notifications, and the plan for encountering known individuals.

Exhibit 9
Page 00143

6

**ICE ACADEMY**

USA 0046368

Case 8:20-cv-00641-DOC-JPR Document 69-10 Filed 10/16/20 Page 27 Page 4 of Page ID Page ID #:290632

U.S. Immigration
and Customs
Enforcement

## 8 step - general plan for "official" contact with public

- **Appropriate greeting**
- **Identify self/agency**
- **Explain the reason for the contact**
- **Assessment**
- **Ask for identification and cooperation**
- **Request additional information**
- **Decision stage**
- **Appropriate close**

## 5 step – general plan for dealing with resistance from "difficult" people

- **Ask**
- **Set Context**
- **Give Options**
- **Confirm Non-Compliance**
- **Act**

Exhibit 9
Page 00144

7

**ICE ACADEMY**

# Consensual Encounter

- ## What is it?
  - Are they free to leave?
  - Ask don't tell

- ## Purpose?
  - To develop reasonable suspicion

- ## Coercive?
  - Display of weapon
  - Tone of voice/Command
  - Touching
  - Return I.D.
  - Number of Officers

Exhibit 9
Page 00145

8

ICE ACADEMY

USA 0046370

# Consensual Encounter

- # Reasonable Suspicion
  - **Objective belief supported by articulable facts that a person is involved in criminal activity**
  - **Investigative detention is used to dispel or develop PC**
  - **Be careful not to unintentionally escalate the detention**

- # Probable Cause
  - **Reasonable LEO believes person has/is committed or committing a crime or a place contains items connected with a crime**

Exhibit 9
Page 00146    9

ICE ACADEMY

USA 0046371

# Basic Tactics vs Team Tactics

You have already reviewed and practiced basic tactics skills:

- Weapons handling
- Contact and cover
- Weapon retrieval
- Cover and concealment

Exhibit 9
Page 00147

10

**ICE ACADEMY**

USA 0046372

# Team Tactics

## Team approach

- Setting up an administrative perimeter (vs. perimeter for criminal warrant)
- Dealing with and identifying consent giver and others
- Hallway movement
- Room entry
- Encountering and arresting target

Exhibit 9
Page 00148
11

ICE ACADEMY

USA 0046373

# Agenda

- Basics of any knock and talk
- Effecting the arrest
- Business /Commercial Setting
- Special situations
- Open Area Arrests
- Vehicle Stops
- Departing the scene
- Emergency Action

Exhibit 9
Page 00149     12

ICE ACADEMY

USA 0046374

Case 2:25-cv-00082-SAB Document 83-9 Filed 11/06/23 Page 33 of 82 Page ID#: 25930

# Knock and Talk Basics

U.S. Immigration
and Customs
Enforcement

## Structure Identification

- Use plain language
- Front, Back, Left side, Right side
- Floors are as is (i.e. 1st floor, 2nd floor)
- Openings such as (Windows, doors)

Exhibit 9
Page 00150
13

ICE ACADEMY

USA 0046375

# Knock and Talk Basics

- NOTIFICATIONS
  - Charlie 100 and local law enforcement
  - LESC

- APPROACH

- ADMINISTRATIVE PERIMETER
  - 360 degree security
  - 4th amendment curtilage
  - Overwatch position
  - Set up

Exhibit 9
Page 00151    14

**ICE ACADEMY**

USA 0046376

# Knock and Talk Basics

U.S. Immigration
and Customs
Enforcement

- 2-Man
  - Intelligence or information gathering

- 5-man
  - Contact/Cover plus 3-man search team

Exhibit 9
Page 00152

15

ICE ACADEMY

USA 0046377

Case 1:25-cv-08892-JHR Document 63-9 Filed 08/27/25 Page 26 of 82 PageID #: Page ID #: 23941

# Consent and Withdraw

- Consent to enter
  - <u>Communicate to entire team!!</u>
- Consent to search - Should we use the term "search"?

** 4th Amendment issues

- Actual/Apparent/Common Authority
- Mutual Access/Joint Control
- Exceptions

** Refer to Student Disc/OPLA Opinion 2012

- Withdraw of consent

**Good verbal Techniques – 8 and 5 step

Exhibit 9
Page 00153

16

**ICE ACADEMY**

USA 0046378

# Encounter and Arrest

- Visually identify target
- Verbal commands
- POA/POD
- Cover officer(s) - 360 security
- Verify identity

Exhibit 9
Page 00154

17

**ICE ACADEMY**

USA 0046379

# When you encounter "Target"

## OFFICER CONSIDERATIONS

- Surroundings
- Obstacles
- Number of Occupant(s) / violator(s)
- Size and type of dwelling
- Size of arrest area (ie: small hallway/room)
- Communication

Exhibit 9
Page 00155

18

**ICE ACADEMY**

# Encounter and Arrest

❖ **Identify self as ICE** (during arrest)



287.8(c) - ID self and purpose of arrest

❖ **State purpose of arrest**

❖ **3 Questions-** ERO/NFOP guidance policy

➢ Do you have any medical issues or concerns?
If so, do you have medication or an assistive device to take with you?

➢ Do you have any children or other custodial responsibilities?
If so, are you the sole caregiver?

➢ Do you have a travel document or form of Identification?

Exhibit 9
Page 00156
19

Exhibit 9
Page 00156

ICE ACADEMY

USA 0046381

# Encounter and Arrest

- ## **<u>Search Incident to Arrest</u>**
  - ## – Reason
    - Weapons, Means of Escape, Evidence
  - ## – Three concentric circles
    - Immediate Area(Body)
    - Lunging area
    - Adjacent Spaces(Man Sized Space)
  - ## – Vehicles
    - Arizona v. Gant
    - https://www.lexipol.com/resources/blog/8th-circuit-case-clarifies-scope-vehicle-searches-incident-arrest/

Exhibit 9
Page 00157

20

**ICE ACADEMY**

# Warrantless Arrests

- *Castanon-Nava v. DHS*, No. 18-3757 (N.D. Ill. filed Dec. 18, 2018)

- An officer who conducts a warrantless arrest of a noncitizen, <u>must</u> document the facts and circumstances surrounding the warrantless arrest in the narrative section of the I-213.

Exhibit 9
Page 00158   21

**ICE ACADEMY**

USA 0046383



# Warntless Arrest
# I-213 documentation

## The I-213 must contain the following 6 facts for an individual flight risk analysis

1. The noncitizen was arrested without a warrant

2. The location of the arrest

3. Whether the noncitizen is an employee or a resident of location where the arrest took place

4. The noncitizens ties to the community at the time of arrest

5. Specific facts supporting the noncitizens likelihood to escape prior to obtaining a warrant

6. A statement of how the Officers identified themselves as Immigration Officers who are authorized to execute an arrest and the reason for the arrest

Exhibit 9
Page 00159
22

**ICE ACADEMY**



# Warrantless Arrest Continued

Officers may also carry a blank form I-200 for the arrest of each collateral so that an individual flight risk analysis is not needed

➢ The I-200 <u>may not</u> be pre signed

➢ A supervisor needs to be available in the field to sign the I-200

Exhibit 9
Page 00160

23

**ICE ACADEMY**



# Special Situations

➢**Juveniles/Minor children**

See Policy Memorandum **"Detention and Removal of Alien Parents or Legal Guardians"**, dated August 29, 2017, Thomas Homan

➢**Elderly fugitive (No Criminal history)**

See Policy Memorandum **"Humanitarian Resolution Procedures for Elderly Fugitives"**, dated January 12, 2009, James T. Hayes, Jr.

➢**Medical cases**

See Policy Memorandum **"Discretion in Cases of Extreme or Severe Medical Concern"**, dated December 11, 2006, John Torres

Exhibit 9
Page 00161

24

**ICE ACADEMY**



# Special Situations

## ➢ Administrative Target Referrals

Referrals for arrest based on administrative violations do not confer additional detention or arrest authority. Many encounters will still be consensual and consent must be obtained for a search.

- Alternatives to Detention (ATD) – Violating the conditions of release may only affect future custody redeterminations

- Fugitive Alien Removal Requests (FAR) – Removable aliens with clear immigration violations. A provisional warrant issued by a U.S. Magistrate must be issued for other subjects not amenable to removal (i.e. LPRs without removable convictions)

- Criminal Alien Program (CAP) – Removable aliens identified through other LEA encounters

- National Criminal Analysis and Targeting Center (NCATC) – Information Referral Lists & Case Analysis Records for potential targets and Lead Referrals for Priority aliens with recent locate info

Exhibit 9
Page 00162   25

**ICE ACADEMY**



# Special Situations

## ➢ Obtaining non-custodial biometrics

### Issues of consensual vs. custodial/arrest apply. Clarify with your local OCC

#### EAGLE DirecteD Identification Environment (EDDIE)
➢ NeoScan mobile biometric collection device collects 10 prints and photo, download app to iPhone to search IDENT & FBI NGI(NCIC)



{Only IDENT info relayed}



{NGI Rapsheet}

**EDDIE will display both the IDENT and NGI response on the Subject Details Screen. You will be able to view details from each database search by clicking on the rows.**

Exhibit 9
Page 00163    26

# ICE ACADEMY

# Open Areas

➢ **No Reasonable Expectation of Privacy**

Remember Basic Tactics considerations

- 360° security/awareness

- Administrative perimeter/REP

- Contact and Cover/Subject containment/Tactical "L" or "V"

- Vehicle containment and subject extraction

- Disrupters

Exhibit 9
Page 00164

27

**ICE ACADEMY**

# Vehicle Stops

## Viable Option for ERO Enforcement Action

- Vehicle pursuits are not authorized under any circumstance

- FOD's discretion to authorize vehicle stops

- Officers must complete FLETC or ICE vehicle stop training

- Vehicles emergency equipment must comply with state law

- LEO dictates where to stop the vehicle
  - avoid high traffic, sensitive locations

Exhibit 9
Page 00165

28

**ICE ACADEMY**

USA 0046390

# Business and Commercial Settings

- Type of business

- Speak with highest level employee at the business (owner/manager)

- Avoid giving specifics of why you are there to anyone who does not have a need to know

- Building Identification

- Know what are public / private areas

- Entrances and exits

- How should you dress when you go to a business?

- Number of employees

**Note: Do not disrupt business operations**

Exhibit 9
Page 00166

29

**ICE ACADEMY**

USA 0046391

# Departing the Scene

❖ Team accountability
- Members & Equipment

❖ Close out

❖ Notify "Charlie 100"

Exhibit 9
Page 00167

30

**ICE ACADEMY**

# Emergency Action Plan

U.S. Immigration
and Customs
Enforcement

- What is an Emergency Action Plan?

  - A discussion or training before any enforcement action that enables an officer or team to take immediate action to mitigate injury or loss of life

    Just discussing an emergency action plan mentally prepares an officer to take action

Exhibit 9
Page 00168    31

**ICE ACADEMY**

# Emergency Action Plan

U.S. Immigration
and Customs
Enforcement

- When should an Emergency Action Plan be discussed?


  - Should be part of daily briefing with all operational members present and specific to geographical area the team is working


***Discuss and visualize your actions before the emergency happens***

Exhibit 9
Page 00169

32

**ICE ACADEMY**

# Emergency Action Plan

U.S. Immigration and Customs Enforcement

- When is an Emergency Action Plan needed and what should be discussed?

  - Uses of Force
    - Officer/Civilian injured

  - Shots Fired
    - Downed Officer Extraction

  - Explosives/Meth Lab

Exhibit 9
Page 00170

33

ICE ACADEMY

# Down and Disabled Officer

- Stop the threat

- Activate 911

- Single officer drags

- Multiple officer drags and carries

- Can use heavier firepower and ballistic shields if available

Exhibit 9
Page 00171    34

ICE ACADEMY

USA 0046396

# Down and Disabled Officer

- Officer Rescue – Directed by Team Lead

- Ballistic Shields
- – Normally carried by one officer, but can be two
- – Recognize its limitations – nomenclature
- – Pros/Cons

Exhibit 9
Page 00172
35

ICE ACADEMY

USA 0046397

# Review

- Identify the knock & talk basics for residential vs. business/commercial setting.

- **Good Communication** is the key to success before, during, and after

- Name some officer considerations when making an arrest

- Create an emergency action plan

- Utilize a shield and Downed Officer extraction

Exhibit 9
Page 00173    36

ICE ACADEMY

USA 0046398

# Practice

U.S. Immigration
and Customs
Enforcement

- Lab 1 - 4 Drill Stations
  - » 2-Man K&T
  - » Admin Warrant Residence
  - » Admin Warrant Residence
  - » Business setting
- Lab 2 - 4 Drill Stations
  - » MILO Lab (TT & UoF)
  - » Vehicle Stop
  - » Admin Warrant Residence
  - » Open Area Arrest
- Lab 3 – 4 Drill Stations (3 hours)
  - o Admin Warrant Residence
  - o CAP/FAR Scenario
  - o Vehicle Stop II
  - o Open Area II Arrest

Exhibit 9
Page 00174

37

**ICE ACADEMY**

# Field Operations PE

- Final Test of Activity (TD 9)

  ❖ Vehicle Stop
  ❖ Administrative Warrant-Residence
  ❖ Administrative Warrant –Business
  ❖ UoF - MILO

Exhibit 9
Page 00175

38

**ICE** ACADEMY

# Summary and Integration

U.S. Immigration
and Customs
Enforcement

- Law enforcement operations are inherently dangerous.

- Officer safety is paramount.

- Working as a team increases chance of successfully completing the mission while surviving a potentially hazardous environment.

- Employ basic fundamentals to minimize the physical and legal risks to your team.

Exhibit 9
Page 00176    39

**ICE ACADEMY**

USA 0046401

# EXHIBIT 10

Exhibit 10

## Legal and Policy Based Instruction for ERO Field Operations

### INTRODUCTION

The mission of the National Fugitive Operations Program is to identify, locate, arrest, and remove the ICE fugitive alien population in the United States. Immigration and Customs Enforcement has defined an ICE fugitive alien as any alien who has failed to depart the United States following the issuance of a final order of removal deportation, or exclusion; or who has failed to report to ICE after receiving a notice to do so.

The information presented in the following videos reflects current policies and directives and are subject to change or revision at any time. It is the responsibility of the learner to stay informed on any updated material.

### MODULE 1: ADMINISTRATIVE WARRANT SCENARIO

#### DOCUMENTATION OF OPERATIONAL ACTIVITY

SCENARIO:
My husband and I were at our home with our daughter just outside of Tijuana. We had just finished playing a board game when I heard a car pull up to the house. A few seconds later there was a knock at the door. Juan must have known something was wrong because he grabbed his gun before he went to the door. He asked who was there. A man's voice said that he had a delivery for Juan Ortiz. When Juan opened the door... (Gunshots) I heard a man say 'grab his gun'...and they left. I tried to stop the bleeding...but there was nothing I could do.

Hey, good morning guys, how's everybody doing? Hey, did you see that Intel brief that came this morning about the latest threats made against U.S. officers? Yea, Mounce forwarded that. It all started when that TJ cop was assassinated a few years ago.

Hey, I remember that; the drug cartel declared war against the police.

Yea exactly, hey, look it's on the news right now.

*(News Reporter) ●n the night of February 7th, 2007, Tijuana Police Chief Juan ●rtiz was shot to death at his home on the outskirts of Tijuana. The murder set off six weeks of shootings by Mexican drug traffickers targeting Mexican police officers. When the shootings subsided, 10 Tijuana officers had been wounded and 5 killed. In March of 2008, seven suspects were arrested.*

*Yesterday, after a prolonged trial, all seven were convicted for drug trafficking and for their involvement in the Tijuana murders. Unfortunately, the individual who shot Police Chief ●rtiz remains at large.*

This world is crazy. Another bad guy gets away. You know, just once, I'd like to catch a guy like that.

Yeah, well this might be your big chance, Jackson. I've got a good one for ya; come on to my office. Have a seat. Meet Mr. and Mrs. Rodriguez. Both have been arrested multiple times for shoplifting. We had our DRA run some of the checks. We don't have anything on the husband, but it looks like the wife is living on Hubble St. in N. Charleston. Yea, it's on 306 Hubble. I think she found something about her working as a cleaning lady also. Go get 'em Jackson.

Well, it's time to go arrest a shoplifting cleaning lady and her husband, this ought to make the world a safer place.

1

Exhibit 10
Page 00177

## Legal and Policy Based Instruction for ERO Field Operations

Alright guys, let me get somebody here and then we'll head over and check out the FOW.

Hi yes, this is Officer Jackson with ICE. We're in the area to serve a local warrant, was hoping to get the help of a local officer, if that's alright.

Yeah, sure can. We're at Joe's Coffee shop off of Hibben Road. Alright, I appreciate your help. Thank you. Alright, sounds like we're all set.

They had a guy in the immediate area. They're sending him right over.

Hey thanks. Your coffee.

I just got off the phone with the locals - they're on the way over and I was talking with the guys and we were gonna head over and check out the FOW.

Sound good? Sounds good. Alright, I see you over there.

(AGENT JACKSON VOICEOVER) The team gathered up about 100 yards from the coffee shop. When the local officer arrived, we took a look at the FOWs for Mr. and Mrs. Rodriguez. Agent Miles suggested a ruse to get us into the house.

Hey, I know how we can get in the house, no problem. I knew these guys who once used a local delivery truck - drove right up into the driveway, knocked on the door and they're in...

That's a good one right there. That might work.

(AGENT JACKSON VOICEOVER) I decided it would be best to move straight to the target's house and check it out. Mrs. Rodriguez worked for a cleaning company. With any luck, we would catch her before she left the house.

---

### CURTILAGE (teaching point)

Maybe you have heard the often-used adage that a man's house is his castle," which recognizes the fact that a person has a high level of REP, or a reasonable expectation of privacy, in his residence or home. It is an extremely important principle since, in serving administrative warrants, many of you are faced with obtaining consent in order to gain entry to the target's castle."

The concept of curtilage is a parallel consideration that flows from the importance the founders of this country attached to the privacy a person is entitled to in his home. According to the Supreme Court, "the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" The Court has also held that the protection extended to "the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened."

---

4

Exhibit 10
Page 00178
USA 0045535

# Legal and Policy Based Instruction for ERO Field Operations

There are four factors that are considered in deciding whether a particular area is part of the curtilage: (1) the proximity of the area claimed as the curtilage to the residence; (2) whether the area is within an enclosure that also surrounds the house; (3) the nature of the use that is made of the area; and (4)the steps taken by those living in the home to protect the area from being seen by individuals who pass by. No single factor is dispositive in deciding whether the area surrounding the residence and within an enclosure is one in which intimate family activities occur.

Although a curtilage could be defined by a natural enclosure or barrier, homeowners often take measures to ensure privacy by erecting privacy fences or high walls to obstruct any view of the area surrounding the home and keep unwanted visitors from entering. Since steps are taken more often to restrict the view of backyards, and possibly areas to the side of a home, the curtilage in front of a house is generally afforded a lower level of REP than areas in the back or on the side.

Observation by law enforcement officers is not precluded just because an area is within the curtilage. An officer's view from a vantage point where he has a right to be present is not barred simply because a homeowner has taken steps to limit or block some observation of his activities. As previously mentioned, what an individual has knowingly exposed to the public is not subject to protection by the Fourth Amendment. For example, although a low fence may establish a curtilage area, it is only a limited barrier and does not prevent visibility from an adjacent street or sidewalk. Likewise, a walk or path leading from a gate in the fence to the front door of a house does not prevent an officer from going to the door if a neighbor, visitor, postman, salesperson, or census taker would access the home by using that same route. Under some circumstances, a walkway or path to the side or back of the house may properly be viewed as a way to access the residence.

Where there is no defined entrance to a home, it may be reasonable to conclude that an open garage affords the primary means of entry into a home.

An officer should not enter the garage, however, when a resident clearly indicates he does not want the officer to do so. It is never permissible to enter an area where there is a locked gate on a privacy fence. The concept of "open fields," which also includes wooded sections of property, refers to unoccupied or undeveloped areas beyond the curtilage in which there is no REP. Although the area may be fenced, and even if "no trespassing" signs have been posted, an officer may enter such open areas for legitimate law enforcement reasons. Please be mindful of officer safety considerations when making this determination.

Without a criminal warrant, or a recognized exception to the requirement for a warrant, such as consent, you may not, however, enter barns, sheds, or other structures located on "open fields."

---

CONSENT
SCENARIO:
May I help you?

**(teaching point)**
In our scenario, there is no reason for an officer to walk to the back of the house through the curtilage since someone has answered Officer Jackson's knock at the front door.

SCENARIO:
May I help you?

Hey good morning, I'm Officer Jackson, this is officer Taggart. Are the Rodríguezes home?

Yes, Mrs. Rodriguez she's in the back getting ready. I'm just the babysitter.

You said Mrs. Rodriguez is in the back? Yes, sir.

---

5

# Legal and Policy Based Instruction for ERO Field Operations

Would it be alright if we came in?

Sure, that's fine.

Great.

**(teaching point)**
If you ever had any doubt about the exceedingly high level of respect that our courts have regarding the sanctity of one's home, all you need to do is review the U.S. Supreme Court's 1980 decision in Payton v. New York. That case held that a criminal arrest warrant based on probable cause gives the authority to enter a residence where a suspect lives when there is reason to believe the suspect is inside.

Without a criminal arrest warrant or a search warrant, an officer does not have that authority. In addition to references to the familiar adage that a "man's house is his castle," the Court noted William Pitt's 1763 address to the House of Commons in which he stated: "The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter - all his forces dare not cross the threshold of the ruined tenement!" With that in mind, you must understand that a basic tenet of the Fourth Amendment is that there is a presumption of unreasonableness concerning searches and seizures conducted in a home without a warrant. As a result, in order to enter a residence, you must have a criminal arrest or search warrant, or an exception to the warrant requirement, such as consent or, in rare cases, exigent circumstances.

What that boils down to for most of you executing administrative warrants is that, in order to enter and search a residence for your target, voluntary consent must be obtained from an adult with authority over the premises. Although the Fourth Amendment case law may not absolutely require that consent be given by an adult, ICE policy does. You may rely on consent from a person who appears to be 18 years of age or older, even if it turns out later that he or she is 17 or younger. On the other hand, if you suspect the potential consent-giver is younger than 18, you must ask questions to clarify that issue. Hopefully, in most cases you will be dealing with a consent-giver who has actual authority over the target's residence. This will include situations where, based on mutual use of the property by persons generally having joint access or control for most purposes, the consent-giver has common authority with others. This includes situations where the consent-giver has common authority with other persons. Spouses, roommates, and others who share residences have common authority based on their mutual use of the property and joint access or control for most purposes.

At a minimum, however, the Fourth Amendment case law requires that consent be obtained from a person with "apparent authority." This addresses the situation where an officer has a reasonable--although mistaken--belief that the consent-giver has common authority.

An example of this is when officers reasonably believe that a woman lives with her boyfriend in an apartment, only to learn later, after using her consent and key to enter, and arresting the boyfriend, that she moved out two weeks earlier. Also, a non-resident landlord does not have authority to consent to the entry and search of a tenant's residence, just as an employer providing housing to a worker does not have authority to permit officers to enter the employee's residence and look around.

You must have consent to both enter and look around a residence for your target. A person with only limited authority over a residence, such as a woman who cleans a house once every two weeks, a baby-sitter watching the children, or a neighbor who is there to feed the cat or check on the premises, does not have authority to give consent for you to enter a residence. You must clarify the status of a possible consent-giver if you have any suspicion or doubt whatsoever as to their authority. The burden is upon the Government--which means you--to prove that any consent was given voluntarily.

In legal terms, consent is not voluntary if the will of the consent-giver has been overborne by the conduct of the officer. This means that your behavior as an officer might affect whether the consent was given voluntarily. This includes asking for consent while handling your holstered weapon and using a commanding tone of voice or

6

# Legal and Policy Based Instruction for ERO Field Operations

language that can be understood to demand compliance. Voluntariness is a factual question that is resolved after an assessment of all the circumstances.

While it is a factor to be considered, the Fourth Amendment does not require that a person know of his or her right to refuse an officer's request for consent. In other words, you do not need to explicitly tell your target that he or she can refuse to let you enter the residence. However, ICE requires that a target does express verbal consent, although a combination of facial expressions, body language and physical movements could possibly imply that a person has given permission to enter or look around. Your ability to articulate the circumstances of the encounter, including what occurred and was said, is of critical importance.

As you are probably aware, a January 2010 memorandum addresses the documentation of consent. At a minimum, it requires that you document the name of the consent-giver, the scope of the consent, the time of day the consent was given, and other relevant information, such as the identity of other persons who witnessed the grant of consent. The time the search was completed should also be recorded. The time of withdrawal should be noted if the consent was revoked. This information must be recorded in the Field Operations Worksheet (FOW) and in the narrative section of the I-213 if an arrest was made.

From time to time, you may encounter a potential consent-giver who appears to have been drinking. If the person is intoxicated to the point where it appears his or her ability to comprehend what is occurring has been impacted, you should leave and try again at a later time. It is also important to keep in mind that the scope of any consent given is measured by an objective standard – what would a typical reasonable person understand based upon the exchange between the officer and the consent-giver? You must be careful to not exceed the scope of any consent that you receive.

Although the use of ruses may be permitted by your supervisor, you must be careful to ensure that you do not obtain consent through coercive means. As an example, in the Western District of Texas, San Antonio Division, at least two federal judges issued opinions finding that consent was not voluntary when a fake photograph ruse was used by ERO officers. The use of ruses should be consistent with the policy set by your FOD and ICE Headquarters.

Questions concerning the use of particular ruses should be directed to the FOD and to your local Office of Chief Counsel.

In our scenario, the babysitting neighbor does not have actual or common authority concerning the residence at 306 Hubble Drive. Based on the facts presented here, Officer Jackson cannot rely on the neighbor having apparent authority. With knowledge that the target's wife is present, the neighbor should be asked to bring Mrs. Rodriguez to the door. In addition to entering without obtaining consent from someone with authority to do so, Officer Jackson did not obtain consent to look around for the target and should not have sent Taggart and Miles to check the rest of the house.

L.A. DECLARATION

# Exhibit B-2

Case: 25-4312, 08/11/2025, DktEntry: 61.4, Page 73 of 300
Case 1:25-cv-00397-JB-C    Doc# 30-3    Filed 10/27/25    Page 67 of 82    PageID#
329
Case 2:25-cv-05605-MEMF-SP    Document 45-9    Filed 07/03/25    Page 5 of 7    Page ID
#:473

1 **<u>DECLARATION OF JASON BRIAN GAVIDIA</u>**

2 I, Jason Brian Gavidia, hereby declare:

3 I make this declaration based on my own personal knowledge. If called, I could

4 and would competently testify hereto:

5 1. I am a U.S. citizen. I was born and raised in East Los Angeles. I have lived

6 in East Los Angeles all my life. I am currently renting and residing in East Los Angeles.

7 2. I am of Latino ethnicity.

8 3. I am a proud Christian, deeply devoted to my church and my community. I

9 have volunteered and served on the church medical team during our worldwide

10 congregation, which brings together more than 30,000 members in a single location. In

11 this role, I have assisted medical personnel, coordinated team assignments, and directed

12 individuals to designated areas. I continue to support the medical team.

13 4. In addition to my faith-based service, I am a businessman with a diverse

14 professional background. Before entering the world of business, I held roles in various

15 fields, including roles as an Operations Supervisor, Pest Control Technician, and

16 Automobile Broker. I also started a car detail business. After two young friends of mine

17 passed away in a car accident, I organized a car wash event fundraiser, raising more than

18 $2,500 for the funeral, and this led me to incorporate a car detail component to my car

19 sales business.

20 5. I am also an active member of a boxing team based in East Los Angeles. I

21 support the local boxing community by sponsoring several athletes in their career

22 development. I am currently sponsoring three boxers.

23 6. On Thursday, June 12, 2025, I went to Yank Towing, located at 1537 W.

24 Olympic Blvd. in Montebello, CA 90640. Yank Towing is a tow yard, junk car removal,

25 and storage lot. I rent space at the tow yard to work on cars.

26 7. Around 4:30 PM, I was inside the tow yard working on my car. I was

27 waiting for my mechanic to bring me a part. Suddenly, I heard someone say immigration

28 agents may be at the premises. I was curious and went outside to confirm whether

1

Case: 25-4312, 08/11/2025, DktEntry: 61.4, Page 74 of 300
Case 1:25-cv-00397-JB-C   Doc# 30-3   Filed 10/27/25   Page 68 of 82   PageID#
330
Case 2:25-cv-05605-MEMF-SP   Document 45-9   Filed 07/03/25   Page 6 of 7   Page ID
#:474

immigration agents were present. I was on the phone as I stepped out of the tow yard premises. On the sidewalk outside the gate, I saw a federal agent between two cars step forward and acknowledge my presence. I assumed it was a federal agent because he was wearing a green vest. Later, I saw several other agents wearing similar vests with the words "Border Patrol Federal Agent." I also noticed the agents were carrying handguns, which they had holstered, and at least two of the agents had a military-style rifle.

8.     Immediately after, as I attempted to head back inside the tow yard premises, the agent said, "Stop right there." I noticed he was masked; I could not see his face. At this point, I stopped. I am a law-abiding citizen. I felt that I could not leave, and that the agent had stopped me.

9.     While the masked agent approached me, another unmasked agent ran towards me and questioned me whether I am American. I told him that I am American at least three times. He responded by asking, "What hospital were you born in?" I calmly replied that I did not know. He repeated the question two more times, and each time I said that I did not know. At that point, the agents forcefully pushed me up against the metal gated fence, put my hands behind my back, and twisted my arm. I had been on my phone this entire time, and the masked agent also took my phone from my hand at that point. I felt like the agents were trying to cause me pain, because I did not know what hospital I was born in.

10.    I explained, "Look how you got my hand—you're twisting that shit, bro. I'm American, bro." As soon as I said that, the masked agent stopped twisting my arm. The unmasked agent asked a final time, "What hospital were you born in?" I responded again that I did not know and said East L.A. I then told the agents that I could show them my Real ID.

11.    When I showed my Real ID to the agents, one of them took it from me. Even after providing my Real ID and repeatedly stating that I am an American, they did not let me go. In fact, even after telling the agents I was an American, they took my phone. I begged to have my phone back; I asked every agent for my phone. One of the agents told

2

1  me to stand close to the gate and I would get my phone back. It ultimately took about 20

2  minutes to get my phone back. But I never got my Real ID back.

3       12.    My best understanding of what I experienced on June 12, 2025 is that

4  federal agents stopped me literally based on my skin color, just because of the way I

5  look—because I am brown, Latino. My clothes were dirty from working on my car, and I

6  believe this might have also factored in to why the agents stopped and questioned me. It

7  was the worst experience I have ever felt. I felt like I was going to die; in fact, one agent

8  literally racked a chamber in his rifle. And going forward, I am disturbed and deeply

9  concerned that federal agents will stop me and violate my rights again for the same

10  reason.

11       13.    I live and work in Los Angeles County, and I know and have heard that

12  these immigration raids have continued all throughout the area. I am afraid that I will be

13  racially profiled again for my skin color. I feel that federal agents can detain me for no

14  reason other than the fact that I appear and am Latino. This is just wrong, and it is scary

15  that there is a high chance I might get picked up just because I am walking while brown,

16  walking while dirty, coming home from work.

17       I declare under penalty of perjury that the foregoing is true and correct.

18       Executed on June 30, 2025 in East Los Angeles, California.

19

20                             _____

21                             Jason Brian Gavidia

22

23

24

25

26

27

28

3

D.C. Declaration 1

# Exhibit B-3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSÉ ESCOBAR MOLINA, *et al.*, *individually and on behalf of all others similarly situated*

> *Plaintiffs*,

> v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

> *Defendants*.

No. 1:25-cv-3417

## DECLARATION OF JOSÉ ELISEO ESCOBAR MOLINA

I, José Eliseo Escobar Molina, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is José Eliseo Escobar Molina. I was born in El Salvador in 1978, and I am currently 47 years old. I first came to the United States in 1998 and I have lived in the District of Columbia since approximately 2000. I have Temporary Protected Status (TPS), which I first applied for in 2001. I have continued to renew my TPS each time since then, including most recently in February of this year before the March application cutoff date. My renewal application from February is still pending, and my TPS is currently valid.

2. Since I first arrived in the U.S., I have traveled approximately three times on advanced parole to visit my family in El Salvador, including my parents and siblings who still reside there, and have returned to the U.S. without issue.

3. I live in an apartment in the Mount Pleasant neighborhood of DC. I live with my partner and two sons, and we have lived there for about eight years. My partner and I have been together for 21 years, and our two sons are both U.S. citizens because they were born here. My eldest son currently attends a university in DC, and my younger son, who is a

1

minor, goes to public school. I enjoy spending time with my sons and going with them to the local park when I am not working.

4. I work full-time in construction, specifically as a scaffolder. With my work in scaffolding, I travel throughout DC, Maryland, and Virginia to different job sites.

5. On August 21, 2025, at approximately 6:00 am, I left my apartment building dressed in my work clothes and was on my way to my work truck, which was parked across the street from the apartment building where I live. I had walked across the street and was about to get into the driver's seat of my truck when two Suburbans, one white and one black, drove up. Officers dressed in plainclothes got out of the vehicles. First, two of them grabbed me by the arms and immediately handcuffed me, and then the two officers from the other Suburban came over and grabbed me by the legs.

6. The officers weren't wearing uniforms or badges, and they did not identify themselves. I felt like I was being kidnapped. They called me "illegal" repeatedly, and I responded that I have papers. They said, "No you don't. You are illegal." They did not ask for my name or to see my identification, which I had with me in my wallet, before handcuffing me. After they handcuffed me, they took my wallet from my pocket but did not look at what was inside.

7. Pulling me by my limbs, they shoved me into the black Suburban. Once in the car, I told them again that I had papers. The driver of the car, who was one of the officers that handcuffed me, told me, "Shut up bitch! You're illegal." After he yelled at me, I stayed silent. I did not try to resist arrest or to flee.

8. None of the agents at any point ever identified themselves, presented a warrant, explained why they stopped me, or indicated that they knew my name prior to stopping me. Nor did any of them ask me any questions about my ties to the community, how long I've

been living and working in DC, my family here, or anything else about my circumstances.

9. Then the two officers drove me to a local police station about eight minutes from my home. There, the officers who arrested me waited to speak to a supervisor, but I couldn't hear their conversation. We were parked there for about 15 minutes.

10. Next, I was driven to a parking lot, which was near the Pentagon and about 15 minutes from the police station. Here, there were about four vans with two officers per vehicle, and the officers had badges and jackets that read "Department of Homeland Security." These officers were waiting to collect people who had been arrested in order to transport them to Chantilly, Virginia. I was taken out of the Suburban and put into a van. I was not asked any questions before being put in the van, not even my name. I saw other cars drive up and drop off other people who had been arrested; some were put into the same van as me.

11. At around 9:00 am, I arrived at Chantilly. I had to wait about four hours to be interviewed and processed, so I was kept in a holding cell with about 65 other people. The area was so crowded that it was impossible to lie down and sleep. I was fed one small bean burrito, something sweet, and a glass of water during my entire 23-hour stay at Chantilly. It was very expensive to make any calls at the facility but I had no other choice. I called my son to help me find a lawyer.

12. About four hours after my arrival, I was finally called into a small room where they took my fingerprints and asked me questions like my name, what country I am from, and my parents' names. An officer, whose shirt said "Homeland Security," asked me the questions in Spanish, and the process took about 40 minutes. During the interview, I saw the officer was holding my work permit in his hands. The work permit specifies that I

3

have TPS. I was hopeful that the officer knew I had TPS and would release me.

13. Once the process was done, I was sent back to the holding cell where I spent the night. I did not sleep. In the early morning, I was called out of the holding area and shackled again. I became concerned and told one of the officers I had TPS. He said, "That's not legal status. TPS doesn't count as being legal here." At around 8:00 am, I was transported to an office in Richmond, Virginia.

14. The drive to Richmond was about two hours, so we arrived around 10:30 am. As I entered the building, there was a supervising ICE officer with a paper in his hand. He asked for my name, and I responded. Shortly after this, the same officer approached me and said he did not know why I had been brought to Richmond and that the officers had made an error in arresting me because I have TPS. He said to me, "Sorry you had to live through this. These are new officers. They do not know what they are doing." He apologized to me three times and said I was free to go. He gave me a copy of my TPS approval notice and told me to carry it with me so I could show it if officers stopped me again. After waiting a few hours for my son to come pick me up, I left the Richmond office around 2:30 pm on August 22, the day after I was initially arrested.

15. I have not received any kind of representation that I will not be subject to arrest or detention by ICE or by law enforcement officials for immigration purposes in the future.

16. This is the first time I had been arrested by immigration officials or had any contact with ICE in my more than 20 years living in the United States.

17. I believe I was arrested solely because of my appearance and because I live in an area with a lot of immigrants. It was clear that the officers did not know who I was, did not have a warrant, and did not have a reason to arrest me.

18. I live and work in DC, and I am very scared that I may be arrested and detained again.

4

Recently, I saw a police car followed closely by a Suburban pass by my apartment building, and the Suburban looked a lot like the one driven by the officers who arrested me. And I have heard about many other people arrested by ICE in my area of D.C. I fear the same for my sons because even though they are U.S. citizens, they are Hispanic just like me. I told them to carry their U.S. passports with them at all times just to be safe.

19. After this arrest, I have not been physically or mentally well. I still have pain from when the officers grabbed me by my arms and legs and pushed me into their vehicle while I was handcuffed. I have nightmares where I relive my arrest or about being arrested again.

20. Although I am still working, I have changed my habits out of fear. I leave the house even earlier and will check outside two or three times before exiting my apartment building. I'm hesitant and worry that officers might be around the corner or following me. I used to go to the park with my sons in my free time, but now I do not go because I do not want to be arrested on the way or for my sons to see me being arrested, which would traumatize them. When I am not working, I rarely leave my house.

21. Since my arrest, my partner has stopped going to work often due to fear that she too will be detained, as she has to travel on the Metro to her job. Now, she can only go to work one or two days a week, normally on the weekends, and I have to drive her.

22. I understand that there are many other people who have experienced something similar to what I experienced. I am seeking to represent a class of people in D.C. who have been arrested without a warrant and without proper reasons.

23. If the Court recognizes this case as a class action, I understand the responsibilities involved in being a plaintiff representing a class. I understand that I need to keep informed about what is going on with the case, including any agreements between the plaintiffs and the government to resolve this case. I understand that I need to think about

the interests of other proposed class members, who are people in a similar situation to me, and act on those interests. I am prepared to represent the proposed class in this case and will take my responsibilities seriously.

24. I understand that I will be part of a team making important legal decisions and directing the lawyers on this case after getting their advice. I will share what I think about these legal decisions and will be involved in the final approval of major legal decisions, including whether to settle this case with the government.

25. I will work with the other class representatives on this case to make decisions when issues come up about how to proceed.

26. I will communicate with and direct the lawyers representing the class about important motions, settlement talks, trial preparation, and trial. I understand that I am responsible for directing the lawyers on each of these things, after getting their advice. I will speak to the lawyers as often as necessary. I understand that I may need to answer questions from the government's lawyers in writing or in person.

27. I understand that if a class is certified, my lawyers will owe a duty to all members of the proposed class to provide fair and adequate representation.

28. I believe that the following organizations and law firms should be approved by the Court to serve as co-counsel for the class: Amica Center for Immigrant Rights, the American Civil Liberties Union, the National Immigration Project, the Washington Lawyers' Committee, CASA, and Covington and Burling. I believe they will work to obtain the best result for the class.

29. This declaration was read to me in full in Spanish on September 21, 2025, by a lawyer leading this case, Ian Austin Rose. I confirm and completely understand the contents of this declaration.

6

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2025.

_____

José Escobar Molina

# D.C. DECLARATION 2

# Exhibit B-4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSÉ ESCOBAR MOLINA, *et al., individually and on behalf of all others similarly situated*,

*Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

*Defendants*.

No. 25-cv-3417

## <u>DECLARATION OF M.P.</u>

I, M.P., pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is M.P. I am 41 years old and I live in Millersburg, Ohio. I make this declaration on my own personal knowledge, except as to facts relayed to me by my brother concerning his arrest and detention by federal agents in a telephone call and except as to matters expressly stated to be upon information and belief, and as to these, I believe them to be true.

2. My brother's name is M.A.P. He is 40 years old and has lived in the United States since 2007. M.A.P. is originally from Nicaragua, but currently lives in Laurel, Maryland. He owns a house and lives with his girlfriend and five-year-old son, who is a U.S. citizen. M.A.P. works in construction and operates his own construction company, which often involves work in Washington, D.C. He has a work permit authorization, a social security number, and a valid driver's license. He also has a pending asylum application.

3. On August 25, 2025, at approximately 10:30 AM, M.A.P. was departing a Lowes in Northeast D.C on his way to a construction site on 16th Street in Northeast D.C. where he was to work that day. His car is registered under his name and had current license plates and registration.

4. Two blocks before he reached his destination, M.A.P. noticed that multiple cars were following him. Suddenly, a car pulled in front of him and blocked his path, and he pulled over. Approximately 16 agents then surrounded his vehicle. The agents were plain clothed and were not wearing anything to indicate that they were law enforcement. The agents did not identify who they were or what agency they were with.

5. M.A.P. remained in his car and did not make any attempt to drive away. He was instructed to step out of his car but was not asked anything about his immigration status or for any form of identification. He told the agents that he would comply with their instructions, but implored them not to hurt him as he stepped out of his vehicle.

6. Upon exiting his vehicle, M.A.P. explained to the agents that he has a work permit authorization, a social security number, a valid driver's license, and an open asylum case. However, he was immediately handcuffed, and an agent told him that his documentation did not matter and was not valid to them.

7. None of the agents at any point ever identified themselves, presented a warrant, explained why they stopped M.A.P., or indicated that they knew his name prior to stopping him. Nor did any of them ask him any questions about his ties to the community, how long he has been living or working in D.C., his family here, or anything else about his circumstances.  At no point did M.A.P. try to flee or resist arrest.

8. After arresting M.A.P. and placing him in a vehicle, he was taken to an area near the Pentagon in Virginia and held to wait in the car for approximately 45 minutes. Then he was taken to another unidentified location where he was also held in the car for approximately an hour. Because he was not allowed to use a restroom, he became highly uncomfortable and was forced to hold his bladder. During this time, the agents did not provide him with any additional information, a warrant, or other documentation related to his arrest.

9. M.A.P. was then taken to the ICE Washington, D.C. field office and detained for approximately 24 hours alongside other people who had been similarly detained. He was allowed to make a phone call to me early the following morning, August 26, around 4:00 AM, where he told me he was being transferred to Virginia.

10. That day, he was transferred to an ICE facility in Farmville, Virginia. During his detention in Farmville, he described that the detainees were held in cramped quarters with several other people. While M.A.P. was at Farmville, the officers refused to turn off the lights in his cell, forcing him and his cellmates to sleep with the lights on. He was provided with food, but was not allowed to bathe during this time.

11. After being detained at Farmville for approximately six days, M.A.P. was transferred to the Moshannon Valley Processing Center in Pennsylvania. He was finally able to shower at the Moshannon Valley Processing Center and was given new clothes and shoes. However, his shoes are not the proper size, causing pain and discomfort in his feet. He has been held at the Moshannon Valley Processing Center for about a month.

12. Since 2007 when M.A.P. entered this country, this is the first and only time he was arrested by law enforcement. He has not had any other interactions with law enforcement,

he has never been convicted of any crime or offense, and he has not had any issues with meeting deadlines or appearing in court in relation to his immigration case.

13. As a result of his detention, M.A.P. and his family have been deeply traumatized. He remains detained at the Moshannon Valley Processing Center in Pennsylvania. His son, who is a U.S. citizen, constantly asks where his father has been taken and when he will return. He waits every day by the window in hopes of M.A.P. returning. His girlfriend is struggling to make ends meet and pay their bills without his support, including their monthly car and house payments. I have been left to try and support his family, while also supporting my own family.

14. I believe M.A.P. was stopped and arrested solely because of the color of his skin and his appearance, as it was clear that the arresting officer did not know who he was, did not present any warrant, and did not say why he was stopped and/or why he was being arrested.

15. Due to M.A.P.'s pending asylum application, I fear he would face retaliation and grave danger if his persecutors in El Salvador were to learn of his asylum claims through this lawsuit. I am also afraid of retaliation me and my family may face if my identity were to become public as a result of my participation in this lawsuit. Although I have a green card through my marriage, I am particularly afraid that me and my family members will be retaliated against and harassed by members of the public on social media given recent reports about people harassing noncitizens and asylum seekers online.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2025.

_____

10/1/2025