# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTIRCT OF ALABAMA

| | |
|---|---|
| Venegas, <br><br> Petitioner, <br><br> -v- <br><br> Homan, *et al.* <br><br> Respondents, | Civil Action No. 1:25-cv-000397 |

**DECLARATION OF PHILIP LAVOIE**

I, Philip Lavoie, pursuant to the authority of 28 U.S.C. § 1746, and based on my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment hereby declare to the best of my knowledge, information, and belief, the following relating to the above-captioned matter is true and correct:

1. I am employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and serve as the Acting Assistant Special Agent in Charge (ASAC) of the Mobile, Alabama Office.

2. As an Acting ASAC, I am charged with the responsibility of overseeing the HSI Mobile Office. I have served in this position since January 2024. Effective January 2024, I was the Acting ASAC over all the offices in Alabama until late July 2025.

3. I previously served as the Resident Agent in Charge (RAC) of the Mobile Office, from August 2022 through January 2024. Prior to becoming the RAC, I was the Group Supervisor of the High Intensity Drug Trafficking Area Task Force in the Mobile Office, from September 2018 until entering on duty as the RAC in August 2022.

4.  I am aware of the above-captioned lawsuit and the Plaintiff's Motions for Preliminary Injunction and for Class Certification that have been filed in the U.S. District Court for the Southern District of Alabama.

5.  While preparing this declaration, I reviewed the relevant DHS records, systems and databases for information surrounding Plaintiff, Leonardo Garcia Venegas, and two alleged encounters on May 21st and June 12th of 2025. I am therefore familiar with the facts and circumstances regarding this Plaintiff. The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business provided to me in my official capacity.

**May 21st Encounter**

6.  On May 21, HSI Special Agents were conducting surveillance of various subdivision construction sitesto include the Lennar subdivision, located near 19428 County Road 10 in Foley, Alabama in response to information received from the public and from aliens arrested during previous operations that suggested aliens were potentially present in violation of the immigration laws. Information received included but was not limited to employers and property owners, locations, and types of employment that had recently resulted in numerous arrests of individuals present and/or working in violation of immigration laws. After identifying sites that matched the information gathered, HSI Special Agents traveled to the subdivisions to potentially conduct interviews with suspected aliens potentially present in violation of the immigration laws to determine whether there were any individuals present in violation of immigration law.  As these were investigatory operations designed to lead to immigration enforcement or further information, HSI had not generated administrative arrest warrants for particular individuals nor had HSI

determined it was appropriate to serve I-9 documentation requests to the employer.

7. The HSI Special Agents were wearing federal law enforcement identifying markings —patches with either "POLICE," "ICE," "HSI," or "Homeland Security Investigations" on the front and back of their vests.

8. Before the ICE officers exited their vehicles, they observed three individuals running away from the worksite.

9. As the HSI Special Agents exited their vehicles in pursuit of these three individuals, these HSI Special Agents heard whistles alerting the individuals in the surrounding area of their presence. Based on my training, knowledge, and experience, whistles are often used as a warning signal to alert potential aliens that immigration enforcement officers are present in the area. When individuals respond to this warning by fleeing, it provides immigration officers with reasonable suspicion that those fleeing are present in the United States in violation of the immigration laws.

10. As they were running, those individuals presented a safety risk due to the dangerous nature of the construction site, and running through oncoming traffic which forced the HSI Special Agents to give chase and to de-escalate the situation.

11. One individual remained at the worksite. One HSI Special Agent approached the individual, later identified as Plaintiff's brother, Carlos Garcia-Venegas, who did not understand questions posed to him in English. ERO Deportation Officer came to assist through asking questions in the Spanish language however, the individual exhibited body language indicating an intention to flee. Once the ERO Deportation Officer found that Plaintiff's brother posed a flight risk, the ERO Deportation Officer began to apprehend Plaintiff's brother. Plaintiff then began to move quickly toward the arresting ERO Deportation Officer, posing a possible safety threat and potentially attempting to intervene in an ongoing apprehension.

3

12. An HSI Special Agent moved in between Plaintiff and the arresting ERO Deportation Officer and asked for Plaintiff's identification, which Plaintiff vehemently refused to provide, insisting that he was not required to produce any documents and became confrontational.

13. Plaintiff began moving away from the HSI Special Agent in an effort to go around him. The HSI Special Agent instructed Plaintiff to stop, but the Plaintiff quickened his pace until he was circling around the arresting ERO Deportation Officer and his brother. The HSI Special Agent stopped Plaintiff by grabbing his wrist, as the HSI Special Agent was concerned for everyone's safety due to the presence of a concrete pad with exposed rebar and other sharp objects in the area, and due to Plaintiff's refusal to comply with any commands given.

14. Plaintiff, continued to refuse to comply with commands and stated for the first time in the encounter that he was a U.S. citizen. The HSI Special Agent stated that if Plaintiff could provide identification demonstrating his citizenship, he would be released.

15. Plaintiff continued to use physical force against the HSI Special Agent by wrenching his arms and body, in an effort to resist law enforcement actions and create a risk of bodily injury to the officers. The HSI Special Agent employed multiple deescalating control techniques to secure Plaintiff for both the safety of officers on scene and Plaintiff until another HSI Special Agent was able to assist. Plaintiff continued to resist and was directed to the ground by two HSI Special Agents. Plaintiff was then handcuffed, with his hands restrained behind his back.

16. Only after being cuffed, Plaintiff stated that he had identification in his pocket. He was then brought to stand by the government vehicles. A subsequent search of his pocket by the HSI Special Agent located Plaintiff's wallet, containing Plaintiff's REAL ID-compliant Alabama driver's license, as well as a second driver's license. The HSI Special Agent needed to further

verify his U.S. citizenship because each state has its own REAL ID compliance laws, which may provide for the issuance of a REAL ID to an alien and therefore based on HSI Special Agent training and experience, REAL ID can be unreliable to confirm U.S. citizenship.

17. Plaintiff agreed to communicate with law enforcement while the officers verified his U.S. citizenship. Plaintiff informed the HSI Special Agents that he knowingly transports illegal aliens for Southern Home Crafters following his employers' direction and with the owner's knowledge.

18. I was advised by HSI Special Agents that Plaintiff was referred to the U.S. Marshals Service for further investigation under Title 18 in reference to resisting federal officers and interfering with a federal investigation. I am unaware of any resulting criminal charges or the outcome of any investigation.

19. After U.S. citizenship was verified, the handcuffs were taken off and Plaintiff was released. Plaintiff was handcuffed for approximately 18 minutes.

**June 12th Encounter**

20. On the alleged June 12, 2025 date and near the alleged location of Baldwin County, AL near Fairhope, Alabama, there were multiple operations undertaken by several different teams and federal agencies. The property owner D.R. Horton owns and was developing a number of different housing complexes in the area of Fairhope, AL. Plaintiff has failed to provide enough information for me to address the alleged encounter on June 12, 2025 as it is not clear from the complaint where the alleged encounter occurred.

21. There is no documentation in our databases regarding Plaintiff on the alleged encounter that I have been able to find.

22. Although ICE and other agencies with Title 8 authorities conducted immigration

enforcement at worksites on the alleged date and near the alleged location, the alleged encounter with Plaintiff on this date is unknown to me, or any other officers I have spoken with concerning the matter.

I reviewed the relevant DHS records, systems and databases specifically for information surrounding Plaintiff, Leonardo Garcia Venegas on June 12, 2025 and there are no records that would support the encounter described by the Plaintiff. Per the description, a record would be generated.

**Relevant Training Received**

23. I am not aware of any Warrantless Entry Policy, Preemptive Detention Policy, or Continued Detention Policy used in my area of responsibility (AOR) as described by the Plaintiff.

24. ICE officers and agents are required to follow the relevant statutory authorities in enforcing immigration laws, preventing terrorism, and combating transnational criminal threats.

25. Prior to engaging in investigative stops (i.e., *Terry* stops), HSI agents are trained to have developed reasonable suspicion that the individual has committed or is committing a federal crime or federal immigration violation. This determination is evaluated based on the totality of the circumstances. The factors that contribute to reasonable suspicion include, but are not limited to, information from intelligence sources, information from law enforcement and open-source databases, analysis of trends and patterns associated with immigration violations, previous encounters with undocumented individuals at a specific location or working for certain employers, and information provided by human sources.

26. Federal immigration officers have specialized expertise and practical knowledge of factors that are most indicative of immigration violations, illegal activity, and behaviors typically associated with unlawful presence.

27. As ICE's policy requires officers to follow the Constitution and all relevant statutes and regulations, HSI Special Agents receive extensive training on Fourth Amendment searches and seizures in addition to their practical experience in the field. Their training courses are as follows:

28. ICE HSI Mobile Special Agents receive law enforcement training on the requirements of Fourth Amendment of the U.S. Constitution, and the related statutory and regulatory provisions of the Immigration and Nationality Act (INA) as part of their basic Academy training at the Federal Law Enforcement Training Center. ICE HSI Mobile Special Agents receive Eleventh Circuit Court of Appeals-specific immigration enforcement training on the requirements of the Fourth Amendment, the statutory and regulatory provisions of the INA, and caselaw at least once per year. This training covers the requirements for warrantless arrests and investigatory stops under both Title 8 for immigration law violations and Title 18 for criminal violations, the requirements of having and documenting reasonable suspicion and/or probable cause.

29. ICE HSI Mobile Special Agents are trained that, under the Fourth Amendment, relevant statutes and regulations, and case law, brief detention for questioning or an investigatory stop requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is an alien illegally present in the United States. ICE HSI Mobile personnel are trained that any arrest requires probable cause that the person being arrested is an alien present in the United States in violation of the immigration laws or has violated a criminal statute. They are further trained to clearly differentiate between an investigatory stop and an arrest.

30. ICE HSI Mobile Special Agents are trained to follow ICE procedure for apprehensions of illegal aliens present in the United States by using targeted and non-targeted

investigations, conducting operations, and making arrests. Investigations are developed by gathering information such as employment information; tips from communities or federal agencies; and evidence compiled in law enforcement systems, records and relevant databases. These investigations are designed to identify whether individuals are present in violation of immigration law. When non-targeted individuals are encountered during the targeted operations or in the field, ICE HSI Mobile Special Agents are trained to develop reasonable suspicion prior to conducting an investigatory stop. Once U.S. citizenship is verified, or an alien is found to be lawfully present in the U.S., ICE HSI Mobile Special Agents are trained to end the encounter – absent criminal and safety concerns. ICE HSI Mobile Special Agents identify themselves to the arrestee at the time of arrest/encounter or as soon as practicable when safe to do so.

31. ICE HSI Mobile Special Agents regularly receive training on investigatory stops and consensual encounters, which occur in public places, to include worksites. They are trained to approach the individuals and identify themselves as immigration officers and ask questions to establish identity and citizenship status. The questions include asking individuals their name, date of birth, place of birth, and if they have documentation showing that they may legally be present in or work in the United States. Officers will ask for any form of identification and have the ability to use fingerprints and facial recognition to identify individuals depending on whether technology is available on scene such as mobile fingerprint scanners. ICE HSI Mobile Special Agents often work in cooperation with other immigration officers from other agencies and components to use identification information to run database checks in the field. These database checks can reveal if an individual was encountered in the past by immigration or other law enforcement authorities.

32. In late January of this year, I arranged for ICE Enforcement and Removal Operations (ERO) officers assigned to the Mobile Office to provide an additional Title 8 authority

refresher training to all HSI Mobile Special Agents and partner agencies throughout the Mobile Area of Responsibility (AOR) who would be conducting civil immigration operations. All agents who were present during the May encounter attended this training.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _____ Day of _____ 2025.

**PHILIP S LAVOIE JR**  
Digitally signed by PHILIP S LAVOIE JR  
Date: 2025.12.11 10:57:36 -06'00'

Philip Lavoie  
Acting Assistant Special Agent in Charge  
Homeland Security Investigations  
U.S. Immigration and Customs Enforcement  
U.S. Department of Homeland Security