## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

LEONARDO GARCIA VENEGAS,

      *Plaintiff,*

v.

TOM HOMAN, WHITE HOUSE BORDER CZAR,
IN HIS OFFICIAL CAPACITY, ET AL.,

      *Defendants.*

Case No. 1:25-cv-397-JB-C

---

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION

---

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

    I.     All three policies exist as alleged ................................................. 2

    II.    Leo has standing to challenge the policies that led to his detention twice ........ 6

    III.   Leo is likely to show that all three policies are unconstitutional ..................... 8

         A.     Warrantless Entry Policy ...................................................... 8

         B.     Preemptive Detention Policy ............................................. 10

         C.     Continued Detention Policy............................................... 13

    IV.    The irreparable harm Leo faces and public interest in stopping widespread violations of the Constitution justify an injunction...................... 14

CONCLUSION ................................................................................................. 15

CERTIFICATE OF SERVICE ............................................................................ 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcocer v. Mills*,
  800 F. App'x 860 (11th Cir. 2020) ............................................................................ 13

*Aracely R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) ...................................................................... 2, 5

*Arizona v. United States*,
  567 U.S. 387 (2012) ...................................................................................................... 13

*Career Colls. & Schs. of Tex. v. Dep't of Educ.*,
  98 F.4th 220 (5th Cir. 2024),
  *cert. granted in part*, 145 S. Ct. 1039 (2025) .............................................................. 6

*Church v. City of Huntsville*,
  30 F.3d 1332 (11th Cir. 1994) ............................................................................... 6, 7

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ..................................................................................................... 6, 7

*Creedle v. Miami-Dade County*,
  349 F. Supp. 3d 1276 (S.D. Fla. 2018) ...................................................................... 6

*CropLife Am. v. EPA*,
  329 F.3d 876 (D.C. Cir. 2003) ..................................................................................... 2

*Daniels v. Exec. Dir.*,
  127 F.4th 1294 (11th Cir. 2025) .................................................................................. 7

*Diamond Alt. Energy LLC v. Env't Prot. Agency*,
  606 U.S. 100 (2025) ....................................................................................................... 9

*Escobar Molina v. DHS*,
  2025 WL 3465518 (D.D.C. Dec. 2, 2025) ................................... 2, 3, 4, 5, 7, 8, 11, 15

*Fla. Businessmen for Free Enter. v. City of Hollywood*,
  648 F.2d 956 (5th Cir. Unit B 1981) ....................................................................... 15

*Garcia-Mir v. Meese*,
  781 F.2d 1450 (11th Cir. 1986) ................................................................................. 14

*KH Outdoor, LLC v. City of Trussville,*
    458 F.3d 1261 (11th Cir. 2006) ..................................................................... 15

*Kidd v. Mayorkas,*
    734 F. Supp. 3d 967 (C.D. Cal 2024) ...................................................... 6, 10

*Mancusi v. DeForte,*
    392 U.S. 364 (1968) .................................................................................. 8, 9

*Maryland v. Garrison,*
    480 U.S. 79 (1987) ....................................................................................... 13

*Minnesota v. Carter,*
    525 U.S. 83 (1998) ......................................................................................... 9

*Noble v. Tooley,*
    125 F. Supp. 2d 481 (M.D. Fla. 2000) .......................................................... 7

*Noem v. Vasquez Perdomo,*
    2025 WL 2585637 (U.S. Sept. 8, 2025) .................................................. 8, 11

*Reyes v. Maschmeier,*
    446 F.3d 1199 (11th Cir. 2006) .................................................................... 9

*Truax v. Raich,*
    239 U.S. 33 (1915) ......................................................................................... 9

*United States v. Alabama,*
    691 F.3d 1296 (11th Cir. 2012) .................................................................. 13

*United States v. Gutkin,*
    707 F. Supp. 3d 168, 175 (D.P.R. 2023) ...................................................... 9

*United States v. Marchant,*
    55 F.3d 509 (10th Cir. 1995) ........................................................................ 9

*Venetian Casino Resort LLC v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) ...................................................................... 2

## Codes and Statutes

5 U.S.C. § 551(13) ................................................................................................. 2

5 U.S.C. § 705 ........................................................................................................ 6

Ala. Code § 31-13-3(10) ...................................................................................... 14

Ala. Code § 31-13-29(c)(1)................................................................................ 14

Ala. Code § 31-13-29 (g) ................................................................................ 14

**Rules and Regulations**

6 C.F.R. § 37.3................................................................................................ 14

6 C.F.R. § 37.11.............................................................................................. 14

6 C.F.R. § 37.13.............................................................................................. 14

6 C.F.R. § 37.71.............................................................................................. 14

8 C.F.R. § 287.8(b) ......................................................................................... 10

8 C.F.R. § 287.8(b)(2) ..................................................................................... 13

**Other Authorities**

Restatement (Second) of Torts § 422, cmt....................................................... 9

## INTRODUCTION

Twice since May, immigration officers have detained Plaintiff Leonardo Garcia Venegas without particularized suspicion during warrantless raids on private construction sites. Both times, the officers refused to let Leo go after he told them he's a citizen and produced his REAL ID. Leo's experience has become typical. He's compiled declarations and reports of similar incidents. Plus, Defendants and their superiors have largely acknowledged that the policies exist. Defendants admit they're targeting construction sites in Baldwin County, while other officials claim they can make immigration arrests based on how someone looks. And Defendants freely admit that they don't treat REAL IDs as reliable evidence of lawful presence. That last admission alone justifies an injunction.

In response to this motion, Defendants argue that they don't need warrants for construction sites because they're "open fields." They also admit that officers went to Leo's site with no idea who they'd find, let alone particularized suspicion. And they admit that they kept Leo in handcuffs after seeing his REAL ID because, they say, states can issue REAL IDs to illegal aliens. But that's simply false. And the Secretary of Homeland Security, a Defendant here, should know better since her agency administers the REAL ID program.

Unable to refute the policies' existence, Defendants feebly question Leo's standing and warn that an injunction would imperil immigration enforcement. They suggest that requiring immigration officers to get warrants to search private worksites and to detain only those people for whom they have particularized suspicion—two basic tenets of the Fourth Amendment—would "curtail[] every on-the-ground immigration search and detention" and "chill routine field operations." Defs.' Br. Opp. PI (ECF No. 46) 2–3, 28 ("PI

Opp."). But Leo does not question the federal government's broad authority over immigration, just three lawless policies. That those policies have become so "routine" is exactly why an injunction is necessary. American citizens like Leo must be free to work without living in constant fear that they'll be wrongfully detained based on how they look.

ARGUMENT

## I.    All three policies exist as alleged.

As Leo explained, unwritten policies are subject to review when an agency's decisionmaking is final and has legal consequences. Pl.'s Br. PI (ECF 30-1) 16 ("PI Br."); 5 U.S.C. § 551(13) (defining "agency action"). Courts look to the agency's "expressed intentions" and "the effects of the agency action." *CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003). Those intentions can be expressed in the media, even if the precise details "are still unclear." *See Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 138–39 (D.D.C. 2018) (public statements and news articles). Just this month, a court held that DHS has abandoned the probable-cause standard for immigration arrests based on high-ranking officials' public statements that the plaintiffs "corroborated" with "on-the-ground examples." *Escobar Molina v. DHS*, 2025 WL 3465518, at *25 (D.D.C. Dec. 2, 2025) (emphasis omitted).

Leo provided a litany of public statements, news reports, and declarations to corroborate DHS's policies. PI Br. 3–16. He swore out a declaration about his own unlawful detentions and two more that he witnessed. Leo Decl. (ECF 30-2). And he provided declarations from two more construction workers in Alabama and a lawncare worker in Florida's Escambia County, all of whom had similar experiences and witnessed at least four

2

more lawfully present workers suffer the same. *See* Estrada Decl. (ECF 30-4) ¶¶ 20–29; Doe Decl. (ECF 30-5) ¶¶ 8–19; Alvirde-Ruiz Decl. (ECF 30-6). Leo also compiled news reports and court declarations from around the country to show that these policies come from the top. Windham Decl. (ECF 30-3).[1] If that weren't enough, the public statements of Defendants and other high-ranking officials resolve any doubt. *Id.*

Defendants do not engage with this evidence or the standard for final agency action. Instead, in their standing section, they simply assert that the policies don't exist based on a declaration of a middle-manager at HSI who says, generally, that HSI trains immigration officers to follow the law and develop reasonable suspicion for investigative stops.[2] Lavoie Decl. (ECF 44-1) ¶¶ 23–32. But ASAC Lavoie's declaration is scant on details and does not say that HSI trains officers to get warrants for construction sites or to detain people based only on *particularized* suspicion. Moreover, he freely admits that HSI trains officers to treat REAL IDs as unreliable proof of lawful presence—just as Leo alleged. *Id.* ¶ 16.

There's plenty of reason to doubt that HSI's training still comports with the law, if it ever did. ASAC Lavoie and the officers on the May 21 raid were last trained in January, *id.* ¶ 32, before the policies at issue were implemented. *See Escobar Molina*, 2025 WL 3465518, at *25–26 (agreeing that trainings that predate the policies are "virtually irrelevant"). Top officials' public statements since that January training show that DHS's view of its authority during immigration arrests has no basis in law. For instance, just last

---

[1] An attorney declaration compiling news stories does not violate any ethical rules. *See* Pl.'s Class Cert. Reply Br. (ECF 49) 7; Widas Decl. (ECF 17-1), *Escobar Molina* (Oct. 3, 2025).

[2] Defendants' proffer is limited to HSI's trainings and doesn't explain how the rest of Gulf of America Task Force is trained. *Cf. Escobar Molina*, 2025 WL 3465518, at *25.

week, after *Escobar Molina* enjoined DHS from reducing the evidentiary threshold for immigration arrests, DHS reiterated, in a comment about Leo's lawsuit, that arrests require mere reasonable suspicion. Ex. A (McClain Decl.) ¶ 4. Add that to the fact that the Chief Border Patrol Agent has emphasized that they consider how people "look" to be reasonable suspicion, Windham Decl. ¶ 18, and there's ample reason to doubt that HSI follows the law by developing *particularized* suspicion. The top officials in these different subagencies are taking their orders directly from Secretary Noem, McClain Decl. ¶ 3, and the Administration's policy statements to the press and on social media are disseminated to "a broad audience, which includes law enforcement officers under DHS's command." *Escobar Molina*, 2025 WL 3465518, at *24.

And besides, the little that ASAC Lavoie *does* tell us about HSI's January training runs counter to federal law and DHS's own regulations. He says REAL IDs are unreliable evidence of lawful status because some states issue them to illegal aliens. Lavoie Decl. ¶ 16. But a quick skim of the REAL ID Act and its implementing regulations would have alerted ASAC Lavoie that his agency has the law wrong. *Infra* III.C.

Nevertheless, Defendants ask this Court to ignore almost all evidence besides ASAC Lavoie's unreliable claim about HSI's training. They ask the Court to disregard *all* media reports. PI Opp. 15–16 n.5. And they call the experiences of non-citizens irrelevant. *See id.* at 16. Same for people who live outside the District, *id.*, as if Defendants—who direct raids across the Southeast and take orders from D.C.—created special rules for Southern Alabama. *Contra* McClain Decl. ¶ 10 (Defendant Schrank discussing raids in Northern Alabama). And it's no wonder. Only by ignoring Leo's corroborating evidence can

Defendants claim his detentions are "isolated" incidents rather than reflecting a top-down policy. *See Escobar Molina*, 2025 WL 3465518, at *23 (relying on reports from Los Angeles and Chicago to conclude "[t]he challenged decision originates at the top"). Ultimately, much of what Defendants say only reinforces that the policies exist as Leo described.

*Warrantless Entry Policy*. Defendants do not suggest they get or even *need* warrants for private construction sites. Instead, they compare all construction sites to open fields that do not require a warrant, even when fenced in or posted with No Trespassing signs. PI Opp. 23; *cf.* PI Br. at 9 (explaining that DHS treats construction sites as "open areas"). And they admit that they had no warrant for Leo's worksites. PI Opp. 23. Defendants' assertion that they can enter non-public sites without a warrant, coupled with their stated focus on construction sites in this District,[3] is a policy that has legal consequences for Leo and the putative class. *See Aracely R.*, 319 F. Supp. 3d at 138–39.

*Preemptive Detention Policy*. Defendants don't say much about what *specifically* they think justifies a detention. But what they do say confirms that they're not developing particularized suspicion. For instance, Defendants concede their officers had no prior knowledge of Leo. *See* Lavoie Decl. ¶ 6. Even now, as Defendants assert that officers believed Leo "may be an alien" on May 21 and "had a reasonable suspicion to detain him" on June 21, they offer no facts specific to Leo. *See* PI Opp. 25. While they don't say so explicitly, Defendants' position seems to be that any Latino working in construction is subject to detention. That policy has legal consequences for Leo and the proposed class.

---

[3] Although omitted from his declaration, ASAC Lavoie deems this District "a hotbed of ICE activity" due to the "large amount of construction." McClain Decl. ¶ 6.

*Continued Detention Policy.* ASAC Lavoie reveals that this policy exists and has been applied to Leo. Lavoie Decl. ¶ 16. Specifically, he says that agents kept Leo detained after seeing his REAL ID in order to "verify his U.S. citizenship because . . . *based on HSI Special Agent training* and experience, REAL ID can be unreliable to confirm U.S. citizenship." *Id.* (emphasis added). While ASAC Lavoie is wrong about REAL IDs, *infra* III.C., his declaration confirms DHS's policy of detaining people even after they've produced evidence of lawful status, like a REAL ID, to overcome officers' generalized suspicion.

Leo's unlawful detentions were not the product of rogue officers or mistakes. They were "systematic conduct" based on three policies that this Court should either enjoin, *see Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 977–85 (C.D. Cal 2024), or temporarily set aside to "preserve" Leo's "status or rights." 5 U.S.C. § 705; *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted in part*, 145 S. Ct. 1039 (2025).

## II.    Leo has standing to challenge the policies that led to his detention twice.

A plaintiff seeking to enjoin government conduct must show they're at risk of imminent harm. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Courts in the Eleventh Circuit typically consider whether (1) an official policy authorizes the challenged conduct; (2) the plaintiff is one of the policy's targets; and (3) the plaintiff is subjected to the policy through routine, lawful conduct. *See Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir. 1994). And when a plaintiff's already been injured *twice*, standing is all but certain. *See Creedle v. Miami-Dade County*, 349 F. Supp. 3d 1276, 1291 (S.D. Fla. 2018).

Yet Defendants still invoke *Lyons* to question Leo's injury.[4] In *Lyons*, a plaintiff who was choked during a traffic stop sought to enjoin future chokeholds. 461 U.S. at 97–98, 105. The Court held that Lyons lacked standing to seek an injunction for two main reasons: (1) he could not allege that he'd commit another infraction to get pulled over and (2) Los Angeles did not have a chokehold policy "absent some resistance or other provocation." *Id.* at 108–10. Because the only way Lyons might be subject to the policy again was if he got pulled over and provoked the officers, he did not face an imminent risk of harm.

Leo's case is distinguishable for the same reasons articulated in *Church*, 30 F.3d at 1337–39. Defendants are raiding construction sites without warrants, targeting the Latino workers on those sites, and failing to credit their evidence of lawful status. While Defendants disclaim three policies that Leo described, they confirm that officers "followed their training" during both of Leo's incidents. PI Opp. 15. As a Latino construction worker targeted by the policies, Leo faces an acute risk of another raid and detention just for showing up to work. *See Daniels v. Exec. Dir.*, 127 F.4th 1294, 1303 (11th Cir. 2025) (employment exposed plaintiff to policy). Indeed, the court in *Escobar Molina* just applied *Church*'s "three considerations" to conclude that targets of the Administration's unlawful immigration-enforcement tactics could seek an injunction. 2025 WL 3465518, at *15–16.

Those same factors "crystallize" the likelihood that the policies will harm Leo again. *Escobar Molina*, 2025 WL 3465518, at *16. Leo's circumstances "have not changed" since his last two detentions. *See Daniels*, 127 F.4th at 1303. And the raids show no sign of

---

[4] The other elements of standing are rightly uncontested. *See Noble v. Tooley*, 125 F. Supp. 2d 481, 484 (M.D. Fla. 2000) ("any Fourth Amendment violation" would be traceable to alleged policy and redressed by an injunction).

slowing given the "pressure from the White House to meet increasing goals" for immigration arrests. *Escobar Molina*, 2025 WL 3465518, at *16; Windham Decl. ¶ 10 (local construction company owner noting "I haven't seen [the raids] slowing down").

Still, Defendants ask the Court to dismiss Leo's case based on Justice Kavanaugh's concurrence in *Noem v. Vasquez Perdomo*, 2025 WL 2585637 (U.S. Sept. 8, 2025). PI Opp. 17–18. But Leo's facts are far stronger. He has already been subjected to DHS's policies twice. And he's more likely to be detained yet again because he challenges raids of privately owned construction sites where he works, not roving stops across a region of 20 million people. *Vasquez Perdomo*, 2025 WL 2585637, at *1. Plus, Leo brings "a different type of challenge": He's "not arguing which factors defendants may consider" before raids or detentions "but rather [] that defendants have abandoned the proper legal standard entirely." *Escobar Molina*, 2025 WL 3465518, at *17. Specifically, instead of questioning how officers weigh facts to reach the proper legal threshold for a search or stop, Leo simply asks that officers get a warrant to search non-public areas and develop particularized suspicion to detain workers in those areas. Standing is not a close call.

## III.    Leo is likely to show that all three policies are unconstitutional.

### A.    Warrantless Entry Policy

Leo explained that every reasonable person understands that private construction sites, occupied by workers and dangerous equipment, are closed to the public. PI Br. 18–19. As a worker in exclusive control of these sites, Leo has a right to exclude intruders who violate social customs and trespass onto the parts of his worksite from which the public has been excluded. *Id.* at 19–20 (citing *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968));

*Reyes v. Maschmeier*, 446 F.3d 1199, 1203 (11th Cir. 2006)). Otherwise, officers could disrupt the focus and coordination his work requires. *See Diamond Alt. Energy LLC v. Env't Prot. Agency*, 606 U.S. 100, 113–14 (2025); *Truax v. Raich*, 239 U.S. 33, 38–39 (1915).

For their part, Defendants breeze past the proper legal standard yet again. Rather than distinguishing *Mancusi* or *Maschmeier*, they simply recite the reasonable-expectation-of-privacy standard, invoke the open-fields doctrine, and misread their own regulations.

*First*, Defendants dispute Leo's standing because he's not an owner, so his "mere presence at work" does not let him challenge the intrusion. PI Opp. 19. The cases Defendants cite, however, are no answer to *Mancusi*. On the contrary, *United States v. Gutkin* agrees that reasons that an employee's presence on a site and "ability to regulate access" is what's important. 707 F. Supp. 3d 168, 175 (D.P.R. 2023). *Gutkin* distinguished *Mancusi* because the employee had no physical connection to the office. *Id.* at 176; *see also Minnesota v. Carter*, 525 U.S. 83, 90 (1998) (business guest with no prior relationship who stayed only "a matter of hours"); *United States v. Marchant*, 55 F.3d 509, 516 (10th Cir. 1995) (no expectation of privacy in records of pawn shop where defendant shopped).

Unlike in *Gutkin*, *Carter*, and *Marchant*, Leo is a contractor who actively works on and controls these sites. Even though he's not the owner, "[p]ossession usually is surrendered fully in the case of construction" until "completion of the work." Restatement (Second) of Torts § 422, cmt. c. And for good reason: Allowing strangers to invade construction sites would disrupt the work, risk injury to all involved, and expose the crew to liability. Leo Decl. ¶¶ 11–12. Leo and his crew therefore "take and maintain exclusive control" of each site and carry both a right and a duty to exclude intruders from those sites

until their work is done. *Id.* ¶ 12. For all these reasons—reasons that flow from Leo's eight years of training and experience as a construction worker—Leo reasonably expects privacy from intruders on his worksites. *Id.* ¶¶ 8–12.

*Second*, Defendants argue that partially built developments are "unoccupied or undeveloped areas" like an "open field." PI Opp. 19–23. But the individual construction sites within these residential developments are occupied by the very people developing them. *See* PI Br. 18–19. As Defendants recognize, these sites are dangerous, often scattered with things like "exposed rebar and other sharp objects in the area." PI Opp. 5. The public isn't just free to climb over the fence and wander past the No Trespassing signs. And neither is the government. Indeed, Leo's second detention shows just how far this argument reaches, as he was *inside* a house with only its garage door and siding missing. PI Br. 5. But because the construction wasn't complete, Defendants treat it like an open field.

*Finally*, Defendants say these warrantless entries don't violate the DHS regulation forbidding officers from entering non-public parts of businesses because the INA "allows questioning concerning an individual's right to be or remain in the United States." PI Opp. 20. But the general authority to conduct interviews does not eliminate that more specific (and constitutional) requirement that officers get a warrant or consent to enter private property. *See Kidd*, 734 F. Supp. 3d at 977–85. Otherwise, they could walk into anyone's home to conduct "interviews," just as they did on June 12.

## B.    Preemptive Detention Policy

In Leo's opening brief, he established that DHS abandoned the Fourth Amendment's particularized-suspicion standard and its counterpart codified in 8 C.F.R. § 287.8(b). Yet

Defendants do not engage with the precedent saying officers cannot rely on someone's "demographic profile," or someone's "mere propinquity" to a suspect, or being at a certain business, or sharing an employer with a suspect, or being in a high-crime area. *See* PI Br. 22–23 (collecting cases). Nor do they address the cases holding that someone's ethnicity plus occupation is no more particularized. *See id.* at 23. Instead, they rely solely on Justice Kavanaugh's concurrence in *Vazquez Perdomo*. But Justice Kavanaugh did not purport to overrule the particularized suspicion standard. As *Escobar Molina* recognized, Defendants badly overread *Perdomo* to justify their new enforcement policies. *Cf.* 2025 WL 3465518, at *24–25. Moreover, Justice Kavanaugh's concurrence is unpersuasive because Leo's challenge does not require scrutiny of every officer's assessment of the circumstances. *Id.* at *17. He asks only that officers make the individualized inquiry the law requires.

Take Leo's first detention. Defendants don't articulate a single fact to suggest that Leo behaved suspiciously. *See* PI Opp. 25. They had no idea who was working on that site, and no reason to suspect he was undocumented. Unable to offer firsthand knowledge, ASAC Lavoie cites a vague tip that undocumented workers might work for some of the biggest homebuilders in a region with homes going up everywhere. So they showed up to the site not knowing who they'd find. Just as the officers patrolling the development on June 12 walked into a random house because they saw someone working inside.

Still, Defendants try their best to justify Leo's detentions. They just can't decide if the first was for "attempting to interfere with an arrest, threatening Officer Safety," or because "he may be an alien." PI Opp. 25. The evidence, however, shows that ASAC Lavoie's second-hand account of the arrest is unreliable. Leo encourages the Court to watch

11

Defendants' Exhibit B, which includes three videos that Leo submitted with his SF-95. The first video shows that Leo did not walk quickly; he was walking over rebar and wet cement. He was over 25 feet away from his brother—not walking toward him or interfering with his arrest. There was no order "to stop" for Leo to ignore; the officer just said "you're making this more complicated than you want to" before grabbing him. Leo said he was a citizen four times and offered to show his papers three times. But the officers still told him to "get the fuck on the ground" and tackled him without any interest in his citizenship or documents. In video two, Leo yells, "I'm a citizen" at least two more times as his coworker also shouted that he's a citizen. The officers then retrieved Leo's REAL ID from his pocket *before* removing him from the site, not after. Indeed, as the officers led Leo off the worksite in handcuffs past his non-Latino coworkers, video three shows Leo saying, "I showed them my driver's license" as someone asks, "they trying to say it's fake or something?"

Defendants' claim that Leo was arrested for anything other than an immigration check is a fanciful, post hoc justification. Any doubt is resolved by the fact that the officers didn't detain the non-Latino workers for "Officer Safety" and let Leo go "[a]fter U.S. citizenship was verified." Lavoie Decl. ¶ 19. Plus, the same thing happened at the June 12 stop, which, again, the government says was based on reasonable suspicion and comported with officer training without articulating a single fact to support that suspicion.[5] Because

---

[5] It's unsurprising that Defendants say they have no record of Leo's second detention, as their official position is that they've never detained a U.S. citizen. *See* McClain Decl. ¶ 12. Despite the reduced evidentiary threshold DHS now uses for immigration stops, they still insist they've never been wrong. When a citizen's detention is captured on video, DHS's policy is to accuse the citizen of obstructing or interfering with officers no matter what the video shows. *E.g., id.* ¶¶ 15–16. And when there's no video or news reports capturing a citizen's arrest, DHS's policy is to simply deny it happened. *E.g., id.* ¶ 13–14.

DHS has abandoned the particularized-suspicion standard, Leo is likely to show that the policy violates the Fourth Amendment and 8 C.F.R. § 287.8(b)(2).

### C.    Continued Detention Policy

Leo explained the Continued Detention Policy is unlawful because searches and seizures, including immigration stops, must end as soon as officers should know their justification might have dissipated. PI Br. 24–25 (citing *Maryland v. Garrison*, 480 U.S. 79, 87–88 (1987); *Alcocer v. Mills*, 800 F. App'x 860, 865 (11th Cir. 2020)).

Defendants' response once again ignores the applicable precedent. Instead, they question whether an Alabama-issued REAL ID is sufficient evidence to end a stop. Lavoie Decl. ¶ 16; *cf.* McClain Decl. ¶¶ 3–4, 11. But *Alcocer* already decided that forms of identification issued only to people with lawful presence "negate[] suspicion of illegal presence." 800 F. App'x at 866. So, Defendants seek to undermine the reliability of DHS-certified REAL IDs to excuse their unlawful policy. To get there, they have to mistake how the law and their own regulations work. ASAC Lavoie swears, based on his HSI training, REAL IDs are unreliable evidence "because each state has its own REAL ID compliance laws, which may provide for the issuance of REAL ID to an alien." Lavoie Decl. ¶ 16. But that's simply not true—further undermining Defendants' reliance on ASAC Lavoie and his claim that HSI trains immigration officers to follow the law.

The REAL ID Act "provides that the federal government will not accept a state-issued driver's license or identification card unless the state verified the citizenship or immigration status of the applicant before issuing the document." *United States v. Alabama*, 691 F.3d 1296, 1299 (11th Cir. 2012); *see also Arizona v. United States*, 567 U.S. 387, 449

n.1 (2012) (Alito, J., concurring in part) (explaining that the REAL ID Act will create "forms of identification that suffice to establish lawful presence"). REAL IDs require proof of citizenship or lawful status. 6 C.F.R. §§ 37.11, 37.13. DHS is the very agency responsible for certifying that REAL IDs, including Alabama's STAR IDs, satisfy this requirement. *See* 6 C.F.R. § 37.3. If States choose to *also* issue licenses to people who can't meet the REAL ID Act's rigorous standards, those other IDs must have "a unique design or color indicator that clearly distinguishes them" from REAL IDs, and they must "state on their face and in the machine readable zone that the card is not acceptable for official purposes." 6 C.F.R. § 37.71. And besides, Alabama is not one of those states. *See* Ala. Code §§ 31-13-3(10), 31-13-29(c)(1), (g). Because DHS authorizes officers to disregard proof of lawful presence, the policy likely violates the Fourth Amendment and DHS's own regulations.

## IV. The irreparable harm Leo faces and public interest in stopping widespread violations of the Constitution justify an injunction.

*Leo's irreparable harm.* Defendants diminish the harm involved when they detain someone at work and force them off their jobsite. But "[t]here is, perhaps, no injury more substantial and less reparable than improper denial of the right to liberty." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1455 (11th Cir. 1986). So, remarkably, they attempt to dodge that precedent by claiming that Leo "has not been detained or arrested" at all (PI Opp. 27)— even though they cite Leo's SF-95 videos that show him being walked off his jobsite in handcuffs and Leo submitted a sworn declaration detailing both stops.

*The public interest*. Defendants claim the balance of equities favors the government because, in their view, the government wrongfully handcuffing someone at work for no good reason is a "modest" intrusion compared to placing any limits on the government's

14

immigration enforcement. PI Opp. 28. But Leo does not question the government's authority to enforce immigration laws; he simply asks that Defendants implement policies consistent with the Fourth Amendment and DHS's own regulations. *Cf. Escobar Molina*, 2025 WL 3465518, at *29 (finding balance of equities favored preliminary injunction where "the requested injunction would allow all aspects of immigration enforcement to continue, within the express bounds of the INA, as interpreted to align with the Fourth Amendment"). Officers will remain free to raid construction sites with consent or a warrant. They can still detain anyone who does something objectively suspicious. And they can continue those detentions so long as the justification persists.

But immigration-enforcement policies that violate the Constitution and federal regulations are not in the public interest. *See, e.g.*, *id.* at *30 (preliminary injunction against unlawful immigration arrest policy favored public interest). Again, the government "has no legitimate interest in enforcing an unconstitutional [policy]" and an injunction preventing such enforcement therefore "plainly is not adverse to the public interest." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). On the contrary, the public interest weighs against the government's "expenditure of time, money, and effort in attempting to enforce [policies] that may well be held unconstitutional." *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 959 (5th Cir. Unit B 1981).

## CONCLUSION

Leo respectfully requests that the Court grant his motion and either preliminarily enjoin each of the three policies on behalf of his putative classes or temporarily set aside the policies altogether pending conclusion of the review proceedings.

Dated: December 18, 2025.                    Respectfully submitted,

                                             */s/ Jared McClain*
                                             Jared McClain (DC Bar No. 1720062)*
                                             Jaba Tsitsuashvili (DC Bar No. 1601246)*
                                             Joshua Windham (NC Bar No. 51071)*
                                             INSTITUTE FOR JUSTICE
                                             901 N. Glebe Road, Suite 900
                                             Arlington, VA 22203
                                             (703) 682-9320
                                             jmcclain@ij.org
                                             *Admitted Pro Hac Vice*

                                             *Counsel for Plaintiff*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing PLAINTIFF'S

REPLY BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION with the Clerk of Court using

the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Jared McClain
Jared McClain (DC Bar No. 1720062)

17