**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**MOBILE DIVISION**

| | |
|---|---|
| LEONARDO GARCIA VENEGAS, | |
| *Plaintiff,* | |
| v. | Case No. 1:25-cv-397-JB-N |
| TOM HOMAN, WHITE HOUSE BORDER CZAR, IN HIS OFFICIAL CAPACITY, ET AL., | Oral argument requested |
| *Defendants.* | |

---

**PLAINTIFF'S AMENDED BRIEF IN OPPOSITION TO THE**

**MOTION TO DISMISS APA CLAIMS**

---

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 1

I.    Leo Is Subject to Three DHS Enforcement Policies ................................ 1

    A.  Twice, immigration officers have detained Leo at work ............................ 1

    B.  Three agency-wide policies authorize these raids. ..................................... 3

        1.  Warrantless Entry Policy. ................................................................. 4

        2.  Preemptive Detention Policy. .......................................................... 5

        3.  Continued Detention Policy. ........................................................... 6

II.   Procedural History ................................................................................... 7

STANDARD OF REVIEW ................................................................................... 8

DISCUSSION ...................................................................................................... 9

I.    Leo Has Standing to Bring All of His Claims .......................................... 9

    A.   Leo has standing to seek an injunction ...................................................... 10

    B.   Leo also has standing to bring his APA claims ........................................... 12

II.   The Challenged Policies Are Subject to Injunctive Relief & APA Review .............. 13

    A.   Leo's injunctive claim invokes this Court's equitable direction .................... 13

    B.   The policies are also subject to APA review ................................................ 15

        1.  The three challenged policies are final agency actions ................ 15

        2.  Leo's three discrete challenges are not "programmatic" .............. 17

        3.  The challenged policies are in effect agency wide. ...................... 19

III.  Leo Has Adequately Stated His Claims for Relief ................................. 22

    A.   Counts I & II state claims for violations of the Fourth Amendment ............. 23

1. Warrantless Entry Policy ............................................................. 23

2. Preemptive Detention Policy ...................................................... 27

3. Continued Detention Policy........................................................ 28

B.    Count III states a claim that the policies exceed DHS's statutory power ...... 29

C.    Count IV states a claim that the policies violate binding regulations........... 29

CONCLUSION ..................................................................................... 30

CERTIFICATE OF SERVICE................................................................. 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner,*
  387 U.S. 149 (1967) ............................................................................ 16

*Alcocer v. Mills,*
  800 F. App'x 860 (11th Cir. 2020) ...................................................... 28

*Aracely R. v. Nielsen,*
  319 F. Supp. 3d 110 (D.D.C. 2018) ..................................................... 20

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................................................ 28

*Bark v. U.S. Forest Service*
  37 F. Supp. 3d 41 (D.D.C. 2014) ......................................................... 20

*Bell v. Hood,*
  327 U.S. 678 (1946) ............................................................................ 14

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................... 15, 16, 19, 21, 22

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,*
  781 F.3d 1271 (11th Cir. 2015) ........................................................... 12

*Brown v. Texas,*
  443 U.S. 47 (1979) .............................................................................. 27

*Byrd v. United States,*
  584 U.S. 395 (2018) ............................................................................ 23

*Carpenter v. United States,*
  585 U.S. 296 (2018) ............................................................................ 25

*Church v. City of Huntsville,*
  30 F.3d 1332 (11th Cir. 1994) ....................................................... 10, 11

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ......................................................................... 10, 12

*Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.,*
  603 U.S. 799 (2024) ........................................................................ 9, 12

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ................................................................. 14

*Creedle v. Miami-Dade County,*
    349 F. Supp. 3d 1276 (S.D. Fla. 2018) .................................... 10

*Cronin v. FAA,*
    73 F.3d 1126 (D.C. Cir. 1996) .................................................. 12

*Daniels v. Exec. Dir.,*
    127 F.4th 1294 (11th Cir. 2025) ............................................. 11

*Davis v. Mississippi,*
    394 U.S. 721 (1969) ................................................................. 27

*Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.,*
    514 U.S. 122 (1995) ................................................................. 12

*Donovan v. Lone Steer, Inc.,*
    464 U.S. 408 (1984) ................................................................. 25

*Dugan v. Rank,*
    372 U.S. 609 (1963) ................................................................. 14

*Escobar Molina v. DHS,*
    2025 WL 3465518 (D.D.C. Dec. 2, 2025) .................................. 10, 11, 20, 21, 22, 29

*Fanin v. Department of Veterans Affairs,*
    572 F.3d 868 (11th Cir. 2009) .......................................... 18, 19

*Fla. Agency for Health Care Admin. v. Adm'r for Ctrs. for Medicare & Medicaid Servs.,*
    161 F.4th 765 (11th Cir. 2025) ......................................... 19, 21

*Florida v. United States,*
    660 F. Supp. 3d 1239 (N.D. Fla. 2023) .................................... 21

*FPL Food, LLC v. USDA,*
    671 F. Supp. 2d 1339 (S.D. Ga. 2009) .................................... 12

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................... 15, 17

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ................................................................. 13

iv

*Friends of the Everglades, Inc. v. DHS*,
    2025 WL 2598567 (11th Cir. Sept. 4, 2025) .......................................................... 12

*Garcia v. Copenhaver, Bell & Assocs.*,
    104 F.3d 1256 (11th Cir. 1997) ................................................................. 9

*Garcia-Bengochea v. Carnival Corp.*,
    407 F. Supp. 3d 1281 (S.D. Fla. 2019) ........................................................ 25

*Halmos v. Bomardier Aerospace Corp.*,
    404 F. App'x 376 (11th Cir. 2010) ............................................................. 3

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ................................................................. 8

*Indep. U.S. Tanker Owners Comm. v. Dole*,
    809 F.2d 847 (D.C. Cir. 1987) ................................................................ 12

*Int'l Ladies' Garment Workers' Union v. Donovan*,
    722 F.2d 795 (D.C. Cir. 1983) ................................................................ 13

*Jama v. DHS*,
    760 F.3d 490 (6th Cir. 2014) ................................................................. 8

*Kansas v. Glover*,
    589 U.S. 376 (2020) .......................................................................... 27

*Katz v. United States*,
    389 U.S. 347 (1967) ...................................................................... 24, 25

*Kennedy v. Floridian Hotel Inc.*,
    2018 WL 10601975 (S.D. Fla. May 15, 2018) ................................................... 8

*Kiakombua v. Wolf*,
    498 F. Supp. 3d 1 (D.D.C. 2020) ............................................................. 12

*Kidd v. Mayorkas*,
    734 F. Supp. 3d 967 (C.D. Cal. 2024) ..................................................... 4, 29

*Lake Mohave Boat Owners Ass'n v. NPS*,
    78 F.3d 1360 (9th Cir. 1995) ................................................................ 13

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949) ......................................................................... 14

*Lawrence v. Dunbar*,
    919 F.2d 1525 (11th Cir. 1990) ........................................................... 8, 9

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ....................................................................... 15, 17, 18, 19, 20

*Lyall v. City of Los Angeles,*
    807 F.3d 1178 (9th Cir. 2015) ................................................................. 24

*Made in the USA Found. v. United States,*
    242 F.3d 1300 (11th Cir. 2001) .............................................................. 14

*Mancusi v. DeForte,*
    392 U.S. 364 (1968) ....................................................................... 25, 26

*Marshall v. Barlow's, Inc.,*
    436 U.S. 307 (1978) ....................................................................... 23, 24

*Maryland v. Garrison,*
    480 U.S. 79 (1987) .......................................................................... 28

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) .......................................................................... 12

*Nat'l Treasury Emps. Union v. Vought,*
    149 F.4th 762 (D.C. Cir. 2025) .............................................................. 17

*Nava v. DHS,*
    435 F. Supp. 3d 880 (N.D. Ill. 2020) ...................................................... 18

*Noble v. Tooley,*
    125 F. Supp. 2d 481 (M.D. Fla. 2000) .................................................... 10

*Noem v. Vasquez Perdomo,*
    146 S. Ct. 1 (2025) ....................................................................... 10, 28

*Paterson v. Weinberger,*
    644 F.2d 521 (5th Cir. 1981) .................................................................. 8

*Peterman v. Coleman,*
    764 F.2d 1416 (11th Cir. 1985) .............................................................. 23

*Rakas v. Illinois,*
    439 U.S. 128 (1978) .......................................................................... 24

*Reyes v. Maschmeier,*
    446 F.3d 1199 (11th Cir. 2006) .............................................................. 25

*Sackett v. EPA,*
    566 U.S. 120 (2012) ................................................................................ 17

*Sapuppo v. Allstate Floridian Ins. Co.,*
    739 F.3d 678 (11th Cir. 2014) .............................................................. 14

*Swint v. City of Wadley,*
    51 F.3d 988 (11th Cir. 1995) ................................................................ 27

*Trudeau v. FTC,*
    456 F.3d 178 (D.C. Cir. 2006) ................................................................ 8

*United Food & Com. Workers Union, Loc. No. 227 v. USDA,*
    2021 WL 12312897 (D.D.C. Aug. 20, 2021) ........................................ 13

*United States v. Alarcon-Gonzalez,*
    73 F.3d 289 (10th Cir. 1996) ................................................................ 27

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) .............................................................................. 27

*United States v. De La Cruz,*
    703 F.3d 1193 (10th Cir. 2013) ............................................................ 27

*United States v. Jones,*
    565 U.S. 400 (2012) .............................................................................. 24

*United States v. Lee,*
    106 U.S. 196 (1882) .............................................................................. 14

*Vann v. Dep't of Interior,*
    701 F.3d 927 (D.C. Cir. 2012) .............................................................. 14

*Venetian Casino Resort LLC v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) .............................................................. 19

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) .............................................................................. 16

*Wilding v. DNC Servs. Corp.,*
    941 F.3d 1116 (11th Cir. 2019) ............................................................ 22

*Williamson v. Tucker,*
    645 F.2d 404 (5th Cir. 1981) .................................................................. 9

*Ybarra v. Illinois,*
    444 U.S. 85 (1979) ................................................................................ 27

*Ex parte Young,*
    209 U.S. 123 (1908) ........................................................................... 14

**Statutes**

5 U.S.C. § 702 ...................................................................................... 9

5 U.S.C. § 704 ........................................................................... 8, 9, 15, 16

5 U.S.C. § 706 .............................................................................. 7, 15, 23

8 U.S.C. § 1357 .................................................................................... 29

**Rules and Regulations**

6 C.F.R. § 37.3 .................................................................................... 30

6 C.F.R. § 37.11 .................................................................................. 30

6 C.F.R. § 37.13 .................................................................................. 30

6 C.F.R. § 37.15 .................................................................................. 30

6 C.F.R. § 37.17 .................................................................................. 30

6 C.F.R. § 37.19 .................................................................................. 30

6 C.F.R. § 37.71 .................................................................................. 30

8 C.F.R. § 287.8 .................................................................................. 29

**Other Authorities**

*Alabama construction industry may face devastating worker shortage under
    Trump immigration crackdown*, AL.com (Sept. 21, 2025),
    https://archive.is/GjQPO ............................................................... 4

*Border Patrol official denies racial profiling factors in immigration arrests,
    says officers do consider whether people appear "panicked" or "scared,"*
    CNN (Oct. 8, 2025), https://archive.is/0Zuof ..................................... 6

DHS Sets Record Straight on Administrative Warrants (Feb. 4, 2026),
    https://bit.ly/3MRI6AZ; ................................................................. 3

*Homeland Security investigator talks about Baldwin County raids* (June 12,
    2025), https://bit.ly/3MPUlxV .......................................................... 4

*ICE After Minneapolis*, The Atlantic (Feb. 7, 2026), https://bit.ly/4s3fGDf ................... 21

Gregory K. Bovino, X.com (Dec. 11, 2025), https://bit.ly/4roTbIT ............................... 20

*Judge orders release of US Border Patrol head Gregory Bovino deposition
    videos*, Chicago Tribune (Nov. 6, 2025), https://archive.is/KNLUQ ........................ 20

Lyons Memo (Jan. 28, 2025), https://bit.ly/4rQGNRE..................................................... 3

Secret Lyons Memo (May 12, 2025), https://bit.ly/4bXab44 .................................... 3, 21

*US citizen sues after twice being detained by immigration agents*,
    The Guardian (Oct. 2, 2025), *available at* https://archive.is/4LCeP .......................... 6

## INTRODUCTION

Defendants filed two motions to dismiss some of Leo's claims. This brief deals with the Partial Motion to Dismiss Plaintiff's APA claims (ECF 57). Because Defendants scantly mention the merits, this brief mostly focuses on Leo's ability to seek relief from three Department of Homeland Security policies that allow immigration officers to raid Leo's worksites without a warrant, detain him without particularized suspicion, and continue to hold him after he dispelled any doubt about his lawful presence. This Court should deny the motion to ensure that innocent U.S. citizens like Leo can work in the construction industry without fear that the federal government will treat them like criminals.

## BACKGROUND

### I.    Leo Is Subject to Three DHS Enforcement Policies.

#### A.    Twice, immigration officers have detained Leo at work.

Leo is a U.S. citizen of Mexican descent who works in the construction industry in Baldwin County. Compl. (ECF 1) ¶¶ 1, 26–29. Leo works on a team of subcontractors who lay concrete for new homes on private construction sites that are closed to the public. *Id.* ¶¶ 35–53. The job requires Leo to move from development to development, following the region's housing growth. *Id.* ¶¶ 54–58. That puts Leo at an acute risk of being stopped repeatedly by the DHS's immigration patrols, which target people who look like Leo. *Id.* Because these agents grab construction workers without prior knowledge of who they are, Leo risks being stopped every day he goes to work on a new site. *Id.* ¶¶ 54–62.

That risk isn't speculative. Twice since last May, officers carrying out DHS's enforcement policies have entered Leo's worksites without a warrant to search for workers

who fit the profile DHS associates with undocumented immigrants. *Id.* ¶¶ 63–152. These sites were closed to the public. The first was enclosed with a perimeter fence and posted with a No Trespassing sign, which officers jumped over and ran past. *Id.* ¶¶ 65, 70. The second was a house that an officer walked inside without a warrant. *Id.* ¶¶ 119–31.

In both instances, officers detained Leo without any reason to suspect that he had done anything wrong. Indeed, they knew nothing about him aside from his appearance and occupation. *Id.* ¶¶ 70–75, 108–10, 130. There were no prior investigations and no questions. *Id.* ¶¶ 70, 130. Officers just detained him and his Latino colleagues immediately and left the non-Latino workers alone. *Id.* ¶¶ 67, 71. The first time, an officer walked up to Leo, grabbed him, and yanked him to the ground. *Id.* ¶¶ 77–91. Leo hadn't run or done anything suspicious. *Id.* As soon as he saw the officer was going to grab him, Leo exclaimed that he was a citizen and could show his papers. *Id.* ¶¶ 79–90. But that didn't stop three officers from putting him in handcuffs. *Id.* Even after they checked retrieved Leo's Alabama-issued REAL ID from his pocket, they still led him off his worksite for an hour before finally confirming his citizenship. *Id.* ¶¶ *Id.* ¶¶ 92–108.

Just three weeks later, it happened again. *Id.* ¶¶ 115–16. Officers saw Leo working alone in a house, walked inside, and took him out of the development. *Id.* ¶¶ 116–46. Again, Leo did nothing suspicious. *Id.* ¶ 130. And again, a REAL ID was not enough to end the stop. *Id.* ¶ 141. Simply being seen at work was enough to cost Leo his liberty as government agents took him from work for 30 minutes based on how he looks. *Id.* ¶¶ 130–52. And it wasn't just Leo: He saw two other workers in that half hour who were wrongfully detained by the same patrol. *Id.* ¶¶ 148, 151.

**B.    Three agency-wide policies authorize these raids.**

These raids, Leo's preemptive detention with no questions asked, and officers' failure to release him after seeing his REAL ID were not isolated incidents. They were not mistakes by rogue officers. They reflect new directives that DHS issued based on its new interpretation of executive power. *Id.* ¶ 160.[1] Officers from across the federal government have been reassigned to the "whole-of-government approach" to mass deportations, in hopes of making 3,000 immigration arrests per day. Compl. ¶¶ 161–73.

To that end, the Administration has disclaimed all limits on its power to enforce immigration laws. White House Border Czar Tom Homan asserted that "there is no limitation" on the President's immigration power, and Deputy Chief of Staff Steven Miller called for "unrestricted enforcement of federal immigration law." *Id.* ¶¶ 183–85. Discarding legal restrictions on their power, top officials have directed agents to "do what [they] need to do," to "push the envelope," to turn the "creative knob up to 11," and that "[i]f it involves handcuffs on wrists, it's probably worth pursuing." *Id.* ¶ 165.

This lawsuit challenges just three of the "creative" ways DHS has removed legal restrictions on its own authority, each of which has violated Leo's rights. *Id.* ¶¶ 153–59.

---

[1] New press releases and memos show there are, in fact, new policies. *See, e.g.*, DHS Sets Record Straight on Administrative Warrants (Feb. 4, 2026), https://bit.ly/3MRI6AZ; Secret Lyons Memo (May 12, 2025), https://bit.ly/4bXab44; Lyons Memo (Jan. 28, 2025) (instructing officers that DHS's prior interpretation of its statutory power to conduct warrantless arrests was "unreasoned" and "incorrect"), https://bit.ly/4rQGNRE. Defendants' statements in the public record and their policy memorandums are subject to consideration on a motion to dismiss. *Halmos v. Bomardier Aerospace Corp.*, 404 F. App'x 376, 377 (11th Cir. 2010) ("[A] district court may take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a Rule 56 motion.").

1.     A **Warrantless Entry Policy** authorizes immigration officers to enter private construction sites without a warrant, including those that are fenced in, enclosed, and posted with No Trespassing signs. *Id.* ¶¶ 155, 201–07.

DHS has ordered "massively expand[ed]" "worksite enforcement operations." *Id.* ¶¶ 173–75. The construction industry is one major target. *Id.* ¶¶ 189–200. As Defendant Schrank explained, the Administration is targeting construction sites in Alabama because that's where they believe undocumented immigrants likely work. *Id.* ¶ 193. Construction site raids on new residential developments in Baldwin County began making the news in the Administration's first full month. *Id.* ¶¶ 193–98. Then, over the summer, they "stepped up raids on construction sites."[2] A June 12 report confirmed that "for months" immigration officers "raided multiple construction sites across the bay."[3] By the end of the summer, at least 15 developments were hit, and probably many more. *Id.* ¶¶ 195–96.

DHS directs the officers carrying out these raids to treat construction sites as if they're open to the public. An ICE training document invites officers to enter "open areas" without a warrant even if "the area may be fenced, and even if 'no trespassing' signs have been posted."[4] It even encourages officers to wander into an open garage unless "a resident clearly indicates he does not want the officer to do so."[5]

---

[2] *Alabama construction industry may face devastating worker shortage under Trump immigration crackdown*, AL.com (Sept. 21, 2025), https://archive.is/GjQPO.
[3] *Homeland Security investigator talks about Baldwin County raids*, Fox10 (June 12, 2025), https://bit.ly/3MPUlxV.
[4] *Kidd v. Mayorkas*, 2:20-cv-03512 (C.D. Cal.), ECF Doc. 489-4 (attached to Windham Decl. (ECF 30-3) as Ex. 1).
[5] *Id.*

DHS now applies this broad view of "open areas" to the construction industry. Immigration officers routinely enter private construction sites where the public could not freely go—sites posted with No Trespassing signs and enclosed with fencing or structures—without consent or a warrant. Compl. ¶¶ 201–07. These warrantless raids have targeted sites owned by all the region's largest homebuilders. *See id.* ¶¶ 190, 196–97.

2.     A **Preemptive Detention Policy** authorizes immigration officers to detain anyone who fits DHS's profile for undocumented immigrants, including Latino construction workers, without developing particularized suspicion. *Id.* ¶¶ 156, 208–30.

This policy of grabbing people without particularized suspicion replaced targeted investigations. Before DHS implemented these new policies, officers had to identify their intended targets in advance. *Id.* ¶¶ 176–82. Now, the arrest preempts the investigation. As a top official explained, contrasting a detainee's looks with that of a white reporter: officers simply go to a location where they think they'll find "illegal alienage" and detain individuals based on "how they look." *Id.* ¶ 181. Even though construction sites are staffed by companies bound by law to hire workers with lawful status and 85% of the industry is documented, officers still detain anyone in construction who they think looks undocumented. *Id.* ¶¶ 210–12, 215–30. That means at least one-third of Alabama's documented construction workers are now considered so suspect just for being Latino that they can be detained without doing or saying anything wrong. *Id.* ¶¶ 213–15, 225–30.

Armed with this policy, officers invade construction sites and round up all Latino workers, often handcuffing or zip-tying immediately. *Id.* ¶¶ 110, 226–28. These are not *Terry* stops—they are not brief and there is no inquiry. *Id.* ¶¶ 229–30. Leo was held for

about 90 minutes across two stops at which officers did not ask questions and nothing he said could have set him free. *Id.* ¶¶ 107, 152. Others haven't been so lucky. *Id.* ¶¶ 230, 247.

One reason these raids don't function like *Terry* stops is that DHS thinks it can *arrest* people based on the "reasonable suspicion" created by their ethnicity and occupation. As then-Chief Border Patrol Agent Bovino explained: "We need reasonable suspicion to make an immigration arrest. You notice I did not say probable cause, nor did I say I need a warrant."[6] Then-Assistant DHS Secretary Tricia McLaughlin gave a similar response to this very lawsuit: "DHS law enforcement uses 'reasonable suspicion' to make arrests."[7]

3.    A **Continued Detention Policy** authorizes the detention of anyone who fits DHS's demographic profile for undocumented immigrants even after they have produced evidence to dispel any suspicion, such as a REAL ID. Compl. ¶¶ 157, 231–43.

This policy helps implement DHS's order that officers "err on the side of action, not caution," because "[t]his administration would rather have you arrest the U.S. citizen and sort it out later."[8] In practice, that means refusing to accept *all* government-issued IDs—including the REAL IDs that DHS certifies to ensure they're only issued to people with lawful status. Compl. ¶¶ 93–99, 112, 239–41. Senior officials try to justify this policy by claiming states can issue driver's licenses without proof of lawful presence, *supra* n.8, but those licenses are *not* REAL IDs. Compl. ¶¶ 97–100. Leo has had five officers, during two

---

[6] *Border Patrol official denies racial profiling factors in immigration arrests, says officers do consider whether people appear "panicked" or "scared,"* CNN (Oct. 8, 2025), https://archive.is/0Zuof.
[7] *US citizen sues after twice being detained by immigration agents*, The Guardian (Oct. 2, 2025), https://archive.is/4LCeP.
[8] Article cited at Compl. 112 n.3, *available at* https://archive.is/mdlJQ; *see also infra* n.14; Lavoie Decl. (ECF 44-1) ¶ 16.

6

raids that were three weeks and 20 miles apart, tell him that they could not trust that his REAL ID was real. *Id.* ¶¶ 102, 142. And he's far from alone. *See, e.g.*, *id.* ¶ 217.

\* \* \*

The Gulf of America Task Force is a group of officers from at least eight agencies across DHS and DOJ who are responsible for immigration enforcement within this District. *Id.* ¶¶ 186–88. They have all been deputized as immigration officers by Secretary Noem, who controls DHS's enforcement policies nationwide. *Id.* ¶¶ 16, 171.

## II.    Procedural History

Leo filed this lawsuit against DHS, DOJ, the officials who enforce the challenged policies in this District, and the officers who violated his rights. His Complaint raises 13 claims, four of which are relevant here. Count I seeks to enjoin the officials responsible for enforcing these unconstitutional policies. Counts II–IV seek vacatur of the policies under the Administrative Procedure Act ("APA"). Count II alleges that, because the policies are unconstitutional, each should be set aside. *See* 5 U.S.C. § 706(2)(B). Count III alleges that the policies exceed DHS's statutory power. *See id.* § 706(2)(C). And Count IV alleges that the policies violate the binding regulations. *See id.* § 706(2)(A), (D).

Defendants have moved to dismiss the APA claims (Counts II–IV). With little mention of the merits, Defendants focus on Leo's ability to bring this lawsuit. They say that Leo lacks standing to seek injunctive relief, that there's no final agency action to challenge, and that Leo lacks Fourth Amendment "standing" to challenge the Warrantless Entry Policy. Then, in little more than a page, they assert without elaboration that Leo failed to state a plausible claim for relief because the 250+ factual allegations in his Complaint are all

conclusory. And finally, they conclude—again without explanation—that Leo's injunctive claim (Count I) must also be dismissed as "dependent" on his APA claims.

## STANDARD OF REVIEW

On Rule 12(b)(1) and 12(b)(6) motions alike, courts typically limit their review to the pleadings and grant all factual inferences in the plaintiff's favor. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). Defendants, however, suggest two reasons why they can still rely on their agent's declaration that the challenged policies don't exist.

*First*, Defendants contend that Lavoie's declaration is permissible because it's "central" to the complaint and authentic. MTD 7. But this limited exception applies only when the document's "*contents* are not in dispute." *See Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (emphasis added). A declaration sworn out by Defendants' agent to dispute Leo's allegations is neither central to the complaint nor undisputed.

*Second*, Defendants say the Lavoie declaration is admissible in a factual attack on jurisdiction. MTD 7.  While a factual attack allows the court to consider extrinsic evidence, *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981), Defendants' "factual attack" is premature and impermissibly questions elements of Leo's cause of action.[9]

A court's factual evaluation under Rule 12(b)(1) may only occur after "the answer has been served." *Kennedy v. Floridian Hotel Inc.*, 2018 WL 10601975, at *3 n.3 (S.D. Fla. May 15, 2018) (citing *Mortensen v. First Fed. Sav. & Loan*, 549 F.2d 884, 891–92 (3d Cir.

---

[9] Leo disputes that Section 704's elements are subject to a jurisdiction challenge. But he the Eleventh Circuit has split from other circuits that do not treat the APA's claim elements as jurisdictional. *Jama v. DHS*, 760 F.3d 490, 494 (6th Cir. 2014); *Trudeau v. FTC,* 456 F.3d 178, 184 (D.C. Cir. 2006), so Leo merely preserves his argument for appeal.

1977)). That's because "the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence." *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981). And besides, a factual attack on whether an agency took final action wrongfully "implicates an element" of the cause of action and should be made under Rule 12(b)(6). *See Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997); *Lawrence*, 919 F.2d at 1529. Under the APA, both "§ 702's injury requirement and § 704's finality requirement" are "a 'necessary … ground for stating a claim[.]'" *Corner Post, Inc. v. Bd. of Governors of Fed. Res. Sys.*, 603 U.S. 799, 808 (2024). Those elements are not susceptible to a factual attack. The Court should confine itself to the typical standard for Rule 12(b) motions.[10]

## DISCUSSION

There is no basis to dismiss Leo's complaint. As Part I explains, Leo's standing is clear cut. Part II explains that this Court has authority to redress the alleged violations—both through its equitable authority and the APA. And Part III concludes that Leo's Complaint states four claims for relief.

### I.    Leo Has Standing to Bring All His Claims

Leo has standing to challenge the policies that authorize immigration officers to enter his worksites without a warrant, detain him and his coworkers without particularized suspicion, and refuse to credit their proof of citizenship. We know these three policies pose a risk to Leo's constitutional rights because DHS's immigration officers have already

---

[10] If Defendants *could* wage a factual attack, the evidence in Leo's PI Brief meets the "preponderance of the evidence" standard at this stage. *See Paterson*, 644 F.2d at 523.

enforced them against Leo *twice* in the year since their implementation. Defendants insist, however, that two prior injuries plus Leo's continued employment in an industry targeted for these raids isn't enough to seek an injunction. They're wrong, and their argument also misses the distinction between the forms of Leo's requested relief.

### A.    Leo has standing to seek an injunction.

Count I seeks to enjoin the officials who enforce the policies that violate Leo's Fourth Amendment rights. A plaintiff seeking to enjoin government conduct must show they're at risk of imminent harm. *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). In determining imminence, courts consider whether (1) an official policy authorizes the challenged conduct; (2) the plaintiff is one of the policy's targets; and (3) the plaintiff routine, lawful conduct subjects them to the policy. *See Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir. 1994). When policies have already harmed a plaintiff *twice*, standing is all but certain.[11] *See Creedle v. Miami-Dade County*, 349 F. Supp. 3d 1276, 1291 (S.D. Fla. 2018).

Defendants ignore *Church* and largely rehash their *Lyons* arguments from the preliminary-injunction briefing.[12] *Lyons* held that a plaintiff who was choked during a traffic stop lacked standing to enjoin future chokeholds. 461 U.S. at 97–98, 105. The Court

---

[11] The other elements of standing are rightly uncontested because "any Fourth Amendment violation" would be traceable to alleged policy and redressed by an injunction. *See Noble v. Tooley*, 125 F. Supp. 2d 481, 484 (M.D. Fla. 2000).

[12] To their credit, Defendants abandoned their reliance on Justice Kavanaugh's concurrence in *Noem v. Vasquez Perdomo*, 146 S. Ct. 1 (2025). *See* PI Opp. (ECF 46) 17–18. That case is distinguishable because Leo has already been detained *twice*. And he's more likely to be detained again because the raids target his workplace, not a massive area with 20 million people. *Id.* at 1. Plus, Leo is "not arguing which factors defendants may consider," "but rather [] that defendants have abandoned the proper legal standard entirely." *Escobar Molina v. DHS*, No. 25-cv-3417, 2025 WL 3465518, at *17 (D.D.C. Dec. 2, 2025).

reasoned that, because Lyons was seeking an injunction, he had to show imminent risk of another chokehold. He couldn't do that, though, because he could not allege that he'd commit another traffic infraction and then, during the stop, resist or provoke the officers. *Id.* at 108–10. Crucially, LAPD policy did not allow baseless traffic stops or chokeholds absent resistance or provocation. *Id*. So, innocent drivers going about their days were not actually threatened with chokeholds.

Leo, by contrast, satisfies all three *Church* factors: there's a policy in place that targets his lawful, everyday behavior. *See* 30 F.3d at 1337–39. Defendants are raiding construction sites without warrants and detaining people based on how they look, without any reason to believe they've done something wrong, and then refusing to release them after the show evidence of lawful status. As a Latino construction worker targeted by the policies, Leo faces an imminent risk of another raid and detention just for showing up to work. *See Daniels v. Exec. Dir.*, 127 F.4th 1294, 1303 (11th Cir. 2025) (standing when employment exposed plaintiff to policy). Indeed, we know how the *Church* factors cash out because *Escobar Molina* already applied them to hold that plaintiffs targeted for warrantless arrests could challenge the Administration's policy. *Escobar Molina v. DHS*, 2025 WL 3465518, at *15–16 (D.D.C. Dec. 2, 2025). The same logic applies here.

Leo's circumstances "have not changed" since his two detentions. *See Daniels*, 127 F.4th at 1303. And the raids show no sign of slowing given the "pressure from the White House to meet increasing goals" for immigration arrests and the ongoing construction boom in Baldwin County. *Escobar Molina*, 2025 WL 3465518, at *16; Compl. ¶ 246.

11

### B.    Leo also has standing to bring his APA claims.

Leo brings Counts II through IV under the APA. Distinct from traditional injunctive relief, the APA authorizes courts to review, "hold unlawful and set aside" federal agency actions. *Friends of the Everglades, Inc. v. DHS*, 2025 WL 2598567, at *5 (11th Cir. Sept. 4, 2025). As then-Judge Jackson has explained, vacatur is a "substantially less intrusive" form of relief than an injunction requiring future compliance. *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52–53 (D.D.C. 2020) (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010)). Vacatur merely requires the agency to adopt a new policy to fix the prior one's flaws if it wants "to confront the problem anew." *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987).

Leo's ability to clear the higher bar of *Lyons* makes this distinction largely academic. *Cf. FPL Food, LLC v. USDA*, 671 F. Supp. 2d 1339, 1347 (S.D. Ga. 2009) ("The injury-in-fact requirement is somewhat modified when a plaintiff seeks an injunction."). But if the Court were to, for some reason, find that *Lyons* barred Leo's injunctive claims, he could still bring his claims under the APA to set aside the agency's unlawful policies. The APA authorizes all "persons injured by agency action to obtain judicial review." *Corner Post*, 603 U.S. at 807–08. Once a litigant shows "that he is injured in fact by agency action," *Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 127 (1995), the "ordinary APA remedy" of vacatur is appropriate, *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (citation omitted).

As a member of the "regulated class" who has already endured two detentions during workplace raids, Leo has standing to seek APA review. *See Cronin v. FAA*, 73 F.3d

1126, 1130–31 (D.C. Cir. 1996) (pilot subject to drug-testing had standing as member of "regulated class"); *Lake Mohave Boat Owners Ass'n v. NPS*, 78 F.3d 1360, 1366 (9th Cir. 1995) ("A regulated entity normally has standing to sue an agency to claim that the agency implemented regulations in violation of the APA."); *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 809–10 (D.C. Cir. 1983) (garment workers' union had standing to bring APA challenge to recission of workplace regulations); *United Food & Com. Workers Union, Loc. No. 227 v. USDA*, 2021 WL 12312897, at *5 (D.D.C. Aug. 20, 2021) (poultry workers' union could bring APA challenge to worksite safety regulations).

## II.    The Challenged Policies Are Subject to Injunctive Relief & APA Review

To refresh, Leo brought a claim to enjoin the officers responsible for enforcing the three unconstitutional policies and three claims under the APA to set aside the policies. Defendants say they are moving to dismiss only three of those claims: Leo's "Administrative Procedure Act (APA) claims, Counts II and IV." MTD 1. Their entire brief focuses solely on Leo's APA claims. And then, without ever saying why, Defendants conclude that Leo's injunctive claim must *also* be dismissed as "dependent" on the APA claims. *Id.* at 21. But that undeveloped argument misses the differences between Leo's claims. As Part A explains, Leo's injunctive claim (Count I) is justiciable with or without his APA claims (Count II–IV). Part B explains why Leo's APA claims are also justiciable.

### A.    Leo's injunctive claim invokes this Court's equitable discretion.

Leo brings Count I under this Court's inherent equitable jurisdiction—not the APA. Equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally." *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561

U.S. 477, 491 n.2 (2010) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001)). Federal courts have inherent equitable jurisdiction "to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Ex parte Young*, 209 U.S. 123, 159–60 (1908).

When suing federal officers, the "*Larson-Dugan* exception" to sovereign immunity permits the courts to hear suits "alleging that a government's official's actions were unconstitutional or beyond statutory authority[.]" *Made in the USA Found. v. United States*, 242 F.3d 1300, 1308 n.20 (11th Cir. 2001) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949); *Dugan v. Rank*, 372 U.S. 609, 621–23 (1963)). A suit for injunctive relief is the "standard approach" to stop government officials from violating the Constitution. *Vann v. Dep't of Interior*, 701 F.3d 927, 928 (D.C. Cir. 2012) (Kavanaugh, J.). This equitable power ensures that "[n]o officer of the law may set that law at defiance with impunity." *United States v. Lee*, 106 U.S. 196, 220 (1882).

Because Count I invokes this Court's power to enjoin unconstitutional conduct by government officials, it is not "dependent" on Leo's APA claims. *Contra* MTD 21. Defendants developed no argument to the contrary to which Leo can respond. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (a party forfeits an argument by "mak[ing] only passing references to it or rais[ing] it in a perfunctory manner without supporting arguments and authority"). So long as the Court agrees that Leo stated a Fourth Amendment claim, then his claim for injunctive relief proceeds regardless of whether the Court decides that the policies meet the APA's requirements for review.

14

**B.    The policies are also subject to APA review.**

Leo alleged that, as part of DHS's broader immigration enforcement, the agency has adopted three discrete policies that have impacted his rights and threaten to do so again. Because these policies are already in effect, each is a final action subject to APA review.

Defendants offer three reasons why this case does not meet Section 704 of the APA's "final agency action" requirement. *First*, they question whether the challenged policies satisfy the test for finality. MTD 14–16 (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). *Second*, they ask the Court to apply the rule against programmatic challenges. *Id.* at 15–16 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990)). And *third*, they contend that officers' "field-level decisions," like the "reasonable suspicion determinations," are not attributable to the agency. *Id.* at 18.

None of their arguments work. Part 1 explains that, despite Defendants' invoking *Bennett*, they don't address the relevant factors. Part 2 explains that *Lujan*'s rule against programmatic challenges doesn't fit Defendants' arguments, either. And Part 3 sets out and applies the standard for APA review of unpublished agency actions.

**1.    The three challenged policies are final agency actions.**

Leo has plausibly alleged that the three challenged policies are "final agency action[s]" subject to APA review. *See Bennett*, 520 U.S. at 177–78 (citing 5 U.S.C. § 704). An agency action is final if (1) the agency "completed its decisionmaking process" and (2) its decision will "affect the parties['] rights or legal obligations. *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). This two-part inquiry is pragmatic and reflects

15

the APA's presumption that the Courts can review agency actions. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 140, 149 (1967).

Despite structuring their brief around *Bennett*'s factors for finality, Defendants don't really argue about finality. Instead, under the subheadings for both factors, they focus on whether the policies really exist. *See* MTD 16 (no "facts show[] the alleged policies exist"); *id.* at 18 ("there are no corresponding policies"). That's not an argument about finality—an argument that an agency's decision is tentative or has no legal effect. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478–79 (2001) (explaining that "[t]he bite in the phrase 'final action'" is not the word "action" but whether the agency has concluded its decisionmaking). It's a separate argument that the policies don't exist, which Leo will address in Section II.B.3. But on finality itself—on whether the policies would be *final* agency actions under Section 704 if they exist as alleged—Defendants are silent.

That silence is explained by the fact that the *Bennett* factors prove finality. *First*, as alleged, DHS has determined that warrants are not required to enter construction sites, particularized suspicion is not required for *Terry* stops, and evidence of legal status does not require officers to release detainees. Immigration officers from across at least eight agencies with different law-enforcement backgrounds have been enforcing these policies consistently nationwide. Compl. ¶¶ 158, 188. *Second*, the targets of these policies, like Leo, have had their rights affected. Without these policies, immigration officers would have to get a warrant to enter private construction sites, develop particularized suspicion for immigration stops, and release detainees once any justification subsided. That makes the policies final agency actions subject to review. Policies authorizing government agents to

access private property and detain people going about their daily life are final agency actions. *See, e.g., Sackett v. EPA*, 566 U.S. 120, 126 (2012); *Franklin*, 505 U.S. at 796–97.

### 2.   Leo's three discrete challenges are not "programmatic."

Defendants' second argument also misconstrues precedent. They urge this Court to "apply *Lujan* to find that Plaintiff's challenges of immigration officers' discrete in-the-field reasonable suspicion determinations" do not show there's an agency action. MTD 16.

But *Lujan* is about "programmatic" challenges—a wholesale claim that attacks different types of agency actions as a single policy. For instance, in *Lujan*, the plaintiff did not limit his challenge to a single order or regulation, "or even to a completed universe of particular [] orders and regulations." 497 U.S. at 890. Instead, the plaintiff challenged a broad program of different things BLM does relating to public lands. Under the umbrella of a single policy, the plaintiff questioned different functions carried out by different departments: BLM's processing of applications, its classification of public lands, how it develops and revises land-use plans, its reporting to Congress, and more. *Id.* at 890–91. The Court compared it to challenging the "'weapons procurement program' of the Department of Defense or a 'drug interdiction program of the Drug Enforcement Administration" under a single APA claim. *Id.*

The analogy here would be if Leo had sued to stop DHS's entire mass deportation campaign. But this isn't some broad challenge to DHS's enforcement writ large. Leo brought three targeted challenges to policies within that program, just as *Lujan* requires: "more manageable proportions" focused on "some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens harm to him." *Id.*

17

The Eleventh Circuit reads *Lujan* the same way. In *Fanin v. Department of Veterans Affairs*, the Court noted that *Lujan* forbids "sweeping changes to VA security procedures" but "does not prevent a plaintiff from bringing a handful of specialized challenges to specific 'final agency actions' that, if successful, would have a broad impact on the agency's program." 572 F.3d 868, 876–77 (11th Cir. 2009). The "proper analysis must go claim by claim" and identify whether it challenges a specific agency action. *Id.*

The D.C. Circuit case that Defendants cite makes the same point. *Cf.* MTD 16 (citing *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762 (D.C. Cir. 2025), *reh'g en banc granted, opinion vacated,* 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025). *Lujan* instructs that "an APA challenge may not bundle together discrete actions in order to challenge them all together." 149 F.4th at 789. The plaintiffs in *Vought* sued to set aside the decision to shut down the CFPB, arguing that they were challenging just one decision: the shutdown. *Id.* But even the plaintiffs agreed that the shutdown was really "hundreds of distinct contract and personnel decisions," such as "actions to suspend or terminate CFPB's statutorily mandated activities—including issuing stop-work instructions, cancelling contracts, declining and returning funding, firing employees, and terminating the lease." *Id.* The broader shutdown directive was not a single agency action. *Id.* Again, an analogy helps: A plaintiff could not challenge DHS's "Midway Blitz" in Chicago as a single policy, because the order directed different parts of the agency to do innumerable different things. That's not a single policy; it's a lot of different actions by a lot of different departments. Even Defendants acknowledge that's not what Leo did here: "Plaintiff's APA claims are styled as a *tailored review* of three non-existent DHS policies." MTD 18 (emphasis added).

18

A claim-by-claim analysis confirms that Leo does, in fact, seek tailored review. The first policy at issue is DHS's decision that agents can raid construction sites without warrants. The claim doesn't question *all* immigration raids; it's a "specialized" challenge to one specific policy. *See Fanin*, 572 F.3d at 877. The same's true for his other two claims. Although a win might have "a broad impact" on DHS's enforcement program, *see id.*, Leo's claims are limited to three discrete policies like *Lujan* requires.

### 3.   The challenged policies are in effect agency wide.

With *Bennett* and *Lujan* out of the way, we're left with Defendants' main argument: the policies don't exist. They call all Leo's allegations conclusory—his two worksite raids and detentions, Compl. ¶¶ 63–152; all the other construction sites raided the same way, *id.* ¶ 196; the corroborating news reports, *id.* ¶¶ 194, 247; and all Defendants' public statement, *e.g.*, *id.* ¶¶ 162–65; 174–75, 181, 193, 195. And that's not counting the further confirmation since Leo sued. *See* Windham Decl. (30-3); McClain Decl. (ECF 48-1).

Defendants' argument is factual. And they ask the Court to decide those facts in their favor based on a lone HSI agent's declaration that Leo is wrong. None of Leo's factual allegations count, they say, because Leo cannot use similar encounters to show his claims are plausible. MTD 15–16. But courts routinely look to an agency's conduct to conclude there's been final action. *See Fla. Agency for Health Care Admin. v. Adm'r for Ctrs. for Medicare & Medicaid Servs.*, 161 F.4th 765, 779 (11th Cir. 2025) (agency's subsequent steps showed the action was final). As Leo explained in his motion for preliminary injunction, a plaintiff can allege unwritten policies based on an agency's public statements, even if the plan's details "are still unclear." *See Venetian Casino Resort LLC v. EEOC*, 530 F.3d 925, 929–

30 (D.C. Cir. 2008); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 138–39 (D.D.C. 2018); *see also Nava v. DHS*, 435 F. Supp. 3d 880, 901–02 (N.D. Ill. 2020) (collecting cases). Defendants still do not address these cases or the standard they apply.

Ironically, the only case Defendants cites on unwritten policies is *Escobar Molina*,[13] which relied on many of the same statements Leo cites here to hold that DHS abandoned the statutory standard for immigration arrests. 2025 WL 3465518, at *25. The plaintiffs "*corroborated*" those statements with "on-the-ground examples" from across the country to show "[t]he challenged decision originates from the top." *Id.* at *23, *25.

Defendants try to distinguish *Escobar Molina* by saying that case had a different DOJ attorney and a narrower claim. MTD 18 & n.3. But Count II in Leo's Complaint includes the *same* claim based on the *same* policy. Compl. ¶¶ 342–52. Plus, Leo cites other statements to corroborate his other claims. Officials have said they're targeting construction sites. *Id.* ¶ 193. They've said they're rounding up people based on "how they look." *Id.* ¶ 181. They've admitted that they require people they target to prove their lawful status.[14] And they've admitted that they don't treat REAL IDs as good evidence. Compl. ¶ 112 & n.3; *see also* Lavoie Decl. ¶ 16. Senior officials are instructing regional commanders to use the Administration's new enforcement policies to increase immigration arrests. Commanders at subagencies are taking their orders from Secretary Noem.[15] That's

---

[13] Defendants also cite *Bark v. U.S. Forest Service* in their *Lujan* section. MTD 16 (citing 37 F. Supp. 3d 41, 50 (D.D.C. 2014)). But that case dealt with isolated decisions that the plaintiffs could not attribute to the agency. Attribution isn't a problem here.

[14] Gregory K. Bovino, X.com (Dec. 11, 2025), https://bit.ly/4roTbIT.

[15] *See* Greg Bovino's sworn deposition, cited in *Judge orders release of US Border Patrol head Gregory Bovino deposition videos*, Chicago Tribune (Nov. 6, 2025) https://archive.is/KNLUQ.

plenty to plausibly allege these policies exist and that they come from "the top." *Escobar Molina*, 2025 WL 3465518, at *23; *see also Bennett*, 520 U.S. at 167–68, 170–71 (evidentiary burden at the pleading stage is "relatively modest").

Indeed, DHS confirms that Secretary Noem has been changing decades-old policies, like a restriction against ICE officers entering private homes without a warrant that prior Administrations had in place "[b]ecause Congress hasn't created a mechanism to obtain a judicial warrant." *See* DHS Press Release *supra* n.1. At least some of DHS's new policies were implemented in secret. *See* Secret Lyons Memo *supra* n.1. Any new enforcement policies implemented based on DHS's reconsideration of its power, including those policies challenged here, are subject to APA review. *See Fla. Agency for Health Care Admin.*, 161 F.4th at 778 (agency's new interpretation of its enforcement power "triggers new real-world rights or obligations"); *Florida v. United States*, 660 F. Supp. 3d 1239, 1270 (N.D. Fla. 2023) (memo giving "new marching orders" to immigration officers was final action).

Finally, Defendants suggest that Secretary Noem's policies do not control "field-level decisions" like "reasonable suspicion determinations." *See* MTD 2, 13, 15. But Leo is not challenging how individual officers calculate reasonable suspicion. He's alleging that DHS has abandoned particularized suspicion altogether—just as it has abandoned the warrant requirement for construction sites and instructed officers not to credit DHS-certified REAL IDs (two points Defendants don't contest). Leo alleges that the officers who raided his worksite and detained him were carrying out three specific agency-wide policies. At the

---

And the White House calls commanders six days a week to direct enforcement. Nick Miroff, *ICE After Minneapolis*, The Atlantic (Feb. 7, 2026), https://bit.ly/4s3fGDf.

pleading stage, the government can't just claim it's some fantastic coincidence that immigration officers nationwide are uniformly disregarding the Fourth Amendment rights of workers in certain industries in the exact same way. *See Bennett*, 520 U.S. at 167–68.

Defendants' response to all this evidence is a single agent's declaration about HSI's January 2025 training, as if it outweighs all of Leo's corroborating allegations. But Lavoie doesn't tell us what DHS thinks reasonable suspicion means. And he doesn't account for the fact that DHS has been reinterpreting the limits on its power since that training. *See supra* n.1; *Escobar Molina*, 2025 WL 3465518, at *25–26 (calling the annual training was "virtually irrelevant"). And besides, the little that Lavoie *does* tell us about HSI's January training gets the law wrong. He says REAL IDs are unreliable evidence of lawful status because some states issue them to undocumented immigrants. Lavoie Decl. ¶ 16. But the REAL ID Act and its implementing regulations, all of which DHS administers, forbid states from issuing REAL IDs without proof of legal status. Compl. ¶¶ 93–100.

At the pleading stage, Leo's allegations are more than enough to overcome any factual dispute created by Lavoie's outdated and faulty declaration. *See Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019) (citing *Bennett* for the pleading-stage standard of review). Whether these policies are in unpublished memos that will come out in discovery or were passed down verbally, they are decisions that mark the consummation of DHS's decisionmaking, have violated Leo's rights, and threaten to keep doing so.

## III.    Leo Has Adequately Stated His Claims for Relief

The four counts relevant to this motion all state plausible claims. Count I claims that the three policies violate the Fourth Amendment and should be enjoined. Count II

claims that, because the policies are unconstitutional, they should be set aside under Section 706(2)(B) of the APA. Count III claims that the policies exceed DHS's statutory authorization. *See* 5 U.S.C. § 706(2)(C). And Count IV claims that the policies violate DHS's regulations. *See id.* § 706(2)(A), (D).

Defendants don't question the merits of Leo's claims. Their only merits arguments are that (1) Leo lacks a reasonable expectation of privacy in his worksites and, again, (2) the policies don't exist. But the second one doesn't get them anywhere. A Rule 12(b)(6) motion is not the time to dispute Leo's factual allegations (though, that doesn't stop them from trying). *See* MTD 12–13. Leo will explain in Section III.A.1 why he can challenge the Warrantless Entry Policy, and then quickly go through his remaining, unchallenged claims.

### A.   Counts I & II state claims for violations of the Fourth Amendment.

Count I alleges that the three policies violate the Fourth Amendment and seeks an injunction, while Count II seeks APA vacatur for the same constitutional violations.

#### 1.   Warrantless Entry Policy

The Fourth Amendment does not allow "federal agents to enter a place of business from which the public is restricted" without a warrant. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 315 (1978); *Peterman v. Coleman*, 764 F.2d 1416, 1420 (11th Cir. 1985). Defendants' only merits argument is that Leo lacks "standing" to challenge the warrantless entry of his worksites. MTD 10–12. But they ignore all the cases that Leo has already cited to refute this same argument in the preliminary injunction briefing. *See* PI Br. (ECF 30-1) 18–21.

A challenge to Fourth Amendment standing is a substantive attack on Leo's rights, not a procedural attack on this Court's jurisdiction. *See Byrd v. United States*, 584 U.S. 395,

410–11 (2018). And on the substance, Defendants fall flat. They forget the *Jones* trespass test, omit the leading precedents on when workers meet the alternative *Katz* privacy test, and repeatedly fight the allegations in the Complaint.

The Supreme Court in *Jones* clarified that the government conducts a "search" when it physically invades a constitutionally protected area to obtain information. *United States v. Jones*, 565 U.S. 400, 404–05 (2012). A "commercial premise[]" "from which the public is restricted" is a protected area. *Marshall*, 436 U.S. at 311–15. Crucially, the trespass test protects "not only actual owners, but also anyone with sufficient possessory rights over the property," including "the right to exclude others." *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1186–87 (9th Cir. 2015) (citing, in part, *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). In *Lyall*, for example, event staff were able to challenge the search of a warehouse they did not own because they were "in charge of the property that night." *Id.* at 1189–90. Leo can challenge the Warrantless Entry Policy for the same reason: He takes possession of his worksites and has a right to exclude intruders until his work is done. Compl. ¶¶ 37–50; Restatement (Second) of Torts § 422, cmt. c ("[p]ossession usually is surrendered fully in the case of construction" until "completion of the work").

Defendants do not mention *Jones*. Nor do they distinguish *Lyall*, even though Leo has already cited *Lyall* for this same point. *See* PI Br. 19. Instead, they fight the facts in the Complaint. Defendants say, for example, that the sites on which Leo works are "open-field[s]" or "open, undeveloped" areas not protected by the Fourth Amendment. MTD 11. But Leo alleged the opposite: He typically works on sites that are posted with No Trespassing signs, enclosed with fences or structures, and "not open to the public." Compl.

24

¶¶ 37–42. That's why the officers who raided Leo's sites last year had to run past signs, jump fences, and enter structures in order to detain him. *Id.* ¶¶ 63–65, 69–70, 119–30. These are not "open" areas—they are "non-public working areas" protected by the Fourth Amendment. *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).

Defendants also dispute Leo's possessory interest because the Complaint "provides no documentation" that he "control[s]" the sites. MTD 11. But Leo does not need to attach proof to survive the pleading stage. It's enough that he repeatedly alleged sufficient facts to support that interest. *See Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1288 (S.D. Fla. 2019). And he did, repeatedly. *See* Compl. ¶¶ 46 ("Leo and his crew typically have exclusive possession, which the owner does not regain from Leo and his crew until the work is done."), 48 ("Leo, his crew, and their supervisors have a right to exclude anyone who enters their construction site without permission."), 50 ("Leo and his crew have possession of the property during their work."). Taking these facts as true, Leo has "standing" to challenge the trespassory searches of his worksites.

Defendants do not fare any better under the reasonable-expectation-of-privacy test. Under *Katz v. United States*, 389 U.S. 347 (1967), a "search" occurs when officials invade a reasonable expectation of privacy. *Carpenter v. United States*, 585 U.S. 296, 304 (2018). As a general matter, "employees have a protectable, reasonable expectation of privacy against workplace searches." *Reyes v. Maschmeier*, 446 F.3d 1199, 1203 (11th Cir. 2006). That principle follows from *Mancusi v. DeForte*, 392 U.S. 364 (1968), the seminal case on workplace privacy—which, again, Defendants do not address. In *Mancusi*, the Supreme Court held that a union worker had the right to challenge the search of a shared office

because he "could reasonably have expected that only [union affiliates] and their personal and business guests would enter." *Id.* at 369–70. Leo alleged that the same is true here because construction sites are dangerous, industry norms dictate that only people affiliated with the project should enter, sites are posted with signs and fences to exclude intruders, and members of the public generally understand that they should not enter without permission. Compl. ¶¶ 37–49. It's entirely reasonable for Leo to expect privacy from unwanted intruders on his dangerous worksites.

Defendants' only real response is that Leo has no privacy because he goes to "multiple worksites … for relatively short periods of time for the single express purpose of laying concrete." MTD 11. But a person can reasonably expect privacy in a place he briefly visits. The Supreme Court, after all, recognized Katz's expectation of privacy when he briefly "entered the [public phone] booth," comparing it to "an office, or a hotel room." *Katz*, 389 U.S. at 352, 359; *id.* at 361 (Harlan, J., concurring) (describing the booth as "a temporarily private place" with "momentary occupants[]"). If Katz could reasonably expect privacy in a *public* booth he used for *minutes*, Leo can reasonably expect privacy on *private* sites where he works for *hours or days*.

Nor do Leo's privacy rights evaporate because he lays concrete for a living. Leo's job is hazardous; his sites are marked to exclude intruders so that they don't get injured. Compl. ¶¶ 38–49. Defendants can't say why it's unreasonable to expect privacy from intruders while doing a dangerous job on private property. And they have no answer for *Mancusi*, in which a union organizer had privacy in a shared office. 392 U.S. at 365. What matters is whether a worker reasonably expects that his only affiliates and "their personal

26

and business guests would enter." *Id.* at 369–70. Likewise, industry norms, posted signs, and common sense confirm that Leo can reasonably expect only people associated with the project will enter active construction sites. Compl. ¶¶ 38–49. Leo has standing to challenge the Warrantless Entry Policy that allows officers to search his worksite.

### 2.    Preemptive Detention Policy

Leo alleged that DHS has adopted a policy authorizing immigration officers to make stops without particularized suspicion. The Fourth Amendment also forbids officers from detaining people to investigate their immigration status absent "observations [that] lead [them] reasonably to suspect that a *particular* [person] … [is] illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (emphasis added). A "demographic profile," standing alone, does not generate "individualized" reasonable suspicion. *Kansas v. Glover*, 589 U.S. 376, 385 n.1 (2020); *see also Davis v. Mississippi*, 394 U.S. 721, 722 (1969) (rejecting dragnet collection of fingerprints in a general search for a "Negro youth"). Nor does someone's "mere propinquity" to a suspect justify a stop. *Ybarra v. Illinois*, 444 U.S. 85, 88–91 (1979). Or being at a business where officers have a good reason to suspect one person of criminal activity. *Id.*; *see also Brown v. Texas*, 443 U.S. 47, 51–52 (1979) (mere presence in a "neighborhood frequented by drug users" does not justify a seizure). Officers must have evidence that "all employees, patrons, and owners present" have committed a crime. *Swint v. City of Wadley*, 51 F.3d 988, 992–96 (11th Cir. 1995); *see also United States v. Alarcon-Gonzalez*, 73 F.3d 289, 290–93 (10th Cir. 1996) (reasonable suspicion that some roofers might be undocumented did not create reasonable suspicion that any roofer *in particular* might be undocumented); *United States v. De La*

27

*Cruz*, 703 F.3d 1193, 1199 (10th Cir. 2013) (reasonable suspicion that a business employed undocumented workers did not justify seizing a particular worker).

Defendants' only response is to introduce a declaration to dispute Leo's allegations. But this is not the posture to resolve factual disputes. Because Defendants do not contend that the Fourth Amendment permits officers to detain people based not on particularized suspicion but on broad demographic profiles, Leo has stated claims for relief.

### 3.    Continued Detention Policy

Finally, Leo alleged that DHS adopted a policy authorizing immigration officers to continue detaining people suspected of being in the country without status even after they've offered proof of legal presence, like a REAL ID. Officers must end a search or seizure "as soon as they … [a]re put on notice of the *risk* that they *might*" no longer have the legal justification they thought at the outset. *Maryland v. Garrison*, 480 U.S. 79, 87–88 (1987) (emphasis added). A REAL ID should "suffice to establish lawful presence." *Arizona v. United States*, 567 U.S. 387, 449 n.1 (2012) (Alito, J., concurring in part). Once officers "learn that the individual they stopped is a U.S. citizen or otherwise lawfully in the United States, they [must] *promptly* let the individual go." *Vasquez Perdomo v. Noem*, 145 S. Ct. at 1 (Kavanaugh, J., concurring) (emphasis added); *Alcocer v. Mills*, 800 F. App'x 860, 865–67 (11th Cir. 2020) (license and Social Security card "should have negated suspicion").

Defendants do not even contest this claim. How could they? Lavoie has admitted that DHS trains its officers not to accept REAL IDs. Lavoie Decl. ¶ 16. And Leo has already explained that DHS is wrong about the REAL ID Act and DHS's own regulations. PI Reply (ECF 48) 13–14. Leo's challenge to the Continued Detention Policy should proceed, too.

### B.    Count III states a claim that the policies exceed DHS's statutory power.

Leo alleged that the Preemptive Detention and Continued Detention policies exceed DHS's statutory authority under 8 U.S.C. § 1357 because they allow officers to (1) detain people without particularized suspicion of unlawful presence or a warrant, (2) make arrests without probable cause that the person is undocumented *and* a flight risk, and (3) search peoplewithout a warrant—just as they searched Leo's pockets for his ID, Compl. ¶¶ 342–52; *accord Escobar Molina*, 2025 WL 3465518, at *22–26. (holding plaintiffs would likely win on a similar statutory claim). Defendants do not challenge the merits of this claim, arguing only that the policies don't exist. As long as this Court agrees there are sufficient facts to allege final agency action, Count III should proceed.

### C.    Count IV states a claim that the policies violate binding regulations.

Finally, Leo alleged that each challenged policy violates DHS's binding regulations and is arbitrary and capricious, not in accordance with law, or fails to observe required procedures. Compl. ¶¶ 357–72. He alleged that the Warrantless Entry Policy violates 8 C.F.R. § 287.8(f), which requires reasonable suspicion for site inspections and forbids searching non-public commercial property without consent or a warrant. *See Kidd v. Mayorkas*, 734 F. Supp. 3d 967, 977–85 (C.D. Cal. 2024) (enjoining "ICE's systemwide policy and practice" of searching curtilage without warrants). The Preemptive Detention Policy violates 8 C.F.R. § 287.8(b)(2) and (c)(2), which forbid immigration officers from rounding up workers on private property without reasonable suspicion and arresting them without probable cause. And the Continued Detention Policy violates 8 C.F.R. § 287.8(c)(2), which forbids immigration officers from detaining suspected illegal

immigrants after they have shown presumptive evidence of their U.S. citizenship or lawful presence. The Continued Detention Policy is also arbitrary and capricious and not in accordance with law because it ignores the requirements of the REAL ID Act and DHS's implementing regulations, *see* 6 C.F.R. §§ 37.3, 37.11, 37.13, 37.15, 37.17, 37.19, 37.71.

Defendants do not challenge the merits of Leo's claim, arguing only that the policies don't exist. As long as this Court agrees there are sufficient facts to allege final agency action, Count IV should proceed.

## CONCLUSION

The Court should deny Defendants' motion and allow Leo's claims to proceed.

Dated: February 20, 2026.                    Respectfully submitted,

                                             /s/ Jared McClain
                                             Jared McClain (DC Bar No. 1720062)*
                                             Jaba Tsitsuashvili (DC Bar No. 1601246)*
                                             Joshua Windham (NC Bar No. 51071)*
                                             INSTITUTE FOR JUSTICE
                                             901 N. Glebe Road, Suite 900
                                             Arlington, VA 22203
                                             (703) 682-9320
                                             jmcclain@ij.org
                                             *Admitted Pro Hac Vice

                                             Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing PLAINTIFF'S AMENDED BRIEF IN OPPOSITION TO THE MOTION TO DISMISS APA CLAIMS with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Jared McClain
Jared McClain (DC Bar No. 1720062)

32