**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **LEONARDO GARCIA VENEGAS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION NO. 25-00397-JB-N** |
| | ) |
| **TOM HOMAN et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This action is before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 30), Defendants' response in opposition (Doc. 46), and Plaintiff's reply (Doc. 48).[1]  However, in the filings, the Government has challenged this Court's Article III standing and requested the Court rule on the jurisdictional issue before ruling on the preliminary injunction. (Doc. 46.). A motion hearing was held on May 6, 2026, on the issue of standing with counsel for all parties present. After careful consideration of the relevant filings and arguments and for the reasons dictated herein below, this Court has determined that Plaintiff has Article III standing to proceed.

### I.    Factual and Procedural Background

Leonardo Venegas ("Venegas") is a U.S. citizen of Mexican descent who was born in Lehigh Acres, Florida, and lives in Robertsdale, Alabama. (Doc. 1). Since graduating high school in 2019, Venegas has been employed building homes in new subdivisions throughout Baldwin County

---

[1] Plaintiff and Defendants have also submitted a Notices of Supplemental Authority (Docs. 65, 80 and 83) which the Court has considered.

typically on sites owned by D.R. Horton and Lennar—two major builders in this District. (*Id*.)  He regularly works on a five-man concrete crew, while at least six other crews come and go to handle everything from framing to painting to landscaping. (*Id*.).

**The May 21, 2025 Encounter**

On May 21, 2025 Venegas arrived at a Lennar site in Foley, where he was scheduled to lay the foundations for four homes in a new development. (*Id*.). The sites were each posted with a No Trespassing sign and surrounded by knee-high black fences. (*Id*.). Around 8:00 a.m., as Venegas was walking back to his site, he saw five armed men—three of whom were masked—hurdling the fence and running past the No Trespassing sign. (*Id*.). The officers also ran past the four non-Latino workers and went straight for Venegas' crew, all of whom were Latino. (*Id*.). Three of Venegas' crewmembers ran, and some officers chased them, but Venegas and his brother stayed put. (*Id*.). When two of the officers approached Venegas' brother (who was undocumented), he asked why they were on the site and if they had a warrant. (*Id*.). Without responding or asking any questions, the officers grabbed Venegas' brother and forced him to the ground. (*Id*.).

At the sight of officers tackling his brother, Venegas took out his phone, started recording, and walked closer. (*Id*.). Venegas got about 25 feet from his brother before a masked officer stepped into Venegas' way. (*Id*.). When Venegas widened his path to keep his camera trained on his brother, the officer declared, "You're making this more complicated than you want to." (*Id*.). Then, without asking Venegas any questions, the officer grabbed Venegas by the arm and started forcing him to the ground. (*Id*.). Venegas yelled, "Don't touch me! I'm a citizen!" and "I'll show you my papers!" (*Id*.). The non-Latino workers watching on yelled, "That's illegal!" "You're not

supposed to be doing that!" "He's a citizen!" "He's not even doing nothing wrong—what the fuck?" (*Id*.). Venegas repeated, "I'm a citizen! Stop! I'll show you my papers now!" (*Id*.). But a second officer, ignoring all the protests about Venegas' citizenship, ran over and tackled Venegas as an officer yelled, "Get on the fucking ground!" (*Id*.). A third officer rushed right past the site's No Trespassing sign and helped hold Venegas down. (*Id*.). One officer reached into Venegas' pocket and pulled out his Alabama driver's license— a STAR ID that complies with the REAL ID Act. (*Id*.). Rather than accept that Venegas was a citizen, however, the officers told him his REAL ID was fake, handcuffed him, removed him from his worksite, and brought him to their unmarked car, where they held him for over an hour. Venegas continued to tell the officers that he's a citizen and pleaded with them to check his Social Security Number. (*Id*.). Eventually, an officer relented, confirmed his citizenship, and released him. (*Id*.). Venegas was never charged with a crime. (*Id*.). Venegas had to take nearly two weeks off work to recover from the raid. (*Id*.).

### The June 12, 2025 Encounter

On June 12, Venegas was working alone inside a home in a D.R. Horton development in Fairhope while the rest of his crew worked at a different development. (*Id*.). The house had its walls, a roof, windows, and doors, but no garage door or siding. (*Id*.). Although there were other crews in the development, the closest was eight houses away. (*Id*.). Venegas was working in a back bedroom when a federal officer walked in the house and ordered Venegas outside. (*Id*.). Venegas said he was a citizen, but the officer insisted. (*Id*.). Venegas saw another officer standing about five feet behind him, just outside the room's open window. (*Id*.). With no choice but to obey, Venegas followed the officer outside. (*Id*.). Outside, the first officer told Venegas they were there to check his immigration status. (*Id*.). Venegas reiterated that he was a citizen. (*Id*.). He

showed the officers his REAL ID. (*Id*.). The officers said Venegas' REAL ID could be fake and ordered him to go with them so they could check his status. (*Id*.). The officers marched Venegas —one officer in front and one behind—about two blocks away, to their unmarked car at the edge of the development. (*Id*.). They lined up Venegas with other Latino workers whom they'd detained at other sites in the development. (*Id*.). This time, it took about 20–30 minutes for officers to acknowledge Venegas' citizenship and release him—along with two other workers Venegas knew had lawful status (and at least one of whom was a citizen). Id. Venegas was never charged with a crime. (*Id*.).

**The DHS Policies**

According to the Complaint, DHS has adopted—and immigration officers are enforcing—the three following search-and-seizure policies for construction sites that exceed the agencies' and officers' constitutional, statutory, and regulatory authority.

> 1) **Warrantless Entry Policy**. DHS has authorized immigration officers to raid private construction sites without a warrant or consent. The policy allows warrantless, nonconsensual entry even when sites are posted with No Trespassing signs, fenced in, enclosed, or otherwise exclude the public.
>
> 2) **Preemptive Detention Policy**. Once on private construction sites, DHS has authorized immigration officers to preemptively detain anyone they think looks undocumented—without any particularized suspicion that the employers staffing the site have hired undocumented workers or that the workers are illegal immigrants—based only on a generalized demographic profile, even though many who meet that profile (like Venegas) are doing nothing wrong. This is not a policy of bona fide investigative detentions; instead, it grants officers the power to round up all the construction workers who fit the target profile—without asking questions—and to detain them until the workers can affirmatively prove their legal status.

4

3) **Continued Detention Policy**. During these detentions, DHS has authorized immigration officers to continue detaining workers even after they show evidence of citizenship or lawful presence. Even an Alabama STAR ID—a document that Alabama issues only to citizens and lawful residents and that DHS certifies complies with the federal REAL ID Act—is not enough to overcome the weight DHS affords its generalized profile of undocumented construction workers.

(*Id.*).   Plaintiff contends these policies are memorialized in a written policy directive, as immigration officers deputized from a wide range of federal agencies with a wide range of training and experience are all executing the same policies. (*Id.*).  Alternatively, Plaintiff contends DHS has adopted an unwritten policy instructing immigration officers to act in the manner described in the described policies.  (*Id.*).

Plaintiff alleges DHS adopted the three challenged policies as part of a broader directive from the White House and Border Czar Homan to increase immigration arrests and removals by raiding workplaces based on which industries tend to employ undocumented workers rather than a prior investigation to identify whether there's any reason to suspect that employees on a particular worksite are undocumented. (*Id.*).  These directives are aimed at increasing the number of undocumented people arrested and removed from several hundred a day to at least 3,000 per day.  (*Id.*).

**Evidence submitted in Support of Motion for Preliminary Injunction**

In addition to the allegations in the Complaint and the supporting Declaration of Venegas (Doc. 30-2), Plaintiff has additionally submitted a declaration of Joshua Windham (Counsel for Venegas) (Doc. 30-3) setting forth the results of his internet searches relating to the administration's efforts to increase immigration arrests, and the  declarations of Jorge Ovidio, Jane Doe, and Gehovani Alvirde-Ruiz (Docs. 30-4, 30-5, and 30-6) describing encounters each of

them experienced as a Latino construction workers in Alabama with similarities to those experienced by Venegas.

**The Affidavit of Phillip Lavoie**

In support of its Challenge to Plaintiff's Motion for Preliminary Injunction, the Government has submitted the Declaration of Phillip Lavoie ("Lavoie"). (Doc. 44-1). According to the Government, the Lavoie declaration - alone- defeats Article III standing. (Doc. 46).

Lavoie is employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and serves as the Acting Assistant Special Agent in Charge (ASAC) of the Mobile, Alabama Office. As an Acting ASAC, he is charged with the responsibility of overseeing the HSI Mobile Office. He has served in that position since January 2024 and was the Acting ASAC over all the offices in Alabama until late July 2025.

Although not squarely material to the instant issue,[2] aside from the acknowledgment that the encounter occurred, Lavoie describes the May 21, 2025 encounter with Plaintiff in a manner that is largely inconsistent with Plaintiff's description. Lavoie indicates he has been unable to find any information or records relating to the June 12, 2025, encounter in DHS records, systems and databases.

With respect to the DHS policies, training, and procedures, Lavoie makes the following declarations:

---

[2] The Court recognizes the Lavoie declaration is meant to refute the facts surrounding the May and June encounters. However, at this stage, the Court must take the factual allegations of the Complaint as true. The contents of the declaration, then, have been reduced to those paragraphs relating to the issue of Article III standing, i.e. whether the policies exists and whether Plaintiff will likely continue to suffer immediate harm as a result of the same.

I am not aware of any Warrantless Entry Policy, Preemptive Detention Policy, or Continued Detention Policy used in my area of responsibility (AOR) as described by the Plaintiff. ICE officers and agents are required to follow the relevant statutory authorities in enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. Prior to engaging in investigative stops (i.e., Terry stops), HSI agents are trained to have developed reasonable suspicion that the individual has committed or is committing a federal crime or federal immigration violation. This determination is evaluated based on the totality of the circumstances. The factors that contribute to reasonable suspicion include, but are not limited to, information from intelligence sources, information from law enforcement and open-source databases, analysis of trends and patterns associated with immigration violations, previous encounters with undocumented individuals at a specific location or working for certain employers, and information provided by human sources. Federal immigration officers have specialized expertise and practical knowledge of factors that are most indicative of immigration violations, illegal activity, and behaviors typically associated with unlawful presence. As ICE's policy requires officers to follow the Constitution and all relevant statutes and regulations, HSI Special Agents receive extensive training on Fourth Amendment searches and seizures in addition to their practical experience in the field. Their training courses are as follows: ICE HSI Mobile Special Agents receive law enforcement training on the requirements of Fourth Amendment of the U.S. Constitution, and the related statutory and regulatory provisions of the Immigration and Nationality Act (INA) as part of their basic Academy training at the Federal Law Enforcement Training Center. ICE HSI Mobile Special Agents receive Eleventh Circuit Court of Appeals-specific immigration enforcement training on the requirements of the Fourth Amendment, the statutory and regulatory provisions of the INA, and caselaw at least once per year. This training covers the requirements for warrantless arrests and investigatory stops under both Title 8 for immigration law violations and Title 18 for criminal violations, the requirements of having and documenting reasonable suspicion and/or probable cause. ICE HSI Mobile Special Agents are trained that, under the Fourth Amendment, relevant statutes and regulations, and case law, brief detention for questioning or an investigatory stop requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is an alien illegally present in the United States. ICE HSI Mobile personnel are trained that any arrest requires probable cause that the person

being arrested is an alien present in the United States in violation of the immigration laws or has violated a criminal statute. They are further trained to clearly differentiate between an investigatory stop and an arrest. ICE HSI Mobile Special Agents are trained to follow ICE procedure for apprehensions of illegal aliens present in the United States by using targeted and non-targeted investigations, conducting operations, and making arrests. Investigations are developed by gathering information such as employment information; tips from communities or federal agencies; and evidence compiled in law enforcement systems, records and relevant databases. These investigations are designed to identify whether individuals are present in violation of immigration law. When non-targeted individuals are encountered during the targeted operations or in the field, ICE HSI Mobile Special Agents are trained to develop reasonable suspicion prior to conducting an investigatory stop. Once U.S. citizenship is verified, or an alien is found to be lawfully present in the U.S., ICE HSI Mobile Special Agents are trained to end the encounter – absent criminal and safety concerns. ICE HSI Mobile Special Agents identify themselves to the arrestee at the time of arrest/encounter or as soon as practicable when safe to do so. ICE HSI Mobile Special Agents regularly receive training on investigatory stops and consensual encounters, which occur in public places, to include worksites. They are trained to approach the individuals and identify themselves as immigration officers and ask questions to establish identity and citizenship status. The questions include asking individuals their name, date of birth, place of birth, and if they have documentation showing that they may legally be present in or work in the United States. Officers will ask for any form of identification and have the ability to use fingerprints and facial recognition to identify individuals depending on whether technology is available on scene such as mobile fingerprint scanners. ICE HSI Mobile Special Agents often work in cooperation with other immigration officers from other agencies and components to use identification information to run database checks in the field. These database checks can reveal if an individual was encountered in the past by immigration or other law enforcement authorities. In late January of this year, I arranged for ICE Enforcement and Removal Operations (ERO) officers assigned to the Mobile Office to provide an additional Title 8 authority refresher training to all HSI Mobile Special Agents and partner agencies throughout the Mobile Area of Responsibility (AOR) who would be conducting civil immigration operations. All agents who were present during the May encounter attended this training.

**II.      Standard of Review**

Before addressing the merits of a claim district courts must address the threshold jurisdictional question of Article III standing. *See* U.S. Const. art. III, § 2, cl. 1 (Article III requires that federal courts can only hear cases and controversies). Standing is considered a justiciable "landmark" setting apart the Article III "Cases" and "Controversies." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992). Therefore, standing is a threshold jurisdictional question that "'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong[.]'" *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (*quoting Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 136 S.Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), as revised (May 24, 2016)).

To prove a right to challenge government policies and action, plaintiffs must establish standing by showing (1) they suffered an injury in fact; (2) the injury is fairly traceable to the challenged conduct, e.g., causation; and (3) redressability. *See Spokeo Inc. v. Robins*, 578 U.S. 330, 338 (2016). The party invoking federal jurisdiction, bears the burden of establishing these elements. *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). When a case is at the pleading stage, the plaintiff must "clearly ... allege facts demonstrating" each element. *Spokeo*, at 338 citing to *Warth v. Seldin*, 422 U.S. 490, 518, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

**III.     Analysis**

The Government has challenged whether Article III standing exists for two reasons: (1) Plaintiff has not shown the DHS policies exist, and (2) Plaintiff has not established he faces an imminent injury from said policies.  (Doc. 46).  Plaintiff has countered each of the Government's

positions and argues Article III standing has been established. (Doc. 48).  The Court will address each argument in turn.

### A. Plaintiff has sufficiently established the DHS policies exist

According to the Government, "Plaintiff has not shown that he faces an imminent injury from any policy, pattern or practice implemented by the Federal Defendants" because "no such policies exist."  (Doc. 46).  For support, the government relies on the Declaration of Philip Lavoie (Docs. 44-1).  (*Id*.) In response, Plaintiff argues the policies exist based on Plaintiff's declarations describing his two previous encounters with DHS and the encounters of two others he personally witnessed. (Docs. 30 and 48). Plaintiff has also relied on public statements, news reports, and declarations.  (Docs. 30-2, 30-3, 30-4, 30-5, 30-6, and 48-1).

To show an actionable "policy, pattern, or practice," plaintiffs must identify conduct that is systemic and widespread, not merely the result of isolated or sporadic incidents. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985). Thus, to establish standing, Plaintiff must show that the policy, in fact, exists and that it requires Federal Officials to take the challenged actions. *Creedle v. Miami-Dade Cnty*., 349 F. Supp. 3d 1276, 1290–91 (S.D. Fla. 2018).

The Court is not compelled by the Government's position that no policies exist for several reasons. First, treating the allegations in the Complaint as true, it is beyond question that Plaintiff has alleged the three subject policies exist.  Plaintiff has additionally put forth factual support that the policies exist.  Second, a declaration, like the one submitted by the Government, does not – at this stage—override what a plaintiff has clearly alleged. Third, even if the declaration were dispositive, the Court is unsatisfied that it conclusively negates that such policies exist.  Rather, at best, Mr. Lavoie has confirmed he is "not aware of" such policies.  (Doc. 44-1).  Fourth, and finally,

in addition to the Court's determination that the Government's supporting documentation is not compelling, the Court also finds that the totality of Plaintiff's supporting documentation when considered along with the well pled allegations of the Complaint, support the conclusion that the policies exist for purposes of Article III standing.

### B. Plaintiff has established a real and immediate injury

Alternatively, the Government contends that even if the DHS policies exist, Plaintiff's request for prospective injunctive relief is insufficient to demonstrate Article III standing pursuant to *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) ("past wrongs do not in themselves amount to that real and immediate threat of Plaintiff injury necessary to make out a case or controversy"). (Doc. 46). The Government further contends that Justice Kavanaugh's concurrence in *Noem v. Perdomo*, No. 25A169, (Sept. 8, 2025) also support a lack of standing here. (*Id*.).

Plaintiff argues he has established the requisite injury for purposes of Article III standing since he has already been subject to DHS's policies twice and argues that this action is clearly distinguishable from *Lyons*. In support, Plaintiff relies heavily on *Church v. City of Huntsville* and the numerous other courts that have determined plaintiffs have standing in situations similar to those presented here. (Doc. 48) (citing to *e.g. Escobar Molina v. DHS*, 2025 WL 3465518, at *16 (D.D.C. Dec. 2, 2025). ("This case differs materially from the facts of *Lyons* on the three considerations discussed above—namely, that [the court found] defendants have likely adopted a policy and practice of warrantless arrests without probable cause, that plaintiffs are likely among those targeted, and that plaintiffs likely cannot avoid repeating the conduct that led to their original injuries."). [3]

---

[3] *See also* Doc. 80.

Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury. *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994) citing *Lyons* at 102, 103 S.Ct. at 1665. Logically, "a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past." *Id*. at 1337 citing *American Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir.1992). Although "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," *O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974), "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons*, 461 U.S. at 102, 103 S.Ct. at 1665 (alterations in original) (quoting *O'Shea*, 414 U.S. at 496, 94 S.Ct. at 676). Courts in the Eleventh Circuit typically consider whether (1) an official policy authorizes the challenged conduct; (2) the plaintiff is one of the policy's targets; and (3) the plaintiff is subjected to the policy through routine, lawful conduct. *See Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir. 1994). Further, when a plaintiff has already been injured twice, a defendant's contention that future harm is unlikely is strongly undermined. *See Creedle v. Miami-Dade County*, 349 F. Supp. 3d 1276, 1291 (S.D. Fla. 2018)

The Government's alternative position based on *Lyons* is equally unconvincing. In *Lyons,* police officers stopped Lyons for a traffic violation. *Id*. at 97, 103 S.Ct. at 1663. Although he offered no resistance or provocation, the officers applied a chokehold that rendered him unconscious and seriously injured him. *Id*. Lyons sued for damages and an injunction to bar future police use of chokeholds absent an immediate threat of deadly force. *Id*. at 98, 103 S.Ct. at 1663. The district

12

court granted a preliminary injunction, the court of appeals affirmed, but the Supreme Court reversed. *Id*. at 99–100, 103 S.Ct. at 1664. The Supreme Court reasoned that Lyons' standing rested on the mere speculation that the police *might* stop him again and that, if stopped, the arresting officers *might* apply an unconstitutional chokehold.   Ultimately the Court concluded that, even assuming that the defendant had a practice of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force," the plaintiff had still failed to show a "real and immediate" injury because the plaintiff could not show that he would likely be subject to that chokehold again. *Id. at* 105, S.Ct. at 1667.  Similarly, in *Noem*, Justice Kavanaugh explained that in his view, the plaintiffs did not have "standing to obtain future injunctive relief . . . merely because [they] experienced past harm and fear its recurrence," and otherwise had "no good basis to believe that law enforcement will unlawfully stop *them* in the future . . . and certainly no good basis for believing that any stop . . . is imminent." *Id*. at *2. (emphasis in original).

Here, *Lyons* and *Noem* do not support the outcome Defendants seek.  More specifically, the facts here plainly establish that Plaintiff's exposure to the alleged policies are not limited to a single isolated incident in the past.  Rather, at the time the Complaint was filed, Plaintiff had already been on the receiving end of the policies twice.  Since the litigation has been pending, Plaintiff has been stopped a third time.  These facts establish what the Plaintiff in *Lyons* could not.  Moreover, even if Plaintiff here had not been stopped numerous times already, the nature of the policies here and factual allegations are distinguishable from the policies at issue in *Lyons*, given that the policies in this action a will subject an individual to future encounters when he/she is simply going about his life.  Accordingly, the Court finds the instant case more analogous to *Church* because Plaintiff "is unable to avoid repeating the conduct that led to the original injury at the

hands of the defendant." *Church,* at 1338.  As a result, the Court is satisfied that Plaintiff has established the likelihood that he will be subject to the identified policies in the future.  This determination is consistent with a number of cases from other circuits who have considered *Lyons* in relation to facts more similar to those presented here.[4]  Accordingly, this Court has jurisdiction to consider the merits of Plaintiff's Motion for Preliminary injunction.

### IV.      Conclusion

After careful consideration of the relevant filings and arguments and for the reasons dictated herein, this Court has determined Article III standing exists. As such, the Court will move forward to consider the merits of Plaintiff's Motion for Preliminary Injunction. (Doc. 30).  In that regard, Plaintiff's motion (Doc. 30) is set for hearing before Chief District Judge Jeffrey U. Beaverstock in US Courthouse, Courtroom 4A, 155 St. Joseph Street, Mobile, AL on **May 27, 2026 at 10:30 a.m.** (CST).

**DONE and ORDERED** this 19th day of May, 2026.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] Notably, when given an opportunity at the hearing, the government was unable to point to a single case where a Court determined a plaintiff did not have standing pursuant to *Lyons*, based on facts similar to those presented here.