**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**MOBILE DIVISION**

| | |
|---|---|
| LEONARDO GARCIA VENEGAS,<br><br>*Plaintiff*,<br><br>v.<br><br>TOM HOMAN, WHITE HOUSE BORDER CZAR, IN HIS OFFICIAL CAPACITY, ET AL.,<br><br>*Defendants*. | Case No. 1:25-cv-397-JB-N |

**PLAINTIFF'S SUPPLEMENTAL REPLY IN SUPPORT OF PRELIMINARY INJUNCTION**

Back when the government filed its opposition brief in December 2025, it failed to address nearly any of the precedent showing that the three challenged DHS policies are unlawful. After the preliminary injunction hearing, the government asked for yet another chance. But its supplemental brief—its fourth shot at the merits of these claims—still fails to grapple with the controlling precedent. It also largely ignores the evidence presented at last month's hearing. At bottom, the government has cited no cases that allow officers to search the non-public areas of worksites without a warrant, detain workers based on how they look rather than particularized suspicion, and refuse to let them go after seeing documentary proof of lawful presence. Leo remains entitled to preliminary relief.

## I. The government's new merits arguments fail.

To obtain a preliminary injunction, Leo must show that he's substantially likely to prove the challenged DHS policies and practices are unlawful. *See Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015). Leo has made that showing. The

evidence demonstrates that DHS has likely authorized immigration officers to enter the non-public areas of construction sites without a warrant, to preemptively detain workers on those sites without particularized suspicion, and to continue detaining workers even after they have shown presumptive proof of lawful presence like a REAL ID. *See* PI Br. (ECF 30-1) at 3–16; PI Reply (ECF 48) at 2–6. Leo has also shown that it's likely those policies violate the Fourth Amendment and DHS's own regulations. *See* PI Br. at 17–28; PI Reply at 8–14. Leo will not fully rehash his arguments or bolster them with "a lot of law that nobody felt . . . was necessary before." PI Tr. 139:19–22. Instead, because the government has repeatedly tried and failed to justify its unlawful policies, Leo will simply refute its revised arguments and rest on his prior briefs.

**A. Warrantless Entry Policy**

*The facts.* There's no dispute that federal immigration officers do not think they need judicial warrants to enter construction sites. *See* PI Tr. 67:12–23 (government's sole witness agreeing they do not get warrants). Indeed, the government's witness testified that there's no "reasonable expectation of privacy on an open jobsite." *Id.* But this "open jobsite" argument doesn't square with the facts. *See* Supp. Resp. (ECF 96) at 1, 5, 8.

As Leo's second detention shows, the government's theory that construction sites are "open" and do not require a warrant means that officers can freely enter nearly completed houses—even ones that already have doors and windows. *See* PI Tr. 23:24–24:20. They can also walk right into a "nearly complete" house and order workers down from the roof, just as they did at Jorge Estrada's jobsite. Estrada Decl. (ECF 30-4) ¶¶ 3–5.

Even before construction is nearly complete, though, active worksites are still typically closed to the public. PI Tr. 18:7–13, 24:19–20. Active worksites like Leo's have visible enclosures around their boundaries. *Id.* They have signs warning the public to keep out. *Id.* And as the government's own witness agreed, they are often dangerous: They have wet concrete, exposed rebar, sharp objects, heavy equipment, and other things that create safety risks. *Id.* at 68:3–16. That's why people other than workers "are not allowed to enter a [] construction site." *Id.* at 16:1–10. As Leo testified, workers expect that only other workers will enter an active site. *Id.* Leo also testified about what would happen if a member of the public entered an active construction site: one of the workers would tell them to leave. *Id.*

*The law.* The government's primary defense of the Warrantless Entry Policy is that Leo lacks Fourth Amendment standing. That's wrong. But let's start with what the government's response ignores: Leo can challenge DHS's failure to adhere to the warrant requirement that its regulations require. DHS regulations prohibit officers from "enter[ing] into the non-public areas of a business . . . for the purpose of questioning *the occupants or employees* concerning their right to be or remain in the United States" without "a warrant or the consent of the owner *or other person in control of the site* to be inspected." 8 C.F.R. § 287.8(f)(2) (emphasis added). Leo has standing to challenge this regulation because he is an "occupant[] or employee[],"a "person in control of the site," and warrantless raids impact his work. *See* PI Br. at 20; MTD Opp. (ECF 61) at 12–13 (collecting cases); *see also* *Truax v. Raich*, 239 U.S. 33, 38–39 (1915) (employees have a "manifest interest in the freedom of the employer to exercise his judgment without illegal interference or

compulsion"). The government did not respond to this argument six months ago, did not respond to it in its Motion to Dismiss briefs, and now its supplemental response remains silent. That failure alone shows that Leo is likely to prevail on the merits.[1]

Should this Court decide to reach the Fourth Amendment, however, Leo has standing to challenge warrantless raids of the construction sites where he works. Although the government fails to acknowledge it, there are actually "two tests for Fourth Amendment standing": Leo "may have Fourth Amendment standing to challenge a search based [either] on his possessory interest in property . . . [or on] any reasonable expectation of privacy in the property." *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1186 n.8 (9th Cir. 2015); *see also id.* at 1185–87. Leo passes both tests.

To begin, Leo has a possessory interest in sites he is actively developing. "Possession usually is surrendered fully in the case of construction" until "completion of the work." Restatement (Second) of Torts § 422, cmt. c. As "one who lawfully possesses" his worksites, it follows that Leo has a "right to exclude others." *Rakas v. Illinois*, 439 U.S. 128, 144 n.12 (1978) (citing 2 W. Blackstone, *Commentaries on the Laws of England*, ch. 1). And when considering a stranger's implied license to enter private property, we consider both the area entered and their "specific purpose." *Florida v. Jardines*, 569 U.S. 1, 9 (2013).

[1] In a single line, the government notes that 8 C.F.R. § 287.8(f) does not protect "any area of a business or other activity to which the general public has access or onto open fields." Supp. Resp. at 5 (quoting 8 C.F.R. § 287.8(f)(4)). But the supplemental response does not develop this point at all. And the original response argued only that construction sites are open fields because they are "unoccupied or undeveloped areas." PI Resp. (ECF 46) at 23. Again, that's just not true. Many of these sites have partially completed houses on them, and even when they don't, they are enclosed and occupied by the people who are actively developing them. *Supra* pp. 2–3. The general public does not have access to these active worksites.

Leo's experience in the construction industry is consistent with the general rule that members of the public cannot enter construction sites to investigate the people working:

> **Q:** What kind of people can be on these sites?
> **A:** Only the workers.
> **Q:** Workers like you?
> **A:** Yes.
> **Q:** So do you think if you saw someone try to walk on who wasn't authorized, you can tell them to leave?
> **A:** Yes.
> **Q:** Why?
> **A:** Because other people are not allowed to enter a work construction site.

PI Tr. 16:1–10.

The government has no response to this evidence. Instead, the government tries to undermine Leo's possessory interest by ignoring the factual record and misreading *Lyall*. In *Lyall*, event staff *had* standing to challenge the search of a warehouse they did not own and were using for only one night because they were "in charge of the property that night." 807 F.3d at 1189–90. Like Leo, the event staff were on the property for a short time, and their possessory interest was subordinate to the owner's. Yet the government says Leo is different because "he is a mere worker" and his "[m]anagers and supervisors make decisions on site access." Supp. Resp. at 4. But what mattered in *Lyall* was not the organizers' job title, but that they were the people present that night with the "right to exclude others from the warehouse." 807 F.3d at 1189 n.10. Similarly, Leo testified that, while he *can't* exclude other construction workers from a site, PI Tr. 33:3–19, he *can* exclude "people [who] are not allowed to enter," *id.* at 16:5–10. The government did not offer any evidence or authority to the contrary. It simply disagrees that the construction industry works the way Leo and the Restatement describe.

Leo has standing under the privacy framework, too, for similar reasons. In *Mancusi v. DeForte*, the Supreme Court held that a union worker could challenge a search of his office—even though he did not own it and shared it with another worker—because he "could reasonably have expected that only [union affiliates] and their personal and business guests would enter." 392 U.S. 364, 369–70 (1968). While the government has finally acknowledged that *Mancusi* exists (Supp. Resp. at 3), it still has not distinguished that case. Because it can't. Like the union worker in *Mancusi*, Leo shares his worksites with other workers and reasonably expects that only those workers and construction affiliates will enter the site while he is working there. PI Tr. 16:1–10, 33:3–19. The government fails to explain why it would be reasonable for strangers to enter enclosed and dangerous construction sites where workers are actively building. *Id.* at 15:20–25, 18:7–15, 67:24–68:16. The reasonable societal expectation is that strangers won't walk into a nearly completed house where people are working. Nor will they enter other active sites as workers are pouring concrete within an enclosed area that's posted with a sign warning off trespassers. *But see id.* at 75:14–22 (explaining that DHS officers "approach[ed] a worker as he stood on a wet concrete pad"). And they certainly won't walk up to the area where workers are actively working to place them in restraints. *See Jardines*, 561 U.S. at 9 (looking to the area the officers entered and their investigatory purpose).

Unable to argue otherwise, the government relies on cases where—unlike the sites at issue here—the public could freely go. *See United States v. Edmonds*, 611 F.2d 1386, 1388 (5th Cir. 1980) (a dock whose "reputation in the community" was that "the public had long had free access"); *United States v. Nohara*, 3 F.3d 1239, 1241–42 (9th Cir. 1993)

(a "common area" in an apartment building). They also cite a case where 75 employees shared a shed in which they "had no possessory interest... and no right to exclude others from the premises." *Martinez v. Nygaard*, 831 F.2d 822, 826 (9th Cir. 1987); *but see Byrd v. United States*, 584 U.S. 395, 403 (2018) ("Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest."). Because Leo has a possessory interest and the right to exclude, none of the government's cases help.

The government trains its immigration agents to treat construction sites as open fields. Yet, in more than six months of trying, it has produced exactly zero cases that say its position is consistent with the law. Under *Katz*'s test, the question is whether it's reasonable for Leo to expect privacy from intruders on his sites. If Katz could reasonably expect privacy in a public phone booth, and Mancusi could reasonably expect privacy in a shared office, then Leo can reasonably expect privacy from strangers raiding active, enclosed, and dangerous construction sites. And if they do enter, his role on the sites gives him the power to tell intruders to leave. Accordingly, under either the trespass or the privacy test, Leo has Fourth Amendment standing to challenge the warrantless entry policy.

**B. Preemptive Detention Policy**

*The facts.* As the Court aptly observed, DHS's approach to surveilling construction site is akin to "recon by fire." PI Tr. 125:2–23. The problem is that, even if some workers flee when they see immigration officers approaching, the officers do not limit themselves to detaining only the workers who flee. The evidence shows that officers *also* detain the remaining workers who have done nothing to create suspicion. *See, e.g.*, *id.* at 17:7–18:6,

75:7–18 (Leo and Lavoie testifying officers did so on May 21); *see also* PI Ex. 5 (ECF 92-5) (only some workers ran, but they detained all Latino workers); PI Ex. 15 (ECF 92-15) (construction worker detained on the way to his car despite not running).

- On February 1, 2025, officers detained Gehovani Alvirde-Ruiz in north Alabama while he was parked in his yard even though he did not run or act suspiciously (PI Tr. 48:17–54:25).

- On May 21, 2025, officers detained Leo and his brother on a construction site in this District even though they did not run or act suspiciously (*id.* at 17:7–23:23).

- On June 12, 2025, officers detained Leo while he was working alone in a house on a construction site in this District even though he did not run or act suspiciously (PI Tr. 23:24–24:23).

- On July 23, 2025, officers detained Jorge Estrada on a construction site in this District even though he did not run or act suspiciously (Estrada Decl. ¶¶ 17–22).

- On October 2025, officers detained Jane Doe at a Florida landscaping business even though she did not run or act suspiciously (Doe Decl. (ECF 30-5) ¶¶ 7–12).

The evidence also shows that these are not the brief detentions that *Terry* allows. On May 21, officers tackled Leo, searched his pockets, led him off his worksite in handcuffs, and detained him for an hour. PI Tr. 23:18–20, 83:12–14. They led him off his worksite again on June 12 and marched him to the edge of the development. *Id.* at 23:24–25:11. They zip-tied Jane Doe and then put her in handcuffs and leg shackles for hours. Doe Decl. ¶¶ 11, 17–18. They took Gehovani to jail. PI Tr. 54:21–25. And they've preemptively detained other people across the country based on how they look—with no prior investigation or individualized suspicion. *See* PI Ex. 4 (ECF 92-4); PI Ex. 5; PI Ex. 6 (ECF 92-6); PI Ex. 7 (ECF 92-7); PI Ex. 8 (ECF 92-8); PI Ex. 9 (ECF 92-9); PI Ex. 10 (ECF 92-10); PI Ex. 11 (ECF 92-11); PI Ex. 12 (ECF 92-12); PI Ex. 13 (ECF 92-13); PI Ex. 14

(ECF 92-14); PI Ex. 15; PI Ex. 17 (ECF 92-17); PI Ex. 18 (ECF 92-18); PI Ex. 20 (ECF 92-20); PI Ex. 23 (ECF 92-23); PI Ex. 26 (ECF 92-26); PI Ex. 29 (ECF 92-29); PI Ex. 33 (ECF 92-33); PI Ex 34 (ECF 92-34). As Agent Lavoie testified, DHS is maintaining the same "tempo" today. PI Tr. 91:19–21.

*The law.* The government acknowledges it cannot demand a person's identification unless the person is detained. *See* Supp. Resp. at 6. Yet it does not engage with any of the precedent Leo cited that requires particularized suspicion for the initial detentions. *See* PI Br. at 22–23 (collecting cases). Instead, the government cites one case where officers had particularized suspicion, *District of Columbia v. R.W.*, 146 S. Ct. 1069 (2026), and another where two nearby guns put the officers' lives at risk, *United States v. Lewis*, 674 F.3d 1298 (11th Cir. 2012). Neither case undermines the well-settled rule that suspicion must be specific to each individual searched or seized.

In *R.W.*, police were called about a suspicious car in a parking lot at 2:00 am. When they arrived, two people fled from a car on foot while the defendant tried to drive away with the car's door still open. 146 S. Ct. at 1071–72. The government makes it sound as if the Court held the driver could be detained just because his passengers fled. *See* Supp. Resp. at 6. But the Court expressly declined to go that far because the driver *also* tried to flee. *See R.W.*, 146 S. Ct. at 1071–72. And *Lewis* is even further afield. The police there detained four people in a parking lot because there were two guns within reach. 674 F.3d at 1300–01. Even though the defendant was not a suspect, the court upheld his detention because "[t]he officers faced substantial, immediate danger." *Id.* at 1306.

Neither case says the government can round up all workers at a job site based on how they look. Neither says that officers can immediately put workers in physical restraints —regardless of whether, like Leo, they have not fled and pose no threat. *Cf. INS v. Delgado*, 466 U.S. 210, 218 (1984) (explaining that workers must be free to go about their day or leave). And neither says that they can take workers to a second location and hold them for hours or days. The evidence shows that these stops are far more intrusive than *Terry* allows. So, Leo is likely to show they are unlawful.

**C. Continued Detention Policy**

*The facts.* The government's defense of the third policy yet again ignores the facts. As the government tells it, after officers detain a worker whom they suspect of being an illegal immigrant, they merely ask for ID and "conduct brief inquiries to ensure that an identification document is what it purports to be and to confirm that it contains accurate details." Supp. Resp. at 5–7. But the government cites zero examples of any officer treating a Latino construction worker that way. That's because, in the real world, officers disregard government-issued IDs that can be issued only to lawful residents. *See* PI Ex. 9 (officers were "not asking for that [a U.S. passport]"); PI Ex. 15 ("papers are useless"); PI Ex. 16 (ECF 92-16) ("paperwork did not matter at all"); PI Ex. 29 (detainee told his ID "don't matter"); PI Ex. 31 (ECF 92-31) ("no way to prove [Green Card] is real").

Indeed, the sole government witness testified that, even though DHS certifies REAL IDs, immigration officers are trained to distrust them "[b]ecause each state has its own REAL ID compliance laws." PI Tr. 83:18–22, 86:1–14. He couldn't really explain *why* REAL IDs are unreliable, though. As he proclaimed, "I'm no expert in REAL ID law." *Id.* at 86:3–

14. Nor could he say which states, if any, issue REAL IDs to aliens. *Id.* at 85:6–8 ("I'm not saying that at all."). In reality, all states issue REAL IDs to aliens. The REAL ID Act requires proof of lawful status—not citizenship. *See* 6 C.F.R. § 37.11(g). And DHS imposes rigorous requirements on states to confirm that an applicant can document their lawful status. *Id.* §§ 37.3, 37.11, 37.13.

Rather than relying on the requirements of the law or DHS's own regulations that govern REAL IDs, however, the "training and experience" on which immigration officers base their distrust of REAL IDs boils down to nothing more than some vague hearsay assertions that some unspecified people in California might have had a REAL ID despite DHS determining they were in the country illegally. PI Tr. 85:9–12. But there's no evidence showing that's ever happened. And DHS officers clearly are not trained that the REAL IDs include security features to prevent forgery, have machine-readable barcodes, and must expire when a person's lawful presence expires. *See* 6 C.F.R. §§ 37.15–.21.

Immigration agents' distrust of REAL IDs and DHS's own regulations continues to harm Leo:

- On May 21, 2025, officers tackled Leo to the ground without asking questions after he offered to show his REAL ID and then, once they saw it, dismissed it as fake and detained him for an hour (PI Tr. 19:20–22:4).

- On June 12, 2025, officers ordered Leo to exit a house without asking questions and marched him multiple blocks away after he showed his REAL ID, again claiming it might be fake (*id.* at 24:24–25:2).

- Last month, officers tackled Leo to the ground without asking questions while he was holding his REAL ID and then threw him in leg shackles in the back of a car until they confirmed his citizenship (*id.* at 27:19–28:7).

Leo's experiences are common. Immigration officers dismissed Gehovani's Green Card and Social Security Card last year. *Id.* at 48:1–25, 50:21–51:16. They dismissed Jorge's REAL ID at another construction site in Baldwin County. Estrada Decl. ¶¶ 21–23. They dismissed Jane Doe's REAL ID, Social Security Card, and work permit across the state line last year. Doe Decl. ¶¶ 13–18. And they've done the same to people across the country. *See, e.g.*, PI Ex. 9 ("not asking for that" [a passport]); PI Ex. 15 ("papers are useless"); PI Ex. 16 (ECF 92-16) ("paperwork did not matter at all"); PI Ex. 25 (officer told Latino detainee his work permit was "fake"); PI Ex. 27 (ECF 92-27) (officer told Latino detainees that their REAL ID, Social Security Card, and work permit "weren't valid, and that they didn't give [them] any valid legal status"); Windham Decl. (ECF 30-3) ¶¶ 23, 27, 28, 33 (similar stories from Chicago, D.C., Idaho, and L.A.).

*The law*. The government does not come close to justifying this policy. All Leo asks is that, when federal officers detain a worker whom they suspect is an illegal immigrant, they promptly release that person when presented with a government-issued ID that ought to dispel their suspicion—like a REAL ID. PI Br. at 30. As Leo has explained, that is what the Fourth Amendment and 8 C.F.R. § 287.8(c)(2)(i)–(ii) demand. *Id.* at 24–27. The government cites *Rodriguez v. United States*, 575 U.S. 348 (2015), and *United States v. Diaz-Lizaraza*, 981 F.2d 1216 (11th Cir. 1993), but those cases hold that stops must end promptly when it would be unreasonable to extend them further. And, as we know from *Alcocer v. Mills*, officers can't extend an immigration detention when the person shows a driver's license that can be issued only to people lawfully present. 800 F. App'x 860, 860–67 (11th Cir. 2020). The government continues to ignore *Alcocer*'s holding that documents

of that kind—like the REAL ID Leo has repeatedly presented—"negate[] suspicion of illegal presence." *Id.* at 866. Leo is likely to show that a policy authorizing *Alcocer* detentions is unlawful.

## II. The government's remaining arguments fail.

While the supplemental response spends most of its time on the first preliminary injunction factor (likelihood of success), it takes passing shots at the other three factors (irreparable harm, balance of equities, public interest), too. Those shots also miss.

*Irreparable harm.* An injunction must be necessary to prevent irreparable harm. *Gissendaner*, 799 F.3d at 1280. Restraints on liberty are a classic irreparable harm. *See Garcia-Mir v. Meese*, 781 F.2d 1450, 1453–54 (11th Cir. 1986). And unlawful searches and seizures are a classic restraint on liberty that courts readily enjoin, including preliminarily in cases just like this. *See, e.g.*, *Fla. Immigrant Coal. v. Uthmeier*, 778 F. Supp. 3d 1315, 1325 (S.D. Fla. 2025) (irreparable harm based on threat of future unlawful arrests); *Escobar Molina v. DHS*, 811 F. Supp. 3d 1, 51 (D.D.C. 2025) (same); *United Farm Workers v. Noem*, 785 F. Supp. 3d 672, 740–41 (E.D. Cal. 2025) (same). The government does not dispute any of this. It argues, instead, that Leo faces no harm from the warrantless entry policy because he lacks Fourth Amendment standing, and that he faces no harm from the two detention policies because any future unlawful detentions are speculative. *See* Supp. Resp. at 5, 8. The first argument is wrong for the reasons discussed on pages 4–7 above, and the second argument is one this Court recently rejected when it held that Leo had Article III standing to seek an injunction against the challenged policies, Order (ECF 87).

As Agent Lavoie just assured the Court, these raids are ongoing and the tempo has not subsided. *See* PI Tr. 91:19–21. The imminent threat of irreparable harm is clear.

*Equities and public interest.* The government's final argument fares no better. It claims that a preliminary injunction "would thwart valid law enforcement operations." Supp. Resp. at 5, 8. But Leo seeks to enjoin only *unlawful* searches and seizures—the ones that flow from the challenged DHS policies. *See* PI Br. at 30. Neither the government nor the public has any valid interest in allowing unlawful searches and seizures to continue. *See Lebron v. Wilkins*, 820 F. Supp. 2d 1273, 1292–93 (M.D. Fla. 2011) ("[P]reliminarily enjoining what appears likely to be deemed to be an unconstitutional intrusion on . . . Fourth Amendment rights . . . serves the public interest and outweighs whatever minimal harm a preliminary injunction might visit upon the State."). That is why Leo has had no trouble finding several recent PI decisions that agree with him (like *Florida Immigrant Coalition*, *Escobar Molina*, and *United Farm Workers*), while the government has found none that support it.

* * *

Six months after filing its PI response, the government asked for another chance to come up with arguments. It failed. The supplemental response ignores all the evidence presented at the hearing and doesn't cite a single case that says it can raid construction sites without a warrant, detain all the workers who fit the same profile, and refuse to let them go after they show an ID that the government issues only to people who are here lawfully. Leo respectfully requests that this Court either issue a preliminary injunction or temporarily set aside the challenged policies under Section 705 of the APA.

Dated: June 10, 2026.

Respectfully submitted,

*/s/ Jared McClain*
Jared McClain (DC Bar No. 1720062)*
Jaba Tsitsuashvili (DC Bar No. 1601246)*
Joshua Windham (NC Bar No. 51071)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jmcclain@ij.org
**Admitted Pro Hac Vice*

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing PLAINTIFF'S SUPPLEMENTAL REPLY IN SUPPORT OF PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Jared McClain
Jared McClain (DC Bar No. 1720062)