**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LEONARDO GARCIA VENEGAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:25-00397-JB-N** |
| | ) | |
| **TOM HOMAN, et al,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This action is before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. 30), the Government's response in opposition (Doc. 46), and the Plaintiff's reply (Doc. 48). After the initial briefing of the motion, the Plaintiff additionally submitted a Notice of Supplemental Authority (Doc. 65). A hearing was held on May 27, 2026, and evidence was presented by both parties. Following the hearing, the Court permitted additional time for supplementation on limited issues. Thereafter, Defendants filed a supplemental response (Doc. 96) and Plaintiff filed a supplemental reply (Doc. 99). After careful review of the relevant filings and for the reasons set forth below, Plaintiff's motion is GRANTED to the extent that the alleged policies will be temporarily stayed and otherwise, DENIED.

## I. Factual and Procedural Background

Leonardo Venegas ("Venegas") is a U.S. citizen of Mexican descent who was born in Lehigh Acres, Florida, and lives in Robertsdale, Alabama. (Doc. 1). Since graduating high school in 2019, Venegas has been employed building homes in new subdivisions throughout Baldwin County typically on sites owned by D.R. Horton and Lennar—two major builders in this District.

(Id.) He regularly works on a five-man concrete crew, while at least six other crews come and go to handle everything from framing to painting to landscaping. (*Id*.).

**The May 21, 2025 Encounter**

On May 21, 2025 Venegas arrived at a Lennar site in Foley, where he was scheduled to lay the foundations for four homes in a new development. (*Id*.). The sites were each posted with a No Trespassing sign and surrounded by knee-high black fences. (*Id*.). Around 8:00 a.m., as Venegas was walking back to his site, he saw five armed men—three of whom were masked—hurdling the fence and running past the No Trespassing sign. (*Id*.). The officers also ran past the four non-Latino workers and went straight for Venegas' crew, all of whom were Latino. (*Id*.). Three of Venegas' crewmembers ran, and some officers chased them, but Venegas and his brother stayed put. (*Id*.). When two of the officers approached Venegas' brother (who was undocumented), he asked why they were on the site and if they had a warrant. (*Id*.). Without responding or asking any questions, the officers grabbed Venegas' brother and forced him to the ground. (*Id*.).

At the sight of officers tackling his brother, Venegas took out his phone, started recording, and walked closer. (*Id*.). Venegas got about 25 feet from his brother before a masked officer stepped into Venegas' way. (*Id*.). When Venegas widened his path to keep his camera trained on his brother, the officer declared, "You're making this more complicated than you want to." (*Id*.). Then, without asking Venegas any questions, the officer grabbed Venegas by the arm and started forcing him to the ground. (*Id*.). Venegas yelled, "Don't touch me! I'm a citizen!" and "I'll show you my papers!" (*Id*.). The non-Latino workers watching on yelled, "That's illegal!" "You're not supposed to be doing that!" "He's a citizen!" "He's not even doing nothing wrong—what the

fuck?" (*Id*.). Venegas repeated, "I'm a citizen! Stop! I'll show you my papers now!" (*Id*.). But a second officer, ignoring all the protests about Venegas' citizenship, ran over and tackled Venegas as an officer yelled, "Get on the fucking ground!" (*Id*.). A third officer rushed right past the site's No Trespassing sign and helped hold Venegas down. (*Id*.). One officer reached into Venegas' pocket and pulled out his Alabama driver's license— a STAR ID that complies with the REAL ID Act. (*Id*.). Rather than accept that Venegas was a citizen, however, the officers told him his REAL ID was fake, handcuffed him, removed him from his worksite, and brought him to their unmarked car, where they held him for over an hour. Venegas continued to tell the officers that he was a citizen and pleaded with them to check his Social Security Number. (*Id*.). Eventually, an officer relented, confirmed his citizenship, and released him. (*Id*.). Venegas was never charged with a crime. (*Id*.). Venegas had to take nearly two weeks off work to recover from the raid. (*Id*.).

**The June 12, 2025 Encounter**

On June 12, Venegas was working alone inside a home in a D.R. Horton development in Fairhope while the rest of his crew worked at a different development. (*Id*.). The house had its walls, a roof, windows, and doors, but no garage door or siding. (*Id*.). Although there were other crews in the development, the closest was eight houses away. (*Id*.). Venegas was working in a back bedroom when a federal officer walked in the house and ordered Venegas outside. (*Id*.). Venegas said he was a citizen, but the officer insisted. (*Id*.). Venegas saw another officer standing about five feet behind him, just outside the room's open window. (*Id*.). With no choice but to obey, Venegas followed the officer outside. (*Id.*).

Outside, the first officer told Venegas they were there to check his immigration status. (*Id*.). Venegas reiterated that he was a citizen. (*Id*.). He showed the officers his REAL ID. (*Id*.). The

officers said Venegas' REAL ID could be fake and ordered him to go with them so they could check his status. (*Id*.). The officers marched Venegas —one officer in front and one behind—about two blocks away, to their unmarked car at the edge of the development. (*Id*.). They lined up Venegas with other Latino workers whom they'd detained at other sites in the development. (*Id*.). This time, it took about 20–30 minutes for officers to acknowledge Venegas' citizenship and release him—along with two other workers Venegas knew had lawful status (and at least one of whom was a citizen). (*Id*.). Venegas was never charged with a crime. (*Id*.).

**The DHS Policies**

According to Venegas, the described raids and many others like it are the result of the current Administration's immigration goals. To that end, Plaintiff points out that on inauguration day, the President set a policy "to achieve the total and efficient enforcement of [immigration] laws" and ordered DHS to establish task forces nationwide and "use all available law enforcement tools" to achieve his goal. Executive Order 14159 §§ 2, 6(c). DHS Secretary Noem, in turn, ordered DHS to prioritize mass deportations and deputized officers from other federal agencies to join the "whole-of-government approach to immigration enforcement." (Doc. 30-3). The Administration "set a goal of a minimum of 3,000 arrests for ICE per day" and "is going to keep pushing to get that number up higher[.]" (*Id*.).

To that end, senior immigration officials have asserted that the Administration has unlimited power to enforce immigration laws. (*Id*.) (White House Border Czar asserting "there's no limitation" on the President's immigration power, and White House Deputy Chief of Staff for Policy and Homeland Security Advisor asserting government's "duty" to "ensur[e] the full and unrestricted enforcement of federal immigration law"). Indeed, senior officials have directed

officers to "do what [they] need to do," to "push the envelope," to turn the "creative knob up to 11," and that "[i]f it involves handcuffs on wrists, it's probably worth pursuing." (*Id*.).

According to the Complaint, DHS has adopted—and immigration officers are enforcing—three search-and-seizure policies for construction sites that exceed the agencies' and officers' constitutional, statutory, and regulatory authority. The three targeting Alabama's construction industry are enforced by the "Gulf of America Homeland Security Task Force," which enlists officers from seven subagencies within DHS and DOJ (*e.g.*, ICE, CBP, FBI, ATF). (Doc. 1). Those policies are set forth as follows:

> **1) Warrantless Entry Policy.** DHS has authorized immigration officers to raid private construction sites without a warrant or consent. The policy allows warrantless, nonconsensual entry even when sites are posted with No Trespassing signs, fenced in, enclosed, or otherwise exclude the public.
>
> **2) Preemptive Detention Policy.** Once on private construction sites, DHS has authorized immigration officers to preemptively detain anyone they think looks undocumented—without any particularized suspicion that the employers staffing the site have hired undocumented workers or that the workers are illegal immigrants—based only on a generalized demographic profile, even though many who meet that profile (like Venegas) are doing nothing wrong. This is not a policy of bona fide investigative detentions; instead, it grants officers the power to round up all the construction workers who fit the target profile—without asking questions—and to detain them until the workers can affirmatively prove their legal status.
>
> **3) Continued Detention Policy**. During these detentions, DHS has authorized immigration officers to continue detaining workers even after they show evidence of citizenship or lawful presence. Even an Alabama STAR ID—a document that Alabama issues only to citizens and lawful residents and that DHS certifies complies with the federal REAL ID Act—is not enough to overcome the weight DHS affords its generalized profile of undocumented construction workers.

(*Id.*). Plaintiff contends these policies are memorialized in a written policy directive, as immigration officers deputized from a wide range of federal agencies with a wide range of training and experience are all executing the same policies. (*Id.*). Alternatively, Plaintiff contends DHS has adopted an unwritten policy instructing immigration officers to act in the manner described in the described policies. (*Id.*).

Plaintiff alleges DHS adopted the three challenged policies as part of a broader directive from the White House and Border Czar Homan to increase immigration arrests and removals by raiding workplaces based on which industries tend to employ undocumented workers rather than a prior investigation to identify whether there's any reason to suspect that employees on a particular worksite are undocumented. (*Id.*). These directives are aimed at increasing the number of undocumented people arrested and removed from several hundred a day to at least 3,000 per day. (*Id.*).

**Evidence submitted in Support of Motion for Preliminary Injunction**

In addition to the allegations in the Complaint and the supporting Declaration of Venegas (Doc. 30-2), Plaintiff has additionally submitted a declaration of Joshua Windham (Counsel for Venegas) (Doc. 30-3) setting forth the results of his internet searches relating to the administration's efforts to increase immigration arrests, and the declarations of Jorge Ovidio, Jane Doe, and Gehovani Alvirde-Ruiz (Docs. 30-4, 30-5, and 30-6) describing encounters each of them experienced as a Latino construction workers in Alabama with similarities to those experienced by Venegas.

**The Affidavit of Phillip Lavoie**

In support of its challenge to Plaintiff's Motion for Preliminary Injunction, the Government has submitted the Declaration of Phillip Lavoie ("Lavoie"). (Doc. 44-1).

Lavoie is employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and serves as the Acting Assistant Special Agent in Charge (ASAC) of the Mobile, Alabama Office. (Doc. 44-1). As an Acting ASAC, he is charged with the responsibility of overseeing the HSI Mobile Office. (*Id*.). He has served in that position since January 2024 and was the Acting ASAC over all the offices in Alabama until late July 2025. (*Id*.).

Lavoie describes the May 21, 2025 encounter with Plaintiff in a manner that is largely inconsistent with Plaintiff's description. Lavoie indicates he has been unable to find any information or records relating to the June 12, 2025, encounter in DHS records, systems and databases.

With respect to the DHS policies, training, and procedures, Lavoie makes the following declarations:

> I am not aware of any Warrantless Entry Policy, Preemptive Detention Policy, or Continued Detention Policy used in my area of responsibility (AOR) as described by the Plaintiff. ICE officers and agents are required to follow the relevant statutory authorities in enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. Prior to engaging in investigative stops (i.e., *Terry* stops), HSI agents are trained to have developed reasonable suspicion that the individual has committed or is committing a federal crime or federal immigration violation. This determination is evaluated based on the totality of the circumstances. The factors that contribute to reasonable suspicion include, but are not limited to, information from intelligence sources, information from law enforcement and open-source databases, analysis of trends and patterns associated with

immigration violations, previous encounters with undocumented individuals at a specific location or working for certain employers, and information provided by human sources. Federal immigration officers have specialized expertise and practical knowledge of factors that are most indicative of immigration violations, illegal activity, and behaviors typically associated with unlawful presence. As ICE's policy requires officers to follow the Constitution and all relevant statutes and regulations, HSI Special Agents receive extensive training on Fourth Amendment searches and seizures in addition to their practical experience in the field. Their training courses are as follows: ICE HSI Mobile Special Agents receive law enforcement training on the requirements of Fourth Amendment of the U.S. Constitution, and the related statutory and regulatory provisions of the Immigration and Nationality Act (INA) as part of their basic Academy training at the Federal Law Enforcement Training Center. ICE HSI Mobile Special Agents receive Eleventh Circuit Court of Appeals-specific immigration enforcement training on the requirements of the Fourth Amendment, the statutory and regulatory provisions of the INA, and caselaw at least once per year. This training covers the requirements for warrantless arrests and investigatory stops under both Title 8 for immigration law violations and Title 18 for criminal violations, the requirements of having and documenting reasonable suspicion and/or probable cause. ICE HIS Mobile Special Agents are trained that, under the Fourth Amendment, relevant statutes and regulations, and case law, brief detention for questioning or an investigatory stop requires an immigration officer to have reasonable suspicion, based on specific, articulable facts, that the person being questioned is an alien illegally present in the United States. ICE HSI Mobile personnel are trained that any arrest requires probable cause that the person being arrested is an alien present in the United States in violation of the immigration laws or has violated a criminal statute. They are further trained to clearly differentiate between an investigatory stop and an arrest. ICE HSI Mobile Special Agents are trained to follow ICE procedure for apprehensions of illegal aliens present in the United States by using targeted and non-targeted investigations, conducting operations, and making arrests. Investigations are developed by gathering information such as employment information; tips from communities or federal agencies; and evidence compiled in law enforcement systems, records and relevant databases. These investigations are designed to identify whether individuals are present in violation of immigration law. When non-targeted individuals are encountered during the targeted operations or in the field, ICE HSI Mobile

> Special Agents are trained to develop reasonable suspicion prior to conducting an investigatory stop. Once U.S. citizenship is verified, or an alien is found to be lawfully present in the U.S., ICE HSI Mobile Special Agents are trained to end the encounter – absent criminal and safety concerns. ICE HSI Mobile Special Agents identify themselves to the arrestee at the time of arrest/encounter or as soon as practicable when safe to do so. ICE HSI Mobile Special Agents regularly receive training on investigatory stops and consensual encounters, which occur in public places, to include worksites. They are trained to approach the individuals and identify themselves as immigration officers and ask questions to establish identity and citizenship status. The questions include asking individuals their name, date of birth, place of birth, and if they have documentation showing that they may legally be present in or work in the United States. Officers will ask for any form of identification and have the ability to use fingerprints and facial recognition to identify individuals depending on whether technology is available on scene such as mobile fingerprint scanners. ICE HSI Mobile Special Agents often work in cooperation with other immigration officers from other agencies and components to use identification information to run database checks in the field. These database checks can reveal if an individual was encountered in the past by immigration or other law enforcement authorities. In late January of this year, I arranged for ICE Enforcement and Removal Operations (ERO) officers assigned to the Mobile Office to provide an additional Title 8 authority refresher training to all HSI Mobile Special Agents and partner agencies throughout the Mobile Area of Responsibility (AOR) who would be conducting civil immigration operations. All agents who were present during the May encounter attended this training.

(*Id.*).

## II. Legal Standard

A preliminary injunction is appropriate where a plaintiff shows (1) a substantial likelihood of success on the merits of any claim, (2) an injunction is necessary to prevent irreparable harm, (3) the threatened injury outweighs the harm the injunction could cause the defendants, and (4) the preliminary injunction is in the public interest. *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1280 (11th Cir. 2015). Similarly, Section 705 of the Administrative Procedure Act

empowers a court to issue all relief necessary to "preserve status or rights" to "the extent necessary to prevent irreparable injury" during its review of agency action. "[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colls. & Schs. of Tex. v. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted in part*, 145 S. Ct. 1039 (2025).

## III. Analysis[1]

Venegas seeks a preliminary injunction and relief under the APA because he has already been seized during two separate warrantless raids, on two different construction sites 20 miles apart, while doing his job. (Doc. 30-1). According to Venegas without an injunction, he faces an imminent risk that his liberty and privacy rights will continue to be violated. (*Id*.). According to the Government, an injunction is not warranted because Venegas cannot establish a likelihood of success on the merits or irreparable harm. (Doc. 46). The Court will address the applicable elements with regard to each allegedly unconstitutional policy.

### A. Likelihood of Success on the Merits

Venegas contends he will likely prevail on the merits of Counts I, II, and IV because both the Fourth Amendment and DHS regulations forbid immigration officers from (1) searching the non-public areas of construction sites without consent or a warrant, (2) conducting dragnet,

[1] As a threshold matter, the Government raised the issue of Article III standing in response to Plaintiff's Motion for Preliminary Injunction and requested a ruling on the same be entered prior to any other rulings related to the motion for injunction. As a result, the Court entered an Order on Article III standing in May. (Doc. 87). That order specifically determined that the record as a whole demonstrated that the three relevant policies existed. At the subsequent hearing on the instant motion, the Government called one witness, Philip Lavoie who testified consistently with his previously submitted Declaration. The Court remained satisfied that the three alleged policies existed. As such, this Order addresses the secondary inquiry as to whether Plaintiff will likely prevail on the merits that those policies violate the Constitution and DHA regulations.

suspicionless seizures of Latino workers on those sites, and (3) continuing to detain workers who show presumptive evidence of U.S. citizenship or lawful presence. (Doc. 30-1). Conversely, the Government argues Venegas is not likely to succeed on the merits because he lacks a reasonable expectation of privacy sufficient to establish standing. (Doc. 46).

**1. Warrantless entry**

According to Venegas, the Warrantless Entry Policy violates the Fourth Amendment and 8 C.F.R. § 287.8(f)(2), both of which forbid immigration officers from searching non-public commercial property without consent or a warrant. (Doc. 30-1). In contrast, the government contends that it does not need consent or a warrant to enter a construction site because Venegas does not have a legitimate expectation of privacy in the worksite to warrant Fourth Amendment standing. (Doc. 46). More specifically, the Government contends Venegas cannot establish standing because he does not own or control the worksite on which the Federal Agents detained him. (*Id*.).

In support of his position, Venegas cites to several cases that offer convincing authority for the right of privacy in the workplace. For example, Venegas points out that the Fourth Amendment does not allow "federal agents to enter a place of business from which the public is restricted . . . to conduct their own warrantless search." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 315 (1978); *Peterman v. Coleman*, 764 F.2d 1416, 1420 (11th Cir. 1985). Similarly, Venegas relies on a similar DHS rule that echoes this limitation. An immigration officer,

> may not enter into the non-public areas of a business, [or] a residence including the curtilage of such residence . . . for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected.

8 C.F.R. § 287.8(f)(1)–(2). In contrast, the Government likens a construction site to an open field where officers are always permitted to enter without a warrant. (Doc. 46). Beyond that, the Government relies on several cases that restrict the expectation of privacy in the workplace. For example, the Government points to *United States v. Hastie*, No. CR 14-00291-CG-N, 2015 WL 13309604, at *2 (S.D. Ala. Mar. 23, 2015) (citing *O'Connor v. Ortega*, 480 U.S. 709, 716– 17 (1987)) (discussing expectations of privacy in a government office). It argues that third party- standing claims are disfavored and ultimately that "expectations of privacy derive in part from the right to exclude others from the property, lawful possession, ownership, or control are important considerations in determining whether a defendant has a legitimate expectation of privacy in the item seized or the area searched." (Doc. 46 citing to *United States v. Marchant*, 55 F.3d 509, 516-17 (10th Cir. 1995).).

The Fourth Amendment establishes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). The person claiming the protection of the Fourth Amendment must demonstrate a legitimate expectation of privacy in the area searched or the item seized. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The person asserting the right must show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." *United States v. Mancini*, 8 F.3d 104, 107 (1st Cir. 1993).

Here there is no dispute that Venegas did not own the property on which the Federal agents entered. There is, likewise, no dispute that Venegas was an employee of private

developers responsible for building the homes where Venegas was detained. Finally, there is no dispute that the Federal agents lacked a warrant or consent when entering the work site.

As an initial matter, the Court is not persuaded by the Government's position that it never needs a warrant to enter a construction site. When taken at face value, this position undermines the fact specific considerations required by Fourth Amendment precedent. As a result, the Court will consider the facts here and determine only whether a right of privacy existed in this instance.

Although not separately addressed by the Government, there were two distinct warrantless entries by the agents: the first occurred in May, where Venegas was standing outside of a partially constructed home; the second occurred in June, when agents entered an almost completed residential structure.

The Government's position that the construction site is an open filed for which no consent or warrant is ever needed is unconvincing.[2] The "open fields doctrine," "permits police officers to enter and search a field without a warrant." *Oliver v. United States*, 466 U.S. 170, 173, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). As the Supreme Court explained, "open fields do not provide the setting for those intimate activities [that occur within the home and its curtilage] that the [Fourth] Amendment is intended to shelter from government interference or surveillance." *Oliver*, 466 U.S. at 179, 104 S.Ct. 1735. Thus, "the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech." *United States v. Dunn*, 480 U.S. 294, 304, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (quoting *Oliver*, 466 U.S. at 180 n. 11, 104 S.Ct. 1735).

[2] The Court notes this argument completely undermines the Government's position that it does not have a policy of entering the non-public areas of a construction site without a warrant or consent.

Whether or not the open fields doctrine is implicated by the first encounter with Venegas is not a simple question. Admittedly, a construction site can, in some instances, reasonably be considered an open field. *See e.g. Unites States v. Mathis*, 738 F.3d 719 (6th Cir. 2013) (finding a demolition site qualified as an open filed). But the circumstances in the instant action do not weigh in the Government's favor for several reasons. First, here, it was objectively obvious that that people were actively working in the development and at each residential site. The land was not abandoned, undeveloped, unoccupied, or even unmarked. Instead, the site where Venegas was encountered was clearly the yard of a partially constructed home on a lot delineated by a small fence marker. The Court recognizes that the construction site at issue was partially exposed (depending on the state of the construction and where the employees were located) and that there were no security measures to prevent passersby of walking into the site or efforts taken obscure the employees, but in this instance the Court is not convinced that visibility alone negates that the site was clearly a private worksite, not "open" to the public. Moreover, even if this Court's conclusion with respect to the May encounter is incorrect and that property visible to the public and not protected by security measures should be considered akin to an open field, the Government says nothing to compel the same conclusion with respect to the June encounter which took place inside nearly complete structure. *See e.g. Perez v. Blue Mountain Farms*, 961 F.Supp.2d 1164 (E.D. Wash. August 9, 2013) (distinguishing whether the Fourth Amendment is implicated for warrantless entry onto a farm from warrantless entry into open structures on a farm.). As a result, the Government has not convinced this Court that the warrantless entry into a structure – which undisputedly occurred during the June encounter -does not implicate the Fourth Amendment.

Having determined the open fields exception does not apply, the Court will next consider whether Venegas had a reasonable expectation of privacy. "Factors courts generally consider include property ownership, whether the defendant has a possessory interest in the things seized or place searched, whether the defendant has the right to exclude others from the place, whether he has exhibited a subjective expectation the place would remain free from governmental invasion, whether he took precautions to maintain his privacy, and whether he was legitimately on the premises." *United States v. Medina*, 158 F.Supp.3d 1303, 1308 (S.D. Fla. Dec. 15, 2015) citing to *United States v. McCullough*, 2012 WL 11799871, at *4 (N.D. Ga. Oct. 9, 2012) (citation omitted). However, "[n]o single factor determines whether an individual" has an expectation of privacy protected by the Fourth Amendment. *Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

The facts here establish that the construction site was marked with a small plastic fence. While this fence is not a barrier, like a closed door, it is an indicator of the properties' boundaries where work was being performed. Second, it is undisputed that Venegas was not simply a member of the public present on the property, but an employee with authority to be present and perform work. While it is undisputed that Venegas was not a foreman or site manager, he testified that if a member of the public entered the construction site, he would have the authority to instruct them to leave. He further testified that his authority for this instruction is based on the type of work he performs, his safety concerns, his experience, and communications with his crew and his supervisors. (Doc. 1). One who "lawfully possesses or controls property" has a right to be free from unreasonable searches of the property "by virtue of [the] right to exclude." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978). That Venegas does not have authority over other

construction workers, a fact which the Government repeatedly points out, does not negate that he may exercise authority over his jobsite to the public.

The workplace cases also lean in favor of Venegas. As a whole, the Court is not convinced that a construction site, by its nature of being "visible" renders it constitutionally subpar to other workplace environments where an expectation of privacy exists. As a result, the Court is satisfied that Venegas, an employee working at his place of work, has a reasonable expectation of privacy. *See Barlow,* at 315 ("The owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of Government agents.") Here, the nature of the worksite does not open the floodgates to warrantless government intrusion and there exists no justification to enter a construction site that is not open to the public to conduct warrantless seizure. Finally, Venegas, as an employee has a reasonable expectation of privacy in his workplace. *Reyes v. Maschmeier*, 446 F.3d 1199, 1203 (11th Cir. 2006) ("employees have a protectable, reasonable expectation of privacy against workplace searches.") (citing *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968)). Because the Court is unpersuaded that Venegas lacks standing or that the Fourth Amendment permits warrantless searches of Venegas' worksite, Plaintiff is likely to prevail on the merits of his claims.[3] Similarly, Plaintiffs will likely prevail on the merits because the warrantless entry of "the non-public areas of a business,"[. . . ] for the purpose of questioning the occupants or employees concerning their

[3] The Government also argues that Venegas cannot show irreparable harm. The arguments presented by the Government on this issue mirror those the Court has already considered when it determined whether Article III standing existed. The Court is unpersuaded by the Government's position here for the same reasons set forth in this Court previous Order. (*See* Doc. 87).

right to be or remain in the United States" without "a warrant or the consent of the owner or other person in control of the site to be inspected" runs afoul of 8 C.F.R. § 287.8(f)(1)–(2).

**2. The Preemptive Detention Policy**

According to Venegas, the Preemptive Detention Policy likely violates the Fourth Amendment and 8 C.F.R. § 287.8(b)(2), both of which forbid immigration officers from rounding up workers on private property without reasonable suspicion that they are violating immigration or other laws. (Doc. 30-1). The Government contends Venegas is unlikely to succeed on the merits of his claims relating to the Preemptive Detention Policy because the Federal Defendants had a reasonable suspicion to detain him. (Doc. 46).

The Fourth Amendment forbids officers from detaining people to investigate their immigration status absent "observations [that] lead [them] reasonably to suspect that a particular [person] . . . [is] illegally in the country." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (emphasis added). Of course, officers who are lawfully present on a worksite can ask people about their immigration status. *See INS v. Delgado*, 466 U.S. 210, 216–17 & n.5 (1984). But when officers physically detain a worker, or make it so a reasonable person would not feel free to leave, the stop is unlawful "absent some reasonable suspicion of misconduct." *Id*. at 216–17 (citing *Brown v. Texas*, 443 U.S. 44, 52 (1979)). Similarly, 8 C.F.R. § 287.8(b)(1)–(2) states: In order to "briefly detain" a person, an officer must have "reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(b)(1)–(2).

According to the Government, its "reasonable suspicion" argument is supported by Justice Kavanaugh's concurring opinion in *Noem v. Vasquez Perdomo*, No. 2025 WL 2585637, at *3 (U.S. Sept. 8, 2025) (granting stay) (citing *Brignoni-Ponce*, 422 U.S., at 880–882, 95 S.Ct. 2574) ("To stop an individual for brief questioning about immigration status, the Government must have reasonable suspicion that the individual is illegally present in the United States"). The Government goes on to point out the recognition by the Supreme Court in *Maryland v. Wilson*, 519 U.S. 408, 413–14 (1997) that "[e]very case involves a balance between the needs of officers to protect themselves, the public; and, the liberty interests of the individuals subject to seizure." (Doc. 46). Finally, the Government points to the Eleventh's Circuits' application of *Wilson* "for the more general proposition that an officer conducting a lawful stop or search may, in an appropriate setting, properly control the movements of persons at the scene in order to ensure officer safety." *United States v. Gibbs*, 917 F.3d 1289, 1295 (11th Cir. 2019); *see also United States v. Lewis*, 674 F.3d 1298, 1308 (11th Cir. 2012) (recognizing that officers may "control the movements of nearby associates and exercise command over the situation once the officers had reasonable suspicion of criminal activity that warranted further investigation").

Relying on the above authority, the Government asserts that on May 21, the Federal officers - lawfully present on the construction site - conducted a "lawful brief investigative stop when Plaintiff attempted to interfere with an arrest". (Doc. 46). The Government also argues "[t]he Federal Officials reasonably believed Plaintiff was attempting to interfere in an arrest, threatening Officer Safety, and that he may be an alien." (*Id*.).

The Court is unpersuaded. First, there is no evidence to support the Government's timeline. Instead, videos of the encounter show that another individual was being detained, and

a Federal agent was next to Venegas. To conclude that the agent approached Venegas only after the detention of the other male being detained is speculation. Moreover, the video does not show Venegas attempting to verbally or physically interfer with the other detention in any manner. Similarly, the Government's position that the safety of the officers was a factor is unsupported by the record especially given that there were multiple individuals on the jobsite who did not appear to be Hispanic, and none of those individuals were detained in the name of safety. Finally, the Government offers no factual support whatsoever as to why officers reasonably believed Venegas "may be an alien".

The Government's position is even more suspect in relation to the events of June 12. With regard to that instance, the Government acknowledges that it has no information whatsoever of the detainer, but still argue that the agents had "reasonable suspicion" to detain Venegas based on their training and experience. The Court is simply not inclined to take the Government's word for it. Accordingly, Plaintiff is likely to succeed on the merits that the Preemptive Detention Policy likely violates the Fourth Amendment and 8 C.F.R. § 287.8(b)(2), because it permits officers to detain individuals without reasonable suspicion that they are violating any laws.

**3. Continued Detention Policy**

In general, Venegas contends the Continued Detention Policy allows officers to ignore an individual's presumptive proof of citizenship or lawful presence based on the general assumption that Latino construction workers are undocumented. As a result, officers do not release individuals who have produced a REAL ID or similar document which leads to continued detainer, arrest, interrogation, or incarceration violates the Fourth Amendment and 8 C.F.R. § 287.8(c)(2). (Doc. 30-1).

The Government provides little in the way of a response. From the record, the Government relies on its previous position that the May and June stops were lawful based on reasonable suspicion and the declaration of Lavoie to establish skepticism on whether a REAL ID is sufficient to end a stop once it has been produced to officers.[4]

The Fourth Amendment, in relevant part, guarantees "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." *U.S. Const. amend. IV*. Detention is a type of seizure of the person to which Fourth Amendment protections attach. *See United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003). The Supreme Court has made clear that a stop made pursuant to *Terry V. Ohio*, must adhere to the reasonableness requirement of the Fourth amendment. *Florida v. Royer*, 460 U.S. 491 (1983). As a result, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id*. at 500. The Eleventh Circuit applied this rule to immigration stops in *Alcocer v. Mills*, 800 F. App'x 860, 865 (11th Cir. 2020). In so doing, it explained, "[t]he Supreme Court has long held that, beyond a *Terry* stop, the detention of a suspected alien 'must be based on consent or probable cause' that the person is, in fact, an [illegal] alien." *Id*. at 868 (quoting *Brignoni-Ponce*, 422 U.S. at 881–82). "To rule otherwise on this record, would raise real concerns about the continued unlawful detention of U.S. citizens based on legally inapplicable, groundless immigration hunches unsupported by even arguable probable cause." *Id*. at 867–68.

Notably, the concurring opinion of Justice Kavanaugh on which the Government repeatedly relies in this action, bolsters Plaintiff's position with respect to this policy. *See*

[4] Again, the Government's position that valid proof of citizenship such as a Real ID is not enough, undermines its position that it does not have a policy of continued detainer of individuals after a valid proof of citizenship has been produced.

Kavanaugh, J., concurring in *Noem v. Vasquez Perdomo*, 2025 WL 2585637, at *3 (U.S. Sept. 8, 2025) (granting stay) ("Importantly, reasonable suspicion means only that immigration officers may briefly stop the individual and inquire about immigration status. If the person is a U. S. citizen or otherwise lawfully in the United States, that individual will be free to go after the brief encounter. Only if the person is illegally in the United States may the stop lead to further immigration proceedings").

Similarly, a DHS regulation mimics the Fourth Amendment on this point: Absent a warrant, an immigration officer may convert a brief investigatory stop into an "arrest . . . only when [the officer] has reason to believe [i.e., probable cause] that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i)–(ii).

In the instant action, the record reflects that Venegas was stopped on two separate occasions ostensibly based on suspicion of being an illegal alien. Both, times however, Venegas produced a REAL ID within minutes of being questioned. Alabama issues licenses only to citizens or those who are lawfully present, Ala. Code § 31- 13-29(c)(1), (g), specifically "to discourage illegal immigration within the state and maximize enforcement of federal immigration laws through cooperation with federal authorities." *United States v. Alabama*, 691 F.3d 1269, 1276 (11th Cir. 2012). Venegas' production of an Alabama's driver license should have availed him to "the presumption that he . . . [was] lawfully present." Ala. Code § 31-13- 3(11). Venegas' license also has a star in the corner, which he could obtain only with the documents DHS certifies are compliant with the federal REAL ID Act. 6 C.F.R. § 37.71.5. Under that Act, a REAL ID "suffice[s] to establish lawful presence." *Arizona v. United States*, 567 U.S. 387, 449 n.1 (2012) (Alito, J.,

concurring in part). The record also reflects that Venegas was not promptly released following the production of his REAL ID to officers. Instead, the officers disregarded the veracity of his documentation and continued to detain him. A policy that permits such action is likely to run afoul of the Fourth Amendment.[5]

**B. Irreparable Harm**

Venegas next argues each challenged policy will irreparably harm him until they are enjoined. (Doc. 30-1). In contrast, the Government argues that Venegas cannot show irreparable harm. (Doc. 46). The arguments presented by the Government on this issue mirror those the Court has already considered when it determined whether Article III standing existed. The Court is unpersuaded by the Government's position here for the same reasons set forth in this Court's previous Order. (*See* Doc. 87).

**C. Balance of Harms and Public interest**

Venegas finally asserts that the government has no interest in, and the public only suffers from, the enforcement of policies that violate the Fourth Amendment and DHS regulations. (Doc. 30-1). According to the Government, "[a] district wide preliminary injunction will curtail Congressionally authorized Federal law enforcement of Executive Branch immigration policies, hinder lawful investigative searches, and chill routine field operations." (Doc. 46).

[5] The Government again does not put forth an argument as to how the continued detention of Venegas did not violate 8 C.F.R. § 287.8(c)(2)(i)–(ii). As a result, even if the continued detention policy was not likely to result in a Fourth Amendment violation, the record is devoid of any legal reasoning as to how it would not violate DHS regulations.

"The balance-of-the-harms and public interest elements merge when the government is the party opposing the injunctive relief." *Doe 1 v. Bondi*, 780 F. Supp. 3d 1277, 1283 (N.D. Ga. 2025) (citing *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020)).

The Court is once again not compelled by the Government's position. First, the Government has maintained that the policies for which Venegas seeks relief do not exist. It defies reason then, that enjoining those polices would "curtail" anything. Second, as explained above, the policies at issue or not likely lawful, and therefore, enjoining them cannot "hinder lawful investigative searches". They might "chill routine field operations", but then again, if such operations are unlawful, "neither the government nor the public has any legitimate interest" in enforcement of a policy that is unlawful. *See Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020).

**D. Remedies**

In light of the likely illegality of the three policies at issue here, Venegas requests this Court either enter a Preliminary injunction or temporarily set aside the challenged policies pursuant to 5 U.S.C. § 705. (Doc. 30-1; Doc. 48). Section 705 permits the Court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The standard for a stay under Section 705 is "the same" as the standard for a preliminary injunction. *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

The Court has considered the implication of both remedies and determined the best course of action is to temporarily stay the policies. Although this Court has found that Venegas

is likely to succeed on the merits, it also recognizes that "[a]n injunction is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165, 130 S.Ct. 2743, 177 L.Ed.2d 461 (2010). In the Court's opinion, staying the likely unlawful policies is a less drastic remedy sufficient to redress Plaintiff's alleged injury. *See e.g., Kidd v. Mayorkas*, 734 F.Supp.3d 967, 987 (S.D. Cal. May 15, 2024) ("the Court finds the less drastic remedy of vacatur to be sufficient to redress the "Knock and Talk" Class's injury"). Accordingly, the Court will temporarily stay the (1) Warrantless Entry Policy (permitting immigration officers to raid private construction sites without a warrant or consent), (2) Preemptive Detention Policy (permitting immigration officers to preemptively detain employees without a particularized suspicion that persons are illegal immigrants), and (3) Continued Detention Policy (permitting immigration officers to continue detaining workers even after they show evidence of citizenship or lawful presence.

**IV. Conclusion**

After careful review of the relevant filings and for the reasons set forth above, Plaintiff's motion (Doc. 30) is GRANTED to the extent that the alleged policies will be temporarily stayed and otherwise, DENIED.

**DONE and ORDERED** this 21st day of September, 2026.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE