# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF ALABAMA
# MOBILE DIVISION

LEONARDO GARCIA VENEGAS,

*Plaintiff,*

v.

TOM HOMAN, White House Border Czar, in his official capacity;

U.S. DEPARTMENT OF HOMELAND SECURITY;

U.S. DEPARTMENT OF JUSTICE;

MARKWAYNE MULLIN, Secretary of the DHS, in his official capacity

TODD BLANCHE, Attorney General, in his official capacity;

STEVE SCHRANK, Special Agent in Charge of HSI's Atlanta Field Office, in his official capacity;

SARA JONES, Special Agent in Charge of FBI's Mobile Office, in her official capacity;

BRIAN ACUNA, Acting Director of ICE's New Orleans Field Office, in his official capacity;

ADAM M. CALDERON, Chief Patrol Agent for CBP's New Orleans Sector, in his official capacity;

Civil Case No. 1:25-cv-397-JB-N

**FIRST AMENDED CLASS ACTION COMPLAINT**

JAMEY VANVLIET, Special Agent in Charge of ATF's Nashville Field Division, in his official capacity;

MARK F. SLOKE, U.S. Marshal for the Southern District of Alabama, in his official capacity;

KENT BLACKLIDGE, HSI Special Agent, in his individual capacity;

JOSHUA WOODRUFF, HSI Special Agent, in his individual capacity;

BENJAMIN PRATER, ERO Deportation Officer, in his individual capacity;

TWO UNKNOWN FEDERAL IMMIGRATION ENFORCEMENT OFFICERS;

THE UNITED STATES OF AMERICA;

*Defendants.*

## TABLE OF CONTENTS


Page

INTRODUCTION ..... 3

JURISDICTION AND VENUE ..... 5

PARTIES ..... 6

BACKGROUND ..... 10

I. Leo, a U.S. Citizen, Was Arrested While Working on Private Property ..... 10

A. Leo's Work Building Homes in Baldwin County ..... 10

B. Immigration Officers Raided One of Leo's Worksites ..... 15

C. After Preemptively Detaining Leo, Immigration Officers Rejected Leo's Proof of Citizenship. ..... 18

D. Immigration Officers Raided Another One of Leo's Worksites ..... 21

E. After Preemptively Detaining Leo, Immigration Officers Rejected Leo's Proof of Citizenship Once Again ..... 24

II. The Doe Defendants Detained Leo Pursuant to Unlawful Policies ..... 25

A. DHS Adopted the Challenged Policies to Further the Administration's Directive to Increase Immigration Enforcement ..... 27

1. Turning Federal Law Enforcement into Immigration Enforcement ..... 28

2. Prioritizing Workplace Raids ..... 30

3. Prioritizing Random Arrests Over Targeted Enforcement ..... 30

B. DHS Disregards Legal Restraints on Immigration Officers' Authority in Order to Increase Arrests. ..... 32

C. The "Gulf of America Task Force" Enforces DHS's Policy in this District ..... 32

D. Defendants Target the Construction Industry in this District ..... 33

1. The Warrantless-Entry Policy Authorizes Immigration Officers to Raid Private Construction Sites Without Warrants ........ 35

2. The Preemptive-Detention Policy Authorizes Immigration Officers to Preemptively Detain Any Construction Workers ........ 36

3. The Continued-Detention Policy Authorizes Immigration Officers to Continue Detaining Workers After They Provide Evidence of Legal Status ........ 39

E. The Challenged Policies Are Regularly Causing the Wrongful Detentions and Arrests of U.S. Citizens and Legal Residents ........ 41

III. CLASS ALLEGATIONS ........ 46

IV. INJURY TO PLAINTIFF ........ 53

V. CLAIMS FOR RELIEF ........ 54

PRAYER FOR RELIEF ........ 86

## INTRODUCTION

1. Leonardo Garcia Venegas is an American citizen and construction worker who lives and works in Baldwin County, Alabama. Twice in the past few months, federal immigration officers have raided the non-public areas of private construction sites in this District, without a warrant, and detained Leo simply for being at work. Both times, Leo told the officers he was a citizen and showed them his REAL ID, an identification card issued only to citizens and lawful residents. But the officers still wouldn't let him go.

2. The unlawful raids and detentions that Leo experienced were no accident. The officers were enforcing three policies adopted by the Department of Homeland Security that grant federal immigration officers sweeping search and seizure powers that violate the Fourth Amendment and exceed officers' statutory and regulatory powers. The policies authorize immigration officers to (1) raid the non-public areas of private construction sites without consent or a warrant, (2) preemptively detain workers on those sites without reasonable suspicion that they are undocumented, and (3) continue detaining those workers even after they have produced evidence of their citizenship or lawful presence.

3. Armed with these broad powers, immigration officers are conducting dragnet raids on construction sites in this District. The officers rarely (if ever) have reasonable suspicion to suspect that the people working on or managing a particular construction site are violating immigration laws. Instead, DHS authorizes these armed raids based on the general assumption that certain groups of people in the industry, including Latinos, are likely illegal immigrants. DHS applies this presumption despite the

fact that the overwhelming number of construction workers are citizens or legal residents.

4. Once immigration officers are on a site, they preemptively seize everybody they think *looks* undocumented. And they detain these workers indefinitely—even those who have a REAL ID—until the officers eventually check the legal status of the people they've detained. Sometimes it takes 20 minutes; sometimes it takes days.

5. As Leo's experience shows, these unlawful policies have real consequences for innocent, hardworking Americans. Leo was born in this country. Construction work is his career—it's how he supports himself as he pursues the American Dream. And when he goes to work on private property, Leo expects the freedom, as an American, to work in peace. Yet, twice, Leo got the opposite: Immigration officers, wielding an overly broad grant of authority but no warrant, raided the private construction sites where Leo was working and rounded up all the workers who looked Latino—even citizens, like Leo, who had done nothing wrong. Leo deserves better. And under the Fourth Amendment and federal laws that constrain immigration enforcement, he is entitled to better.

6. The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. Immigration officers need a warrant, consent, or an emergency to enter the non-public areas of private construction sites (*e.g.*, areas posted with No Trespassing signs, fenced in, or enclosed). And they must have an objective factual basis for suspecting that the particular workers on *that* site are violating immigration laws. They can't just run onto private property and seize everyone because they work in the construction industry and fit a generalized profile. And when someone they've seized produces evidence of their citizenship or other lawful status—like a REAL ID—the officers

must let them go.

7. These Fourth Amendment principles are bolstered by federal laws and regulations that restrict immigration officers' powers. Among other limitations, officers can't enter the non-public areas of business property to question workers about their immigration status without consent or a warrant. 8 C.F.R. § 287.8(f)(2). They can't detain workers without reasonable suspicion that they are violating the law. *Id.* § 287.8(b)(2). And they can't arrest workers without a warrant unless they have probable cause to believe an individual is violating immigration laws and likely to escape before officers can obtain a warrant. *Id.* § 287.8(c)(2); 8 U.S.C. § 1357(c).

8. Because the policies challenged in this Complaint are unlawful, this Court must vacate them under the Administrative Procedure Act. Additionally, Leo asks this Court to enjoin enforcement of the challenged policies against both himself and all those who stand in his shoes—three putative classes of construction workers who, like Leo, are U.S. citizens or otherwise lawfully present. Finally, Leo seeks damages for the tortious and unconstitutional searches and seizures he suffered.

**JURISDICTION & VENUE**

9. This Court has jurisdiction over this suit pursuant to 5 U.S.C. § 702 and 28 U.S.C. §§ 1331, 1346, 1367.

10. This Court has authority to grant relief under 5 U.S.C. § 706, 28 U.S.C. § 1331 and §§ 1346, 2674 *et seq*., and its inherent powers.

11. Venue is proper in the Southern District of Alabama under 28 U.S.C. §§ 1391 and 1402.

## PARTIES

12. Plaintiff Leonardo ("Leo") Garcia Venegas was born in 1999 in Lehigh Acres, Florida. He is a natural-born United States citizen with Mexican heritage. When Leo was 14, he moved with his family to Robertsdale, Alabama, where he has lived ever since. Since graduating from Robertsdale High School in 2018, Leo has worked in construction, mainly as a bricklayer, as a mason, and now as a concrete finisher. Because of Defendants' unlawful policies, Leo has experienced two warrantless raids while working on privately marked or enclosed construction sites. Both times, immigration officers preemptively detained Leo without any particularized basis to suspect he was undocumented—and then *continued* to detain him even after he showed his REAL ID. Because Defendants continue to enforce the policies that caused these abuses, Leo risks enduring another unlawful raid and detention every day he goes to work.

13. Defendant Tom Homan is the White House Border Czar. President Trump announced that Homan is "in charge of all Deportation of Illegal Aliens back to their Country of Origin."[1] In that role, Homan is responsible for overseeing the promulgation and enforcement of immigration-enforcement policies nationwide, including the policies challenged in this case. He is sued in his official capacity.

14. Defendant United States Department of Homeland Security ("DHS") is a cabinet-level agency of the United States. DHS's functions include, among other things, immigration enforcement and border patrol. The agency oversees over 20 subagencies,

---

[1] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 10, 2024, 11:23 p.m.), https://truthsocial.com/@realDonaldTrump/posts/113462412414821782.

including Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO"), Homeland Security Investigations ("HSI"), and Customs & Border Protection ("CBP"). DHS promulgated and enforces the unlawful policies challenged in this case. DHS also formed the Gulf of America Task Force, along with several of its subagencies (ICE, ERO, HSI, and CBP), to aggressively enforce the unlawful policies challenged in this case, including against Leo.

15. Defendant United States Department of Justice ("DOJ") is a cabinet-level agency of the United States. DOJ includes several law-enforcement agencies, including the Federal Bureau of Investigation ("FBI"), United States Marshals Service ("USMS"), and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). DOJ has authority to enforce immigration laws, and it has partnered with its own subagencies (FBI, USMS, and ATF), DHS, and DHS's subagencies to form the Gulf of America Task Force and enforce the unlawful policies challenged in this case, including against Leo.

16. Defendant Markwayne Mullin is Secretary of the DHS. The Secretary of Homeland Security is charged with the administration and enforcement of immigration laws. He is authorized by law to establish immigration-enforcement policies and has control, direction, and supervision over all immigration officers. Additionally, he is authorized by law to confer or impose DHS's immigration-enforcement authority on any employee of the United States. Secretary Mullin is responsible for the promulgation and enforcement of the challenged policies by DHS, its subagencies, and all the officers from other agencies that he has deputized as immigration officers. He is sued in his official capacity.

17. Defendant Todd Blanche is the United States Attorney General. In that capacity, he has authority over the direction and operation of all DOJ's functions, including its law-enforcement agencies and their enforcement of the unlawful policies challenged in this case. He is sued in his official capacity.

18. Defendant Steve Schrank is Special Agent in Charge of the HSI Atlanta Field Office. In that role, he has authority over HSI officers in Alabama, including those who participate in the Gulf of America Homeland Security Taskforce and enforce the unlawful policies challenged in this case. He is sued in his official capacity.

19. Defendant Sara Jones is Special Agent in Charge of the FBI's Mobile Office. In that capacity, she has authority over the FBI agents in this District, including those who participate in the Gulf of America Homeland Security Taskforce and enforce the unlawful policies challenged in this case. She is sued in her official capacity.

20. Defendant Brian Acuna is the Acting New Orleans ICE Field Office Director. In that role, he has authority over ICE's officers in Alabama, including those who participate in the Gulf of America Homeland Security Taskforce and enforce the unlawful policies challenged in this case. He is sued in his official capacity.

21. Defendant Adam M. Calderon is the Chief Patrol Agent for CBP's New Orleans Sector. In that capacity, he has authority over CBP enforcement officers in Alabama, including those who participate in the Gulf of America Homeland Security Taskforce and enforce the unlawful policies challenged in this case. He is sued in his official capacity.

22. Jamey VanVliet is the Special Agent in Charge of ATF's Nashville Field

Division. In that capacity, he has authority over ATF agents in Alabama, including those who participate in the Gulf of America Homeland Security Taskforce and enforce the unlawful policies challenged in this case. He is sued in his official capacity.

23. Mark F. Sloke is the U.S. Marshal for the Southern District of Alabama. In that capacity, he has authority over the deputy marshals in this District, including those who participate in the Gulf of America Homeland Security Taskforce and enforce the unlawful policies challenged in this case. He is sued in his official capacity.

24. Kent Blacklidge was a Special Agent at Homeland Security Investigations at the time of the actions giving rise to this lawsuit. In that capacity, he participated in the illegal detention of Leo on May 21, 2025. He is sued in his individual capacity.

25. Joshua Woodruff was a Special Agent at Homeland Security Investigations at the time of the actions giving rise to this lawsuit. In that capacity, he participated in the illegal detention of Leo on May 21, 2025. He is sued in his individual capacity.

26. Benjamin Prater was a Deportation Officer with ICE's Enforcement and Removal Division at the time of the actions giving rise to this lawsuit. In that capacity, he participated in the illegal detention of Leo on May 21, 2025. He is sued in his individual capacity.

27. Defendants Two Unknown Federal Immigration Enforcement Officers (Officers Doe 4 and 5) are—or, at least at the time, were—immigration officers who committed the raids, detentions, arrests, assaults, batteries, and false imprisonments Leo suffered during the events on June 12, 2025, described in this complaint. These officers are sued in their individual capacities.

28. Defendant the United States of America is the government of the United States.

**BACKGROUND**

**I. LEO, A U.S. CITIZEN, WAS ARRESTED WHILE WORKING ON PRIVATE PROPERTY**

29. Leo Garcia Venegas is a United States citizen of Mexican descent who works in the construction industry in Baldwin County, Alabama.

30. Leo was born in 1999 in Lehigh Acres, Florida. His parents are Mexican nationals who were living in the country at the time of Leo's birth but have since returned to Mexico.

31. When Leo was 14 years old, he moved to Robertsdale, Alabama, where he attended Robertsdale High School. Robertsdale has been his home ever since.

**A. Leo's Work Building Homes in Baldwin County**

32. Leo has worked in the construction industry in Baldwin County for about eight years. He has mainly done bricklaying, masonry, and concrete finishing.

33. Baldwin County, situated between Mobile and Pensacola, is part of the sixth fastest-growing metro area in the country.

34. Population growth requires new housing. To meet the fast-growing demand for new housing throughout this District, homebuilders are constructing dozens of new subdivisions and new schools, and thousands of new homes, per year to accommodate the families who move into those homes.

35. Much of the development throughout this District is in new residential subdivisions owned by large builders like D.R. Horton, DSLD Homes, and Lennar.

36. The construction in these new subdivisions, however, is largely done by private contractors (and subcontractors) who employ local construction workers.

37. Immigration officers have raided construction sites—including areas of those sites that are posted with No Trespassing signs or enclosed with fences or structures—owned by all three developers. On information and belief, the officers do not obtain a warrant or any developer's, supervisor's, employee's, or contractor's consent for the raids. These warrantless, nonconsensual raids are regular and ongoing.

38. Leo works as a contractor for Southern Home Crafters, LLC.

39. He typically helps build homes in subdivisions owned by D.R. Horton and Lennar.

40. On these sites, Leo actively works on private property that is not open to the public.

41. These construction sites are dangerous to people without proper equipment, without proper training, or who do not understand what construction work involves. As a result, members of the public generally understand that they do not have a license to, and should not, enter private construction sites without permission. Construction workers, in turn, typically expect and exert control over sites on which they are actively working (including control over who enters them).

42. Put differently, no reasonable member of the public would enter a private construction site without permission, and no reasonable construction worker would allow such intrusions while they are actively working.

43. Workers on sites owned by Lennar and DSLD Homes post each lot with

No Trespassing signs informing the public that the construction site is closed to the public:




44. And most sites—including many owned by D.R. Horton—are enclosed by perimeter fencing, often black fencing (designed to go up as fast as possible).





45. By law, it is a crime for members of the public to enter these sites without permission. *See* Ala. Code § 13A-7-1(3), 13A-7-4(a).

46. Workers also leave tools and heavy equipment on sites overnight based on

their understanding that the sites are closed to the public.

47. Leo understands that neither the owner of these subdivisions nor his employer would want unauthorized intruders on the construction sites.

48. Leo expects that only the owner, developer, their agents, employees, or contractors, or other authorized personnel or visitors will enter an active construction site.

49. Although the owner could always enter the site, Leo and his crew typically have exclusive possession, which the owner does not regain from Leo and his crew until the work is done.

50. If people were to enter the construction sites on which Leo is working without permission, Leo personally would suffer several harms, including distraction from his work, reduced work quality, increased risk of injury, and even firing and potential legal liability for any injuries that occur.

51. Leo, his crew, and their supervisors have a right to exclude anyone who enters their construction site without permission.

52. This expectation derives from the nature of the work, safety concerns, Leo's experience in the industry, and his communications with his crew and his supervisors.

53. Leo and his crew have possession of the property during their work.

54. Leo's work constructing houses on these properties is an act of dominion or control that suits the nature of the property.

55. Leo and his crew remain on site continuously until their work is done each day—especially in Leo's work, which deals with wet concrete.

56. While on a construction site, Leo typically works on a team of five concrete

specialists.

57. The new developments and sites where Leo works typically include around seven other teams, each consisting of about five workers. Those other teams do things like framing, plumbing, electric, drywall, roofing, siding, and landscaping.

58. Workers move between different subdivisions from day to day and week to week as their portion of the work is completed or while waiting for another team to finish its portion.

59. Thus, Leo rarely works in a fixed location for more than a few days; his work brings him to different construction sites across Baldwin County, with different owners, staffed by different contractors.

60. Given the nature of the work, it would be very difficult for immigration officers to know who is going to be working on what site on any given day, without conducting an investigation beforehand.

61. But under the challenged policies, DHS has dispensed with those investigations. Instead, immigration officers go on patrols to find and raid construction without prior knowledge of who will be there. Once on site, they look for workers who fit a general description that DHS associates with undocumented workers.

62. Leo is aware of at least 15 raids—not including the raids he experienced—of private construction sites in Baldwin County since January 2025.

63. On information and belief, those 15 raids—just like the raids Leo personally experienced—were both warrantless and suspicionless.

64. In a span of just over three weeks across May and June 2025, Leo

experienced two raids on private construction sites where he was working—one on a site owned by D.R. Horton and the other on a site owned by Lennar.

65. Both times that Leo's worksite has been raided, immigration officers entered the property without a warrant and detained Leo just for showing up to work and trying to earn an honest living.

**B. Immigration Officers Raided One of Leo's Worksites**

66. The immigration officers raided the construction site where Leo was working on May 21, 2025.

67. Around 7:00 a.m. on the morning of May 21, Leo showed up to lay the foundation of the first four homes in a new residential subdivision in Foley, Alabama.

68. The property was posted with a No Trespassing sign and closed to the public by a black fence around the perimeter.

69. The concrete crew consisted of five workers, including Leo, all of whom were Latino.

70. There was also a crew of non-Latino workers (two White, two Black) who were delivering concrete to the site.

71. It began to rain, so Leo left the jobsite to go get plastic to cover the freshly poured concrete.

72. When Leo walked back onto the site around 8:00 a.m., he saw five armed men in camouflage—three of whom were masked—jumping over the short fence at the property line and running past the No Trespassing sign, toward his coworkers.

73. On information and belief, the officers had not investigated this particular

construction site prior to the raid; they did not have a warrant; they did not know which employers or contractors would have workers present; and they did not have any particularized suspicion that the workers on this specific site were working unlawfully before raiding the property. The officers simply ran onto the site in a general search for anybody who might be undocumented.

74. The officers ran right past the white and black workers without detaining them and went straight for the Latino workers.

75. Three members of Leo's crew ran at the sight of armed men running toward them, and two officers gave chase.

76. A fourth member of the crew, Leo's brother, did not move; he stood on the freshly poured foundation for a home's garage.

77. Two officers approached Leo's brother, and he asked them why they were on the property and whether they had a warrant.

78. The officers, without answering Leo's brother's questions or asking any of their own, grabbed Leo's brother by the hand and shoulder and pulled him to the ground.

79. When Leo saw the officers physically assault his brother without a warning or explanation, Leo dropped the plastic he was carrying, took out his cell phone, and began to record as he walked toward his brother.

80. As Leo slowly approached, walking on the wire mesh where his colleagues had just begun to spread concrete, an armed and masked officer stepped into Leo's path.

81. Leo got about 25 feet away from where immigration officers were assaulting and detaining his brother when HSI Special Agent Kent Blacklidge cut off Leo's path.

82. Leo asked, "Immigration?," and Special Agent Blacklidge replied, "Yes, immigration."

83. Leo diverted his path slightly and continued walking calmly in a perimeter around his brother's arrest (still at a significant distance) with his cell phone out recording. He did not pick up his pace or make any suspicious movements.

84. Special Agent Blacklidge followed Leo but didn't ask any questions; he simply warned, "You're making this more complicated than you want to."

85. Leo continued walking, but Special Agent Blacklidge suddenly sped up and grabbed Leo by the arm, causing Leo to exclaim, "Don't touch me! I'm a citizen!"

86. Without asking any questions, Special Agent Blacklidge forced Leo's arm behind his back and began to push him to the ground.

87. Leo yelled out, "Help!"

88. As Special Agent Blacklidge wrestled Leo to the ground, Leo said, "I'll show you my papers now."

89. The non-Latino members of Leo's crew (none of whom any officers ever approached) looked on and yelled, "That's illegal!" "You're not supposed to be doing that!" "He's a citizen!" "He's not even doing nothing wrong—what the fuck?"

90. Leo continued to repeat, "I'm a citizen! Stop! I'll show you my papers now!"

91. Then a second officer, HSI Special Agent Joshua Woodruff, rushed over and helped tackle Leo, as one of the two officers shouted, "Get of the fucking ground!"

92. A third officer, ERO Deportation Officer Benjamin Prater, rushed past the property's No Trespassing sign and grabbed Leo, helping to physically restrain his

movement.

93. From the ground, Leo continued to yell, "I'm a citizen! I'm a citizen! I'm a citizen!"

94. Despite Leo telling the officers, in English, that he was a citizen, the three officers detained Leo based on their generalized presumption that Latino construction workers are undocumented.

### C. After Preemptively Detaining Leo, Immigration Officers Rejected Leo's Proof of Citizenship

95. While the three officers held Leo on the ground, Special Agent Blacklidge reached into Leo's pocket to search for his identification.

96. Leo had his active, valid driver's license, an Alabama STAR ID (compliant with the REAL ID Act of 2005) issued in 2023, in his pocket.

97. Alabama issues driver's licenses only to people who are citizens or lawfully present in the country. *See* Ala. Code §§ 31-13-3(10), 31-13-29(c)(1), (g) (providing that, to obtain or renew a driver's license, a person is "required to demonstrate his or her United States citizenship . . . or his or her lawful presence in the United States").

98. Alabama adopted this law "to discourage illegal immigration within the state and maximize enforcement of federal immigration laws through cooperation with federal authorities." *United States v. Alabama*, 691 F.3d 1269, 1276 (11th Cir. 2012).

99. Alabama's identification law was adopted as part of a package of laws that

constituted some of the strictest anti-illegal immigrant measures in the country.[2]

100. Moreover, the REAL ID Act "provides that the federal government will not accept a state-issued driver's license or identification card unless the state verified the citizenship or immigration status of the applicant before issuing the document." *Alabama*, 691 F.3d at 1299 (citing Pub. L. No. 109-13, § 202(c)(2)(B), 119 Stat. at 313).

101. So, to get the Star on his license, Leo had to (and in fact did) provide the government with documents to verify his identity, date of birth, and Social Security Number to prove his citizenship.

102. DHS certifies that REAL IDs, including Alabama STAR IDs, satisfy the REAL ID Act. *See* 6 C.F.R. § 37.3.

103. So, by showing the immigration officers his Alabama STAR ID, Leo provided the officers with presumptive proof of his citizenship or lawful presence. *E.g.*, Ala. Code § 31-13-3(10) (recognizing that presumption).

104. Nevertheless, the officers who detained Leo refused to accept Leo's STAR ID as presumptive proof of citizenship or lawful status.

105. The officers told Leo that his STAR ID was fake, handcuffed him, removed him from his jobsite, and Special Agent Blacklidge led Leo to an unmarked car.

106. The officers held Leo, handcuffed, near the back of their vehicle for over an hour. They kept ignoring Leo's pleas that he was a citizen. The handcuffs were tight and painful, and Leo stood the entire time in the hot Alabama sun.

[2] *See, e.g.*, Richard Fausset, *Alabama enacts anti-illegal-immigration law described as nation's strictest*, L.A. Times (June 10, 2011), https://shorturl.at/mFhRA (reporting that "Alabama set a new standard for get-tough immigration policy").

107. While Leo stood there under arrest, he continued to tell the officers he was a citizen and pleaded with them to check his Social Security Number.

108. One of the officers finally relented, made a phone call, and confirmed that Leo's Social Security Number was valid.

109. The officers removed Leo's handcuffs and let him walk back to work.

110. All told, Leo's wrongful arrest lasted over an hour.

111. Leo was not charged with a crime because he had not done anything wrong.

112. The officers never had any valid reason to believe Leo had done anything wrong; they had no individualized suspicion before arresting him and did not ask Leo any questions to test their generalized profile.

113. On information and belief, the officers had no particularized reason to suspect that the subcontractors who would be staffing that Lennar subdivision in Foley, Alabama, on May 21, 2025, were undocumented.

114. The officers simply showed up at a construction site, jumped the black fencing, ran past the No Trespassing sign, and arrested Leo because he looks Latino and works in the construction industry.

115. Under DHS's challenged policies, immigration officers are authorized to presume that construction workers on private property are undocumented based only on their demographic profile and occupation, and can disregard evidence to the contrary—like Leo's telling them he's a citizen and presenting a REAL ID.[3]

[3] Nick Miroff, *How Do You Prove Your Citizenship? ICE Won't Say*, The Atlantic (Sept. 12, 2025), https://www.theatlantic.com/politics/archive/2025/09/ice-papers-proof-immigration-status-kavanaugh/684183/.

116. Leo had to take nearly two weeks off from work to recover emotionally after his first arrest, at a significant financial cost.

117. Leo felt dreadful after his arrest—not only because it happened once but because he knew it could happen again.

118. Then, it happened again.

### D. Immigration Officers Raided Another One of Leo's Worksites

119. Just about two weeks after Leo apprehensively went back to work, he was arrested again on another private construction site when another immigration patrol saw him working and assumed, without reasonable suspicion, that Leo was undocumented.

120. The second arrest was on June 12, 2025, at a partially built development in Fairhope, Alabama.

121. Leo was still working for Southern Home Crafters, LLC. This job, however, was in a new residential subdivision owned by D.R. Horton.

122. Leo was working alone *inside* a partially constructed home.

123. The property was surrounded by a black perimeter fence, behind which a contractor was storing pallets full of bricks for siding and other building materials.

124. The structure of the home was also already complete.

125. The home had its walls, roof, windows, and some doors (but no garage

doors, siding, or yard).



126. Leo was alone inside the house as he finished up his team's work while the rest of his crew moved on to another construction site.

127. While Leo was working inside this house, he was in exclusive possession of the site and had the right to exclude any unauthorized intruders.

128. There were other construction crews working down the road in the same development, though the closest was about eight houses away.

129. Around 8:20 a.m., Leo was working alone in a back bedroom with his headphones in, listening to music.

130. Suddenly, Leo got the sense that somebody else was in the room watching him from behind.

131. Leo was not expecting anyone to be in the house because he was in a closed structure on private property. Nor was anyone but other construction workers authorized to be on the property—let alone inside the house.

132. The officers had spotted Leo working through the bedroom window, thought he fit DHS's generalized profile of an undocumented worker, and Officer Doe 4 entered the home through an unlocked door.

133. On information and belief, the officers did not have a warrant or consent to enter the home; they did not know which contracting firm was staffing that home's construction on June 12, 2025; they did not know who they might find inside the home; they had no particular reason to suspect any workers inside were undocumented. They did not know who Leo was and had no reason to suspect he had done anything wrong.

134. Feeling someone's presence from behind, Leo turned around and saw Officer Doe 4 standing in the doorway of the bedroom.

135. Officer Doe 4 was armed and masked.

136. Leo took out his headphones and asked, "Why are you here?"

137. Officer Doe 4 responded in Spanish, instructing Leo to follow him outside.

138. Leo told Officer Doe 4 he was a citizen, but the officer insisted Leo exit the house anyway.

139. Leo turned back toward the bedroom and saw another immigration officer, Officer Doe 5, standing about five feet behind him, outside the room's open window.



140. With one officer blocking the bedroom doorway and another standing at the window, Leo was surrounded.

141. Officer Doe 4 again ordered Leo outside.

142. Cornered and understanding that he had no choice but to obey, Leo followed Officer Doe 4 outside to the back patio.

**E. After Preemptively Detaining Leo, Immigration Officers Rejected Leo's Proof of Citizenship Once Again**

143. Outside, Officer Doe 4 told Leo that they were there to check his immigration status.

144. Leo reiterated that he was a citizen. He took out his REAL ID and gave it to the officer.

145. But, once again, Leo's REAL ID was not enough to overcome the generalized profile that DHS policy creates for people who share Leo's demographics and occupation:

The officers told Leo that his ID could be fake and ordered him to follow them to their vehicle so that they could verify his immigration status.

146. Nothing about Leo's ID suggested that it could be fake.

147. The officers then led Leo to the edge of the development, at least 12 lots away, where they'd left their car.

148. As the officers led Leo away, one armed officer walked in front of Leo while the other armed officer walked behind him to make sure that Leo could not leave.

149. Leo understood that he was not free to leave.

150. Once they reached the immigration officers' unmarked vehicle, the officers slowly checked Leo's legal status.

151. In the meantime, other officers arrived with workers they had detained from the other crews in the development.

152. At least two of those detained workers also had lawful status.

153. The officers eventually confirmed what Leo had told them all along: He's a U.S. citizen.

154. The officers released Leo along with two more workers with lawful status whom they had unlawfully detained.

155. Leo's second detention lasted somewhere between 20 and 30 minutes.

## II. THE DOE DEFENDANTS DETAINED LEO PURSUANT TO UNLAWFUL POLICIES

156. Both times immigration officers entered Leo's worksite without a warrant, seized him, and refused to accept his REAL ID as presumptive evidence of legal status, the officers were acting pursuant to three final DHS policies.

157. DHS has adopted—and immigration officers are enforcing—three search-and-seizure policies for construction sites that exceed the agencies' and officers' constitutional, statutory, and regulatory authority.

158. ***Warrantless Entry Policy.*** DHS has authorized immigration officers to raid private construction sites without a warrant or consent. The policy allows warrantless, nonconsensual entry even when sites are posted with No Trespassing signs, fenced in, enclosed, or otherwise exclude the public.

159. ***Preemptive Detention Policy.*** Once on private construction sites, DHS has authorized immigration officers to preemptively detain anyone they think *looks* undocumented—without any particularized suspicion that the employers staffing the site have hired undocumented workers or that the workers are illegal immigrants—based only on a generalized demographic profile, even though many who meet that profile (like Leo) are doing nothing wrong. This is not a policy of *bona fide* investigative detentions; instead, it grants officers the power to round up all the construction workers who fit the target profile—without asking questions—and to detain them until the workers can affirmatively prove their legal status.

160. ***Continued Detention Policy.*** During these detentions, DHS has authorized immigration officers to *continue* detaining workers *even after* they show evidence of citizenship or lawful presence. Even an Alabama STAR ID—a document that Alabama issues only to citizens and lawful residents and that DHS certifies complies with the federal REAL ID Act—is not enough to overcome the weight DHS affords its generalized profile of undocumented construction workers.

161. On information and belief, these policies are memorialized in a written policy directive, as immigration officers deputized from a wide range of federal agencies with a wide range of training and experience are all executing the same policies.

162. Alternatively, DHS has adopted an unwritten policy instructing immigration officers to act in the manner described in ¶¶ 155–157. That unwritten policy is still subject to APA review.

### A. DHS Adopted the Challenged Policies to Further the Administration's Directive to Increase Immigration Enforcement

163. DHS adopted the three challenged policies as part of a broader directive from the White House and Border Czar Homan to increase immigration arrests and removals by raiding workplaces based on which industries tend to employ undocumented workers rather than a prior investigation to identify whether there's any reason to suspect that employees on a particular worksite are undocumented.

164. These directives are aimed at increasing the number of undocumented people arrested and removed from several hundred a day to at least 3,000 per day.

165. The administration's stated goal is to deport one million people per year, which requires 2,739 arrests per day, not counting the citizens and other lawful residents who are mistakenly arrested.[4]

166. The 3,000-arrests-per-day quota is the "minimum" goal.[5]

167. "Arresting, you know, several hundred a day isn't enough. So yeah, we gotta

[4] Brittany Gibson & Stef W. Kight, *Scoop: Stephen Miller, Noem tell ICE to supercharge immigration raids* (May 28, 2025), https://www.axios.com/2025/05/28/immigration-ice-deportations-stephen-miller.
[5] *Id.*

vastly increase that," confirmed Border Czar Homan.[6]

168. The administration's directive to Secretary Noem and ICE's leadership was clear: "do what you need to do" to increase deportation numbers. The administration encouraged immigration officers to "push the envelope" and turn the "creativity knob up to 11"; "[i]f it involves handcuffs on wrists, it's probably worth pursuing."[7]

169. To meet the 3,000-daily-arrest quota, the administration has taken several steps that inform the policies challenged here, including: (1) increasing the number of immigration officers, in part by deputizing law-enforcement officers from other agencies; (2) increasing workplace enforcement; and (3) targeting people who work in certain industries and fit a generalized demographic profile rather than conducting targeted investigations to find people who might be violating immigration laws.

**1. Turning Federal Law Enforcement into Immigration Enforcement**

170. On inauguration day, President Trump signed Executive Order 14159 ("Protecting the American People Against Invasion"), which instructs the Attorney General, DHS, ICE, CBP, U.S. Citizenship and Immigration Services (CIS), and HSI to prioritize immigration arrests and deportations and for the Attorney General and Secretary of Homeland Security to jointly establish Homeland Security Task Forces nationwide.

---

[6] Cam Smith, *Vt. Officials respond to Trump administration's 'sanctuary city' threats*, WCAX3 (May 30, 2025), https://www.wcax.com/2025/05/30/vt-officials-respond-trump-administrations-sanctuary-city-threats/; Transcript of interview with White House Border Czar Tom Homan, *State of the Union*, CNN (aired July 13, 2025), https://transcripts.cnn.com/show/sotu/date/2025-07-13/segment/01.

[7] Elizabeth Findell, *et al.*, *The White House Marching Orders That Sparked the L.A. Migrant Crackdown*, Wall St. J. (June 9, 2025), https://www.wsj.com/us-news/protests-los-angeles-immigrants-trump-f5089877.

171. Executive Order 14159 also instructs the Secretary of Homeland Security to (1) make HSI's "primary mission" enforcement and removal and (2) take all appropriate action to enable the Director of ICE, the Commissioner of CBP, and the Director of CIS to set priorities that ensure enforcement and removal.

172. The Secretary of Homeland Security has statutory authority to "confer or impose" on any federal employee the power to investigate and arrest illegal immigrants. *See* 8 U.S.C. § 1103(a).

173. On January 23, 2025, the Acting Secretary exercised that power to authorize DOJ law-enforcement officers working for USMS, DEA, ATF, and the Bureau of Prisons to serve as immigration officers.[8]

174. Weeks later, Secretary Noem began deputizing law-enforcement officers from other federal agencies to serve as immigration officers.[9]

175. By August 2025, over 14,500 federal law-enforcement officers, another 1,400 non-law-enforcement federal officers, and about 10,000 state and local law-enforcement officers are now deputized to serve as immigration officers.[10]

---

[8] Press Release, *Statement from a DHS Spokesperson on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials*, Dep't of Homeland Sec. (Jan. 23, 2025), https://www.dhs.gov/news/2025/01/23/statement-dhs-spokesperson-directive-expanding-immigration-law-enforcement.

[9] Press Release, *ICYMI: Secretary Noem Deputized State Department Officials as Immigration Officers*, Dep't of Homeland Sec. (Feb. 20, 2025), https://www.dhs.gov/news/2025/02/20/secretary-noem-deputized-state-department-officials-immigration-officers; Vittoria Elliot, *State Department Agents Are Now Working With ICE on Immigration*, WIRED (Sept. 4, 2025), https://www.wired.com/story/state-department-dss-agents-ice-immigration/

[10] David J. Bier, *ICE Has Diverted Over 25,000 Officers from Their Jobs*, Cato Inst. (Sept. 3, 2025), https://www.cato.org/blog/ice-has-diverted-over-25000-officers-their-jobs.

**2. Prioritizing Workplace Raids**

176. DHS has directed immigration officers to prioritize workplace raids in industries where illegal immigrants may work.[11]

177. Then-DHS Assistant Secretary Tricia McLaughlin emphasized in June that workplace raids would remain a priority: "The President has been incredibly clear. There will be no safe spaces for industries who harbor violent criminals or purposely try to undermine ICE's efforts. Worksite enforcement remains a cornerstone of our efforts to safeguard public safety, national security and economic stability."[12]

178. And Border Czar Homan confirmed the directive: "Worksite enforcement operations are going to massively expand."[13]

**3. Prioritizing Random Arrests Over Targeted Enforcement**

179. Until this year, immigration officers planning to search for and seize undocumented immigrants have had to submit a form to a supervisor identifying their target's name, appearance, known addresses, employment, immigration history, and criminal history.[14]

---

[11] Julia Ainsley et al., *A sweeping new ICE operation shows how Trump's focus on immigration is reshaping federal law enforcement*, NBC News (June 4, 2025), https://www.nbcnews.com/politics/justice-department/ice-operation-trump-focus-immigration-reshape-federal-law-enforcement-rcna193494.

[12] Yvette Fernandez, *DHS secretary issues statement saying there's no change in immigration crackdown*, Nev. Pub. Radio (June 18, 2025), https://www.kunc.org/2025-06-18/dhs-secretary-issues-statement-saying-theres-no-change-in-immigration-crackdown.

[13] Ben Smith, *Trump will target US employers in next phase of immigration crackdown, Homan says*, Semafor (June 12, 2025), https://www.semafor.com/article/06/12/2025/trump-will-target-us-employers-in-next-phase-of-immigration-crackdown-homan-says.

[14] Julia Ainsley et al., *Under Trump administration, ICE scraps paperwork officers once had to do before immigration arrests*, NBC News (Sept. 9, 2025),

180. But this year, DHS eliminated the policy that required immigration officers to identify their targets in advance.

181. The policy became useless, according to former immigration officials, because DHS no longer requires officers to know their targets before they go out to make arrests.[15]

182. Rather than relying on targeted investigations, Border Czar Homan and Secretary Noem have directed immigration officers to go on patrols to search for people who work in certain industries and fit a generalized demographic profile of an undocumented worker in that industry.

183. DHS has developed a general demographic profile of what undocumented people tend to look like in an industry or location.

184. A top CBP official, for instance, explained that officers are detaining people based on their "location" and "how they look."[16]

185. When searching worksites, immigration officers detain workers they think fit that profile, without any conversation, regardless of whether the person does anything to create any individualized suspicion.

---

https://www.nbcnews.com/politics/national-security/trump-administration-ice-scraps-paperwork-officers-immigration-arrests-rcna229407.

[15] *Id.*

[16] Chip Mitchell, *Feds march into Chicago; top border agent says people are arrested based on 'how they look,'* Chicago Sun Times (Sept. 28, 2025), https://chicago.suntimes.com/immigration/2025/09/28/ice-agents-spotted-downtown-on-michigan-avenue-along-chicago-river.

### B. DHS Disregards Legal Restraints on Immigration Officers' Authority in Order to Increase Arrests

186. The administration's directives have led DHS to adopt and implement enforcement policies for immigration officers that flout the constitutional, statutory, and regulatory limits on their authority.

187. The administration's position is that there are *no* legal restraints on its authority to enforce immigration laws. As White House Border Czar Homan put it: "President Trump doesn't have a limitation on his authority to make this country safe again. There is no limitation on that."[17]

188. This belief has trickled down to enforcement officers, as one was recorded telling a U.S. citizen, "You have no rights here; you're a migo, brother."[18]

### C. The "Gulf of America Task Force" Enforces DHS's Policy in this District

189. On March 6, DOJ issued a memorandum to all departments announcing the creation of "Operation Take Back America," which furthered the creation of the task forces that EO 14159 ordered.

---

[17] *Tom Homan Speaks to Reporters at White House, Afternoon*, C-SPAN (Aug. 13, 2025), at 7:50–8:06, *available at* https://www.c-span.org/program/white-house-event/tom-homan-speaks-to-reporters-at-white-house-afternoon/664264.

[18] Autumn Billings, *This U.S. Citizen Recorded an Immigration Arrest. Officers Told Him Told Him To Delete It Or Face Charges.*, Reason (July 29, 2025), https://reason.com/2025/07/29/this-u-s-citizen-recorded-an-immigration-arrest-officers-told-him-to-delete-it-or-face-charges/. In another incident caught on bodycamera footage, an immigration officer told a local officer, "They're [] all animals anyway. That's what I would tell my kids all the time." *See* Emily Kenny & Natalie Mooney, *'I'm sad and alone': Man detained in Cato ICE raid wrongfully deported and now separated from his family*, Spectrum News 1 (Sept. 25, 2025), https://spectrumlocalnews.com/nys/central-ny/news/2025/09/25/i-m-sad-and-alone---man-detained-in-cato-ice-raid-wrongfully-deported-and-now-separated-from-his-family-

190. DHS and DOJ formed a task force to implement and enforce the challenged policies in Alabama called the "Gulf of America Homeland Security Task Force."

191. DHS, ICE, ERO, HSI, CBP, FBI, ATF, and USMS all participate in the Gulf of America Task Force, alongside local law-enforcement agencies, as the task force enforces the challenged policies across Alabama.

**D. Defendants Target the Construction Industry in this District**

192. Construction is one industry that Defendant Agencies and the Gulf of America Task Force target for workplace raids in this District.

193. Immigration officers have raided the construction sites of two public schools—one in Bexley and one in Gulf Shores.

194. On information and belief, immigration officers did not have warrants or consent for either school construction raid.

195. The focus of the construction raids in this District, however, has been private residential developments.

196. Indeed, HSI Special Agent Schrank has publicly acknowledged that the Gulf of America Task Force is targeting residential construction in this District due to the region's rapid housing growth: "As we've seen significantly in Alabama, there's tremendous potential and utilization of illegal-alien workforces in development and construction, and with that growth has brought in a significant illegal-alien population to work those construction jobs and develop all of the housing that has been fueling some of

the growth."[19]

197. Other news stories confirm that the construction industry in Alabama has been targeted for immigration raids and that workers in the area—even those lawfully present—are scared to go to work due to fear of being arrested because they fit DHS's profile for undocumented workers.[20]

198. The FBI's Mobile Office has publicly touted around 30 raids since February 2025 by the agencies who now compose the Gulf of America Task Force, around 13 of which appear to have been raids targeting construction workers.

199. In addition to the two raids of construction sites where Leo was working (one a D.R. Horton development and one a Lennar development), Leo has learned of at least 15 other raids on residential developments in Baldwin County through his work in the industry.

200. At least four of these have been on developments owned by DLSD Homes.

201. News reports also show that the Gulf of America Task Force has raided residential construction sites in D.R. Horton developments in Daphne and Spanish Fort, Alabama.

202. On information and belief, these raids all follow a similar formula:

---

[19] *Homeland Security investigator talks about Baldwin County raids*, FOX10 News (June 12, 2025), *available at* https://www.youtube.com/watch?v=3RFJimsAlK4.

[20] Tim Reid, *This construction project was on time and on budget. Then came ICE.*, Reuters (July 28, 2025), https://www.reuters.com/world/us/this-construction-project-was-time-budget-then-came-ice-2025-07-28/; Mike Cason, *Alabama construction industry may face devastating worker shortage under Trump immigration crackdown*, AL.com (Sept. 21, 2025), https://www.al.com/news/2025/09/alabama-construction-industry-may-face-devastating-shortage-of-workers-under-trump-immigration-crackdown.html.

immigration officers enter private construction sites without a warrant or particularized suspicion and preemptively seize all workers who fit the target demographic profile, and they continue detaining those workers even when presented evidence of citizenship or other lawful status like a REAL ID.

203. DHS has adopted three policies that immigration officers apply to the construction industry. The *first* allows for warrantless entry; the *second* allows for suspicionless detentions; and the *third* allows for continued detentions even after someone provides evidence of lawful status.

**1. The Warrantless-Entry Policy Authorizes Immigration Officers to Raid Private Construction Sites Without Warrants**

204. Almost all construction sites in this District are either posted (*e.g.*, with No Trespassing signs), fenced in, enclosed by physical structures, or otherwise indicate that the property is closed to the public.

205. As detailed in ¶¶ 37–52, these construction sites are private property, are not open to the public, and the workers have an expectation of privacy and the authority to exclude intruders.

206. Federal regulations prohibit immigration officers from conducting visits at sites for which they lack particularized suspicion. *See* 8 C.F.R. § 287.8(f)(1).

207. But under the challenged policies, DHS has authorized immigration officers to raid construction sites without a prior investigation into which firms are staffing that site on a particular day, whether those firms are violating their employment-verification obligations, or whether they have any reason to suspect that particular workers on that

site are undocumented.

208. Federal regulations also prohibit immigration officers from entering the non-public parts of businesses or residences, including the curtilage, without a warrant or the consent of the owner or person in control of the site. 8 C.F.R. § 287.8(f)(2).

209. Pursuant to the challenged policies, however, DHS has authorized immigration officers to enter construction sites—regardless of whether they're posted, fenced, or enclosed—without a warrant, consent, or exigency for the purpose of searching for and seizing workers who fit a certain demographic profile.

210. Immigration officers, including those on the Gulf of America Task Force, have applied and are continuing to apply this policy to raid construction sites throughout the District without a warrant, consent, or exigency—including at the two sites where Leo was working on May 21 and June 12, 2025.

**2. The Preemptive-Detention Policy Authorizes Immigration Officers to Preemptively Detain Any Construction Workers**

211. Once immigration officers enter a construction site (whether they entered lawfully or not), DHS authorizes immigration officers to preemptively seize all workers who appear to fit the demographic profile that DHS associates with undocumented workers in the construction industry.

212. For the construction industry in this District, the policy applies at least to workers who look Latino.

213. According to the Bureau of Labor Statistics, even excluding lawful independent contractors, there are roughly 8.3 million people working legally in the

construction industry nationwide.

214. Estimates suggest that an additional 1.4 million undocumented immigrants work in the construction industry nationwide.

215. Taking these numbers together, at least 86% of construction workers are documented.

216. In Alabama, according to the Bureau of Labor Statistics, even excluding lawful independent contractors, there are 17,260 people legally working in the construction industry.

217. Of those (at least) 17,260 lawful workers, nearly one-third are Latino.

218. Conservatively, then, there are over 5,200 Latinos lawfully working in construction in Alabama.

219. The firms that own, develop, and build on these construction sites are subject to federal laws that require them to verify their employees' lawful status. *See* 8 C.F.R. §§ 274.a *et seq.*

220. Construction companies, like other businesses, must verify their employees' eligibility to work in the country by having their employees complete Form I-9 and submit legal documents to prove their legal status, such as a U.S. passport, Green Card, or a foreign passport with a temporary I-551 stamp. *See* 8 C.F.R. § 274a.2.

221. Employees must provide legal documents to prove their legal status. *See* 8 C.F.R. § 274a.2(b).

222. Construction companies, in turn, must attest under penalty of perjury that they have examined the documentation confirming the employee's authorization. *See*

8 C.F.R. § 274a.2(a)(3).

223. Construction companies are forbidden from knowingly hiring any employee or independent contractor who is not authorized to work in the United States. *See* 8 C.F.R. § 274a.5.

224. For residential developments like the ones targeted by the challenged policies, the construction is typically completed by employees who work for a collection of seven or more different contractors and subcontractors.

225. From one day to the next, the people working on a specific subdevelopment may vary, depending on the phase of construction and which contractors are needed at any given time.

226. Without an investigation into the specific contractors and subcontractors that staff a specific construction site and a specific time, immigration officers could not know which workers might be present on any given day, let alone whether those workers or their employers are violating immigration laws.

227. Without a reason to suspect that a particular employer, contractor, or subcontractor is evading federal work-eligibility requirements or that an employee has provided false documentation or otherwise violated immigration laws, there is no reasonable basis to detain workers to check their immigration status.

228. Nevertheless, DHS's preemptive-detention policy authorizes immigration officers to detain construction workers in this District without particularized suspicion that a specific employer has not complied with work-eligibility requirements or a specific employee has violated immigration laws.

229. Accordingly, this policy authorizes searches and seizures without the reasonable suspicion required to conduct site visits or detain particular workers.

230. Once on a construction site without particularized suspicion, the policy authorizes immigration officers to preemptively detain any workers who fit a certain demographic profile.

231. The policy authorizes officers to force all workers on the site to stop working and prevent them from leaving—even without suspicion particular to any of the workers they detain.

232. These detainments go beyond the brief investigatory inquiry typical of *Terry* stops; the policy authorizes immigration officers to seize workers indefinitely and even remove them from their worksite unless the workers affirmatively prove their legal status.

233. Depending on the size of a construction site, the seizures—based on only a generalized demographic profile—can last hours before the workers are able to prove their legal status to the immigration officers' satisfaction.

**3. The Continued-Detention Policy Authorizes Immigration Officers to Continue Detaining Workers After They Provide Evidence of Legal Status**

234. Although workers who fit a basic profile are required to prove their innocence, DHS makes it both difficult and time-consuming for detainees to overcome even the flimsiest basis for a stop.

235. The continued-detention policy authorizes immigration officers to continue detaining people even after they offer evidence of citizenship.

236. Regardless of whether immigration officers lawfully enter a construction

site, and regardless of whether they lawfully detain workers for a brief inquiry, the policy's continued detentions are still unlawful.

237. Workers who provide evidence of their legal status must be permitted to leave as soon as, given the totality of the circumstances, that new evidence overcomes the suspicion that initially justified the stop.

238. A REAL ID is presumptive proof of citizenship.

239. Evidence of lawful status like a REAL ID negates even reasonable suspicion—and especially negates whatever suspicion could be created through DHS's generalized profile of undocumented construction workers.

240. When an officer seizes someone based only (or even mostly) on their demographic profile, it should not take much counter-evidence to dispel the suspicion. A REAL ID is more than enough.

241. DHS certifies that REAL IDs comply with the REAL ID Act, which provides that the federal government will accept licenses as REAL IDs only if a state verifies an applicant's citizenship or immigration status before issuing the license.

242. Duly promulgated federal regulations also establish that a state-issued REAL ID has been certified as complying with the REAL ID Act, 6 C.F.R. § 37.3, which includes security features for IDs to prevent forgery, *id.* §§ 37.15, 37.17, and a requirement that IDs be issued only to applicants who provide evidence of lawful status, *id.* § 37.11, after the state verifies their documents, *id.* § 37.13.

243. REAL IDs must also include barcodes to make them machine-readable. 6 C.F.R. § 37.19.

244. DHS certifies which licenses are REAL-ID-compliant and requires that any non-compliant IDs must have a unique design or color to distinguish them from REAL IDs and must clearly state that the card is not acceptable for official purposes. 6 C.F.R. § 37.71.

245. Despite these regulations certifying the authenticity of REAL IDs, requiring that they are issued only to people with legal status, and making it easy for officers to tell if a license is not REAL-ID compliant, DHS's continued-detention policy does not recognize REAL IDs as strong evidence of legal status.

246. The policy authorizes immigration officers to ignore the verification process that DHS has already completed in order to continue detaining workers with a REAL ID or other evidence that they are authorized to work.

### E. The Challenged Policies Are Regularly Causing the Wrongful Detentions and Arrests of U.S. Citizens and Legal Residents

247. Because DHS has authorized warrantless raids and mass detentions without particularized suspicion, immigration officers have detained, arrested, and continue to detain and arrest U.S. citizens and legal residents, on a regular and ongoing basis.

248. U.S. citizens and permanent residents have stayed home from work out of fear that they'll be arrested because they fit the profile DHS is targeting.[21]

249. Spokespeople for the construction industry in Alabama have confirmed that

[21] Tim Reid, *This construction project was on time and on budget. Then came ICE.*, Reuters (July 28, 2025), https://www.reuters.com/world/us/this-construction-project-was-time-budget-then-came-ice-2025-07-28/; Grace Berry & Isabella Gomez, *Amid rising fears of racial profiling and ICE detention, US citizens are carrying passports and avoiding Spanish in public*, Cronkite News (Sept. 24, 2025), https://cronkitenews.azpbs.org/2025/09/24/citizens-carry-passports-amid-rising-fears-ice-encounters/.

the raids continue and are causing hysteria, even among workers with legal status. "Their head's on a swivel because they're so concerned any minute that they may get raided," said Tim Harrison, chairman of the Associated Builders and Contractors of Alabama. "They've heard that some of these people throughout the process have been picked up even though they had documentation." "I haven't seen it slowing down."[22]

250. The seizure of U.S. citizens has become commonplace due to DHS's new enforcement policies. News reports and filings in federal court as of September 2025 provide a sampling of citizens and other lawful residents who have been detained in circumstances like Leo's:

a. Jorge Luis Hernández Viramontes, a U.S. citizen, was arrested while working at a carwash. Immigration agents took him to a nearby warehouse for questioning even though he had shown them his state-issued identification.[23]

b. Javier Ramirez, a U.S. citizen, was handcuffed during a workplace raid at a tow yard where he worked despite screaming, "I have my passport! I have my ID! I'm a U.S. citizen!"[24]

c. Jonathan Guerrero, a U.S. citizen, was handcuffed at gunpoint by

[22] Mike Cason, *Alabama construction industry may face devastating worker shortage under Trump immigration crackdown*, AL.com (Sept. 21, 2025), https://www.al.com/news/2025/09/alabama-construction-industry-may-face-devastating-shortage-of-workers-under-trump-immigration-crackdown.html.

[23] César Cuauhtémoc García Hernández, *The Trump administration puts ethnicity on the court's emergency docket*, SCOTUSBlog (Aug. 19, 2025), https://www.scotusblog.com/2025/08/the-trump-administration-puts-ethnicity-on-the-courts-emergency-docket/.

[24] Leo Stallworth, *Man arrested by ICE agents at Montebellow tow yard is a US citizen, family says*, ABC7 (June 13, 2025), https://abc7.com/post/man-arrested-ice-agents-montebello-towing-yard-is-us-citizen-family-says/16743898/.

immigration officers while working at a car wash in his hometown.[25]

d. Jensy Machado, a U.S. citizen, was removed from his work truck at gunpoint after immigration officers refused to accept his REAL ID as evidence of his legal status.[26]

e. George Retes, a U.S. citizens and Iraq War veteran, was detained during the raid of a cannabis farm and held for three days without explanation and without immigration officers ever checking his ID.[27]

f. Julio Noriega, a U.S. citizen, was detained after he handed out his resume at a Jiffy Lube and put in the back of a van without the chance to tell the officers he's a citizen. The officers drove Mr. Noriega around for four hours and then held him at a detention center for six more hours before someone checked his wallet and realized he was a citizen.[28]

g. Jason Brian Gavidia, a U.S. citizen, was detained while working in a tow

---

[25] Nicole Foy, *Some Americans Have Already Been Caught in Trump's Immigration Dragnet. More Will be.*, ProPublica (Mar. 18, 2025), https://www.propublica.org/article/more-americans-will-be-caught-up-trump-immigration-raids.

[26] Jackie Bensen, *'Just following Hispanic people': Citizen detained by ICE questions vote for Trump*, NBC Wash. (Mar. 8, 2025), https://www.nbcwashington.com/news/local/northern-virginia/just-following-hispanic-people-citizen-detained-by-ice-questions-vote-for-trump/3861172/.

[27] Press Release, US Citizen and Army Veteran Submits Claims for Unconstitutional Immigration Detention, Institute for Justice (Aug. 18, 2025), https://ij.org/press-release/us-citizen-and-army-veteran-submits-claims-for-unconstitutional-immigration-detention/. *See also* Jazmine Ulloa, *'I'm From Here!' U.S. Citizens Are Ending Up in Trump's Dragnet*, N.Y. Times (Sept. 29, 2026), https://www.nytimes.com/2025/09/29/us/trump-immigration-agents-us-citizens.html.

[28] Pls.' Mot. to Enforce Settlement at 6, ECF 164, *Castanon Nava v. DHS*, No. 18-cv-3757 (E.D. Ill. Mar. 13, 2025).

yard in Los Angeles even after he showed immigration agents his ID.[29]

h. Heidi M. Plummer, a U.S. citizen and attorney, was arrested by immigration officers while walking in a park, then held and questioned in a facility for 90 minutes before the agents finally checked her ID.[30]

i. Jorge Hernandez Viramontes, a U.S. citizen, was detained by immigration officers while working at a car wash despite telling officers he was a citizen.[31]

j. Andrea Velez, a U.S. citizen, was tackled by immigration officers on the sidewalk between her mom's car and her office door.[32]

k. Cary López Alvarado, a U.S. citizen, was violently arrested while nine months pregnant after immigration officers entered her private worksite without a warrant.[33]

l. Hediberto Ramirez Perez was arrested during a workplace raid at a nutrition-bar factory despite carrying his employment-verification ID card;

[29] Dani Anguiano, *'I will not stay quiet': LA man swept up in Trump ICE dragnet on why he's suing*, The Guardian (Sept. 2, 2025), https://www.theguardian.com/us-news/2025/sep/12/los-angeles-immigration-trump-lawsuit.
[30] *OC attorney says she was detained in ICE raid at Santa Ana park*, Daily J. (Jun. 19, 2025), https://www.dailyjournal.com/articles/386228-oc-attorney-says-she-was-detained-in-ice-raid-at-santa-ana-park.
[31] Compl. at 8, ECF 1, *Vasquez Perdomo v. Noem*, No. 25-cv-5605 (C.D. Cal. July 2, 2025).
[32] Patrick Smith, *ICE detains a U.S. citizen in L.A. and charges her with obstructing an arrest*, NBC News (Jun. 27, 2025), https://www.nbcnews.com/news/us-news/ice-detained-us-citizen-l-charged-obstructing-arrest-rcna215481.
[33] Nicole Acevedo, *A pregnant U.S. citizen went to the hospital after immigration agents detained her*, NBC News (June 10, 2025), https://www.nbcnews.com/news/latino/pregnant-us-citizen-went-hospital-immigration-agents-detained-rcna212033.

immigration officers told him, "We don't care about that for the moment."[34]

m. Angel Pina, a U.S. citizen, was violently detained at a grocery store despite telling immigration officers he was a citizen, telling them where he was born and that he had an ID and a Social Security Number.[35]

n. Inoel Zapata Santiago, a legal resident, was arrested while working inside the bay at a car wash. Immigration agents did not check his ID, despite Mr. Zapata Santiago offering. The officers had not been planning to raid that carwash until they drove by and saw Latino workers outside.[36]

o. Michael Angel Ponce, a U.S. citizen, was arrested for two hours by immigration officers before they checked his ID to confirm his citizenship.[37]

p. A U.S. citizen and veteran had his military identification questioned during a workplace raid in Newark, NJ.[38]

q. Juan Carlos Lopez-Gomez, a U.S. citizen, was arrested during a traffic stop

[34] Emily Kenny & Natalie Mooney, *'I'm sad and alone': Man detained in Cato ICE raid wrongfully deported and now separated from his family*, Spectrum News 1 (Sept. 25, 2025), https://spectrumlocalnews.com/nys/central-ny/news/2025/09/25/i-m-sad-and-alone---man-detained-in-cato-ice-raid-wrongfully-deported-and-now-separated-from-his-family-.

[35] Jory Rand, *US citizen detained after federal agents show up at Ontario Stater Bros. store*, ABC7 (July 22, 2025), https://abc7.com/post/us-citizen-detained-federal-agents-show-ontario-stater-bros-store/17238509/.

[36] Supp. Br. i/s/o Mot. Prelim. Inj. at 6–7, ECF 163, *Vasquez Perdomo v. Noem*, No. 25-cv-5605 (C.D. Cal. Aug. 25, 2025).

[37] Sophia Ridley, *'I felt kidnapped': ICE mistakenly detains main born in College Station*, KBTX3 (July 26, 2025), https://www.kbtx.com/2025/07/26/i-pretty-much-felt-kidnapped-ice-mistakenly-detains-man-born-college-station/.

[38] Nicole Acevedo, *Immigration raid in Newark, New Jersey spurs anger from local officials*, NBC News (Jan. 24, 2025), https://www.nbcnews.com/news/latino/immigration-raid-newark-new-jersey-mayor-angry-rcna189100.

in Florida despite having a REAL ID and his Social Security card.[39]

r. A 15-year-old U.S. citizen with learning disabilities was detained at gunpoint and handcuffed outside his school by immigration officers who later claimed they mistook him for a gang member.[40]

s. Dr. Jonathan Anthony Caravello, a U.S. citizen, was arrested and put into an unmarked van by masked immigration officers without explanation.[41]

## III. CLASS ALLEGATIONS

251. To remedy the ongoing constitutional and legal violations caused by DHS's policies and the official-capacity Defendants' enforcement of those policies and practices, Leo seeks to maintain this action on behalf of himself and all others similarly situated under Federal Rule of Civil Procedure 23(b)(2).

252. Leo seeks a declaration that the three challenged policies violate the Fourth Amendment, exceed immigration officers' statutory and regulatory powers, and are unlawful, along with an order vacating and setting aside the policies and enjoining Defendants from enforcing those policies against the putative classes.

253. A class action is superior to other available methods for adjudicating this

---

[39] Jackie Llanos, *Feds blame U.S. citizen for his arrest under suspended immigration law*, Fla. Phoenix (Apr. 21, 2025), https://floridaphoenix.com/2025/04/21/feds-blame-u-s-citizen-for-his-arrest-under-suspended-immigration-law/.

[40] Semantha Raquel Norris, *Family of Wrongfully Detained San Fernando High School Student Files Claim Against ICE*, San Fernando Valley Sun (Aug. 27, 2025), https://sanfernandosun.com/2025/08/27/family-of-wrongfully-detained-san-fernando-high-school-student-files-claim-against-ice/.

[41] Will Conybeare, *Labor union says California university professor was taken during Camarillo immigration raid protest*, KTLA5 (Jul. 12, 2025), https://ktla.com/news/local-news/labor-union-says-california-university-professor-was-taken-during-camarillo-immigration-raid-protest/.

controversy because it will allow for effective, class-wide relief to remedy these ongoing, repeated, and threatened violations of the Fourth Amendment and the statutes and regulations that limit the authority of immigration officers.

254. Plaintiff proposes the following three classes:

a. **Warrantless Entry Class.** All U.S. citizens and lawful residents in the Southern District of Alabama who, while working in non-public areas of private construction sites, have been or will be subject to the Warrantless Entry Policy.

b. **Preemptive Detention Class.** All U.S. citizens and lawful residents in the Southern District of Alabama who, while working a construction job, have been or will be subject to the Preemptive Detention Policy.

c. **Continued Detention Class.** All U.S. citizens and lawful residents in the Southern District of Alabama who, while working a construction job, have been or will be subject to the Continued Detention Policy.

255. The putative classes satisfy the four requirements of Rule 23(a).

256. *Numerosity*. The putative classes are so numerous that joinder of all members is impracticable:

a. This District includes one of the fastest-growing metropolitan areas in the country.

b. Major national builders—including builders like D.R. Horton, Lennar, and DSLD Homes, whose properties Defendants have raided—are building dozens of new developments with thousands of new homes every year in

this District.

c. Since January 21, 2025, at least 17—and likely many more—of these developments have been raided pursuant to the challenged policies.

d. Even excluding independent contractors, there are approximately 17,260 lawfully employed construction workers in Alabama. And, on information and belief, there are thousands more construction workers lawfully working as independent contractors in Alabama.

e. Nearly one-third of those 17,260 construction workers (or about 5,200 people) are Latino and, thus, fit the demographic profile that Defendants typically target during construction site raids.

f. There is abundant work opportunity for lawful construction workers in this District. Indeed, on a single day in one of the new residential developments under construction in this District, it's typical for at least 35 people, working in five-member crews, to collaboratively build different parts of each home.

g. Defendants have publicly admitted that they're raiding construction sites in this District precisely because of the construction needed to keep up with this District's rapid population growth and the abundant job opportunities that growth has created for construction workers.

h. The construction sites on which these homes are built typically have areas that are conspicuously posted with No Trespassing signs or enclosed with fencing or structures in order to exclude the public and intruders from work sites—both to protect workers and to protect the property itself.

i. Defendants are raiding construction sites without particularized, reasonable suspicion to believe that undocumented workers are on a specific site, so it is impossible to predict which sites will be targeted. But every site is, pursuant to Defendants' policies, subject to raids.

j. The members of the proposed classes work for countless different contractors and subcontractors, and they are dispersed across the region.

k. Defendants' raids have already chilled construction work in this District. Whole crews of lawful Latino construction workers are refusing to show up for jobs because they are afraid they will be detained merely for fitting the demographic profile that Defendants typically target.

l. Moreover, even construction workers who are citizens or lawful permanent residents are afraid to speak out against Defendants' raids—including by filing a civil-rights lawsuit—because those workers often have close friends or family who are undocumented who they fear Defendants will target.

m. For all of these reasons, there is simply no reasonable way to identify all lawful construction workers in this District who are or will be threatened by Defendants' policies and who would benefit from equitable relief, which makes joinder of all those workers impracticable.

257. *Commonality*. This action presents questions of law and fact common to the putative classes, resolution of which will not require individualized determinations of the circumstances of any individual, including but not limited to:

a. For the Warrantless Entry Class: (1) Have Defendants adopted the

Warrantless Entry Policy? (2) Does that policy violate the Fourth Amendment? (3) Does that policy exceed immigration officers' statutory and regulatory authority? (4) Are the class members subject to that policy?

b. For the Preemptive Detention Class: (1) Have Defendants adopted the Preemptive Detention Policy? (2) Does that policy violate the Fourth Amendment? (3) Does that policy exceed immigration officers' statutory and regulatory authority? (4) Are the class members subject to that policy?

c. For the Continued Detention Class: (1) Have Defendants adopted the Continued Detention Policy? (2) Does that policy violate the Fourth Amendment? (3) Does that policy exceed immigration officers' statutory and regulatory authority? (4) Are the class members subject to that policy?

258. *Typicality*. Leo's claims for declaratory and injunctive relief are typical of the claims of the putative classes because he raises the same Fourth Amendment and APA claims as the members of the putative classes, and because he has twice been impacted by the challenged policies.

259. *Adequacy of Representation*. The interests of the putative classes are fairly and adequately protected by Leo and his attorneys:

a. Leo is a U.S. citizen who works on private construction sites in this District. If he obtains the declaratory and injunctive relief he seeks against Defendants' unlawful search and seizure policies, that relief will benefit the proposed classes, which are comprised of U.S. citizen and lawful resident construction workers in this District who are similarly threatened by each of

the challenged policies.

b. That is, because Leo seeks prospective relief against unlawful government policies, his interests are necessarily aligned with classes whose members are subject to and threatened by those same unlawful policies.

c. Leo's attorneys are qualified, experienced, and able to litigate this case.

d. The Institute for Justice ("IJ") has litigated constitutional cases nationwide for over 34 years, including several federal class actions:

   i. *Brown et al. v. TSA et al.*, No. 2:20-cv-64 (W.D. Pa. July 17, 2020) (ECF No. 43) (Fourth Amendment and statutory claims against TSA and DEA challenging nationwide policies on behalf of putative nationwide classes; motions for summary judgment pending; litigated by Jaba Tsitsuashvili, counsel on this case);

   ii. *Coleman et al. v. Town of Brookside et al.*, No. 2:22-cv-423 (N.D. Ala. June 17, 2022) (ECF No. 32) (due process claims against municipality on behalf of multiple putative classes; litigated by Jaba Tsitsuashvili, counsel on this case);

   iii. *Snitko v. United States*, No. 21-cv-4405 (C.D. Cal. Oct. 12, 2021) (ECF No. 78) (Fourth Amendment challenge to FBI's searches and seizures of safety deposit boxes).

   iv. *Sourovelis v. City of Philadelphia*, No. 14-cv-4687, 2021 WL 344598 (E.D. Pa. June 28, 2021) (due process and other challenges to City of Philadelphia's civil-forfeiture scheme)

v. *Cho v. City of New York*, No. 16-cv-7961 (S.D.N.Y. Oct. 2, 2020) (ECF No. 111) (Fourth Amendment and other challenges to City of New York's no-fault eviction scheme)

vi. *Whitner v. City of Pagedale*, No. 15-cv-1655 (E.D. Mo. May 21, 2018) (ECF No. 116) (due process and other challenges to City of Pagedale's code-enforcement scheme)

e. Further, all three attorneys of record—Jared McClain, Jaba Tsitsuashivili, and Joshua Windham—have experience litigating Fourth Amendment cases as part of IJ's broader project to protect people from arbitrary government searches and seizures.

i. Mr. McClain has challenged unlawful raids of homes and the unlawful arrests, including a case in this District, *Digmon v. Billy*, No. 1:24-cv-425.

ii. Mr. Tsitsuashvili has challenged unconstitutional and unlawful policies and practices on behalf of several putative classes, including against nationwide federal policies and including in the Northern District of Alabama, *Coleman v. Town of Brookside*, No. 2:22-cv-423.

iii. Mr. Windham has challenged unlawful business searches, unlawful traffic stops, and unlawful searches of private land, including in the Alabama Circuit Court for Lauderdale County, *Boley v. Blankenship*, No. 41-cv-2025-900155.00.

260. This action meets the requirements of and is brought in accordance with

Rule 23(b)(2). Defendants have acted, or refused to act, on grounds generally applicable to the proposed classes. Final declaratory and injunctive relief is appropriate with respect to all class members.

## IV. INJURY TO PLAINTIFF

261. Defendants willfully violated Leo's federally protected rights. They knew or should have known that their conduct outlined in this complaint was unconstitutional, in excess of statutory authority, and in violation of duly promulgated regulations.

262. As a direct and proximate result of Defendants' deliberate, knowing, and reckless conduct, Leo has suffered violations of his Fourth Amendment rights, as well as several torts.

263. As a direct and proximate result of DHS's policies, the individual-capacity Doe Defendants have twice entered private construction sites that were either fenced in or posted with No Trespassing signs; they preemptively detained Leo without any particularized suspicion, despite lacking reasonable suspicion to believe that the employees or contractors on that site were violating federal employment-verification requirements; and they refused to release him from his unlawful detention even after Leo told the officers he was a citizen and presented his Alabama-issued REAL ID.

264. As a direct and proximate result of these Fourth Amendment violations, Leo was tightly handcuffed for over an hour. He's missed almost two weeks of work, lost income, has suffered and continues to suffer stress, anxiety, and emotional distress. He lives in constant fear that he will be subjected to further arrest just for showing up to work.

265. As a direct and proximate result of these Fourth Amendment violations, Leo

continues to suffer serious and justified apprehension about going to work. Until the unlawful policies are enjoined or set aside, Leo will continue to suffer that harm.

266. The injury that Leo has suffered is typical of construction workers throughout Alabama who fit the same demographic profile. As a direct and proximate result of the Fourth Amendment violations outlined in this complaint, U.S. citizens and legal residents who work in Alabama's construction industry have been scared to go to work.

267. Leo also suffered pecuniary loss. This damage includes but is not limited to the time and wages he lost while under arrest and recovering from the arrests.

268. Punitive damages are justified because Defendants' conduct was motivated by evil intent or involved reckless or callous indifference to Leo's federally protected rights.

## V. CLAIMS FOR RELIEF

### COUNT I

### Violations of the Fourth Amendment – Injunctive Claim

*On behalf of Leo & the putative classes*
*Against the Official Capacity Defendants*

269. Leo realleges and incorporates the allegations in ¶¶ 12–268 of this complaint as if they are fully restated here.

270. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

271. Moreover, the Fourth Amendment codifies the constitutional preference for warrants based on probable cause before government agents can enter private property, conduct a search, or seize a person or their property.

272. The Fourth Amendment prohibits officers from stopping people at random to determine their immigration status.

273. It also prohibits officers from entering private property—like the parts of a private business that are closed to the public—without a warrant, exigent circumstances, or the owner's or occupant's consent.

274. Even when officers *can* lawfully enter private property (or remain in publicly accessible areas), officers still need particularized suspicion to conduct investigative stops of any employees on the site and probable cause to make an arrest.

275. Absent individualized suspicion, officers lawfully on private property can conduct only consensual interviews with employees. They cannot stop employees from working, prevent them from leaving, or force them to leave absent at least reasonable suspicion that an individual employee has violated the law.

276. To restrict an employee's movement to investigate their immigration status, officers must have specific articulable facts that, considered with the totality of the circumstances, reasonably warrant suspicion that a specific employee is in the country illegally.

277. Someone's race or ethnicity does not create reasonable suspicion of someone's immigration status.

278. Nor can someone's occupation as a construction worker combined with their ethnicity amount to particularized suspicion—as opposed to a mere generalized hunch—that someone's in the country illegally. After all, the vast majority of construction workers (like Leo) who fit DHS's generalized profile are citizens or have legal authorization to

work.

279. An individual must *do* something to create reasonable suspicion.

280. Reasonable suspicion, in turn, allows only a limited detainment to gather information.

281. During that detainment, the officer may ask questions to confirm their suspicions, but the worker does not have to respond.

282. Only if the investigatory detainment reveals specific information to generate probable cause can the officer turn the detainment into an arrest.

283. Moreover, because the quantum of evidence to justify an investigatory stop or arrest is based on the totality of the circumstances, the Fourth Amendment imposes an ongoing duty on officers to adjust their suspicion based on new facts.

284. As a result, the discovery of new information that undermines the initial basis for a seizure—such as someone stating that they're a citizen and providing their identification—requires the officer to terminate an investigatory stop or arrest.

285. The official-capacity Defendants have adopted and are enforcing three policies that violate the Fourth Amendment.

286. *Warrantless Entry*. The official-capacity Defendants have authorized their agents to enter private construction sites without a warrant, consent, or exigency, even when those sites are posted, fenced, enclosed, or otherwise exclude the public.

287. The warrantless-entry policy violates the Fourth Amendment.

288. Construction sites are private property not open to the public. This fact is conveyed to the public through the posting of No Trespassing signs, fencing, enclosing the

sites, or otherwise demonstrating an intent to exclude.

289. Contractors and employees working on these construction sites have the right to exclude.

290. Despite the private nature of these sites, however, the warrantless-entry policy authorizes immigration officers to enter without a warrant, consent, or exigency.

291. As a result, the policy authorizes immigration officers to search construction sites in violation of the Fourth Amendment.

292. *Preemptive Detentions*. Once on site, immigration officers can and do preemptively detain anyone who fits a demographic profile that DHS associates with undocumented immigrants without reasonable suspicion that the particular employers or workers on that site have violated immigration laws.

293. The preemptive-detention policy violates the Fourth Amendment because it authorizes detentions based on less than reasonable suspicion.

294. Generalized suspicion based on someone's occupation and demographic profile does not justify a detention.

295. Regardless of whether someone's occupation and demographic profile can justify a *Terry* stop, however, the preemptive detentions at issue in this case are unconstitutional for two reasons.

a. *First*, the official-capacity Defendants have authorized their agents to make detentions on worksites based on only generalized suspicion even when there's no reason to believe the particular employers on that jobsite are not complying with their employment-verification requirements—even though

most workers who meet DHS's profile are (like Leo) citizens or have legal status.

b. *Second*, the official-capacity Defendants have authorized their agents to preemptively detain workers who fit a profile, as opposed to conducting a brief investigatory inquiry. The policy does not require officers to question the workers they detain. Instead, the policy authorizes detention until the worker proves their citizenship to the officer's satisfaction.

296. *Continued Detentions*. The official-capacity Defendants have authorized immigration officers to detain people suspected of being in the country unlawfully even after the person offers evidence of citizenship or legal status.

297. This policy goes beyond any conceivably constitutional "show me your papers" policy because showing a REAL ID is still not enough to end a detention.

298. The Fourth Amendment imposes an affirmative duty on officers who seize individuals to actively work to dispel any reasonable suspicion they might have had when they initiated the stop.

299. Although anyone issued a REAL ID presumptively has legal status, the policy instructs immigration officers to underweight the evidentiary value of REAL IDs when considering the quantum of suspicion required to continue a detention or arrest.

300. To obtain a REAL ID, an applicant must provide the government several documents to prove their citizenship or legal status.

301. Although some states (and the District of Columbia) issue driver's licenses to non-citizens, those licenses are not REAL IDs and indicate on the license that they do

not comply with the REAL ID Act.

302. By authorizing immigration officers to continue to detain someone after they provide a REAL ID or other evidence of their legal presence, the continued-detention policy authorizes unreasonable seizures in violation of the Fourth Amendment.

303. When federal officials are acting unconstitutionally or without lawful authority, courts may issue declaratory relief and enjoin the officers responsible from continuing to enforce those unlawful policies and practices. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 687–88 (1949).

304. Leo and the members of the putative classes have suffered and will continue to suffer a violation of their Fourth Amendment rights as a direct and proximate result of the official-capacity Defendants' enforcement of the challenged policies.

**COUNT II**
**Policies Contrary to the Fourth Amendment – APA**
*On behalf of Leo & the putative classes*
*Against the Defendant Agencies & the United States of America*

305. Leo realleges and incorporates the allegations in ¶¶ 12–268 of this complaint as if they are fully restated here.

306. The Administrative Procedure Act provides a cause of action against, and requires courts to vacate and set aside, agency actions that are contrary to a constitutional right. *See* 5 U.S.C. §§ 702, 706.

307. The three policies at issue in this case each violate the Fourth Amendment.

308. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures."

309. Moreover, the Fourth Amendment codifies the constitutional preference requirement for warrants based on probable cause before government agents can enter private property, conduct a search, or seize a person or their property.

310. The Fourth Amendment prohibits officers from stopping people at random to determine their immigration status.

311. It also prohibits officers from entering private property—like the parts of a private business that are closed to the public—without a warrant, exigent circumstances, or the owner's or occupant's consent.

312. Even when officers *can* lawfully enter private property (or remain in publicly accessible areas), officers still need particularized suspicion to conduct investigative stops of any employees on the site and probable cause to make an arrest.

313. Absent individualized suspicion, officers lawfully on private property can conduct only consensual interviews with employees. They cannot stop employees from working, prevent them from leaving, or force them to leave absent at least reasonable suspicion that an individual employee has violated the law.

314. To restrict an employee's movement to investigate their immigration status, officers must have specific articulable facts that, considered with the totality of the circumstances, reasonably warrant suspicion that a specific employee is in the country illegally.

315. Someone's race or ethnicity does not create reasonable suspicion of someone's immigration status.

316. Nor can someone's occupation as a construction worker combined with their ethnicity amount to particularized suspicion—as opposed to a mere generalized hunch—that someone's in the country illegally. After all, the vast majority of construction workers (like Leo) who fit DHS's generalized profile are citizens or have legal status.

317. An individual must *do* something to create reasonable suspicion.

318. And that reasonable suspicion allows only a limited detainment to gather information.

319. During that detainment, the officer may ask questions to confirm their suspicions, but the worker does not have to respond.

320. Only if the investigatory detainment reveals specific information to generate probable cause can the officer turn the detainment into an arrest.

321. Moreover, because the quantum of evidence to justify an investigatory stop or arrest is based on the totality of the circumstances, the Fourth Amendment imposes an ongoing duty on officers to adjust their suspicion based on new facts.

322. As a result, the discovery of new information that undermines the initial basis for a seizure—such as someone stating that they're a citizen and providing their identification—requires the officer to terminate an investigatory stop or arrest.

323. The official-capacity Defendants have adopted and are enforcing three policies that violate the Fourth Amendment.

324. *Warrantless Entry*. The official-capacity Defendants have authorized their agents to enter private construction sites without a warrant, consent, or exigency, even when those sites are posted, fenced, enclosed, or otherwise exclude the public.

325. The warrantless-entry policy violates the Fourth Amendment.

326. Construction sites are private property not open to the public. This fact is conveyed to the public through the posting of No Trespassing signs, fencing, enclosing the sites, or otherwise demonstrating an intent to exclude.

327. Contractors and employees working on these construction sites have the right to exclude.

328. Despite the private nature of these sites, however, the warrantless-entry policy authorizes immigration officers to enter without a warrant, consent, or exigency.

329. As a result, the policy authorizes immigration officers to search construction sites in violation of the Fourth Amendment.

330. *Preemptive Detentions*. Once on site, immigration officers can and do preemptively detain anyone who fits a demographic profile that DHS associates with undocumented immigrants without reasonable suspicion that the particular employers or workers on that site have violated immigration laws.

331. The preemptive-detention policy violates the Fourth Amendment because it authorizes detentions based on less than reasonable suspicion.

332. Generalized suspicion based on someone's occupation and demographic profile does not justify a detention.

333. Regardless of whether someone's occupation and demographic profile can justify a *Terry* stop, however, the preemptive detentions at issue in this case are unconstitutional for two reasons.

a. *First*, the official-capacity Defendants have authorized their agents to make

detentions on worksites based on only generalized suspicion even when there's no reason to believe the particular employers on that jobsite are not complying with their employment-verification requirements—even though most workers who meet DHS's profile are (like Leo) citizens or have legal status.

b. *Second*, the official-capacity Defendants have authorized their agents to preemptively detain workers who fit a profile, as opposed to conducting a brief investigatory inquiry. The policy does not require officers to question the workers they detain. Instead, the policy authorizes detention until the worker proves their citizenship to the officer's satisfaction.

334. *Continued Detentions*. The official-capacity Defendants have authorized immigration officers to detain people suspected of being in the country unlawfully even after the person offers evidence of citizenship or legal status.

335. This policy goes beyond any conceivably constitutional "show me your papers" policy because showing a REAL ID is still not enough to end a detention.

336. The Fourth Amendment imposes an affirmative duty on officers who seize individuals to actively work to dispel any reasonable suspicion they might have had when they initiated the stop.

337. Although anyone issued a REAL ID presumptively has legal status, the policy instructs immigration officers to underweight the evidentiary value of REAL IDs when considering the quantum of suspicion required to continue a detention or arrest.

338. To obtain a REAL ID, an applicant must provide the government several

documents to prove their citizenship or legal status.

339. Although some states (and the District of Columbia) issue driver's licenses to non-citizens, those licenses are not REAL IDs and indicate on the license that they do not comply with the REAL ID Act.

340. By authorizing immigration officers to continue to detain someone after they provide a REAL ID or other evidence of their legal presence, the continued-detention policy authorizes unreasonable seizures in violation of the Fourth Amendment.

341. Because the challenged policies violate the Fourth Amendment, this Court must vacate and set them aside. *See* 5 U.S.C. § 706(2).

**COUNT III**
**Policies in Excess of Statutory Authorization – APA**
*On behalf of Leo & the putative classes*
*Against the Defendant Agencies & the United States of America*

342. Leo realleges and incorporates the allegations in ¶¶ 12–268 of this complaint as if they are fully restated here.

343. The Administrative Procedure Act requires courts to vacate and set aside policies that exceed the administration's statutory authority. 5 U.S.C. § 706(2)(C).

344. By law, Congress gave immigration officers limited authority.

345. Immigration officers can question people they suspect to be in the country without documentation. 8 U.S.C. § 1357(a)(1).

346. And immigration officers can search the person and effects of someone seeking admission into the country. 8 U.S.C. § 1357(c).

347. But they cannot, without a warrant, search the person or effects of someone

they merely suspect to be in the country without documentation.

348. The law also limits immigration officers' authority to make warrantless arrests for violations of immigration laws. An immigration officer must have probable cause to believe both that someone is in the country unlawfully *and* that they are likely to escape before the officer can obtain an arrest warrant. 8 U.S.C. § 1357(a)(2).

349. The preemptive-detention and continued-detention policies exceed these limits on immigration officers' authority.

350. The policies allow officers to detain people without a warrant until the person proves their legal presence.

351. Because the policies authorize the detainment to continue beyond a brief inquiry, it authorizes arrests.

352. The preemptive-detention policy permits immigration officers to effect arrests without probable cause to believe someone is in the country unlawfully and without any probable cause determination that they are a flight risk.

353. Indeed, many of the people arrested detained pursuant to these policies have REAL IDs, permanent addresses, and strong community ties.

354. Yet the challenged policies authorize immigration officers to detain and arrest people without any prior investigation or particularized suspicion—let alone probable cause.

355. The challenged policies also authorize immigration officers to use preemptive and continued detentions to compel a search of people's persons and effects, without probable cause, in order to check a detainee's legal status.

356. Because these aspects of the policies exceed the statutory grant of authority, this Court must set them aside. *See* 5 U.S.C. § 706.

### COUNT IV
### Arbitrary, Capricious, & Without Observance of Lawful Procedure – APA
*On behalf of Leo & the putative classes*
*Against the Defendant Agencies & the United States of America*

357. Leo realleges and incorporates the allegations in ¶¶ 12–268 of this complaint as if they are fully restated here.

358. Federal agencies may not violate their own rules and regulations to the prejudice of others. That includes rules that limit an officer or employee's discretionary authority. 5 U.S.C. § 706(2)(A), (D); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

359. An agency's failure to follow its rules and regulations is subject to review under Section 706 of the APA.

360. Binding regulations limit the authority of immigration officers to conduct site inspections. To conduct a site visit, they must have reasonable suspicion, based on articulable facts, that aliens engaged in unauthorized employment are working on that site. 8 C.F.R. § 287.8(f)(1).

361. But the challenged policies authorize immigration officers to target all businesses within a certain industry based on only a generalized profile of what undocumented workers look like in the construction industry.

362. Binding regulations prohibit immigration officers from entering the non-public areas of a business or residence, including the curtilage, to question the employees

without a warrant or consent of either the owner or person in control of the site. 8 C.F.R. § 287.8(f)(2).

363. But the warrantless-entry policy authorizes immigration officers to enter private construction sites without a warrant, even though they are posted, fenced, enclosed, or otherwise restrict public access.

364. Binding regulations forbid immigration officers from briefly detaining any person for questioning about whether the person is or is attempting to be engaged in an offense against the U.S. or is an illegal immigrant, unless officers first have reasonable suspicion. 8 C.F.R. § 287.8(b)(2).

365. But the preemptive-detention authorizes immigration officers in search of illegal immigrants to detain workers on construction sites and to restrict their freedom of movement without any reasonable suspicion that they are undocumented.

366. Binding regulations forbid immigration officers from arresting any person suspected of a crime against the U.S. or of being an illegal immigrant without first having probable cause that the person has committed said offense and is likely to escape before a warrant can be obtained. 8 C.F.R. § 287.8(c)(2)(i)–(ii).

367. But the continued-detention policy authorizes immigration officers who have detained construction workers they suspect of being illegal immigrants to continue detaining workers even after they have produced evidence of citizenship or lawful presence.

368. Binding regulations require immigration officers to identify themselves as immigration officers as quickly as practicable. 8 C.F.R. § 287.8(c)(2)(iii)(A).

369. But under the challenged policies, officers do not have to identify themselves at all. Immigration officers conceal their agency insignia and often do not identify themselves as federal law-enforcement officers—let alone immigration officers.

370. Binding regulations require immigration officers to provide the basis for an arrest as soon as practicable. 8 C.F.R. § 287.8(c)(2)(iii)(B).

371. But even when workers on a jobsite are fully compliant, the challenged policies permit immigration officers to physically restrain workers and remove them from the site without providing the basis for a detention or arrest.

372. Binding regulations establish that a state-issued REAL ID has been certified as complying with the REAL ID Act, 6 C.F.R. § 37.3, which includes security features for IDs to prevent forgery, *id.* §§ 37.15, 37.17, and a limitation that IDs be issued only to applicants who provide evidence of lawful status, *id.* § 37.11, after the state verifies their documents, *id.* § 37.13.

373. REAL IDs must also include barcodes to make them machine-readable. 6 C.F.R. § 37.19.

374. DHS certifies which states' licenses are REAL ID-compliant and requires that any non-compliant IDs must have a unique design or color to distinguish them from REAL IDs and must clearly state that the card is not acceptable for official purposes. 6 C.F.R. § 37.71.

375. Despite these regulations certifying the authenticity of REAL IDs and that they are issued only to people with legal status, the continued-detention policy does not treat REAL IDs as evidence of legal status.

376. Because binding regulations limit whatever discretion immigration officers may have otherwise, this Court must set aside the policies that violate those regulations. *See* 5 U.S.C. § 706(2)(A), (D).

**COUNT V**
**Assault**
*On behalf of Leo*
*Against Officers Blacklidge, Woodruff, and Prater in their individual capacities under the Westfall Act & Alabama tort law*
*Against the United States of America under the Federal Tort Claims Act*

377. Leo realleges and incorporates the allegations in ¶¶ 12–118 and 261–268 of this complaint as if they are fully restated here.

378. In Alabama, assault is an intentional, unlawful offer to touch a person in a rude or angry manner under circumstances that cause a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented. *See O'Rear v. B.H.*, 69 So. 3d 106, 117 (Ala. 2011), *abrogated on other grounds*, *Ex parte Vanderwall*, 201 So. 3d 525 (Ala. 2015).

379. Officers Blacklidge, Woodruff, and Prater, assaulted Leo when they intentionally detained him without lawful authority on May 21, 2025.

380. Special Agent Blacklidge quickly approached Leo to make him submit to a detention without lawful authority.

381. Special Agent Blacklidge intentionally reached for Leo in a hostile manner, causing Leo to call for help.

382. Leo's fear of an imminent battery was well-founded because Special Agent Blacklidge immediately grabbed Leo and wrestled him to the ground.

383. Special Agent Woodruff then ran over and lunged toward Leo, intentionally

creating a well-founded fear of another imminent touching.

384. That fear was also well-founded because Special Agent Woodruff also grabbed Leo and wrestled him to the ground.

385. Deportation Officer Prater also assaulted Leo when he ran over and lunged at Leo while Special Agents Blacklidge and Woodruff held Leo. In doing so, Deportation Officer Prater intentionally created a well-founded fear of yet another imminent touching.

386. The rude and angry offers to touch were unlawful because Leo had done nothing to create particularized suspicion to justify an arrest or detainment.

387. And because there was no legal justification for the assault, the resulting seizure violated the Fourth Amendment.

388. Because Officers Blacklidge, Woodruff, and Prater were acting as investigative or law-enforcement officers—that is, as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law—the United States is liable for their tortious actions under the Federal Tort Claims Act. Leo timely filed his notice of claims with their respective agencies in October 2025. ICE denied all Leo's claims on behalf of all federal agencies by a letter dated April 15, 2026, making his FTCA claims ripe for this lawsuit.

389. Because Officers Blacklidge, Woodruff, and Prater were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); *see Buchanan v. Barr*, 71 F.4th 1003, 1012–18 (D.C. Cir. 2023) (Walker, J., concurring).

390. Because the tortious conduct of Officers Blacklidge, Woodruff, and Prater violated Leo's constitutional rights, Leo can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

391. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in Count IX is also unavailable, then the Westfall Act is unconstitutional as applied to Leo.

**COUNT VI**
**Battery**
*On behalf of Leo*
*Against Officers Blacklidge, Woodruff, and Prater in their individual capacities under the Westfall Act & Alabama tort law*
*Against the United States of America under the Federal Tort Claims Act*

392. Leo realleges and incorporates the allegations in ¶¶ 12–118 and 261–268 of this complaint as if they are fully restated here.

393. In Alabama, battery is an intentional, unlawful touching done in a harmful and offensive manner. *Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 180 (Ala. 2016).

394. During the raid on May 21, Officers Blacklidge, Woodruff, and Prater battered Leo when they intentionally seized, detained, and restrained him in a harmful and offensive manner without lawful authority.

395. Officers Blacklidge, Woodruff, and Prater tackled and physically restrained Leo in a harmful and offensive manner and then locked him in handcuffs.

396. Because they had no lawful justification to detain Leo, the touchings during the detainment were unlawful.

397. Even after one officer reached into Leo's pocket and retrieved his REAL ID, the three officers continued to touch Leo harmfully and without lawful authority.

398. Because there was no legal justification for the battery, the resulting seizure violated the Fourth Amendment.

399. Because Officers Blacklidge, Woodruff, and Prater were acting as investigative or law-enforcement officers—that is, as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law—the United States is liable for their tortious actions under the Federal Tort Claims Act. Leo timely filed his notice of claims with their respective agencies in October 2025. ICE denied all Leo's claims on behalf of all federal agencies by a letter dated April 15, 2026, making his FTCA claims ripe for this lawsuit.

400. Because Officers Blacklidge, Woodruff, and Prater were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); *see Buchanan*, 71 F.4th at 1012–18 (Walker, J., concurring).

401. Because the tortious conduct of Officers Blacklidge, Woodruff, and Prater violated Leo's constitutional rights, Leo can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

402. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in Count IX is also unavailable, then the Westfall Act is unconstitutional as applied to Leo.

### COUNT VII
### False Arrest
*On behalf of Leo*
*Against Officers Blacklidge, Woodruff, and Prater in their individual capacities under the Westfall Act & Alabama tort law*
*Against the United States of America under the Federal Tort Claims Act*

403. Leo realleges and incorporates the allegations in ¶¶ 12–118 and 261–268 of this complaint as if they are fully restated here.

404. In Alabama, a false arrest requires proof that the defendant(s) caused the plaintiff's arrest without probable cause. *Walker v. City of Huntsville*, 62 So. 3d 474, 493 (Ala. 2010). A detention is invalid unless the officer(s) reasonably and in good faith suspected the plaintiff of violating the law. *Id.*

405. Officers Blacklidge, Woodruff, and Prater committed false arrest because they detained Leo without lawful status on June 12, 2025.

406. The officers had no reasonable or good faith basis to suspect that Leo was violating the law before they detained him.

407. The detention became even more unreasonable once the officers learned that Leo had a REAL ID.

408. Because there was no legal justification for the false arrest, the resulting seizure was unreasonable and violated the Fourth Amendment.

409. Because Officers Blacklidge, Woodruff, and Prater were acting as investigative or law-enforcement officers—that is, as officers of the United States who

were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law—the United States is liable for their tortious actions under the Federal Tort Claims Act. Leo timely filed his notice of claims with their respective agencies in October 2025. ICE denied all Leo's claims on behalf of all federal agencies by a letter dated April 15, 2026, making his FTCA claims ripe for this lawsuit.

410. Because Officers Blacklidge, Woodruff, and Prater were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); *see Buchanan*, 71 F.4th at 1012–18 (Walker, J., concurring).

411. Because the tortious conduct of Officers Blacklidge, Woodruff, and Prater violated Leo's constitutional rights, Leo can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

412. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in Count IX is also unavailable, then the Westfall Act is unconstitutional as applied to Leo.

**COUNT VIII**
**False Imprisonment**
*On behalf of Leo*
*Against Officers Blacklidge, Woodruff, and Prater in their individual capacities under the Westfall Act & Alabama tort law*
*Against the United States of America under the Federal Tort Claims Act*

413. Leo realleges and incorporates the allegations in ¶¶ 12–118 and 261–268 of this complaint as if they are fully restated here.

414. In Alabama, false imprisonment is an unlawful detainment for any duration. Ala. Code § 6-5-170. The tort requires a direct physical restraint, either expressed or implied by the threat of force or effected through actual force, by which a person is deprived of their liberty. *Dolgencorp, Inc. v. Pounders*, 912 So. 2d 523, 527–28 (Ala. Civ. App. 2005). A false imprisonment may involve compelling a person to remain where he does not wish to remain or to go where he does not wish to go. *Id.* Because the arrest must be unlawful, a false imprisonment (or false arrest) in Alabama requires proof that an officer lacked probable cause.

415. Officers Blacklidge, Woodruff, and Prater falsely imprisoned Leo when they detained him without lawful authority on May 21, 2025.

416. Through threat of force, Officers Blacklidge, Woodruff, and Prater deprived Leo of his liberty when they forced Leo to stop working, held him on the ground, handcuffed him, led them off his worksite, and made him stand handcuffed by their car for over an hour.

417. Leo was not free to move. He had to stay where the officers wanted him to stay and move where they wanted him to move.

418. The imprisonment was unlawful because the officers had no probable cause to believe Leo violated the law.

419. That is especially true for the duration of his imprisonment that continued after he showed the officers his REAL ID, undermining any suspicion that could have contributed to his initial detention.

420. Because there was no legal justification for the false imprisonment, the resulting seizure violated the Fourth Amendment.

421. Because Officers Blacklidge, Woodruff, and Prater were acting as investigative or law-enforcement officers—that is, as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law—the United States is liable for their tortious actions under the Federal Tort Claims Act. Leo timely filed his notice of claims with their respective agencies in October 2025. ICE denied all Leo's claims on behalf of all federal agencies by a letter dated April 15, 2026, making his FTCA claims ripe for this lawsuit.

422. Because Officers Blacklidge, Woodruff, and Prater were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); *see Buchanan*, 71 F.4th at 1012–18 (Walker, J., concurring).

423. Because the tortious conduct of Officers Blacklidge, Woodruff, and Prater violated Leo's constitutional rights, Leo can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

424. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in Count IX is also unavailable, then the Westfall Act is unconstitutional as applied to Leo.

**COUNT IX**

**Fourth Amendment – Damages Action**

*On behalf of Leo*

*Against Officers Blacklidge, Woodruff, and Prater in their individual capacities*
*Under the United States Constitution, as recognized in* Bivens *& the Westfall Act*

425. Leo realleges and incorporates the allegations in ¶¶ 12–118 and 261–268 of this complaint as if they are fully restated here.

426. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

427. Moreover, the Fourth Amendment codifies the constitutional preference for warrants based on probable cause before government agents enter private property, conduct a search, or seize a person or their property.

428. Officers Blacklidge, Woodruff, and Prater violated Leo's Fourth Amendment rights when they detained and arrested him without a warrant or probable cause and continued to detain him even after he provided his REAL ID.

429. The officers lacked even reasonable suspicion to detain Leo when they arrived on a private construction site, staffed by contractors bound by federal employment-verification requirements, and preemptively detained Leo without any particular suspicion and without even asking any questions.

430. Whatever general suspicion existed based on Leo's demographic profile was dispelled by the fact that there was no particularized suspicion to believe that Leo's employer was violating immigration laws.

431. That suspicion was further dispelled by Leo's repeated pleas that he is a

citizen.

432. Yet the officers held Leo down and reached into his pocket searching for his ID, which they then read and which should have caused them to recognize that the detention was unlawful.

433. Whatever suspicion the officers had before they checked Leo's REAL ID fell well below the threshold for a seizure once the officers saw Leo's REAL ID.

434. Given the totality of the circumstances, the search and seizure of Leo were constitutionally unreasonable.

435. Leo has suffered violations of his clearly established Fourth Amendment rights as a direct and proximate result of Officers Blacklidge, Woodruff, and Prater's conduct.

436. Because Officers Blacklidge, Woodruff, and Prater violated Leo's Fourth Amendment rights, he can state a claim for damages against them. The Supreme Court in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), recognized a right of action for damages for Fourth Amendment violations. Congress preserved a right of action for damages for constitutional violations via the Westfall Act of 1988, 28 U.S.C. § 2679(b)(2)(A).

## COUNT X
## Assault
*On behalf of Leo*
*Against Two Unknown Immigration Enforcement Agents (Officers Doe 4 & Doe 5) in their individual capacities under the Westfall Act, & Alabama tort law*
*Against the United States of America under the Federal Tort Claims Act*

437. Leo realleges and incorporates the allegations in ¶¶ 12–65, 119–155, and 261–268 of this complaint as if they are fully restated here.

438. In Alabama, assault is an intentional, unlawful offer to touch a person in a rude or angry manner under circumstances that cause a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented. *See O'Rear*, 69 So. 3d at 117, *abrogated on other grounds*, *Ex parte Vanderwall*, 201 So. 3d 525 (Ala. 2015).

439. Officer Doe 4 and 5 assaulted Leo when they detained him without lawful authority on June 12, 2025.

440. Officer Doe 4 snuck up behind Leo while he was working alone in what should have been an empty house.

441. Officer Doe 5 stood outside the bedroom window to make Leo feel as if he had nowhere to go.

442. Officer Doe 4 then ordered Leo out to the patio without lawful authority. Due to the well-founded fear that he would be battered if he did not comply, Leo followed.

443. Once outside, both officers stood close to Leo in a show of force to ensure Leo knew they would grab him if he tried to leave, intentionally creating further well-founded fear of an imminent touching.

444. Leo had done nothing wrong. The immigration officers had no particularized

suspicion to justify a detainment or probable cause to justify an arrest.

445. And because the there was no legal justification for the assault, the resulting seizure was unreasonable and violated the Fourth Amendment.

446. Because Officers Doe 4 and Doe 5 were acting as investigative or law-enforcement officers—that is, as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law—the United States is liable for their tortious actions under the Federal Tort Claims Act. Leo timely filed his notice of claims with their respective agencies in October 2025. ICE denied all Leo's claims on behalf of all federal agencies by a letter dated April 15, 2026, making his FTCA claims ripe for this lawsuit.

447. Because Officers Doe 4 and Doe 5 were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); *see Buchanan v. Barr*, 71 F.4th at 1012–18 (Walker, J., concurring).

448. Because the tortious conduct of Officers Doe 4 and Doe 5 violated Leo's constitutional rights, Leo can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

449. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in Count XIII is also unavailable, then the Westfall Act is unconstitutional as applied to Leo.

**COUNT XI**
**False Arrest**
*On behalf of Leo*
*Against Two Unknown Immigration Enforcement Agents (Officers Doe 4 & Doe 5) in their individual capacities under the Westfall Act, & Alabama tort law*
*Against the United States of America under the Federal Tort Claims Act*

450. Leo realleges and incorporates the allegations in ¶¶ 12–65, 119–155, and 261–268 of this complaint as if they are fully restated here.

451. In Alabama, a false arrest requires proof that the defendant(s) caused the plaintiff's arrest without probable cause. *Walker*, 62 So. 3d at 493. A detention is invalid unless the officer(s) reasonably and in good faith suspected the plaintiff of violating the law. *Id.*

452. Officers Doe 4 and Doe 5 committed false arrest because they detained Leo without lawful status on June 12, 2025.

453. The officers had no reasonable or good faith basis to suspect that Leo was violating the law before they detained him.

454. The detention became even more unreasonable once the officers learned that Leo had a REAL ID.

455. Because there was no legal justification for the false arrest, the resulting seizure was unreasonable and violated the Fourth Amendment.

456. Because Officers Doe 4 and Doe 5 were acting as investigative or law-enforcement officers—that is, as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law—the United States is liable for their tortious actions under the Federal Tort Claims Act. Leo timely filed his notice of claims with their respective agencies in October 2025. ICE denied

all Leo's claims on behalf of all federal agencies by a letter dated April 15, 2026, making his FTCA claims ripe for this lawsuit.

457. Because Officers Doe 4 and Doe 5 were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); *see Buchanan*, 71 F.4th at 1012–18(Walker, J., concurring).

458. Because the tortious conduct of Officers Doe 4 and Doe 5 violated Leo's constitutional rights, Leo can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

459. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in Count XIII is also unavailable, then the Westfall Act is unconstitutional as applied to Leo.

**COUNT XII**
**False Imprisonment**
*On behalf of Leo*
*Against Two Unknown Immigration Enforcement Agents (Officers Doe 4 & Doe 5) in their individual capacities under the Westfall Act, & Alabama tort law*
*Against the United States of America under the Federal Tort Claims Act*

460. Leo realleges and incorporates the allegations in ¶¶ 12–65, 119–155, and 261–268 of this complaint as if they are fully restated here.

461. In Alabama, false imprisonment is an unlawful detainment for any duration. Ala. Code § 6-5-170. The tort requires a direct physical restraint, either expressed or implied by the threat of force or effected through actual force, by which a person is

deprived of their liberty. *Dolgencorp, Inc. v. Pounders*, 912 So. 2d 523, 527–28 (Ala. Civ. App. 2005). A false imprisonment may involve compelling a person to remain where he does not wish to remain or to go where he does not wish to go. *Id.* Because the arrest must be unlawful, a false imprisonment (or false arrest) in Alabama requires proof that an officer lacked probable cause.

462. Officers Doe 4 and Doe 5 falsely imprisoned Leo when they detained him without lawful authority on June 12, 2025.

463. Through threat of force, Officers Doe 4 and Doe 5 deprived Leo of his liberty when they forced Leo to stop working, exit the house he was working in, and follow the officers to their vehicle at the edge of the subdivision.

464. Leo was not free to move. He had to stay where the officers wanted him to stay and move where they wanted him to move.

465. The arrest and imprisonment were unlawful because the officers had no probable cause to believe Leo violated the law.

466. That is especially true for the duration of his first and second arrests that continued after he showed the officers his REAL ID, undermining any suspicion that could have contributed to his initial detention.

467. And because there was no legal justification for the false imprisonment, the resulting seizure was unreasonable and violated the Fourth Amendment.

468. Because Officers Doe 4 and Doe 5 were acting as investigative or law-enforcement officers—that is, as officers of the United States who were empowered by law to execute searches, to seize evidence, or to make arrests for violations of federal law—

the United States is liable for their tortious actions under the Federal Tort Claims Act. Leo timely filed his notice of claims with their respective agencies in October 2025. ICE denied all Leo's claims on behalf of all federal agencies by a letter dated April 15, 2026, making his FTCA claims ripe for this lawsuit.

469. Because Officers Doe 4 and Doe 5 were employees of the United States government, and this tort action is brought for a violation of the Constitution of the United States, the individual officers are personally liable under the exception to the FTCA's exclusivity provision created by the Westfall Act of 1988, 28 U.S.C. § 2679(b); *see Buchanan*, 71 F.4th at 1012–18 (Walker, J., concurring).

470. Because the tortious conduct of Officers Doe 4 and Doe 5 violated Leo's constitutional rights, Leo can state claims under state tort law, as that has been the traditional method of obtaining relief when federal employees' tortious acts violate the Constitution.

471. Alternatively, if none of these remedies are available in this case, and the damages claim pleaded in Count XIII is also unavailable, then the Westfall Act is unconstitutional as applied to Leo.

**COUNT XIII**
**Fourth Amendment – Damages Action**
*On behalf of Leo*
*Against Two Unknown Immigration Enforcement Agents (Officers Doe 4 & Doe 5) in their individual capacities*
*Under the United States Constitution, as recognized in* Bivens *& the Westfall Act*

472. Leo realleges and incorporates the allegations in ¶¶ 12–65, 119–155, and 261–268 of this complaint as if they are fully restated here.

473. The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

474. Moreover, the Fourth Amendment codifies the constitutional preference for warrants based on probable cause before government agents enter private property, conduct a search, or seize a person or their property.

475. Officers Doe 4 and Doe 5 violated Leo's Fourth Amendment rights when they detained and arrested him without a warrant or probable cause and continued to detain him even after he provided his REAL ID.

476. The officers lacked even reasonable suspicion to detain Leo when they arrived on a private construction site, staffed by contractors bound by federal employment-verification requirements, and preemptively detained Leo without any particular suspicion and without even asking any questions.

477. Whatever general suspicion existed based on Leo's demographic profile was dispelled by the fact that there was no particularized suspicion to believe that Leo's employer was violating immigration laws.

478. That suspicion was further dispelled by Leo's repeated pleas that he is a citizen.

479. Whatever suspicion the officers had before Leo provided his REAL ID fell well below the threshold for a seizure once Leo offered to provide his REAL ID.

480. Given the totality of the circumstances, the search and seizure of Leo were constitutionally unreasonable.

481. Leo has suffered violations of his clearly established Fourth Amendment rights as a direct and proximate result of Officers Doe 4 and 5's conduct.

482. Because Officers Doe 4 and Doe 5 violated Leo's Fourth Amendment rights, he can state a claim for damages against them. The Supreme Court in *Bivens v. Six Unknown Named Agents*, 403 US 388 (1971), recognized a constitutional right of action for damages for Fourth Amendment violations. Congress preserved a right of action for damages for constitutional violations via the Westfall Act of 1988, 28 U.S.C. § 2679(b)(2)(A).).

**PRAYER FOR RELIEF**

Leo respectfully requests that this Court provide the following relief:

483. Declare that the seizures of Leo on May 21 and June 12 violated the Fourth Amendment and were tortious.

484. Declare that the search of Leo on May 21 violated the Fourth Amendment and was tortious.

485. Declare that the challenged policies violate the Fourth Amendment.

486. Declare that the challenge policies exceed Defendant Agencies' statutory jurisdiction, are arbitrary and capricious, and fail to observe procedures required by law.

487. Vacate and set aside the challenged policies under the Administrative Procedure Act.

488. Certify the putative classes and name Leo the representative for each class.

489. Enjoin the challenged policies' enforcement against Leo and the putative class.

490. Award nominal, compensatory, and punitive damages against the individual-capacity Defendants for their tortious and unconstitutional conduct.

491. Award nominal and compensatory damages against the United States for the tortious and unconstitutional conduct of its agents.

492. Award reasonable attorneys' fees, costs, and expenses.

493. Award any other legal or equitable relief that this Court deems proper.

Dated: October 13, 2026.

Respectfully submitted,

*/s/ Jared McClain*
Jared McClain (DC Bar No. 1720062)*
Jaba Tsitsuashvili (DC Bar No. 1601246)*
Joshua Windham (NC Bar No. 51071)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jmcclain@ij.org
**Admitted Pro Hac Vice*

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on October 13, 2026, I filed this Plaintiff's First Amended Class Action Complaint through the CM/ECF system, which sent an electronic copy to all counsel or parties of record, and I hereby certify that on this day I served a copy of the foregoing Plaintiff's First Amended Class Action Complaint by U.S. First Class mail, postage prepaid, to the following:

1. KENT BLACKLIDGE, HSI Special Agent, in his individual capacity;
U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor
500 12th St. SW, Mail Stop 5900
Washington, DC 20536-5900

2. JOSHUA WOODRUFF, HSI Special Agent, in his individual capacity;
U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor
500 12th St. SW, Mail Stop 5900
Washington, DC 20536-5900

3. BENJAMIN PRATER, ERO Deportation Officer, in his individual capacity;
U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor
500 12th St. SW, Mail Stop 5900
Washington, DC 20536-5900

*/s/ Jared McClain*
Jared McClain
*Counsel for Plaintiff*