**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**MOBILE DIVISION**

| | |
|---|---|
| LEONARDO GARCIA VENEGAS,<br><br>*Plaintiff*,<br><br>v.<br><br>TOM HOMAN, WHITE HOUSE BORDER CZAR, IN HIS OFFICIAL CAPACITY, ET AL.,<br><br>*Defendants*. | Case No. 1:25-cv-397-JB-N |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR RECONSIDERATION**

Following full briefing, an evidentiary hearing, supplemental briefing, and another morning of argument in court, this Court granted Leo's motion for preliminary relief and certified Leo's three proposed classes on a provisional basis. The thrust of the parties' dispute over the last year has been whether Leo adduced enough evidence to show that the Department of Homeland Security adopted three policies, either unwritten or unpublished, targeting construction sites and workers with unlawful searches and seizures. *See* Mot. for Reconsideration (ECF 114) at 5 ("A factual dispute on the existence of the alleged policies lies at the heart of this litigation."). To prove that the policies likely exist, Leo testified about two construction site raids he experienced and submitted testimony and declarations from dozens of people who suffered similar encounters nationwide. And he cross-examined a supervisor within DHS about the agency's policies and how those policies played out during Leo's first raid.

All this evidence pointed in the same direction: Immigration officers across the country are raiding construction sites in the manner Leo described because DHS has authorized them to do so. They enter private construction sites without a warrant, round up workers who fit DHS's target demographic profile, and refuse to let them go when they show a REAL ID or other proof of lawful status. Although DHS still disclaims having official "policies," a supervisor within Homeland Security Investigations confirmed that DHS agents believe they have the authority in question. Assistant Special Agent in Charge Philip Lavoie testified that immigration officers do not get warrants to enter construction sites because DHS believes there is "no reasonable expectation of privacy on an open jobsite." *See* Tr. May 27, 2026, at 67:12–23. He also confirmed that officers had not developed particularized suspicion before detaining only the Latino workers on Leo's jobsite, including those who did not do anything to create suspicion. *Id.* at 66:8–67:7. And he testified that DHS trains immigration officers not to trust REAL IDs. *Id.* at 83:18–22, 86:1–14.

Based on all this evidence and the parties' extensive arguments, this Court determined that Leo will likely prove that DHS has authorized agents to raid construction sites without a warrant, round up workers without individualized suspicion, and refuse to credit REAL IDs and forms of identification that demonstrate lawful status. The Court also held that these three policies likely violate the Fourth Amendment and DHS's own regulations. Accordingly, this Court stayed the enforcement of all three policies for the duration of this case and certified Leo's three proposed classes on a provisional basis.

Now, a year after Leo moved for preliminary relief and class certification, Defendants come to the Court with an argument they failed to develop in their first four tries, a case they failed to cite in their first four tries, and two pleas for clarity about what this Court ordered. Specifically, they reiterate their position that interim relief against unpublished policies is inappropriate when there's a factual dispute about the policies' existence. And they also provide another open-fields decision from the 1980s that they only just found. As Leo will explain in Section I, these far-too-late arguments are not a proper basis for reconsideration.

From there, Defendants ask for clarity. They say that this Court's rulings on both preliminary relief and provisional class certification lack the specificity that the federal rules require. While Leo is not opposed to this Court providing Defendants with even more guidance, Leo will explain in Section II why this Court's rulings were sufficiently clear.

**I. Defendants' motion does not meet the standard for reconsideration.**

Motions for reconsideration are "disfavored" and seek "extraordinary" relief that should be "employed sparingly." *Grupo HGM Tecnologias Submarina, S.A. v. Energy Subsea, LLC*, No. 1:18-CV-00430-JB-N, 2022 WL 211589, at *3 (S.D. Ala. Jan. 24, 2022) (citing *Krstic v. Princess Cruise Lines, Ltd.*, 706 F. Supp. 2d 1271, 1282 (S.D. Fla. 2010)). The only legitimate bases for reconsideration are newly discovered evidence, an intervening change of law, or the need to correct clear errors or prevent manifest injustice because the Court has misunderstood the parties' positions. *See United States v. Marion*, 562 F.3d 1330, 1335 (11th Cir. 2009); *Inetianbor v. CashCall, Inc.*, 962 F. Supp. 2d 1303, 1307 (S.D. Fla. 2013), *aff'd,* 768 F.3d 1346 (11th Cir. 2014). By contrast, reconsideration is not a chance "to

relitigate old matters, or to raise arguments or present evidence that could have been raised prior" to the Court's order. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (citation omitted); *see also Richardson v. Johnson*, 598 F.3d 734, 740 (11th Cir. 2010).

Based on these settled principles, courts in this Circuit recognize that "[a] motion for reconsideration should not be used as a vehicle to present authorities available at the time of the first decision or to reiterate arguments previously made[.]" *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992). Nor is it "a vehicle to relitigate old matters or present the case under a new legal theory or to give the moving party another bite at the apple by permitting the arguing of issues and procedures that could and should have been raised prior to judgment." *Mincey v. Head*, 206 F.3d 1106, 1137 n.69 (11th Cir. 2000) (cleaned up); *see also King v. Lumpkin*, No. 1:11-CV-0549-WSD, 2013 WL 12142372, at *2 (N.D. Ga. Jan. 14, 2013) ("A motion for reconsideration should not be used to present the Court with arguments already heard and dismissed, or to offer new legal theories or evidence that could have been presented in the previously-filed motion."); *Gipson v. Mattox*, 511 F. Supp. 2d 1182, 1185 (S.D. Ala. 2007) ("Nor may a party properly utilize a motion to reconsider as a vehicle for rehashing arguments considered and rejected in the underlying order."); *Reyher v. Equitable Life Assurance Soc'y,* 900 F. Supp. 428, 430 (M.D. Fla. 1995) ("The Court will not reconsider when the motion . . . only relitigates what has already been found lacking.").

Two of Defendants' arguments violate this basic rule. *First*, after multiple rounds of briefing and argument, Defendants cite a decades-old open-fields case for the very first time to argue that the Court's open-fields decision was flawed. *Second*, Defendants argue

that interim relief under Section 705 of the Administrative Procedure Act (5 U.S.C. § 705) is inappropriate when Defendants dispute that the challenged policies exist. While neither argument is correct, the simpler solution is to reject these retread arguments as improper bases for reconsideration.

**A. A case from the 1980s is not a proper basis for reconsideration.**

Defendants argue that "the Court's analysis of the open fields doctrine [wa]s too narrow, and its discussion of Fourth Amendment standing [wa]s too broad." Mot. at 6. Under the guise of seeking clarity, Defendants introduce an Eleventh Circuit decision from the 1980s that they failed to cite in their initial rounds of briefing, during oral arguments, or in their supplemental briefing. *Id.* (citing *McLaughlin v. Elsberry, Inc.*, 868 F.2d 1525, 1530 (11th Cir. 1988)). This case, Defendants say, supports their same old theory that construction sites are all open fields. *Id.* But this Court has already rejected this exact argument, and Defendants' recent discovery of the *McLaughlin* decision cannot change that outcome. *See Z.K. Marine Inc.*, 808 F. Supp. at 1563.

Moreover, even if Defendants *could* use a 40-year-old case to go back and bolster arguments this Court already rejected, *McLaughlin* wouldn't move the needle. That decision was about 2,500 acres of farmland (literal open fields) and what the Eleventh Circuit described as "quasi-public" common areas in farmworkers' labor camps. *McLaughlin*, 868 F.2d at 1526, 1530. Although the camps were "located on private property and [we]re not public in the same sense as [] neighborhoods in a town or city," the Court explained that the common areas of the camps were open to visitors and, as a result, also open to investigators so long as they didn't intrude into the private residences. *Id.* at 1530–

31 & n.6. There is nothing of the sort on the construction sites at issue in this case. And besides, as this Court recognized in its ruling, Defendants' treatment of all construction sites as open fields likely violates not only the Fourth Amendment but also DHS's own regulation, 8 C.F.R. § 287.8(f)(2), which requires immigration agents to get a warrant or consent to enter all "non-public areas of a business," including "a farm or other outdoor agricultural operation" like the one at issue in *McLaughlin*. So, regardless of whether construction sites (or farms) are open fields, DHS must still get a warrant or consent to enter the non-public areas of those sites absent some exigency.

**B. Defendants already had several chances to contest the propriety of a stay.**

Defendants also use their motion for reconsideration to argue that Section 705 of the APA is "improper in these circumstances." Mot. at 5. They say "Section 705 is an ill-fitting measure" because there's a "factual dispute on the existence of the alleged policies" and DHS "maintains that there is no written policy." *Id.*

While still underdeveloped and without citation, this argument is the same one Defendants made at the September 2 hearing. Indeed, they argued that *no* form of preliminary relief could "be fashioned against some kind of policy that's been enacted by these agencies" when "there's just not [a] sufficient showing that there is a policy from which relief could be granted." Tr. Sept. 2, 2026, at 7:21–8:1; *see also id.* at 19:13–24. There was no confusion about their argument; the Court recognized that "[i]t's a little technically tricky when the policies that are alleged the defense says they don't exist." *Id.* at 27:4–6. To address this concern, the Court specifically asked about the "practical implication[s]" of issuing a stay instead of an injunction. *Id.* at 16:3–7; *see also id.* at 22:9–

10. When given the chance, however, Defendants had no real response—let alone a developed argument about the application of Section 705 to unpublished policies. *Id.* at 16:2, 25:3–26:9. To this day, Defendants have not offered any authority for their position that a stay is improper. *Cf. Immigr. Ctr. for Women & Child. v. Noem*, 351 F.R.D. 324, 348, 381–92 (C.D. Cal. 2026) (staying two ICE policies after finding the policies likely existed and were likely unlawful). Restating a position already raised and rejected is not a basis for reconsideration. *Mincey*, 206 F.3d at 1137 n.69; *see Inetianbor*, 962 F. Supp. 2d at 1307.

## II. Defendants' requests for clarity are unnecessary.

In addition to reconsideration, Defendants make two requests for clarity. They say this Court's stay order and provisional class certification both lack the particularity required by the federal rules. While Leo is not opposed to this Court providing more clarity, he does not believe it is something the rules require or that Defendants need to comply with the Court's order.

### A. The stay, which is not an injunction, is sufficiently clear.

Defendants call the stay "confusing, unworkable, and [] overly broad." Mot. at 7. In their view, "the Court has not made clear the operational state that the United States should follow during the pendency of this litigation." *Id.* at 5. They ask the Court to "identify with specificity the terms of the alleged policy that it has found and that it intends to stay and identify its construction of the policy that the United States should not follow during this litigation." *Id.* at 5–6. Without a particular description of which agency actions are proscribed, they say, "the United States cannot determine the effect of the injunction, provide adequate guidance to its agents, or fully assess the impact of the ruling for any

potential appeal." *Id.* at 6–7. They even suggest that the stay might prevent them from applying "any exceptions to the 4th Amendment." *Id.* at 7.

As for *why* they need more clarity, Defendants are less clear. On the one hand, they say Federal Rule of Civil Procedure 65 requires injunctions to be specific. *Id.* at 4. But then, perhaps recognizing that the Court did not enter an injunction (and so Rule 65 does not apply), they urge the Court to be more specific to avoid the stay having the "*de facto* effect of an injunction." *Id.* at 6. To avoid the stay becoming a preliminary injunction, Defendants say the Court should "apply[] the principles of a preliminary injunction[.]" *Id.* at 7.

As best as Leo can tell, there are a few things going on here. Defendants (1) question which policies were stayed; (2) suggest an APA stay must follow all the rules for a preliminary injunction; and (3) prefer the clarity that comes from an injunction that prevents certain conduct by officers in the field over a stay that suspends the source of authority to enforce certain agency-wide policies.

On the *first* point, Leo sees no room for doubt. The Court plainly stayed the three policies the parties have been debating for over a year. Leo alleged that DHS has three unwritten or unpublished policies, he supported those allegations with evidence, and the parties briefed and argued those policies' existence and legality at length. After hearing evidence, the Court observed that "the plaintiff[] ha[d] adequately alleged that there's a policy . . . at least at this point in the case," Sept. 2 Tr. at 21:18–21, and noted that Defendants' open-fields argument "completely undermines the Government's position that it does not have a policy of entering the non-public areas of a construction site without a warrant or consent." Stay Op. (ECF 106) at 13 n.2. It's clear from this Court's ruling, the

parties' extensive briefing, and their repeated discussions in open court that the three policies the Court stayed are the policies that Leo defined as the Warrantless Entry Policy, the Preemptive Detention Policy, and the Continued Detention Policy.

*Second*, Defendants are wrong that Rule 65 applies to the stay. Rule 65 governs injunctions, and this Court did not issue an injunction. Instead, it issued interim relief under Section 705 of the APA, which is distinct from an injunction. *Cf. Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (Jackson, J.) ("[T]he Supreme Court has made it abundantly clear that injunctions and [APA] vacaturs are distinct remedies, and that the latter is considered substantially less intrusive." (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010))).

The APA authorizes a court reviewing an agency action to "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Colloquially known as a stay, relief under Section 705 "is the temporary form of vacatur." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023), *rev'd on other grounds*, 602 U.S. 367 (2024). A stay of an agency's policies suspends the source of the agency's power to act. *Id.* And because executive agencies (and their agents) have "literally [] no power to act" except the power vested in them by law, *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), a stay means "Defendants will be prohibited from enforcing that policy." *Neguse v. ICE*, 822 F. Supp. 3d 86, 117 (D.D.C. 2026). Because this relief divests the agency's authority, its effect is not limited to the parties of the case. *See Corner Post, Inc. v. Bd. of Gov'rs of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring); *Ass'n of Am. Univs. v. DOD*, 806 F. Supp. 3d 79, 121

(D. Mass. 2025) ("The scope of vacatur . . . is therefore not truly a product of the remedy, nor of the Court's prerogative, but of Defendants' own capacious undertaking.").

A stay also differs from an injunction in that it does "not 'enjoin' or 'restrain' the actions of individual officials." *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *16–17 (D.C. Cir. Nov. 22, 2025); *see also Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255–56 (5th Cir. 2024), *cert. dismissed*, 146 S. Ct. 59 (2025) (same). Rather than forbidding immigration officers from engaging in any specific action with respect to Leo and the provisionally certified classes, the stay instead strips immigration officers of their power to act. *See Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 119–20 (D.C. Cir. 2026); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). So Rule 65 does not apply. And Defendants should know that given how many courts have stayed or vacated their policies recently.

The stay here prevents DHS from enforcing the three challenged policies until the parties can fully litigate their legality. That means immigration officers are no longer authorized to treat all construction sites like open fields. They are also no longer authorized to detain workers based on their demographic profile rather than individualized suspicion. And they are no longer authorized to disregard government-issued IDs as evidence of lawful status.

The stay does nothing to prevent officers from carrying out their jobs consistently with the Fourth Amendment and the agency's statutory and regulatory authority. Agents can still get a warrant or consent, or enter construction sites in exigent circumstances, and they can develop particularized suspicion and probable cause to support investigative stops

and arrests. Moreover, DHS remains free to adopt new policies that "confront the problem[s] anew." *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987). In doing so, however, DHS would be limited by this Court's preliminary view that construction workers have a reasonable expectation of privacy on their worksites, along with 8 C.F.R. § 287.8(f)(2), which requires a warrant or consent to enter the non-public parts of a business. The same goes for the other two policies. Immigration officers can no longer detain construction workers without individualized suspicion and can no longer continue detaining workers because DHS does not credit a REAL ID, U.S. passport, green card, Social Security card, or any other government-issued ID as evidence that the workers are lawfully present.

While a stay is not focused on the one-off actions of any individual officers in the field, it does require Defendants to ensure that their agents are aware that they have lost the authority to treat all construction sites as open fields, round up all workers who fit the agency's demographic profile, and refuse to credit government-issued IDs that show a worker is in the country lawfully. Any training until this case concludes should also reflect the agency's lack of authority to continue enforcing the challenged policies. This Court has found that the challenged policies likely exist, and Defendants cannot avoid implementing this Court's order by simply maintaining that decision was wrong. *Cf. Baez-Sanchez v. Barr*, 947 F.3d 1033, 1036 (7th Cir. 2020) ("We acted under a statutory grant of authority to review the Board's decisions. Once we reached a conclusion, both the Constitution and the statute required the Board to implement it." (citation omitted)); *Badger Cath., Inc. v. Walsh*, 620 F.3d 775, 782 (7th Cir. 2010) ("A litigant who tries to evade a federal court's

judgment—and a declaratory judgment is a real judgment, not just a bit of friendly advice—will come to regret it."). Failure to adhere to this Court's order can result in more coercive orders, including injunctive relief, contempt, and affirmative relief. *See, e.g.*, *Anatol Zuckerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1366–67 (D.C. Cir. 2023); *Rodriguez Vazquez v. Hermosillo*, 816 F. Supp. 3d 1234, 1238–40, 1248 (W.D. Wash. 2026) (remedying DHS's noncompliance with declaratory judgment by ordering DHS to provide notice of the court's judgment "to all noncitizens" whose rights were within the scope of that judgment).

*Third*, to the extent Defendants prefer the certainty of an injunction that specifically proscribes particular conduct, Leo does not object. Having already analyzed the relevant factors, this Court could easily convert its stay into an injunction and enjoin Defendants' agents from entering the non-public areas of construction sites occupied by the Warrantless Entry Class without a judicial warrant, exigency, or consent; detaining members of the Preemptive Detention Class without particularized suspicion; and refusing to credit the government-issued IDs of members of the Continued Detention Class.

**B. The classes are defined with particularity.**

Leo moved to certify three classes on at least a provisional basis. The Court granted that request after briefing and argument in open court. *See* Sept. 2 Tr. at 28:25–37:15. The discussion concluded with Defendants acknowledging that the parties could come back after discovery and revisit full class certification if, through discovery, Leo is "able to establish that there is such a thing as the warrantless entry policy" (or presumably the other policies). *Id.* at 37:5–9.

Now, Defendants contend the Court's order does not define the classes with particularity. Mot. at 7. In Leo's reading, however, the Court's ruling left no question that the Court provisionally certified the same three classes Leo moved to provisionally certify. There were no alternative class definitions discussed, and there's no other fair reading of the Court's order. That said, Leo sees no harm in the Court restating the class definitions for Defendants' satisfaction.

Dated: November 2, 2026.

Respectfully submitted,

*/s/ Jared McClain*
Jared McClain (DC Bar No. 1720062)*
Jaba Tsitsuashvili (DC Bar No. 1601246)*
Joshua Windham (NC Bar No. 51071)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
jmcclain@ij.org
**Admitted Pro Hac Vice*

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR RECONSIDERATION with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Jared McClain
Jared McClain (DC Bar No. 1720062)